UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YURI STAROSTENKO
IRINA TSAREVA,
and all others similarly situated,

                      Plaintiffs,

      -against-

UBS AG (A SWISS BANK)

                    Defendant.

**19 CV 9993**

_____ CV _____

**COMPLAINT**

## SUMMARY

1.    Plaintiffs bring this private action as a plaintiff class action pursuant to the Federal Rules of Civil Procedure, against UBS AG in the United States District Court for the Southern District of New York, in the first instance, which contains Securities Exchange and Sherman Acts claims, and common-law claims of unjust enrichment and the breach of the implied covenant of good faith and fair dealing.

2.    Dates of occurrence: between August 12, 2012 and this day (the "class period"), which are not the dates when the plaintiffs were aware of what UBS AG did or failed to do that harmed the named and unnamed plaintiffs causing the injury or the sequence of losses and/or damages.

3.    During the period between June 2013 through April 2015 (the "relevant period"), defendant UBS AG (the "defendant" or "defendant bank" or "UBS") conducted through its Bahamian subsidiary, UBS (Bahamas) Ltd., fraudulent schemes by unlawfully not carrying out actions as instructed by the plaintiffs, the customers, namely by not sending or routing to and not representing or executing on national securities exchanges the plaintiffs' orders to buy (sell) equity securities traded publicly on these exchanges, which must yield priority, parity and precedence.

4.   As a result, the defendant did not effect any transaction on any national securities exchange for the plaintiffs' account with respect to which it acted as an agent.

5.   The said fraudulent scheme involved illicit and unauthorized actions by UBS' Bahamian subsidiary to steal directly from the plaintiffs, by the doctoring account statements and other records of financial information issued and delivered to the plaintiffs, intended for the purpose to defraud the public, including the plaintiffs.

6.   The defendant had little legitimate business activity in that:

   6.1.   Most or all of the plaintiffs' orders for transactions in equity securities publicly traded on national securities exchanges were not sent or routed to and not represented or executed on these exchanges;

   6.2.   Trading in securities on national securities exchanges was not conducted by or on behalf of the plaintiffs, in clear contravention of their natural persons' freedom to buy or sell any equity security;

   6.3.   The plaintiffs' funds were misappropriated for undisclosed purposes, resulting in the loss of the plaintiffs' trading capital deposited in an account with the UBS' Bahamian subsidiary.

7.   As a result, trading in securities on national securities exchanges was restrained because the price discovery process was corrupted and the true value at the time of purchases or sales of the said securities (ie, the fair value in the absence of fraudulent and anti-competitive conduct) could not be and was not determined.

8.   Additionally, sham or fictitious transactions were recorded by defendant or its subsidiaries, who maintained inaccurate trading and financial books and records.

# I. BASIS FOR JURISDICTION

9.     This action is brought in this judicial district in which a substantial part of the events or omissions giving rise to the plaintiffs' claims occurred and there is no other district, in which the action may otherwise be brought.

**Diversity of Citizenship**

10.    This case is a diversity of citizenship case under 28 U.S.C. § 1332 in which a citizen of one State sues subjects of another nation, and the amount in controversy is more than $75,000.00, where defendant bank is not a citizen or subject of the same nation as any of plaintiffs.

*Citizenship of the parties*

11.    Plaintiffs, Yuri Starostenko and Irina Tsareva, are citizens of the foreign state of Italy residents in the Commonwealth of The Bahamas.

12.    Defendant, UBS AG, is a corporation incorporated under the laws of the Swiss Confederation and headquartered in Zurich and Basel, Switzerland.

**Federal Question**

13.    In the alternative, this is a case arising under the United States Constitution or federal laws or treaties under 28 U.S.C. § 1331.

14.    This Complaint pleads, among other things, a claim denominated as a federal cause of action in the Exchange Act and federal jurisdiction attaches to it.

15.    Venue lies in this Court under Section 27(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78aa(a)] because a substantial part of the events comprising acts, practices, transactions and courses of business constituting violations of the federal securities laws alleged herein occurred

within this district, a venue that corresponds to the location of the New York Stock Exchange and NASDAQ in New York.

16.   It has basis to lay venue for the Counts of this Complaint in this District, because the transactions took place in New York from trading desks in Switzerland or in the United States where defendant bank engaged in the alleged transactions by the use, directly or indirectly, of facilities of the said national securities exchanges.

17.   Defendant bank had violated the federal securities laws such as, for example, antifraud provisions and the provision against manipulation of security prices of the Exchange Act, which granted federal district courts exclusive jurisdiction over suits and national service of process.

18.   Violations of subsection (b) of Section 10 of the Exchange Act [15 U.S.C. § 78j(b)] was intended as a "catch-all" enforcement provision directed at both buyers and sellers of securities and was purposefully written in broad language to effect this purpose. (See *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 859 (2d Cir. 1968))

19.   On June 24, 2010, the Supreme Court in *Morrison v. National Australia Bank* concluded that there is no "affirmative indication" in the Exchange Act that Section 10(b) applies extraterritorially adopting a new transactional test under which:

> "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."

20.   This Court has jurisdiction over this action, where plaintiffs' injury resulted directly from conduct within the United States with the purchase or sale of a security listed on American stock exchanges and their losses were a direct result

of defendant's conduct in the United States, while there is no risk of potential conflict with foreign nations' laws.

21.   This Court has jurisdiction over this action, where plaintiffs plead facts creating "a strong inference of knowing, or intentional misconduct" on the part of the defendant, pursuant to Section 21D of the Exchange Act [15 U.S.C. § 78u-4], the provisions of which shall apply in each private action arising under this title provided that interpretation of section 21D(b)(2) is not only faithful to the text, structure, and legislative history of the Private Securities Litigation Reform Act of 1995, but is also consistent with the purposes behind the federal securities laws.

22.   This Court has jurisdiction over this action, having exclusive jurisdiction of violations of the Exchange Act or the rules and regulations thereunder, and of all suits in equity and actions at law brought in this district, wherein relevant subsidiaries of UBS may be found or transact business, to enforce any liability or duty created by the Exchange Act or the rules and regulations thereunder, and therefore process may be served in this District.

**The basis for Federal Court specific personal jurisdiction**

23.   As to plaintiffs' claim under the Sherman Act, antitrust is one area of law where Congress provided specific statutory venue and jurisdiction provisions for corporate defendants. Section 12 of the Clayton Act [U.S. Code § 22] provides special personal jurisdiction and authorizes special venue and service of process provisions for all antitrust plaintiffs against corporate defendants. Specifically, Section 12 states:

> *"Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."*

24.   The first tier of Section 12 establishes the venue requirements for corporate antitrust defendants; the second clause allows worldwide service of process. Given that a federal court may exercise personal jurisdiction over a defendant when service of process is authorized by a federal statute, Section 12 authorizes personal jurisdiction for antitrust defendants in virtually any district court of the United States. (See *GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d 1343, 1350-51 (D.C. Cir. 2000) (finding that suit can be brought in any district where the corporation is found or does business); *Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 127, 143 (W.D.N.Y. 1997); *Gen. Elec. Co. v. Bucyrus-Erie Co.*, 550 F. Supp. 1037, 1038 (S.D.N.Y. 1982))

*National Contacts Test in Exchange Act*

25.   This Court has jurisdiction over defendant bank based on its contacts with the United States as a whole under the jurisdictional test in Section 27 of the Exchange Act matches the one formulated for 28 U.S.C. § 1331, and both are subject to familiar "arising under" principles.

26.   The nature of the trading in equity securities on national securities exchanges itself weighs for the exercise of specific personal jurisdiction, thus, any false records would be misrepresentations of the quotes recorded by a national securities exchange or misrepresentations about the United States' quotes, and therefore the substance of, and participants in, any false record of national securities exchange quotes are anchored squarely in the United States.

27.   Defendant UBS expressly aimed its wrongful conduct at the United States that formed the necessary connection with the forum that is the basis for its jurisdiction over it.

28.   Defendant bank is subject to specific personal jurisdiction because it purposefully availed itself of the privilege of trading equity securities in this forum, wherein relevant subsidiaries of defendant UBS may be found or transact business, and

could foresee being haled into Court in this District, and therefore minimum contacts exist.

29. The forum is the "focal point" or "nucleus" of plaintiffs' underlying claims in the sense that the existence, causation or intent to engage in transnational securities fraud on the part of defendant bank had its "nucleus" or "focal point" in the United States.

*Specific jurisdiction*

30. Specific jurisdiction, if asserted, confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.

31. Defendant bank is subject to specific jurisdiction based on suit-related conduct directed toward the United States.

32. The basis for specific jurisdiction in this case is an affiliation between the forum and the underlying controversy, activity or an occurrence that took place in the forum, where there are many substantial connections with the forum created by defendant bank's suit-related conduct.

33. Specific jurisdiction over the defendant focuses on the relationship among that defendant bank, the forum, and the litigation.

34. The quality and nature of the defendant bank's contacts that UBS itself created with the forum are as follows:

    34.1. Defendant bank's presence in the United States such as, for example, maintaining branches, having U.S.-based employees, including those who trade in equity securities, issuing shares listed on a national securities exchange etc., involve "suit-related conduct" and have a nexus to the misconduct underlying plaintiffs' claims;

34.2.  Among significant, direct and indirect, wholly owned subsidiaries of the defendant there are UBS Financial Services, Inc. and UBS Securities LLC, major broker-dealers of equity securities;

34.3.  The Dealing Procedure Manual UBS Capital Markets ("UBS-CM") (Booking Center Bahamas), version V2, April 2013:

    34.3.1.  reads in Paragraph 2 among other things: *"2 Organisation and Responsibilities "The execution desk in the Bahamas is part of Capital Markets.";*

    34.3.2.  refers to Tibaud Halwyck as the UBS-CM Head Nassau;

    34.3.3.  refers in many parts to communications with other subsidiaries within defendant UBS, with the United States' connection, including UBS Financial Services, Inc., a wholly-owned subsidiary of defendant UBS giving *"access to products and services offered by the UBS Group as well as by selected third parties worldwide through our open architecture approach"*;

    34.3.4.  refers to Kevin Price, a citizen of the United States, as the IPS (Investment Portfolio Supervision) Head Nassau, who, according to the U.S. FINRA BrokerCheck Report# 66539-83561, KEVIN LEE PRICE CRD# 2159039, data current as of Friday, September 04, 2015, as reported by the individual broker on the most recently filed Form U4: "01/2010 - Present UBS FINANCIAL SERVICES INC. WEEHAWKEN, NJ; 12/2002 - Present UBS BAHAMAS LTD. NASSAU, BAHAMAS ``".

35.  The United States' subsidiaries of defendant bank participated in the above mentioned fraudulent and anti-competitive schemes and during discovery it would be possible to identify the United States' persons with whom defendant bank

made communications in furtherance of a conspiracy to produce and disseminate false records of transactions on national securities exchanges.

36.   The United States' management of defendant bank, during the relevant period, employed managers who knew about false records of transactions on national securities exchanges, and made directives from the United States that facilitated or encouraged the above mentioned fraudulent and anti-competitive schemes.

37.   During discovery it would be possible to locate the offices in the United States, from which defendant bank determined or transmitted data necessary to compile false records of transactions on national securities exchanges.

38.   Additionally, jurisdiction satisfies the Fifth Amendment due process standard in that serving a summons or filing a waiver of service establishes personal specific jurisdiction over the defendant bank because exercising jurisdiction is consistent with the United States Constitution and laws pursuant to Rule 4(k)(2), Fed. R. Civ. P., which states:

> *"For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Rule 4(k)(2) "`extends the reach of federal courts to impose jurisdiction over the person of all defendants against whom federal law claims are made and who can be constitutionally subjected to the jurisdiction of the courts of the United States.'"*

39.   By the reason of the above, defendant's bank suit-related conduct created a substantial connection with the forum. Thereby, defendant bank purposefully established minimum contacts with the forum sufficient to confer specific jurisdiction on plaintiffs' the Exchange Act, the Sherman Act and common-law claims against it.

40.    Accordingly, plaintiffs have made a prima facie showing that defendants' national contacts are sufficient for the Court to exercise specific personal jurisdiction.

41.    The exercise of jurisdiction comports with due process pursuant to traditional notions of fair play and substantial justice, relevant factors of which include:

41.1.    (1) the burden that the exercise of jurisdiction will impose on each defendant bank;

41.2.    (2) the interests of the forum in adjudicating the case;

41.3.    (3) the plaintiffs' interest in obtaining convenient and effective relief;

41.4.    (4) the judicial system's interest in obtaining the most efficient resolution of the controversy; and

41.5.    (5) the interest of the United States in furthering substantive adjudication and litigation efficiency.

## II. PARTIES

### A. Plaintiffs Information

42.    This is a putative class action brought by the initial plaintiffs ("plaintiff 1" and "plaintiff 2") on behalf of themselves and of all known and unknown plaintiffs similarly situated naming UBS AG defendant.

*Named plaintiffs*

43.    Plaintiff 1, Yuri Starostenko, and plaintiff 2, Irina Tsareva, (collectively "plaintiffs"), natural persons, husband and wife and parents of six children residing on New Providence Island, The Bahamas; address for service by hand: c/o Priderock Corporate Centre, 11 East & Bay Streets, Nassau, The Bahamas; postal address: P.O. Box SS-5800, Nassau, The Bahamas. Phone: 1(242)817-4372; email: starostenkovubsag@gmail.com

44.     During the relevant period, plaintiffs, who were not members or associated with members of any national securities exchange, through the medium of their company Junkanoo Estates Ltd. had direct dealings and were direct counterparties to transactions with UBS and its Bahamian subsidiary, UBS (Bahamas) Ltd.

45.     Plaintiffs are witnesses themselves and in this Complaint they provide original information and point to important witnesses and other sources of information about conduct that was not yet investigated or examined by regulators or courts.

46.     Without this Complaint, which is supposed to be the principal motivating factor in a decision to sue the defendant for the misconduct alleged, the violations at issue would be difficult to identify and prove.

47.     Plaintiffs claim that they are in a position to provide continuing assistance, as well as discovery may provide the information to substantiate plaintiffs' information.

*Plaintiff classes*

48.     Plaintiffs seek to serve as representative parties on behalf of classes and represent the interests of all plaintiffs, known and unknown, who have been injured by the UBS' fraudulent and anti-competitive schemes, false or misleading statements and the market data corrupted by UBS and its subsidiaries' manipulation of national securities exchanges about which all others similarly situated may adduce evidence at trial over the class period.

49.     First of all, plaintiffs bring their claims in this action against defendant bank on behalf of all others similarly situated, persons or entities, that engaged in transactions in securities publicly traded on any national securities exchange, for which quoted prices are readily and regularly available to the public, and had direct dealings with or were direct counterparties to transactions with defendant bank or any of its subsidiaries ("class of securities investors").

50.    Second of all, plaintiffs bring their claims in this action against defendant bank on behalf of all others similarly situated, persons or entities, that engaged in transactions in securities-based derivative contracts or equity derivative contracts, whether standard form contracts or customized agreements over the counter (OTC) swaps, the amount of the consideration, or the value, or a return, or a portion of return of which are linked or tied to, determined or derived from or varies by reference, wholly or in part, to the price value or amount of a particular equity security or to an index of equity security, a hypothetical portfolio of which contains any of such an equity security ("securities-based derivatives"), even if they do not identify defendant bank or any of its subsidiaries as a counterparty ("class of derivatives investors").

51.    Thirdly, plaintiffs bring their claims in this action against defendant bank on behalf of all others similarly situated, persons or entities, that purchased market data tied to real-time quotations of national securities exchanges, which were affected by the fraudulent and anti-competitive schemes specified in this Complaint ("class of the market data consumers").

52.    Fourthly, plaintiffs bring their claims in this action against defendant bank on behalf of all others similarly situated, persons or entities, that purchased unauthorised financial products from UBS or any of its subsidiaries ("class of purchasers of UBS financial products").

53.    Fifthly, plaintiffs bring their claims in this action against defendant bank on behalf of all other persons or entities, that, in reliance upon false or misleading statements, have purchased or sold a security at a price which was affected by such statements ("class of investors in UBS Shares").

*Class standing*

54.    Class standing is conferred on plaintiffs, who made a motion for class certification, as follows.

55.    Under Second Circuit authority, at the pleading stage, a plaintiff has standing to pursue claims on behalf of class members who have suffered suffer an injury based on the same underlying misconduct that harmed the named plaintiffs.

56.    At the pleading stage, plaintiffs have standing to assert claims on behalf of class members because they allege that they have "suffered some actual injury as a result of the putatively illegal conduct of the defendant," and that this conduct "implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."

57.    To pursue a claim on behalf of the class, the plaintiffs need not necessarily have suffered the same injury, provided that it suffered actual injury caused by the same underlying misconduct.

58.    Plaintiffs personally suffered the injury-in-fact of US$11,281,645.00, which is an injury that is fairly traceable to the defendant bank's alleged conduct, and `not th[e] result [of] the independent action of some third party not before the court.'

59.    There is a 'causal connection' or "causal nexus" between that injury and the complained-of conduct of the defendant, and a likelihood that the injury will be redressed by a favorable decision.

60.    There is also harm that flows indirectly from this action, where "indirectness is not necessarily fatal to standing . . .".

**B. Defendant Information**

61.    Defendant, UBS AG ("defendant UBS" or "defendant bank" or "UBS"), is a Swiss corporation organized as an Aktiengesellschaft (AG), which is a corporation that has issued shares of common stock to investors. Headquartered in Zurich and Basel with addresses: Bahnhofstrasse 45, P.O. Box, CH-8098 Zurich and Aeschenvorstadt 1, P.O. Box, 4051 Basel, Switzerland.

62.     Pursuant to its articles of association, the purpose of UBS is the operation of a bank. Its scope of operations extends to all types of banking, financial, advisory, trading and service activities in Switzerland and abroad. UBS may establish branches and representative offices as well as banks, finance companies and other enterprises of any kind in Switzerland and abroad, hold equity interests in these companies, and conduct their management.

63.     UBS is the ultimate parent company of all subsidiaries globally (UBS AG and its direct and indirect subsidiaries, the "UBS Group") and it is a global institution with offices in more than 50 countries, including all major financial centers, and employs approximately 65,000 people.

64.     UBS is a bank within the meaning of subsection (a)(6) of Section 3 of the Exchange Act [15 U.S. Code § 78c(a)(6)], the major global investment banking and multi-service brokerage firm that, among other things, trade securities for institutional and individual customers and offer the services related to global trading and transition management as the execution, clearance and/or settlement of orders and/or transactions in hypothetically all available financial instruments.

65.     Defendant bank is a "foreign private issuer" which has a class of securities registered pursuant to Section 12 of the Exchange Act or is required to file reports pursuant to Section 15(d) of the Exchange Act.

66.     Defendant bank is an issuer which has a class of securities registered pursuant to section 78l of 15 U.S. Code and it is an issuer which is required to file reports pursuant to section 78o(d) of 15 U.S. Code.

67.     For example, on May 5, 2014, which was the last trading day preceding the date on which UBS announced its intention to establish a group holding company through a share exchange offer subject to regulatory approvals, the last reported sales price of a UBS Share on the New York Stock Exchange was $20.84.

68.   UBS, during the relevant period, provided brokerage and research services within the meaning of Section 28(e) of the Exchange Act [15 U.S.C. § 78bb(e)] and was a broker within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)] not exempted from the definition of "broker" having had no policies and procedures in place to comply with Section 3(a)(4)(B) of the Exchange Act [15 U.S.C. 78c(a)(4)(B)] and the rules and regulations thereunder.

69.   UBS is an institutional investment manager that uses the United States mail (or other means or instrumentality of interstate commerce) in the course of business, and exercises investment discretion over $100 million within the meaning of the reporting and eligibility requirements stated in the Exchange Act, which explains that an institutional investment manager is:

69.1.   (1) an entity that invests in, or buys and sells, securities for its own account; or

69.2.   (2) a natural person or an entity that exercises investment discretion over the account of any other natural person or entity.

70.   UBS maintains a net of subsidiaries, affiliates, branches, offices etc in the United States, some of which are significant subsidiaries within the meaning of its annual reports deposited with the Securities and Exchange Commission ("SEC").

71.   UBS is a "Covered Company", a "nonbank financial company supervised by the Board [of Governors of the Federal Reserve System] . . . with total consolidated assets of [USD] 50 billion or more under 12 C.F.R. § 243 and 12 C.F.R. § 381 (together, the "Regulation") issued pursuant to section 165(d)(8) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") (Pub. L. 111-203, 124 Stat. 1376, 1426-1427), 12 U.S.C. 5365(d)(8), which requires the Board of Governors of the Federal Reserve System (the "Board") and the Federal Deposit Insurance Corporation (the "FDIC") to jointly issue rules implementing the provisions of section 165(d) of the Dodd-Frank Act.

72.     A "Material Entity" is defined in the Regulation as "a subsidiary or foreign office of the covered company that is significant to the activities of a critical operation or core business line." The Regulation defines "Critical Operations" as "those operations of the covered company, including associated services, functions and support, the failure or discontinuance of which, in the view of the covered company or as jointly directed by the Board and the Corporation, would pose a threat to the financial stability of the United States."

73.     "Core Business Lines" are defined in the Regulation as "those business lines of the covered company, including associated operations, services, functions and support, that, in the view of the covered company, upon failure would result in a material loss of revenue, profit, or franchise value."

74.     Critical Operations for UBS AG in the United States were jointly identified by the Board and the FDIC and communicated to UBS AG.

75.     Based upon the Core Business Lines identified by the UBS Group and the Critical Operations designated by the Board and the FDIC, the following entities were designated as Material Entities as of May 4, 2012:

75.1.    UBS AG New York WM Branch;

75.2.    UBS AG London Branch;

75.3.    UBS AG Stamford Branch;

75.4.    UBS Bank USA;

75.5.    UBS Financial Services Inc.;

75.6.    UBS Global Asset Management (Americas) Inc.;

75.7.    UBS Loan Finance LLC;

75.8.    UBS O'Connor LLC;

75.9.   UBS Realty Investors LLC;

75.10.   UBS Securities LLC; and

75.11.   UBS Services LLC.

76.   The UBS Group has five business divisions globally: Retail & Corporate, Wealth Management, Wealth Management Americas, Global Asset Management and the Investment Bank.

77.   For purposes of this Complaint three out of five business divisions within the global operational structure of the UBS Group are relevant and include the Wealth Management and the Investment Bank by the medium of which UBS was engaged in extensive high volume market-making and client facilitation trading on national securities exchanges referred to as the flow business.

78.   The Wealth Management focuses on delivering comprehensive financial services to high net worth and ultra high net worth individuals around the world – except to those served by Wealth Management Americas – as well as private and corporate clients in Switzerland. The UBS Group's Wealth Management business unit provides a broad range of products and services to clients in over 40 countries, including Switzerland, businesses around the world booked worldwide.

79.   The Investment Bank provides a broad range of products and services in equities, fixed income, foreign exchange and commodities to corporate and institutional clients, sovereign and government bodies, financial intermediaries, alternative asset managers and the UBS Group's wealth management clients. The Investment Bank is housed largely in Swiss, UK, and U.S. entities. The Investment Bank is an active participant in capital markets flow activities, including sales, trading and market-making across a broad range of securities. It provides financial solutions to a wide range of clients, and offers advisory and analytics services in all major capital markets.

80.   For purposes of this Complaint two out of three business divisions with U.S. operations, the Wealth Management Americas and the Investment Bank, are relevant and comprice: the former one Core Business Line and the latter five Core Business Lines, as set forth below.

81.   The Wealth Management Americas business division of the UBS Group includes the domestic U.S. business, the domestic Canadian business and the international business booked in the U.S. Wealth Management Americas consists of branch networks in the U.S., Puerto Rico and Canada, with 6,796 financial advisors as of December 31, 2011. Wealth Management Americas provides advice-based solutions through financial advisors who deliver a fully integrated set of products and services specifically designed to address the needs of ultra high net worth, high net worth and core affluent individuals and families. Wealth Management Americas accounts for 33% of the invested (i.e., client) assets of the UBS Group.

82.   The Investment Bank business division of the UBS Group (the "Investment Bank") is the largest division by owned assets, accounting for 76% of the consolidated total for the UBS Group.

83.   The Investment Bank contains five Core Business Lines:

83.1.   (a) Investment Banking Division ("IBD"): IBD provides strategic advice and a range of capital markets execution services to corporate clients, financial institutions, financial sponsors, sovereign wealth funds and hedge funds. Its advisory group assists on acquisition and sale processes and also advises on strategic reviews and corporate restructuring solutions.

83.2.   (b) Cash Equities: Cash equities provides clients with liquidity, investment advisory, trade execution offerings and related consultancy services, together with comprehensive access to primary markets, corporate management and subject matter expertise. It provides full-service trade execution for single stocks and portfolios, delivers capital commitments,

block trading, small cap execution, commission management services, and a full suite of advanced electronic trading strategies.

83.3.    (c) Fixed Income, Currency and Commodities Macro-FX ("FICC Macro FX"): FICC Macro FX consists of the foreign exchange, money market and interest rate sales and trading businesses, as well as cash and collateral trading. FICC Macro FX provides a range of foreign exchange, precious metals, treasury and liquidity management solutions to institutional and private clients via targeted intermediaries. Interest rate activities include standardized rate-driven products and services such as interest rate derivatives trading, underwriting and trading of government and agency securities.

83.4.    (d) FICC Lending & Credit: Credit sales and trading portions of this business line encompasses the origination, underwriting, trading and distribution of cash and synthetic products across the credit spectrum, including bonds, derivatives, notes and loans. FICC Lending & Credit is active across all major markets in secondary trading and market making of flow and structured credit instruments, securitized products and loans, and focused on providing market liquidity and tailored solutions to clients. In partnership with IBD, FICC Lending & Credit also provides capital markets debt financing and liability risk management solutions to corporates and institutions.

83.5.    (e) Linear Interest Rates - Short End: The Linear Interest Rates - Short End business line makes markets and provides clients with liquidity in G10,10 money markets, overnight index swaps, FX swaps, forward rate agreements, short-date interest rate swaps, interest rate and bond futures, bank notes and precious metals.

84.    Certain entities in the UBS Group are members of numerous securities and derivative exchanges and clearinghouses such as, for example, a significant

subsidiary of defendant bank UBS Securities LLC, a Delaware limited liability company engaged in the business of global investment banking, securities trading for institutional and individual customers, and asset management, with its principal place of business in Stamford, Connecticut ("UBS Securities"), an entity registered with the Securities and Exchange Commission ("SEC") and a member organization of the New York Stock Exchange ("NYSE"), which under NYSE Rule 132 required to submit certain audit trail data regarding its side of each trade to a fully interfaced clearing agency for comparison and settlement, as set forth in NYSE Rule 132.30 and explained in various Information Memos issued by the NYSE, including Information Memo 02-59 (New Identification Code/Audit Trail Account) (December 17, 2002) and Information Memo 96-36 (New Audit Trail Identifiers) (December 5, 1996); each office, department or business activity of which "shall be under the supervision" of the same "through a general partner or principal executive officer", as provided by NYSE Rules 342(a) and 342(b); which "shall at all times adhere to the principles of good business practice in the conduct of his or its business affairs" within the meaning of NYSE Rule 401, preserve accurate books and records, including terms and conditions of customer orders required by NYSE Rules 410(a),(b) and 440 and Section 17(a) oaf the Exchange Act and Rule 17a-4(b)(1) [17 C.F.R. §240.17a-4(b)(1)] thereunder.

85.   Additionally, UBS Securities is a reporting institution for purposes and by definitions of Exchange Act Rule 17f-1 [17 C.F.R. §240.17f-1].

86.   Also, among significant subsidiaries of defendant bank there is U.S.-registered broker-dealer UBS Financial Services, Inc. ("UBS FS") which, during the relevant period, provided brokerage and research services within the meaning of subsection (e) of Section 28 of the Exchange Act [15 U.S.C. § 78bb(e)] and was a broker within the meaning of subsection (a)(4) of Section 3 of the Exchange Act [15 U.S. Code § 78c(a)(4)].

87.    Both UBS Securities and UBS FS are large traders for the purpose and by definitions of subsection (h) of Section 13 of the Exchange Act, where the term "large trader" means every person who, for his own account or an account for which he exercises investment discretion, effects transactions for the purchase or sale of any publicly traded security or securities by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of a national securities exchange, directly or indirectly by or through a registered broker or dealer in an aggregate amount equal to or in excess of the identifying activity level, 2 million shares or $20 million during any calendar day, or 20 million shares or $200 million during any calendar month, to identify itself to the Commission and make certain disclosures to the Commission on Form 13H under Exchange Act Rule 13h-1 [17 C.F.R. § 240.13h-l Large trader reporting].

88.    Among non-significant subsidiaries of the defendant, during the relevant period, there was a wholly owned Bahamaian subsidiary UBS (Bahamas) Ltd ("UBS Bahamas"), a corporation incorporated under the laws of the Commonwealth of The Bahamas, which, since 1st April 2015, carries out remaining functions as UBS (Bahamas) Ltd (In Voluntary Liquidation) after defendant bank had wound up the affairs of it.

89.    Bahamian subsidiary of UBS, during the relevant period, provided brokerage and research services within the meaning of Section 28(e) of the Exchange Act [15 U.S.C. § 78bb(e)] and was a broker within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)] not exempted from the definition of "broker" having had no policies and procedures in place to comply with Section 3(a)(4)(B) of the Exchange Act [15 U.S.C. 78c(a)(4)(B)] and the rules and regulations thereunder.

90.    Also, among non-significant subsidiaries of defendant UBS there was UBS Capital Markets L.P, 111 Pavonia Avenue East, Jersey City, NJ 07310, United States ("UBS-CM"), which, as of October 29, 2004, operated as a subsidiary of

UBS Americas, Inc., Wilmington, Delaware, United States, having it, as Limited Partner and one of the General Partners, and Credit Suisse Capital Markets & Co., as one of the General Partners. In 2005, UBS-CM acted as a non-member affiliate and approved person of UBS defendant on the New York Stock Exchange being a separate broker/dealer that primarily acted as a wholesale intermediary, accepting orders from many correspondent broker/dealers. UBS Securities had acquired UBS-CM as of November 1, 2004 and UBS Securities, at the time, was in the process of integrating UBS-CM onto the UBS Securities Platform. UBS-CM utilized a riskless principal method while UBS Securities utilized an agency method of routing such orders. However, the subject orders were routed through UBS Securities for the account of UBS-CM, a non-member affiliate, and therefore the trades should have been reported as "agency" rather than "proprietary," as reflected in NYSE Information Memo 02-59 (New Indentification Code/Audit trail Account) (December 17, 2002).

## Regulation and supervision in the United States

*Banking regulation*

91.    The UBS Group's operations in the U.S. are subject to a variety of regulatory regimes. UBS AG maintains branches in several states including Connecticut, Illinois, Florida and New York. These branches are licensed either by the Office of the Comptroller of the Currency, an independent bureau of the U.S. Department of the Treasury (the "OCC") or the state banking authority of the state in which the branch is located. Each U.S. branch is subject to regulation and examination by its licensing authority. The UBS Group also maintains state and federally chartered trust companies and other limited purpose banks, which are regulated by state regulators or the OCC. In addition, the Board exercises examination and regulatory authority over the UBS Group's state-licensed U.S. branches. Only the deposits of UBS AG's subsidiary bank located in the State of Utah, UBS Bank USA, are insured by the FDIC. The regulation of UBS AG's

U.S. branches and subsidiaries imposes restrictions on the activities of those branches and subsidiaries, as well as prudential restrictions, such as limits on extensions of credit to a single borrower, including UBS AG subsidiaries and affiliates.

92. The licensing authority of each U.S. branch of UBS AG has the authority, in certain circumstances, to take possession of the business and property of the UBS Group located in the state of the office it licenses. Such circumstances generally include violations of law, unsafe business practices and insolvency. As long as the UBS Group maintains one or more federal branches, the OCC also has the authority to take possession of the U.S. assets of UBS AG under generally similar circumstances, as well as in the event that a judgment against a federally licensed branch remains unsatisfied. This federal power may preempt the state insolvency regimes that would otherwise be applicable to UBS AG's state-licensed branches. As a result, if the OCC exercised its authority over the U.S. branches of UBS AG pursuant to federal law in the event of a UBS AG insolvency, all U.S. assets of UBS AG would generally be applied first to satisfy creditors of these U.S. branches as a group, and then made available for application pursuant to any Swiss insolvency proceeding.

93. In addition to the direct regulation of UBS AG's U.S. banking offices, because UBS AG operates U.S. branches, it is subject to oversight regulation by the Board under various laws (including the International Banking Act of 1978 and the Bank Holding Company Act of 1956). On April 10, 2000, UBS AG was designated a "financial holding company" under the Bank Holding Company Act. Financial holding companies may engage in a broader spectrum of activities than bank holding companies or foreign banking organizations that are not financial holding companies, including underwriting and dealing in securities. To maintain UBS AG's financial holding company status, (i) UBS AG's U.S. subsidiary federally chartered trust company and U.S. subsidiary bank located in Utah are required to

meet certain capital ratios, (ii) UBS AG's U.S. branches, U.S. subsidiary federally chartered trust company, and U.S. subsidiary bank located in Utah are required to meet certain examination ratings, and (iii) UBS AG's subsidiary bank in Utah is required to maintain a rating of at least "satisfactory" under the Community Reinvestment Act of 1997.

94.    A major focus of U.S. governmental policy relating to financial institutions in recent years has been aimed at fighting money laundering and terrorist financing. Regulations applicable to UBS AG and its subsidiaries impose obligations to maintain effective policies, procedures and controls to detect, prevent and report money laundering and terrorist financing and to verify the identity of their clients. Failure of a financial institution to maintain and implement adequate programs to combat money laundering and terrorist financing could have serious consequences for the UBS Group, both in legal terms and in terms of the UBS Group's reputation.

95.    The Dodd-Frank Act impacts the financial services industry by addressing, among other issues, the following: (i) systemic risk oversight, (ii) bank capital standards, (iii) the liquidation of failing systemically significant financial institutions, (iv) OTC derivatives, (v) the ability of deposit taking banks to engage in proprietary trading activities and invest in hedge funds and private equity, (vi) consumer and investor protection, (vii) hedge fund registration, (viii) securitization, (ix) investment advisors, (x) shareholder "say on pay," (xi) the role of credit rating agencies, and more. The details of the legislation and its impact on the UBS Group's operations will depend on the final regulations ultimately adopted by various agencies and oversight boards.

*U.S. regulation of other UBS operations*

96.    In the U.S., UBS Securities LLC and UBS Financial Services Inc., as well as UBS AG's other U.S.-registered broker-dealer entities within the UBS Group, are subject to regulations that cover all aspects of the securities business, including:

sales methods; trade practices among broker-dealers; use and safekeeping of clients' funds and securities; capital structure; recordkeeping; the financing of clients' purchases; and the conduct of directors, officers and employees.

97.     These entities are regulated by a number of different government agencies and self-regulatory organizations, including the SEC and the Financial Industry Regulatory Authority ("FINRA"). Each entity is also regulated by some or all of the following: the New York Stock Exchange, the Municipal Securities Rulemaking Board, U.S. Department of the Treasury, the Commodities Futures Trading Commission and other exchanges of which it may be a member, depending on the specific nature of the respective broker-dealer's business. In addition, the U.S. states, provinces and territories have local securities commissions that regulate and monitor activities in the interest of investor protection. These regulators have a variety of sanctions available, including the authority to conduct administrative proceedings that can result in censure, fines, the issuance of cease-and-desist orders or the suspension or expulsion of the broker-dealer or its directors, officers or employees.

98.     FINRA is dedicated to investor protection and market integrity through effective and efficient regulation and complementary compliance and technology-based services. FINRA covers a broad spectrum of securities businesses, including: registering and educating industry participants; examining securities firms; writing rules; enforcing those rules and the federal securities laws; informing and educating the investing public; providing trade reporting and other industry utilities; and administering a dispute resolution forum for investors and registered firms. It also performs market regulation under contract for the NASDAQ Stock Market, the American Stock Exchange and the Chicago Mercantile Exchange.

### III. STATEMENT OF CLAIM

**FACTS:**

99. Place of occurrence of the acts of primary liability by the defendant bank: the City of New York, New York, United States, while acts of secondary liability occurred in The Bahamas or in Switzerland.

100. Date(s) of occurrence: between June 2012 and September 2013.

101. All dates, times, and amounts stated herein are approximate.

102. The plaintiffs' facts and allegations herein below are non-conclusory and this Court may "consider 'any written instrument attached to [the Complaint] as an exhibit or any statements or documents incorporated in it by reference . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.'"

103. Facts that support the plaintiffs' case are as follows.

104. In August 2012, UBS Bahamas made a loan to Junkanoo Estates Ltd., a company owned by plaintiffs, and created a lien (mortgage) collateralized by a real estate property belonging to Junkanoo Estates Ltd., when, at the time of the making of the loan and creating of the lien, UBS Bahamas had actual knowledge of facts by reason of which the making of such loan and the acquisition of such lien is a violation of the provisions of this chapter or any rule or regulation thereunder.

105. Between June and October 2013, Junkanoo Estates Ltd., a company owned by plaintiffs, was sending through the medium of plaintiff Irina Tsareva orders for the transactions of the purchase or sale of equity securities publicly traded on national securities exchanges in the United States.

106. Defendant through UBS Bahamas, specifically through UBS Capital Markets ("UBS-CM") (Booking Center Bahamas), accepted or facilitated and purportedly

effected the said transactions involving the loan in contravention in contravention of such rules and regulations as the SEC prescribed as necessary or appropriate in the public interest or for the protection of investors.

107.   UBS Bahamas produced records of the said transactions in the securities that are the subjects of this Complaint attached to the Certification as Exhibit 1 and Exhibit 2 to be filed with the Complaint pursuant to Section 21D(a) of the Securities Exchange Act of 1934 [15 U.S. Code § 78u–4] in:

107.1.   Statement of Account 32,377/01,00 of Junkanoo Estates Ltd. issued by UBS (Bahamas) Ltd. as of 01.07.2013; and

107.2.   Statement of Account 32,377/01,00 of Junkanoo Estates Ltd. issued by UBS (Bahamas) Ltd. as of 31.12.2013.

108.   The above-referenced activities were engaged in at a time during which none of the following client advisers of UBS Bahamas were registered with the SEC or with the Securities Commission of The Bahamas as a broker or a Trading Representative and none of them were exempted from any of these registrations:

108.1.   George Maillis;

108.2.   Jamaal Wright;

108.3.   Lynette Martinborough; and

108.4.   Marcia Adderley.

109.   The following members of management of UBS Bahamas joined the scheme in the relevant period:

109.1.   Beat Paoletto,

109.2.   Fabian Jenny; and

109.3.   Renate Raeber.

110.   Tibaud Halwyck, the UBS-CM Head Nassau, joined the scheme in April 2013 by issuing the Dealing Procedure Manual UBS Capital Markets ("UBS-CM") (Booking Center Bahamas), version V2 (see a copy of that Manual attached to this Complaint as Exhibit 1), which was produced on October 2, 2018, in discovery proceedings of the Supreme Court of The Bahamas in civil action 2015/CLE/gen/No.01451 consolidated with 2014/CLE/gen/No.01620 *Junkanoo Estates Ltd et al. v UBS (Bahamas) Ltd (In Voluntary Liquidation)* (the "SCB Proceedings")

111.   Kevin L. Price, the IPS (Investment Portfolio Supervision) Head Nassau, joined the scheme during the relevant period, he was registered with the SEC as a broker and associated with a registered broker-dealer UBS FS at the time of these transactions. According to ata from the Central Registration Depository ("CRD®") database and system of the Financial Industry Regulatory Authority ("FINRA") released through BrokerCheck Report about KEVIN L. PRICE CRD#: 2159039 (incorporated into by reference) shows his registration history, that Kevin Lee Price, among other things, previously was registered with the following firms:

> *"01/2010 - 10/2014 UBS FINANCIAL SERVICES INC. CRD# 8174 WEEHAWKEN, NJ;*
>
> *12/1994 - 08/1998 BERNARD L. MADOFF CRD# 2625 NEW YORK, NY"*

and his employment history as reported on the most recently filed Form U4:

> *"01/2010 - Present UBS FINANCIAL SERVICES INC. WEEHAWKEN, NJ*
>
> *12/2002 - Present UBS BAHAMAS LTD. NASSAU, BAHAMAS"*

112.   On October 3, 2014, UBS Bahamas began in the Supreme Court of The Bahamas a money lending (mortgage) action against the plaintiffs and their company

Junkanoo Estates Ltd. to recover the loan made against a lien created in a civil proceedings 2014/CLE/gen/No.01620.

113.    On September 16, 2015, plaintiffs along with their company began in the Supreme Court of The Bahamas an action against UBS Bahamas claiming, among other things, damages for breach of the implied covenant of good faith and fair dealing and challenging the validity of the loan and creation of the lien (mortgage) in a civil proceedings 2015/CLE/gen/No.01451.

114.    Despite many requests, defendant bank failed to provide any proof that the said transactions were registered on the book or system of the New York Stock Exchange such as, for example, execution reports, as required by NYSE Rule 123(f), setting forth the data elements to be recorded for each execution entered into the same database as required by NYSE Rule 123(e) for the entry of orders.

115.    In discovery of SCB Proceedings of the Supreme Court of The Bahamas in civil action 2015/CLE/gen/No.01451 consolidated with 2014/CLE/gen/No.01620 ***Junkanoo Estates Ltd et al. v UBS (Bahamas) Ltd (In Voluntary Liquidation)*** (the "SCB Proceedings") UBS Bahamas produced:

115.1.    On October 2, 2018, 206 so called "Junkanoo Estates Ltd - Trade Confirmation" and "UBS (Bahamas) Ltd - Custodian Instructions" laso called by UBS Bahamas 'trade advices and trade receipts', which purported to be records of transactions executed on national securities exchanges pursuant to 204 plaintiffs' orders for such transactions; and

115.2.    On November 20, 2018, 50 so called "UBS (Bahamas) Ltd Security Trail Contracts" purported to be allocated execution reports or 'contract notes' of trades purportedly executed on the New York Stock Exchange ("NYSE") and NASDAQ pursuant to 204 plaintiffs' orders for such

transactions (see copies of 50 "UBS (Bahamas) Ltd. Security Trail Contracts" attached to this Complaint as Exhibit 2).

116.   On December 6, 2018, plaintiffs began a private prosecution in the Magistrate's Court in The Bahamas under the Criminal Procedure Code Act instituting the summary criminal proceedings by making of 5 Complaints against certain individuals, client advisers of UBS Bahamas, who were not registered with the SEC or with the Securities Commission of The Bahamas as brokers or Trading Representatives and none of whom was not exempted from the registration (see a copy of Letter of Submissions to the Chief Magistrate dated December 6, 2018 attached to this Complaint as Exhibit 3)

117.   Between April 16 and May 7, 2019, plaintiffs delivered letters of requests to the following UBS persons or related to the defendant (see copies of these letters and receipts attached to this Complaint as Exhibit 4):

117.1.   on April 16, 2019, Jonathan Bourne (Auditor in Charge) via email delivery: jbourne@nexant.com;

117.2.   on April 17, 2019, Thomas Schneider (Licensed Audit Expert and Statutory Auditor) via email delivery: thomas.schneider@blkb.ch, kathrin.schneider@blkb.ch;

117.3.   on April 18, 2019, Isabelle Romy (UBS) via email delivery: iromy@froriep.ch;

117.4.   on April 23, 2019, Beatrice Weder di Mauro (UBS) via email delivery: bwederdimauro@cepr.org;

117.5.   on April 24, 2019, Sergio Ermotti (UBS) via email delivery: alexandra.mantovani@ubs.com;

117.6.    on April 30, 2019, Urs Kaegi (Bär & Karrer AG) via email delivery: urs.kaegi@baerkarrer.ch, diana.afzal@baerkarrer.ch;

117.7.    on May 2, 2019, Tom Naratil (UBS) via email delivery: marsha.askins@ubs.com, peter.stack@ubs.com, laura.hastings@ubs.com;

117.8.    on May 8, 2019, Bernard Sechaud (UBS) via hand delivery at UBS Annex, 31 East Bay Street, Nassau, The Bahamas.

118.    On February 21, 2019, in the SCB Proceedings, the Supreme Court of The Bahamas pronounced an Order that, among other things, UBS Bahamas swears and file a supplemental affidavit verifying their lists of documents and confirming that (1) No other documents are in its possession and (2) The documents set out by the Plaintiffs on February 21, 2019 do not exist or to produce the same.

119.    On March 7, 2019, in the SCB Proceedings, UBS Bahamas filed an affidavit (see a copy of Fifth Affidavit of renate Raeber filed on March 7, 2019 attached to this Complaint as Exhibit 5) which, among other things, reads in the paragraph 8:

> *"8. As it relates to Schedule 1 of Exhibit RR-5, to the best of my knowledge, information and belief, UBS has produced all the contract notes, trade advices and trade receipts in its possession. UBS does not have any other contract notes in its possession, other than what has already been produced."* (Emphasis added)

120.    On September 17, 2019, in the SCB Proceedings, plaintiffs filed an affidavit indicating a sum US$11,281,645.00 which had been claimed by them in money terms at the Prayers to Claims No.No. 1,4,5,6,7,8 and 9 of the Statement of Claim filed on November 14, 2017 (see a copy of 24th Affidavit - Payment of US$11,281,645.00 Into Court filed on September 17, 2019 attached to this Complaint as Exhibit 6), which may serve as the plaintiffs' damages evidence.

**COUNT ONE: Violations of Section 10(b) and Rules 10b-5(a), (b) and (c) of the Exchange Act**

121.    Paragraphs through are re-alleged and incorporated by reference as if set forth fully therein.

122.    Plaintiffs allege that, during the relevant period, defendant bank, acting as agent of plaintiffs, deliberately orchestrated and conducted a fraudulent scheme regarding plaintiffs' orders for the transactions in equity securities publicly traded on national securities exchanges booked at the Booking Center Bahamas of UBS-CM by unlawfully not sending or routing to and not representing or executing the said orders on these securities exchanges.

123.    For the purpose and by definitions of Exchange Act Rule 13h-1 [17 C.F.R. § 240.13h-1 Large trader reporting], as subparagraph (8)(B) has it:

> *"the term "publicly traded security" means any equity security (including an option on individual equity securities, and an option on a group or index of such securities) listed, or admitted to unlisted trading privileges, on a national securities exchange, or quoted in an automated interdealer quotation system;"*

124.    The said orders were both marketable orders and displayed limit orders for the purpose of Rules under Regulation NMS (National Market System) and two amendments to the joint industry plans for disseminating market information adopted on August 29, 2005 ("Regulation NMS") in addition to redesignating the national market system rules previously adopted under Section 11A of the Exchange Act, which states at Page 118:

> *"Displayed limit orders are the primary source of public price discovery. They typically set quoted spreads, supply liquidity, and in general establish the public "market" for a stock. The quality of execution for marketable orders, which, in turn, trade with displayed liquidity, depends*

> *to a great extent on the quality of markets established by limit orders (i.e., the narrowness of quoted spreads and the available liquidity at various price levels). Limit orders, however, make the first move – when submitted, they must be displayed rather than executed, and therefore offer a "free option" for other market participants to trade a stock by submitting marketable orders and taking the liquidity supplied by limit orders. Consequently, the fate of limit orders – whether or when they receive an execution – is dependent on the choices made by those who route marketable orders. Much of the time, the interests of marketable orders in obtaining the best available price are aligned with those of limit orders that are displaying the best available price."*

125.   Regulation NMS was adopted to ensure the fairness and efficiency of the NMS for all investors and to promote fair and efficient access by the public to the markets' quotations where, for example, data for each stock, quotations and trades are continuously collected from many different trading centers and then disseminated to the public in a consolidated stream of data (Rules 601 and 603 under Regulation NMS). When Congress mandated the creation of the NMS in 1975, it noted that the systems for disseminating consolidated market data would *"form the heart of the national market system."* H.R. Rep. No. 94-229, 94th Cong., 1st Sess. 93 (1975).

126.   Regulation NMS is premised on promoting fair competition among individual markets, while at the same time assuring that all of these markets are linked together, through facilities and rules, in a unified system that promotes interaction among the orders of buyers and sellers in a particular NMS stock and allowed the resulting unparalleled transparency concerning stock trading activity that is one of the reasons that the U.S. equity markets are widely recognized as being the fairest, most efficient, and most competitive in the world.

127. At all material times, defendant bank has knowledge of the said unexecuted customer's orders and concealed its wrongs.

128. It is alleged that defendant bank acting as agent of a plaintiffs' company called Junkanoo Estates Ltd., with intent to deceive the principal, used documents in respect of which the principal is interested, and which contain statements which are false, and which were intended to mislead the principal as follows.

129. They in defendant bank knew that the unexecuted trades were fictitious and the above mentioned records of these trades were false, intended them to be so and sought to and did execute this scheme to engage in transnational securities fraud, as a part of defendant bank's strategies to defraud the public, including plaintiffs.

130. In doing so, defendant bank engaged in acts, practices, or courses of business which operated as a fraud or deceit upon plaintiffs

131. As described in the paragraphs above, defendant bank, by the use of means or instrumentality of interstate commerce or of the mails, or of facilities of national securities exchanges, employed, in connection with the purchase or sale of securities registered on these exchanges, manipulative or deceptive, or other fraudulent device or contrivance within the term meaning in Exchange Act Rule 15c1-2 [17 C.F.R. § 240.15c1-2].

132. As described in the paragraphs above, defendant bank made untrue and misleading oral and written statements, disseminated to the public, including plaintiffs, or omitted to state material facts necessary in order to make the statements or omissions made, in the light of the circumstances under which they were made, not misleading, with knowledge or reasonable grounds to believe that these statements or omissions were untrue or misleading.

133. By virtue of the violative conduct alleged herein, defendant bank, directly or indirectly, singly or in concert, willfully violated provisions contained in Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 [17 C.F.R. §

240.10b-5] thereunder having the scope which shall not be limited by any specific definitions of the term "manipulative, deceptive, or other fraudulent device or contrivance" contained in Exchange Act Rule 15c1-2 [17 C.F.R. § 240.15c1-2] or other Rules and Regulations adopted pursuant to Section 15(c) of the Exchange Act.

134.  For the purposes of this Count, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services as provided by Section 1343 of the Criminal and Penal Code of the United States [18 U.S. Code § 1346 Definition of "scheme or artifice to defraud"].

135.  Plaintiffs were not aware that their orders for the transactions in securities were not sent or routed to and not represented or executed on any national securities exchange by defendant bank or its subsidiaries or agents.

136.  Plaintiffs would have considered it important in their decision to trade through defendant bank or any of its subsidiaries to know that their orders were not sent or routed to and not represented or executed on any national securities exchange; neither would plaintiffs do it if they were to make the decision again.

137.  The said manipulative or deceptive activities that occurred in connection with the purchase or sale of a security in the United States entitled plaintiffs for private rights of action seeking damages and such other relief as this Court deems necessary or appropriate taking in consideration that the purchase or sale prices paid or received by the plaintiffs for the subject securities does not exist, and therefore could not be determined for the purposes under Section 21D(e) [15 U.S.C. § 78u-4(e)] of the Securities Exchange.

**COUNT TWO: Infringement of a natural person's freedom to buy or sell any equity security**

138.    Paragraphs through are re-alleged and incorporated by reference as if set forth fully therein.

139.    Plaintiffs allege that, during the class period, defendant bank, by not sending or routing to and not representing or executing on securities national securities exchanges plaintiffs' orders for transactions in equity securities, made the impact on the plaintiffs' freedom to buy or sell any equity security, their natural right, which is a sort of "unalienable right" to pursue happiness recognised in the United States Declaration of Independence.

140.    When submitting to defendant bank orders for transactions in equity securities on national securities exchanges, plaintiffs, as investors, were exercising their intellectual and financial freedoms, and in doing so, plaintiffs were orderly pursuing their happiness.

141.    The Declaration of Independence has no standing in the legal system of the United States; nevertheless, more than 200 years after Thomas Jefferson, who penned the words "pursuit of happiness," this right has gained significant protections in American jurisprudence and international constitutional theory.

142.    In June 1776, the Virginia Convention of Delegates adopted the Virginia Declaration of Rights, which included a guarantee of the inherent right to *"the enjoyment of life and liberty... and pursuing and obtaining happiness and safety"*; and these protections remain in place today in the Virginia's constitution.

143.    The Commonwealth of Massachusetts followed Virginia's lead, including the term happiness in the state constitution and protecting the unalienable rights of the people in *"seeking and obtaining their happiness and safety."*

144.    The Wisconsin's constitution, adopted in 1848, repeated the assurance of the inherent rights of "life, liberty, and the pursuit of happiness," for its people.

145.    In the nineteenth century, immigrants from all over the world, who came by the millions, and by the millions were absorbed most of whom prospered in the United States because they were left perfectly free to pursue their own interest in their own way, and to bring both their industry and capital into competition with those of any other man, or order of man.

146.    As the Statue of Liberty inscription has it:

> *"Give me your tired, your poor,*
>
> *Your huddled masses yearning to breathe free,*
>
> *The wretched refuse of your teeming shore.*
>
> *Send these, the homeless, tempest-tossed to me:*
>
> *I lift my lamp beside the golden door."*

147.    While the right to the pursuit of happiness may not be stated outright in the United States Constitution, the Supreme Court has, and continues to recognize this right, and to protect the many freedoms it encompasses.

148.    In 1923, the United States Supreme Court recognized the pursuit of happiness at the national level when interpreting the Fourteenth Amendment's protection of the right to liberty. In the case *Meyer v. State of Nebraska* (No. 325) 262 U.S. 390 Justice McReynolds, writing for the majority, found that the Fourteenth Amendment's due process clause protects not only one's freedom from restraint, but also one's freedom, among others, to engage in contracts, to hold an occupation etc: *"While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not*

*merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and <u>generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.</u> Slaughter-House Cases, 16 Wall. 36; Butchers' Union Co. v. Crescent City Co., 111 U.S. 746; Yick Wo v. Hopkins, 118 U.S. 356; Minnesota v. Barber, 136 U.S. 313; Allgeyer v. Louisiana, 165 U.S. 578; Lochner v. New York, 198 U.S. 45; Twining v. New Jersey, 211 U.S. 78; Chicago, Burlington & Quincy R.R. Co. v. McGuire, 219 U.S. 549; Truax v. Raich, 239 U.S. 33; Adams v. Tanner, 244 U.S. 590; New York Life Ins. Co. v. Dodge, 246 U.S. 357; Truax v. Corrigan, 257 U.S. 312; Adkins v. Children's Hospital, 261 U.S. 525; Wyeth v. Cambridge Board of Health, 200 Mass. 474."* (Emphasis added)

149.  The **Meyer** precedent has held, and the right to pursue happiness has been central to two landmark decisions defining the constitutionality of marriage in the case **Loving v. Virginia** (No. 395) 388 U.S. 1 and in the Court's majority opinion in **Obergefell v Hodges** 772 F. 3d 388.

150.  In the like manner, as in cases **Loving v. Virginia** (No. 395) 388 U.S., **Obergefell v Hodges** 772 F. 3d 388 there is a constitutional protection for the right to buy or sell any equity security "essential to the orderly pursuit of happiness by free men."

151.  This right had been interfered with under the execution of the fraudulent and anti-competitive schemes by defendant bank, by actions which were unlawful or arbitrary or without reasonable relation to any purpose within the defendant bank's duties or competencies, as agent acting on behalf of plaintiffs, to effect.

152.  Under Title 15 of the U.S. Code the SEC, consistent with the purposes of subsection (i) of Section 9 of the Exchange Act [15 U.S.C. § 78i(i)], undertook to minimize an impact such as mentioned above on "a natural person's freedom to

buy or sell any equity security, in adopting rules under paragraph (2) of this subsection."

153.  Defendant bank by engaging in the conduct described above, made use of the mails or means or instrumentalities of interstate commerce or facilities of national securities exchanges, employed acts or practices in connection with the purchase or sale of equity securities in contravention of rules or regulations adopted by the SEC, consistent with the public interest, the protection of investors, and the maintenance of fair and orderly markets, and interfered with the free and fair operation of the market and plaintiffs' freedom to buy or sell any equity security.

154.  The said interference has the effect of destroying or injuring the right of plaintiffs to receive the fruits of the freedom to buy or sell any equity security and entitled them for rights of action seeking damages, declaratory relief and such other relief as this Court deems necessary or appropriate.

### COUNT THREE: Unjust enrichment

155.  Paragraphs through are re-alleged and incorporated by reference as if set forth fully therein.

156.  Plaintiffs allege that, during the class period, defendant bank, by the use of manipulative or deceptive, or other fraudulent device or contrivance, such as the said records of fictitious trades, and making false claims that all plaintiffs' orders for the transactions of purchase or sale of securities publicly traded on national securities exchanges have been executed, misappropriated money from plaintiffs using them for:

156.1.   (i) the services that the defendant or its subsidiaries never performed; or

156.2.   (ii) items and expenses plaintiffs never agreed to pay; or

156.3.   (iii) trades in securities on national exchanges that were never made.

157.    The plaintiffs' money has been diverted for the defendant bank's use facilitated by doctoring of account statements, unauthorized funds transfer activities, or other conduct in breach of the agent's fiduciary responsibilities to plaintiffs.

158.    In particular, defendant bank through the medium of its Bahamain subsidiary's illicit and unauthorized actions to steal directly from plaintiffs through transfers from or by debiting plaintiffs' bank account at the said subsidiary, withdrawn brokerage and transaction fees and profited by reaping plaintiffs' wealth in case if fictitious trades recorded in UBS' books resulted in loss, even though none of these revenues were proceeds of any real trading activity.

159.    They in UBS knew that trades in securities were fictitious, intended them to be so, and knew and intended that the records of these fictitious trades would and did allow defendant bank to unlawfully use or misappropriate plaintiffs' money.

160.    In doing so, UBS had misused and/or misappropriated plaintiffs' money.

161.    Plaintiffs were not aware that their money were being used for purposes other than trading in securities on national securities exchanges.

162.    Plaintiffs would have considered it important in their decision to trade through defendant bank or its Bahamian subsidiary to know that their money were being used for purposes other than the purposes claimed by defendant bank; neither would plaintiffs do it if they were to make the decision again.

163.    Unknown persons in defendant bank colluded among themselves to engage in transactional securities fraud for their own benefit by making fictitious quotations and indicating false cash prices to plaintiffs, who dealt directly with them or have something akin to specific knowledge of one another's existence, and thereby harmed those plaintiffs.

164.   As a result, defendant bank was enriched at the plaintiff's expense, and that it is against equity and good conscience to permit defendant bank to retain what is sought to be recovered.

165.   The misappropriation described in the paragraphs above entitled plaintiffs for rights of common-law action against unjustly enriched defendant bank seeking damages and such other relief as this Court deems necessary or appropriate.

**COUNT FOUR: Breach of the implied covenant of good faith and fair dealing**

166.   Paragraphs through are re-alleged and incorporated by reference as if set forth fully therein.

167.   In the alternative to Count Three, plaintiffs allege that, during the class period, defendant bank's manipulative, deceptive and fraudulent devices or contrivances included misrepresentations to plaintiffs that securities transactions occurred on national securities exchanges, trades were carried out and securities were held in their account with defendant bank, when no such transactions occurred on any national securities exchange and no securities were held in the plaintiffs' account.

168.   The said misrepresentations were made through the medium of client advisers or members of management employed by UBS Bahamas acting as agent of the company owned by plaintiffs and owing fiduciary and other duties, including duties of fair dealing and transparency, trust and confidence.

169.   Defendant bank by engaging in the conduct described above, breached the implied covenant of good faith and fair dealing with plaintiffs, who dealt directly with the said persons within defendant bank, and that breach has the effect of destroying or injuring the right of plaintiffs to receive the fruits of the contract with the defendant bank.

170.   This breach entitled plaintiffs for rights of common-law action seeking damages for breach of the implied covenant of good faith and fair dealing and such other relief as this Court deems necessary or appropriate.

**COUNT FIVE: Violations of Section 1 of the Sherman Act and subsection (i) of Section 9 of the Exchange Act**

171.   Paragraphs through are re-alleged and incorporated by reference as if set forth fully therein.

172.   Plaintiffs allege that, during the class period, defendant bank and its subsidiaries agreed, combined, and conspired and intentionally sought to negate, and did negate, price competition in trades, transactions or positions in equity securities publicly traded on national securities exchanges ordered by plaintiffs, wilfully, not sending or routing and not representing, handling, executing, clearing, or not carrying the transactions openly and competitively by any open and competitive methods adopted in trading places or prescribed by relevant market for trading in such equity securities, provided that none of the transactions ordered by plaintiffs was a transaction which in accordance with rules of the relevant market specifically providing for the non-competitive execution of certain transactions submitted to and approved by the Securities and Exchange Commission ("SEC"), which, if executed non-competitively, must be identified and marked by appropriate symbol or designation any contract, order, record, and memoranda pertaining thereto by a person handling, executing, clearing, or carrying such a transaction.

173.   This practice was effective where defendant bank with large money-market desks was involved because it could easily move cash prices and affect the market for such security it would lawfully submit the said customers' orders to the relevant exchange. There was a years-long conspiracy to indirectly manipulate the securities prices, where the misconduct occurred on a daily basis.

174. Management at defendant bank and its subsidiaries facilitated their employees' activities by making structural changes to their money markets and derivatives desks that allowed for collusion, implemented lax compliance standards that failed to detect misconduct, and concealed evidence from regulators. As an example, defendant bank did not maintain records which employees accepted and handled the said customers' orders and did not train employees on the methodologies used for handling or making submissions of customers orders for transactions in instruments traded on public exchanges.

175. As a result of the defendant bank and subsidiaries' manipulation, plaintiffs suffered losses in their own equity securities transactions, as did others unnamed plaintiffs similarly situated.

176. Transactions directly involving the plaintiffs made up a modest portion of the overall value of the U.S. stock market which is currently $34 trillion, compared to the rest of the world's $44 trillion capitalization or 43% of world market value, housing only 17% of the world's stocks, while the gross market value of OTC derivatives nears $10 trillion at end-June 2018 and $11 trillion at end-2017 – compared with the peak of $35 trillion observed in 2008 according to the Statistical release: OTC derivatives statistics at end June 2018 published on October 31, 2018 by the Bank for International Settlements.

177. By virtue of violative conduct alleged herein, defendant bank caused actual adverse effects in the marketplace as follows.

*The marketplace consequences that flow from the violation*

178. Defendant bank by unlawfully not sending or routing to and not representing or executing plaintiffs' orders on national securities exchanges indirectly manipulated price levels of the relevant equity security market by corrupting the result of the price discovery.

179.    It is alleged that:

179.1.    Defendant bank by engaging in the conduct described above was able to influence market prices;

179.2.    Prices of the relevant securities were artificial not being the result of ordinary market process of competion of quotes to buy and sell;

179.3.    Defendant caused the said artificial price. (See in *re Amaranth*, 730 F.3d at 173.)

180.    The said indirect manipulation of security prices created artificial, false or misleading appearances with respect to the price of an equity security, subject of unexecuted orders, or the market for such a security, the widespread last sale and quotation information with respect to which was not reliable and accurate.

181.    As a result of the said manipulative or deceptive activities of defendant bank, quotations for such securities were fictitious or the market for these securities suffered from a lack of reliable and accurate quotation and last sale information available to investors and regulators against the public interest and inappropriate for the protection of investors and the maintenance of fair and orderly markets.

182.    It is alleged that by reason of the said manipulative or deceptive conduct:

182.1.    Investors and market participants were unable to meet their information needs deprived of the visibility of all orders to buy or sell an equity security at the instances of the said unexecuted orders;

182.2.    Automated quotation systems operated by the relevant registered securities association or national securities exchanges in accordance with rules prescribed by the SEC,   at the instances of the said unrepresented or unexecuted orders:

182.2.1.   collected and disseminated real-time quotation and transaction information which were misleading;

182.2.2.   provided misleading bid and ask real-time quotations of participating brokers or dealers, which constituted UBS Securities' or UBS FS' bids or offers; and

182.2.3.   provided the volume and the last sale reportings of transactions, subjects of the said unexecuted orders, which were misleading.

183.   As a result of the anti-competitive or manipulative conduct alleged herein, the NYSE market data disseminated to data consumers, at the instances of the said unrepresented or unexecuted orders, was misleading.

184.   Such data consumers include the Network A (real-time quotes and transactions information in New York Stock Exchange LLC) professional subscribers:

184.1.   (a) Broker-Dealer Enterprises, [followed description] entities that are registered as brokers/dealers under the Exchange Act, which according to the Consolidated Tape Association's Schedule of Market Data Charges are not required to pay more than the enterprise maximum for any month for the aggregate amount of (a) a network's display device charges for devices used for its Internal Distribution plus (b) that network's display device and per-quote-packet charges payable in respect of services that it provides to nonprofessional subscribers that are brokerage account customers of the broker/dealer, "BrokerDealer Enterprise Maximum" which, during 2013, for the Network A became $686,400 applicable monthly; and

184.2.   (b) Television Broadcasters [followed description]who may simulcast over multiple channels through cable, satellite, or traditional means, which according to the Consolidated Tape Association's Schedule of Market Data Charges are not required to pay more than the "Television Ticker

Maximum" for any calendar month, where for months falling in calendar year 2012, the monthly Network A Television Ticker Maximum was $125,000 with prorating permitted for those who broadcast the data for less than the entire business day, based upon the number of minutes the real-time ticker is displayed, divided by the number of minutes the primary market is open for trading (currently 390 minutes) and billing amounts based on the "households-reached" totals that are published periodically in the Nielsen Report. The Participants of the Consolidated Tape Association (CTA) post the amount of each network's applicable monthly BrokerDealer Enterprise Maximum and Television Ticker Maximum on the website that CTA maintains for the CTA Plan and its amendments.

185.    The Consolidated Tape Association (CTA) oversees the dissemination of real-time quotes and transactions information in New York Stock Exchange LLC (Network A) and Bats, NYSE Arca, NYSE American and other regional exchange (Network B) listed securities. Since the late 1970s, all SEC-registered exchanges and market centers that trade Network A or Network B securities send their trades and quotes to a central consolidator where consolidated data products, the Consolidated Tape System (CTS) and Consolidated Quote System (CQS) data streams, are produced and distributed worldwide. The purpose of the above dissemination and use of market data was to ensure the executions in the above trading venues occurred at or within the current National Best Bid and Offer ("NBBO"), which is required by the SEC Rules under Regulation NMS.

186.    Defendant bank contributed to the risk of lower liquidity which refers to the ability of market participants to buy and sell securities in that, hypothetically, some orders were only partially executed, or not at all by the following reasons:

186.1.    the more orders that are available in a market, the greater the liquidity;

186.2.    with greater liquidity it is easier for investors to buy or sell securities; and

186.3.    investors are more likely to pay or receive a competitive price for securities purchased or sold.

187.    As a result, defendant bank contributed to the risk of wider spreads which refers to the difference in price between what an investor can buy a security for and what he can sell it for, when lower liquidity may result in wider than normal spreads for a particular security.

188.    Market volatility was affected by the said indirect manipulation of price levels of the equity securities market or the relevant segment thereof by defendant bank, who, when doing so, contributed to levels of volatility that even if had not or have not threatened the maintenance of fair and orderly markets, but made an impact on the normal operations of the market, contrary to the public interest and the maintenance of fair and orderly markets.

189.    By virtue of the anti-competitive conduct alleged herein in violation of section 1 of the Sherman Act, where unknown persons in defendant bank, who dealt directly with each other or have something akin to specific knowledge of one another's existence, colluded among themselves to engage in the said anti-competitive or manipulative scheme for the defendant bank's benefit and thereby injured plaintiffs.

190.    Section 1 of the Sherman Act states:

> "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1.

191.    Defendant bank and its subsidiaries restrained trading in equity securities by colluding to not send or transmit to and not represent or execute on national securities exchanges consumers' orders for transactions in equity securities on

these exchanges, artificially starving them with cash resulting in an indirect manipulation of price levels, at the instances of the said unrepresented or unexecuted orders, by corrupting the result of the price discovery process.

192.  As a consequence, the prices, at the said instances, were the product of collusion and did not accurately reflect competitive market prices; this, in turn, caused plaintiffs and putative class members to either pay more or receive less than they should have when they participated in equity securities transactions on either side thereof, having as core components for calculating these value such securities. *"[T]he fixing of a component of price violates the antitrust laws."* (See **United States v. Sacony-Vacuum Oil Co**., 310 U.S. 150, 222 (1940)).

193.  It is alleged that the following plaintiff classes suffered *"antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."* (See **Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.**, 429 U.S. 477, 489 (1977)). *"Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer `injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"* (See **Gelboim**, 823 F.3d at 772 (quoting **Brunswick**, 429 U.S. 489); **State of N.Y. v. Hendrickson Bros., Inc.**, 840 F.2d 1065, 1079 (2d Cir. 1988) *"In general, the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust law is deemed to have suffered the antitrust injury within the meaning of § 4 of the Clayton Act. . . ."*):

193.1.  Class of securities investors, who have participated in equity securities transactions on national securities exchanges that included both defendant bank or any of its subsidiaries as counterparty and were injured as a result of the said manipulation;

193.2.   Class of derivatives investor, who have participated in transactions in securities-based derivative contracts, the amount of the consideration, or the value of which are determined, derived from or varies by reference to, wholly or in part, tied to the value or amount of any security or any securities index, a hypothetical portfolio of which contains any of securities subject of the said unexecuted orders, and were injured as a result of the manipulation, where their "umbrella"-type damages claims would include virtually any loss on any such securities-based derivative transaction, regardless of the nature of the transaction or identity of counterparty; the damages would be determined based on transactions with non-parties; and the total quantum of damages would be orders of magnitude greater than any ill-gotten gains of defendant bank; and

193.3.   Class of the market data consumers, who have purchased or used the market data, real-time quotes and transactions information for in New York Stock Exchange LLC (Network A) and Bats, NYSE Arca, NYSE American and other regional exchange (Network B) listed securities, dissemination of which is overseen by the Consolidated Tape Association (CTA), and were injured as a result of the manipulation.

194.   Plaintiffs suffered injury-in-fact because any unlawful manipulation of any quote in any national securities exchange would have affected the value of any transaction on these exchanges, where prices are determined according to the auction process, and there would be no need to separately assess different categories of financial instruments than those transacted in by plaintiffs and separate acts of manipulation because any harm suffered by a plaintiff as a result of the said manipulation would have been caused by the identical misconduct of defendant bank or any of its subsidiaries.

195.   It is alleged that defendant bank have purposefully devised that anticompetitive scheme for its own benefit, and plaintiffs were injured as a direct result. The many

intervening links between the defendant bank and its subsidiaries' manipulations and plaintiffs' ultimate injuries also weigh the attenuated causation between the said scheme and any harm to plaintiffs.

196. Plaintiff class of securities investors paid or sold for artificially "discovered" prices instead of market prices and/or liquidated their positions at a loss depending from influences caused by the defendant bank's not submissions of their orders to the securities exchanges that corrupted market conditions.

197. Defendant bank and its subsidiaries knew that they were acting unlawfully, and actively concealed their actions from the public by producing records of financial information which are false, as described in Count One of this Complaint.

198. It is alleged that defendant bank's unlawful manipulation placed plaintiffs in a worse position, thereby thereby demonstrating "that their injury is one the antitrust laws were designed to prevent."

199. Plaintiffs allege the following links of causation: 1.) defendant bank and its subsidiaries' agreement to not submit customers' orders to exchanges, 2.) the corruption of the price discovery process by the exclusion of the said orders, 3.) the effect that the final, widespread disseminated security's price had on market perceptions about the price level of that security and 4.) any final pricing effect on security-based derivatives.

200. Plaintiffs claim violation (and injury in the form of artificial prices) flowing from the corruption of the price discovery process, which turned a process in which defendant bank and its subsidiaries jointly participated into conspiracy.

201. Plaintiffs allege an anticompetitive tendency: the warping of market factors affecting the prices for equity securities and other related financial instruments.

202. Plaintiffs were injured by this purposefully anti-competitive conduct, with the injury intertwined with the injury the said persons sought to inflict.

203.    It is alleged that the plaintiffs' injury and the nature of their dealings with defendant bank render them suitable as an instrument for vindicating the Sherman Act, where they are well positioned to serve as efficient enforcers and vindicate the public's interest in enforcing the antitrust laws

204.    Plaintiffs allege that defendant bank and its subsidiaries' conduct implicates the same set of concerns between themselves and those who transacted in any financial instrument traded on national securities through defendant bank or any of its subsidiaries.

205.    By virtue of the anti-competitive or deceptive conduct alleged herein, defendant bank and its subsidiaries made use of the mails or means or instrumentalities of interstate commerce, by acts, practices, and courses of business which were fraudulent, deceptive, or manipulative, indirectly, negatively affected the maintenance of fair and orderly markets.

206.    Defendant bank and its subsidiaries by engaging in the conduct described above, by the use of the mails or means or instrumentalities of interstate commerce or facilities of national securities exchanges, employed acts or practices in connection with the purchase or sale of any equity security in contravention of rules or regulations adopted by the SEC, consistent with the public interest, the protection of investors, and the maintenance of fair and orderly markets to prescribe means reasonably designed to prevent manipulation of price levels of the equity securities market or a substantial segment thereof under subsection (i) of Section 9 of the Exchange Act [15 U.S. Code § 78i(i)].

207.    It is alleged that any person who has purchased or sold securities at prices which were affected by the said manipulative or deceptive activities and anti-competitive conduct may enforce any liability of bank, who willfully participated in acts in violation of subsection (a)(1)(A) of Section 9 of the Exchange Act [ 15 U.S. Code

§ 78i(a)], and to recover the damages sustained as a result of any such act under subsection (f) of Section 9 of the Exchange Act [ 15 U.S. Code § 78i(f)].

208. The said manipulative or deceptive activities that occurred in connection with the purchase or sale of a security in the United States entitled plaintiffs for private rights of action seeking damages and such other relief as this Court deems necessary or appropriate.

**COUNT SIX: Violations of Section 13(b), Section 15(d) and for enforcement liability pursuant to Section 18(a) of the Exchange Act**

209. Paragraphs through are re-alleged and incorporated by reference as if set forth fully therein.

210. In the alternative to Counts One to Five, if the said "UBS (Bahamas) Ltd Security Trail Contracts" are legal allocated execution reports, between June 13 and September 18, 2013, UBS Bahamas as an agent of Junkanoo Estates Ltd., a company owned by plaintiffs, by the use of means or instrumentality of interstate commerce or of the mails, or of facilities of national securities exchanges purportedly effected, accepted, or facilitated transactions of the purchase or sale of securities in the United States involving the loan in contravention of such rules and regulations as the SEC prescribed as necessary or appropriate in the public interest or for the protection of investors promulgated under subsection (c) of Section 10 of the Exchange Act [15 U.S. Code § 78j(c)], having the actual knowledge of the violation of the provisions of this chapter and  rules or regulations thereunder affecting the legality of such debt, obligation, or lien.

211. It is alleged that when defendant bank claimed to have executed the plaintiffs' orders on a national securities exchange, it is in effect claiming that it has made those transactions available for regulation and oversight of this exchange, which is, for the purpose of this Count, the New York Stock Exchange ("NYSE").

212.    The plaintiffs' orders were *"public customers' orders"* within the meaning of NYSE Rule 112. Orders initiated "Off the Floor." Adopted: May 21, 1964. Amended: July 16, 1964 effective August 3, 1964; September 21, 1967 revised October 19, 1967 effective December 11, 1967; December 11, 1975 effective March 12, 1976; May 18, 1972; August 9, 1976; August 11, 1978; February 1, 1979; June 2, 1983; September 27, 1985; October 26, 1989; May 24, 1991; June 17, 1991; October 1, 2002, effective August 10, 2002 (NYSE-02-31); June 14, 2007 (NYSE-2007-51) of Dealings and Settlements (Rules 45—299C) of the Regulation of the Exchange and its Member Organizations ("NYSE Regulation").

213.    Under NYSE Regulation, the plaintiffs' orders *"must be sent to the Floor through a clearing firm's order room or other facilities regularly used for transmission of public customers' orders to the Floor."* (NYSE Rule 112(a)) *"On the Floor" or "On-Floor" means the trading Floor of the Exchange and the premises immediately adjacent thereto, such as the various entrances and lobbies of the 11 Wall Street, 18 New Street, 8 Broad Street, 12 Broad Street and 18 Broad Street Buildings, and also means the telephone facilities available in these locations."* (NYSE Rule 112(b)) Any of these orders *"deemed to be an off-Floor order, provided (i) that such order is transmitted to the Floor through an order room or other facility regularly used for the transmission of public orders to the Floor, where a time-stamped record of the order is maintained; or (ii) an exception from the order room transmission requirement is available under paragraph (a) of this Rule."* (NYSE Rule 112(d)) These orders were orders to buy (sell) NMS (National Market System) stocks.

214.    The NYSE facilitates trading and brings together potential buyers and sellers to engage in price discovery by developing computer systems, rules, and processes that allow these market participants: (1) to show the level of trading interest and to learn about the eligible contra-side interest, by displaying (a) orders' display prices (""Display price" means the price at which a Limit Order is displayed,

which may be different from the limit price or working price of the order." NYSE Rule 7.36(1)) or (b) orders' limit prices (""Limit price" means the highest (lowest) specified price at which a Limit Order to buy (sell) is eligible to trade." NYSE Rule 7.36(2)) or (c) orders' working prices (""Working price" means the price at which an order is eligible to trade at any given time, which may be different from the limit price or display price of the order." NYSE Rule 7.36(3)), and by assigning to orders working times (""Working time" means the effective time sequence assigned to an order for purposes of determining its priority ranking." NYSE Rule (4)); and (2) to transact with each other, and to determine a market price when a quotation is traded-through, where buy and sell orders, aggregated together, contribute to price discovery, by matching orders for execution against contra-side orders in the Exchange Book. "The term "Exchange Book" refers to the Exchange's electronic file of orders, which contains all orders entered on the Exchange." NYSE Rule 1.1(i).

215.   After orders have been submitted, the NYSE, having a legal obligation to meet its responsibilities under the Exchange Act to provide venues for trading that is orderly and efficient (See, e.g., Exchange Act Sections 6(b)(1) and 6(b)(5); Exchange Act Section 15; Exchange Act Sections 15A(b)(2) and 15A(b)(6); Exchange Act Section 11A(a)(1)(C)), provided to the world two types of real-time quotes and transaction information: (1) market data on the willingness of traders to buy or sell before transactions take place; and (2) market data on transactions that result from the matching of buyers and sellers after executing with eligible contra-side interest on the Exchange Book.

216.   Despite many requests, defendant bank failed to provide any proof that the said transactions were registered on the book or system of the New York Stock Exchange such as, for example, execution reports, as required by NYSE Rule 123(f), setting forth the data elements to be recorded for each execution entered into the same database as required by NYSE Rule 123(e) for the entry of orders.

217.    Defendant bank by engaging in the conduct described above made a negative impact on the public reporting of trade data and trading activity and contributed to the risk of lack of calculation or Dissemination of Underlying Index Value ("UIV") or Intraday Indicative Value ("IIV").

218.    The defendant bank's defaults described above impaired the ability of New York Stock Exchange Regulation., Inc. ("NYSE Regulation" or "NYSER") Division of Market Surveillance ("MKS") to perform certain surveillances and to detect trading in violation of NYSE rules and regulations, such as, for example, NYSE Rule 123(e) and NYSE Rule 123(f), NYSE Information Memo 05-13 and NYSE Information Memo 06-67, and federal securities laws, in efforts to fulfill its regulatory mission to maintain the integrity of the marketplace and protect the investing public.

219.    In particular, defendant bank or its agents failed to provide the details of plaintiffs' orders for transactions in equity securities to Front End Systemic Capture ("FESC") database, thereby corrupting FESC data, which impaired MKS's ability to perform certain surveillances which utilized the FESC data.

220.    As a result, defendant bank, indirectly, by generating or causing exceptions, interfered with the operation of FESC system, which captures and electronically time-stamps all orders (including order modifications and/or cancellations) prior to representation or execution at the point-of-sale, and links the entry of orders with reports of execution after the execution.

221.    In particular, the defendant bank's FESC exceptions that occurred during the class period involved instances in which no execution report was found in FESC database corresponding the plaintiffs' orders because they were not sent or routed to FESC system by any member organization proprietary system used to record the details of orders pursuant to NYSE Rule 123(e).

222.    Also, defendant bank's failure to reasonably supervise and implement adequate

controls, including a separate system of follow-up and review, reasonably designed to achieve compliance with the UBS Securities' FESC obligations, as described above, constitutes a failure to supervise on the part of UBS Securities in violation of NYSE Rule 342.

223. Additionally, defendant bank by engaging in the conduct described above, impaired the functioning of a national system of linked or coordinated facilities established for the prompt and accurate clearance and settlement of transactions in securities under Section 17A of the Exchange Act [U.S. Code § 78q–1 National system for clearance and settlement of securities transactions].

224. By virtue of the violative conduct alleged herein, defendant bank failed to comply with the Recordkeeping and Internal Controls Provisions of subsection (b) of Section 13 of the Exchange Act [15 U.S.C. § 78m(b)], for the purpose of paragraph (2) of this subsection, to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

    224.1.    (i) transactions are executed in accordance with management's general or specific authorization; and

    224.2.    (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements.

225. It is alleged that unknown person or persons in defendant bank or in any of its subsidiaries in the United States or in The Bahamas knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified books, records, or accounts described above and as alleged in Count One of this Complaint.

226. For the purposes of paragraphs (2) and (6) of the said subsection, defendant bank is an issuer which has a class of securities registered pursuant to section 78l of 15 U.S. Code or an issuer which is required to file reports pursuant to subsection

78o(d) of 15 U.S. Code which holds more then 50 per centum of the voting power with respect to UBS Securities, UBS FS, UBS-CM and UBS Bahamas.

227. It is alleged that under the defendant bank's circumstances the Recordkeeping and Internal Controls Provisions of subsection (b) of Section 13 of the Exchange Act [15 U.S.C. § 78m] must be construed as the obligation for defendant bank to exercise its powers of control over the said subsidiaries to ensure that the subsidiary did not fail to comply with the said provisions, in particular with the provisions of paragraph (2) of this subsection.

228. There is a reasonable ground to believe that defendant bank, UBS Securities or UBS FS, a member organization of NYSE, continued and still continue to generate such exceptions from the class period with respect to ordres of other plaintiffs that had or have direct dealings and were or are direct counterparties with any subsidiary or affiliate of defendant bank to transactions in equity securities publicly traded on the NYSE.

229. By virtue of the violative conduct alleged herein, defendant bank failed to comply with the provisions of  Section 13(a) or 15(d) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder in that at least one since 2014 its annual reports, containing the assets, liabilities, capital and major funding sources of the consolidated organization for each year, in particular, the Annual Report for the year ending December 31, 2011, filed with the United States Securities Exchange Commission ("SEC") on 14th April 2014, did not contain then current and accurate information, being certified as required by the rules and regulations of the SEC by independent public accountants; and any securities offering in the United States, during the class period, into which the SEC allowed UBS Group to "incorporate by reference" certain reports and other documents that UBS filed with, or furnished to, the SEC, and which is deemed to form part of this offering even though such information is not physically included therein.

230.    In particular, in the instances mentioned above, there is a reasonable ground to believe that defendant bank failed to furnish, for the purpose of Section 229.301 of Title 17, Code of Federal Regulations [17 CFR § 229.301 - (Item 301) Selected financial data], then current selected financial data which highlight certain significant trends in the registrant's financial condition and results of operations.

231.    By virtue of the violative conduct alleged herein, defendant bank failed to comply with the provision of Section 240.13b2-1 of title 17, Code of Federal Regulations [17 CFR § 240.13b2-1 Falsification of accounting records] in that unknown person or persons in defendant bank, directly or indirectly, falsified or cause to be falsified, books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act.

232.    Additionally, defendant bank failed to comply with the provision of Section 240.13b-2 of title 17, Code of Federal Regulations [17 CFR § 240.13b2-2 Representations and conduct in connection with the preparation of required reports and documents] in that unknown director(s) or officer(s) of defendant bank, or any other person acting under the direction thereof, directly or indirectly:

232.1.    (1) Made or cause to be made a materially false or misleading statement to an accountant in connection with; or

232.2.    (2) Omitted to state, or cause another person to omit to state material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:

232.2.1.    (i) Any audit, review or examination of the financial statements of defendant bank required to be made pursuant to this subpart; or

232.2.2.    (ii) The preparation or filing of any document or report required to be filed with the SEC pursuant to this subpart or otherwise.

232.3.     (3) Took action(s) to coerce, manipulate, mislead, or fraudulently influence independent public or certified public accountants engaged in the performance of an audit or review of the financial statements of defendant bank that are required to be filed with the SEC pursuant to this subpart or otherwise, knowing that such action(s), if successful, could result in rendering the defendant bank's financial statements materially misleading, including, for purposes of paragraph (b)(1) of Section 240.13b-2 of title 17, Code of Federal Regulations, actions that, "if successful, could result in rendering the defendant bank's financial statements materially misleading" include, but are not limited to, actions taken at any time with respect to the professional engagement period to coerce, manipulate, mislead, or fraudulently influence an auditor:

232.3.1.     (iii) Not to withdraw an issued report; or

232.3.2.     (iv) Not to communicate matters to the defendant bank's audit committee.

233.     It is alleged that, for purposes of paragraph (b)(1) of Section 240.13b-2 of title 17, Code of Federal Regulations, at least the following persons "knew or should have known that such action, if successful, could result in rendering the issuer's financial statements materially misleading", who were asked to be notified by plaintiffs for the purpose of Section 302 of the Sarbanes-Oxley Act of 2002 and for the purpose to ascertain their knowing state of mind with regard to the defendant bank's violative conduct under Title 15 of the U.S. Code when it was engaged in securities trading through Execution Desk in The Bahamas on behalf of plaintiffs, in particular, regarding the defendant bank's defaults to comply with the Record of Orders provisions of Rule 123 of NYSE Dealings and Settlements Rules 45—299C regarding plaintiffs' orders for the transactions in equity securities on the New York Stock Exchange ("NYSE") booked at the Booking

Center Bahamas of UBS-CM which were not sent or routed to and represented or executed on this exchange:

233.1.   Beatrice Weder di Mauro;

233.2.   Bernard Sechaud;

233.3.   Isabelle Romy;

233.4.   Sergio Ermotti; and

233.5.   Tom Naratil.

234.   The above named UBS persons were also contacted by plaintiffs for the purpose of pre-action correspondence regarding an eventual application in civil or criminal proceedings against defendant bank.

235.   By virtue of the violative conduct alleged herein, defendant bank failed to comply with the Recordkeeping and Internal Controls Provisions of Section (b) of Section 13 of the Exchange Act [15 U.S.C. § 78m], for the purpose of paragraph (2) of this subsection, to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of defendant bank.

236.   It is alleged that unknown person or persons in defendant bank or in The Bahamas knowingly circumvented or knowingly failed to implement a system of internal accounting controls described above.

237.   For the like reasons as aforesaid, it is alleged that when UBS Bahamas defaulted there was a clear breach by defendant bank in allowing it to do so.

238.   As described in the paragraphs above, defendant bank, who is an issuer which has filed a registration statement containing an undertaking which is or becomes operative under subsection (d) of Section 15 of the Exchange Act [15 U.S. Code § 78o] as in effect prior to August 20, 1964, and an issuer which shall after such

date file a registration statement which has become effective pursuant to the Securities Act of 1933, as amended [15 U.S.C. § 77a et seq.], made or caused to be made in the reports, or documents filed pursuant to this Title or any rule or regulation thereunder or any undertaking contained in registration statements as provided in subsection (d) of Section 15 of this Title were, at the time and in the light of the circumstances under which they were made, false or misleading with respect to certain material facts within the meaning of Section 18 of the Exchange Act [15 U.S. Code § 78r. Liability for misleading statements].

239.   It is alleged that any person (not knowing that such statements were false or misleading) who, in reliance upon such statements, have purchased or sold a security at a price which was affected by such statements may seek to enforce liability of defendant bank under subsection (a) of Section 18 of the Exchange Act [15 U.S. Code § 78r(a)] in this action for damages caused by such reliance, unless defendant bank shall prove that it acted in good faith and had no knowledge that such statements were false or misleading.

## IV. RELIEF

240.   WHEREFORE, the plaintiffs respectfully request that this Court, and grand the following relief:

240.1.   (a) Final Judgment in favour of the plaintiffs finding that the defendant violated the securities laws and rules promulgated thereunder as alleged herein and directing the defendant to pay damages pursuant to Section 21D of the Exchange Act [15 U.S. Code § 78u–4], subsection (f) of Section 9 of the Exchange Act [ 15 U.S. Code § 78i(f)] and subsection (a) of Section 18 of the Exchange Act [15 U.S. Code § 78r(a)];

240.2.   (b) Final Judgment in favour of the plaintiffs finding that there is a constitutional protection for the natural person's right to buy or sell any equity security as alleged herein;

240.3.    (c) Final Judgment in favour of the plaintiffs finding that the defendant unjustly enriched or, in the alternative, breached the implied covenant of good faith and fair dealing as alleged herein and directing the defendant to pay money damages damages;

240.4.    (d) Final Judgment in favour of the plaintiffs finding that the defendant violated the antitrust laws as alleged herein and directing the defendant to pay money damages for antitrust injuries;

240.5.    (e) Such other and further relief as this Court may deem just and appropriate.

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the Complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Respectfully submitted,

_October 18, 2019_
Dated                                         Plaintiff's Signature

_18 October, 2019_
Dated                                         Plaintiff's Signature

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Yuri Starostenko
_____

Irina Tsareva and all others similarly situated
_____

Write the full name of each plaintiff.

**19  CV  9993**

_____CV_____
(Include case number if one has been
assigned)

-against-

UBS AG (A SWISS BANK)
_____

_____

_____

Write the full name of each defendant. If you need more
space, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of
names. The names listed above must be identical to those
contained in Section II.

**COMPLAINT**

Do you want a jury trial?
☐ Yes    ☑ No

2019 OCT 28  AM 9:49
U.S.D. OF N.Y.
RECEIVED
PRO SE OFFICE

---

## NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore *not* contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include *only*: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑   **Federal Question**

☑   **Diversity of Citizenship**

### A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

See paragraphs 13 - 41 of the plaintiffs' complaint (the "Complaint")

### B.   If you checked Diversity of Citizenship

#### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , **Yuri Starostenko** _____ , is a citizen of the State of
(Plaintiff's name)

_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

Italy, resident in The Bahamas _____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

Page 2

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
(Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____ .

If the defendant is a corporation:

The defendant, **UBS AG**_____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) **Switzerland**_____

and has its principal place of business in **Switzerland and worldwide**_____ .

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

| Yuri | | Starostenko |
|------|------|------|
| First Name | Middle Initial | Last Name |

**11 East & Bay Street and see paragraphs 42 - 60 of the Complaint**

Street Address

| Nassau | Bahamas | PO Box SS-5800 |
|------|------|------|
| County, City | State | Zip Code |

| +1(242)817-4372 | starostenkovubsag@gmail.com |
|------|------|
| Telephone Number | Email Address (if available) |

## B.   Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

UBS AG                                          a corporation

First Name                              Last Name

See the Complaint, as described in paragraphs 61 - 90

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                              State                    Zip Code

Defendant 2:

First Name                              Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                              State                    Zip Code

Defendant 3:

First Name                              Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                              State                    Zip Code

Defendant 4:

First Name                              Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                              State                    Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence:   the City of New York, New York, United States

Date(s) of occurrence:   between June 2012 and September 2013

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

See the facts described in paragraphs 104 through 239 of the Complaint

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

As per the injury-in-fact of US$11,281,645.00, see paragraphs 58 and 120 and, as per

antitrust injuries, see paragraphs 171 through 207 of the Complaint.

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

See paragraph 240 of the Complaint.

## V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| October 18, 2019 | |
|---|---|
| Dated | Plaintiff's Signature |
| Yuri | Starostenko |
| First Name            Middle Initial | Last Name |
| 11 East Street & Bay Street | |
| Street Address | |
| Nassau | Bahamas            PO Box SS-5800 |
| County, City | State            Zip Code |
| +1(242)817-4372 | starostenkovubsag@gmail.com |
| Telephone Number | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☑ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

Page 7

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

YURI STAROSTENKO
IRINA TSAREVA,
on behalf of themselves and all others similarly situated,
                                                    Plaintiffs,

          -against-

UBS AG (A SWISS BANK)
                                    Defendant.

**19 CV 9993**

_____ CV _____

### CERTIFICATION

1.   Plaintiffs bring this private action as plaintiffs class action pursuant to the Federal Rules of Civil Procedure.

2.   Plaintiff Yuri Starostenko seeking to serve as a representative party on behalf of classes referred to in the plaintiffs' Complaint provides a sworn certification to be filed with the Complaint pursuant to Section 21D(a) of the Securities Exchange Act of 1934 [15 U.S. Code § 78u–4].

3.   I, Yuri Starostenko, the plaintiff 2 in this action, of New Providence Island of the Commonwealth of The Bahamas, make oath and state that:

4.   I have reviewed the Complaint and authorized its filing;

5.   I did not purchase the security that is the subject of the Complaint at the direction of any counsel or in order to participate in any private action arising under this chapter;

6.   I am willing to serve as a representative party on behalf of the classes, including providing testimony at deposition and trial, if necessary;

7.   The following transactions in the securities that are the subjects of the Complaint during the relevant period were recorded by the defendant in:

7.1.   Statement of Account 32,377/01,00 of Junkanoo Estates Ltd. issued by UBS (Bahamas) Ltd. as of 01.07.2013, attached to this Certification as Exhibit 1; and

7.2.   Statement of Account 32,377/01,00 of Junkanoo Estates Ltd. issued by UBS (Bahamas) Ltd. as of 31.12.2013, attached to this Certification as Exhibit 2;

8.   There is no any other action under this chapter, filed during the 3-year period preceding the date on which this Certification is signed by me, in whichI have sought to serve as a representative party on behalf of any class;

9.   I will not accept any payment for serving as a representative party on behalf of the classes beyond my pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4) of this Section.

SWORN to at New Providence, The Bahamas)

This        day of October, A.D., 2019) _____

Before Me, _____
NOTARY PUBLIC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YURI STAROSTENKO
IRINA TSAREVA,
on behalf of themselves and all others similarly situated,
                              Plaintiffs,

                                                    _____ CV _____

        -against-

UBS AG (A SWISS BANK)
                        Defendant.

I, hereby certify that the exhibits referred to and marked as "Exhibit 1" and "Exhibit 2" in this Certification of Yuri Starostenko sworn herein.

        This            day of October, A.D., 2019.



                                        Before Me,
                                        NOTARY PUBLIC

# CERTIFICATION

# Exhibit 1


**UBS**

UBS (Bahamas) Ltd.
UBS House, East Bay Street
P.O. Box N-7757
Nassau, Bahamas
Tel. +1 242 394 9300
Fax +1 242 394 9333

09/066

Junkanoo Estates Ltd.

RETAINED

Statement of Account
01.01.2013 - 30.06.2013
USD Account

32,377/01,00

Page 1/1

| Value Date | Description | Debit | Credit | USD Balance |
|---|---|---|---|---|
| 31.12.2012 | Balance Brought Forward | | | 715,419.06 |
| 02.01.2013 | Account Transfer | 15,026 76 | | 700,392.30 |
| 28.03.2013 | FEES - ACCOUNT MAINTENANCE FEE | 175.00 | | 700,217.30 |
| 31.03.2013 | Account Transfer | 13,932.33 | | 686,284.97 |
| 18.06.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X  USD 9.5823 | 97,259.84 | | 589,025.13 |
| 19.06.2013 | SOLD 10000 DRXN DLY GLDMN BI3X  USD 9.9994 | | 98,492.60 | 687,517.73 |
| 27.06.2013 | BOUGHT 3000 BARCL IPATH ETN 19   USD 23.0143 | 69,560.79 | | 617,956.94 |
| 28.06.2013 | FEES - ACCOUNT MAINTENANCE FEE | 175.00 | | 617,781.94 |
| 30.06.2013 | Total Debits/Credits | 196,129.72 | 98,492.60 | |

| | Balance | **617,781.94** |
|---|---|---|

**Pending Transactions**

| Value Date | Description | Debit | Credit |
|---|---|---|---|
| 01.07.2013 | ACCOUNT TRANSFER | 14,226.33 | |
| 01.07.2013 | BOUGHT 1200 DIREXION DL SC BL3X  USD 45.6899 | 55,239.09 | |
| 01.07.2013 | SOLD 3000 BARCL IPATH ETN 19   USD 21.6397 | | 64,430.98 |
| 01.07.2013 | SOLD 1200 DIREXION DL SC BL3X  USD 45.5800 | | 54,284.83 |

E. & O.E.

Statements of Account are now available on-line.  For more information please contact your client advisor.

Transactions subject to correction pending collection from paying agent.

# CERTIFICATION

# Exhibit 2



# UBS

UBS (Bahamas) Ltd.
P.O. Box N-7757
Nassau, Bahamas

Tel. (242) 394-9300
Fax (242) 394-9333

# Statement as of 31.12.2013

## Client Information

Name:                NO. 3 2 ' 3 7 7
Portfolio Number:    32377

## Client Investment Profile

Account Currency:    USD

Junkanoo Estates Ltd.

## Important Notes

Please examine this statement and report any discrepancies to us within 30 days.



# UBS

NO. 3 2 ' 3 7 7

Portfolio Number 32377

Statement of Assets as of 31.12.2013

## Table of Contents

| | |
|---|---|
| Valuation | |
| Asset Summary | 3 |
| Account Summary | 4 |
| Performance Details | 5 |
| Detailed Positions | |
| Cash & Money Market | 6 |
| Detailed Transactions | |
| Transactions | 7 |
| Additional Information | |
| Foreign Exchange Rates, Abbreviations and Explanations | 27 |
| Other Information | 28 |

Please examine this statement and report any discrepancies to us within 30 days.

# UBS

## Asset Summary

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

### Summary of Currency as of 31.12.2013

| | Value USD |
|---|---|

### Portfolio Breakdown By Asset Category Group and Currency

| Currency | Cash and Money Market % | Bonds % | Equities % | Real Estate % | Alternative Investments % | Others | Totals % |
|---|---|---|---|---|---|---|---|
| USD | 557,704.26 | | | | | | 557,704.26 |
| USD | 557,704.26 | | | | | | 557,704.26 |
| | 100.00 | | | | | | 100.00 |
| Totals | | | | | | | |
| USD | 557,704.26 | | | | | | 557,704.26 |
| | 100.00 | | | | | | 100.00 |

# UBS

## Account Summary

### Summary of Account as of 31.12.2013

NO. 3 2 ' 3 7 7
Portfolio Number: 3:377
Statement of Assets as of 31.12.2013

#### Asset Allocation

Value USD



Cumulative Performance

#### Portfolio Breakdown

| | Value in USD | % of Portfolio |
|---|---|---|
| ☐ Cash and Money Market | 557,704.26 | 100.00 |
| Total | 557,704.26 | 100.00 |

100.00%

#### Market Indicators

| | QTD | YTD | 1 Yr | 3 Yr | 5 Yr |
|---|---|---|---|---|---|
| DOW JONES INDUS. AVG | 9.56 | 26.50 | 26.50 | 43.18 | 88.88 |
| EURO STOXX 50 INDEX | 7.46 | 17.95 | 17.95 | 11.32 | 27.02 |
| NIKKEI 225 | | | 56.72 | 59.27 | 83.88 |
| S&P/TSX COMPOSITE INDEX | 6.53 | 9.56 | 9.56 | 1.33 | 51.56 |
| BRAZIL BOVESPA INDEX | -1.59 | -15.50 | -15.50 | -25.68 | 37.17 |

#### Quarterly Details

| | |
|---|---|
| Value as of   30.09.2013 | 575,036.76 |
| Withdrawals | 14,520.33 |
| Deposits | |
| Change in Market Value | -2,812.17 |
| Value as of   31.12.2013 | 557,704.26 |
| QTD Performance | -0.50% |

#### Performance Details

| | |
|---|---|
| Portfolio Inception Date* | 01.10.2012 |
| YTD Performance | -12.45% |
| 1 Year Performance | -12.45% |
| 3 Year Annualized Performance | |
| 5 Year Annualized Performance | |
| Cumulative Performance | -14.38% |

* Performance is based on a time-weighted return calculation.

Valuation

# UBS

NO. 3 2 ' 3 7 7
Portfolio Number. 32377
Statement of Assets as of 31.12.2013

## Performance Details

Performance Period 01.10.2012 To 31.12.2013

Value USD

| Period Start | Period Ending | Beginning Value | Withdrawals & Deposits | Change in Market Value | Closing Value | % Change |
|---|---|---|---|---|---|---|
| 01.10.2012 | 31.12.2012 | -637,944.35 | 1,367,420.00 | -14,056.59 | 715,419.06 | -2.20 |
| 01.01.2013 | 31.03.2013 | 715,419.06 | -15,026.76 | -175.00 | 700,217.30 | -0.02 |
| 01.04.2013 | 30.06.2013 | 700,217.30 | -13,932.33 | -5,026.31 | 681,258.66 | -0.73 |
| 01.07.2013 | 30.09.2013 | 681,258.66 | -30,962.13 | -75,259.77 | 575,036.76 | -11.35 |
| 01.10.2013 | 31.12.2013 | 575,036.76 | -14,520.33 | -2,812.17 | 557,704.26 | -0.50 |

Please examine this statement and report any discrepancies to us within 30 days.

# UBS

## Detailed Positions

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

### Cash & Money Market

| Currency | Amount | Description | Avg Cost Price | Book Value | Market Price | Market Value Market Value USD | Unrealized G/L USD | % of Portfolio Acc Int USD |
|---|---|---|---|---|---|---|---|---|
| USD | 557,704.260 | 32,377/01,00 CURRENT ACCOUNT | 100.0000 | | 100.0000 | 557,704.26 557,704.26 | | 100.00 |
| | | Subtotal | | | | 557,704.26 | | 100.00 |
| | | Total | | | | 557,704.26 | | 100.00 |

# UBS

No. 3 2 ' 3 7 7
Portfolio Number 32377
Statement of Assets as of 31.12.2013

## Cash Transactions 31.12.2013

| USD | 0/032,377/01,00 | By Currency & Value Date | | | |
|---|---|---|---|---|---|
| Value Date | CURRENT ACCOUNT | Description | Debit | Credit | Balance |
| | | Balance Brought Forward | 0.00 | | 617,781.94 |
| 01.07.2013 | | SOLD 3000 BARCLIPATH ETN 19   USD 21.6397 | | 64,430.98 | 682,212.92 |
| 01.07.2013 | | BOUGHT 1200 DIREXION DL SC BL3X  USD 45.6899 | 55,239.09 | | 626,973.83 |
| 01.07.2013 | | SOLD 1200 DIREXION DL SC BL3X  USD 45.5800 | | 54,284.83 | 681,258.66 |
| 01.07.2013 | | ACCOUNT TRANSFER | 14,226.33 | | 667,032.33 |
| 19.07.2013 | | SOLD 10000 DRXN DLY GLDMIN BI3X  USD 6.1371 | | 60,909.40 | 727,941.73 |
| 19.07.2013 | | BOUGHT 10000 DRXN DLY GLDMIN BI3X  USD 5.8100 | 58,535.75 | | 669,405.98 |
| 24.07.2013 | | SOLD 10000 DRXN DLY GLDMIN BI3X  USD 6.2000 | | 61,998.92 | 731,404.90 |
| 24.07.2013 | | BOUGHT 10000 DRXN DLY GLDMN BI3X  USD 6.1700 | 61,700.00 | | 669,704.90 |
| 26.07.2013 | | SOLD 1000 PR ULSH 20+Y TR ETF  USD 73.7800 | | 73,778.72 | 743,483.62 |
| 26.07.2013 | | SOLD 10000 DRXN DLY GLDMIN BI3X  USD 8.1600 | | 81,598.58 | 825,082.20 |
| 26.07.2013 | | BOUGHT 10000 DRXN DLY GLDMIN BI3X  USD 8.0499 | 80,499.00 | | 744,583.20 |
| 26.07.2013 | | BOUGHT 1000 PR ULSH 20+Y TR ETF  USD 74.4000 | 74,400.00 | | 670,183.20 |
| 30.07.2013 | | SOLD 10000 DRXN DLY GLDMIN BI3X  USD 7.8339 | | 78,337.64 | 748,520.84 |
| 30.07.2013 | | BOUGHT 10000 DRXN DLY GLDMIN BI3X  USD 7.8100 | 78,100.00 | | 670,420.84 |
| 30.07.2013 | | BOUGHT 10000 DRXN DLY GLDMIN BI3X  USD 7.7173 | 77,173.00 | | 593,247.84 |
| 30.07.2013 | | SOLD 10000 DRXN DLY GLDMIN BI3X  USD 7.6800 | | 76,798.66 | 670,046.50 |
| 31.07.2013 | | SOLD 10000 DRXN DLY GLDMIN BI3X  USD 7.3500 | | 73,498.72 | 743,545.22 |
| 31.07.2013 | | BOUGHT 10000 DRXN DLY GLDMIN BI3X  USD 7.4219 | 74,219.00 | | 669,326.22 |
| 31.07.2013 | | BOUGHT 10000 DRXN DLY GLDMIN BI3X  USD 7.3700 | 73,700.00 | | 595,626.22 |
| 31.07.2013 | | SOLD 10000 DRXN DLY GLDMIN BI3X  USD 7.7398 | | 77,397.08 | 673,023.30 |
| 05.08.2013 | | SOLD 500 DRXN DLY GLDMIN BR3X  USD 79.0000 | | 39,499.31 | 712,522.61 |
| 05.08.2013 | | BOUGHT 500 DRXN DLY GLDMIN BR3X  USD 79.9400 | 39,970.00 | | 672,552.61 |
| 06.08.2013 | | BOUGHT 5000 DRXN DLY GLDMIN BI3X  USD 7.0960 | 35,480.00 | | 637,072.61 |
| 06.08.2013 | | SOLD 5000 DRXN DLY GLDMIN BI3X  USD 6.9400 | | 34,699.40 | 671,772.01 |
| 06.08.2013 | | SOLD 500 DRXN DLY GLDMIN BR3X  USD 80.3221 | | 40,160.36 | 711,932.37 |
| 06.08.2013 | | SOLD 500 DRXN DLY GLDMIN BR3X  USD 81.0500 | | 40,524.29 | 752,456.66 |
| 06.08.2013 | | BOUGHT 500 DRXN DLY GLDMIN BR3X  USD 81.8680 | 40,934.00 | | 711,522.66 |

Please examine this statement and report any discrepancies to us within 30 days.



# UBS

## Cash Transactions 31.12.2013

No. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

**USD     0/032,377/01,00     CURRENT ACCOUNT     By Currency & Value Date**

| Value Date | Description | Debit | Credit | Balance |
|---|---|---|---|---|
| 06.08.2013 | BOUGHT 500 DRXN DLY GLDMN BR3X USD 81.1340 | 40,567.00 | | 670,955.66 |
| 07.08.2013 | SOLD 5000 DRXN DLY GLDMN BI3X USD 6.8901 | | 34,449.65 | 705,405.31 |
| 07.08.2013 | BOUGHT 5000 DRXN DLY GLDMN BI3X USD 6.8700 | 34,350.00 | | 671,055.31 |
| 07.08.2013 | SOLD 500 DRXN DLY GLDMN BR3X USD 86.1000 | | 43,049.25 | 714,104.56 |
| 07.08.2013 | BOUGHT 500 DRXN DLY GLDMN BR3X USD 86.4480 | 43,224.00 | | 670,880.56 |
| 09.08.2013 | SOLD 1000 DRXN DLY GLDMN BI3X USD 5.5200 | | 5,519.90 | 676,400.46 |
| 09.08.2013 | BOUGHT 1000 DRXN DLY GLDMN BI3X USD 5.5000 | 5,500.00 | | 670,900.46 |
| 09.08.2013 | SOLD 1000 DRXN DLY GLDMN BR3X USD 102.4040 | | 102,402.22 | 773,302.68 |
| 09.08.2013 | SOLD 1000 DRXN DLY GLDMN BR3X USD 102.6434 | | 102,641.56 | 875,944.24 |
| 09.08.2013 | BOUGHT 1000 DRXN DLY GLDMN BR3X USD 101.5128 | 101,512.80 | | 774,431.44 |
| 09.08.2013 | BOUGHT 1000 DRXN DLY GLDMN BR3X USD 102.7000 | 102,700.00 | | 671,731.44 |
| 12.08.2013 | SOLD 1000 DRXN DLY GLDMN BR3X USD 101.1520 | | 101,150.24 | 772,881.68 |
| 12.08.2013 | BOUGHT 1000 DRXN DLY GLDMN BR3X USD 103.1580 | 103,158.00 | | 669,723.68 |
| 14.08.2013 | SOLD 10000 DRXN DLY GLDMN BI3X USD 6.3772 | | 63,770.97 | 733,494.65 |
| 14.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 6.4854 | 64,854.30 | | 668,640.35 |
| 14.08.2013 | SOLD 10000 DRXN DLY GLDMN BI3X USD 6.7609 | | 67,607.84 | 736,248.19 |
| 14.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 6.8951 | 68,951.49 | | 667,296.70 |
| 14.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 6.8400 | 68,400.00 | | 598,896.70 |
| 14.08.2013 | SOLD 10000 DRXN DLY GLDMN BI3X USD 6.9890 | | 69,888.78 | 668,785.48 |
| 15.08.2013 | SOLD 10000 DRXN DLY GLDMN BI3X USD 7.5900 | | 75,898.68 | 744,684.16 |
| 15.08.2013 | SOLD 10000 DRXN DLY GLDMN BI3X USD 7.7600 | | 77,598.65 | 822,282.81 |
| 15.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 7.7300 | 77,299.75 | | 744,983.06 |
| 15.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 7.7300 | 77,300.00 | | 667,683.06 |
| 19.08.2013 | SOLD 10000 DRXN DLY GLDMN BI3X USD 8.2400 | | 82,398.57 | 750,081.63 |
| 19.08.2013 | SOLD 10000 DRXN DLY GLDMN BI3X USD 8.1600 | | 81,598.58 | 831,680.21 |
| 19.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 8.3000 | 83,000.00 | | 748,680.21 |
| 19.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 8.2600 | 82,600.00 | | 666,080.21 |
| 19.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 8.2557 | 82,556.50 | | 583,523.71 |

Please examine this statement and report any discrepancies to us within 30 days.

Detailed Transactions



# UBS

NO 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Cash Transactions 31.12.2013

**USD    0/032,377/01,00    By Currency & Value Date**

| Value Date | | Description | Debit | Credit | Balance |
|---|---|---|---|---|---|
| | CURRENT ACCOUNT | | | | |
| 19.08.2013 | | SOLD 10000 DRXN DLY GLDMN Bl3x  USD 8.3300 | | 83,298.55 | 666,822.26 |
| 21.08.2013 | | SOLD 20000 DRXN DLY GLDMN Bl3x  USD 9.8101 | | 196,198.09 | 863,020.35 |
| 21.08.2013 | | BOUGHT 10000 DRXN DLY GLDMN Bl3x  USD 9.5523 | 95,523.00 | | 767,497.35 |
| 21.08.2013 | | BOUGHT 10000 DRXN DLY GLDMN Bl3x  USD 9.7531 | 97,531.00 | | 669,966.35 |
| 22.08.2013 | | SOLD 10000 DRXN DLY GLDMN Bl3x  USD 9.1232 | | 91,230.17 | 761,196.52 |
| 22.08.2013 | | BOUGHT 10000 DRXN DLY GLDMN Bl3x  USD 9.2800 | 92,800.00 | | 668,396.52 |
| 22.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 9.0500 | 9,050.00 | | 659,346.52 |
| 23.08.2013 | | BOUGHT 324 DRXN DLY GLDMN Bl3x USD 94.0000 | 30,456.00 | | 628,890.52 |
| 23.08.2013 | | SOLD 1324 DRXN DLY GLDMN Bl3x  USD 95.2042 | | 126,048.13 | 754,938.65 |
| 23.08.2013 | | BOUGHT 500 DRXN DLY GLDMN Bl3x USD 94.9240 | 47,462.00 | | 707,476.65 |
| 23.08.2013 | | BOUGHT 100 DRXN DLY GLDMN Bl3x  USD 96.8800 | 9,688.00 | | 697,788.65 |
| 23.08.2013 | | BOUGHT 100 DRXN DLY GLDMN Bl3x  USD 97.0000 | 9,700.00 | | 688,088.65 |
| 23.08.2013 | | BOUGHT 100 DRXN DLY GLDMN Bl3x  USD 97.2500 | 9,725.00 | | 678,363.65 |
| 23.08.2013 | | BOUGHT 400 DRXN DLY GLDMN Bl3x USD 96.0000 | 38,400.00 | | 639,963.65 |
| 23.08.2013 | | SOLD 300 DRXN DLY GLDMN Bl3x  USD 97.4000 | | 29,219.49 | 669,183.14 |
| 26.08.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3X USD 24.0000 | | 23,999.58 | 693,182.72 |
| 26.08.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x  USD 91.7057 | | 91,704.10 | 784,886.82 |
| 26.08.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x  USD 90.8700 | | 90,868.42 | 875,755.24 |
| 26.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3X USD 24.4000 | 24,400.00 | | 851,355.24 |
| 26.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 93.0000 | 93,000.00 | | 758,355.24 |
| 26.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 93.6390 | 93,639.00 | | 664,716.24 |
| 26.08.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x  USD 91.0000 | | 90,998.42 | 755,714.66 |
| 26.08.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x  USD 91.1740 | | 91,172.41 | 846,887.07 |
| 26.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 91.7740 | 91,774.00 | | 755,113.07 |
| 26.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 91.1100 | 91,110.00 | | 664,003.07 |
| 26.08.2013 | | SOLD -1000 DRXN DLY GLDMN Bl3x  USD 90.8700 | | -90,868.42 | 573,134.65 |
| 26.08.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x USD 92.5000 | | 92,498.42 | 665,633.07 |
| 28.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 95.6338 | 95,633.84 | | 569,999.23 |

Please examine this statement and report any discrepancies to us within 30 days.

Detailed Transactions



# UBS

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Cash Transactions 31.12.2013

| USD | 0/032,377/01,00 | By Currency & Value Date | | | |
|---|---|---|---|---|---|
| Value Date | CURRENT ACCOUNT | Description | Debit | Credit | Balance |
| 28.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 95.0000 | 95,000.00 | | 474,999.23 |
| 28.08.2013 | | SOLD 2000 DRXN DLY GLDMN Bl3x USD 95.5566 | | 191,109.91 | 666,109.14 |
| 28.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 96.5880 | 96,588.00 | | 569,521.14 |
| 28.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 96.3158 | 96,315.75 | | 473,205.39 |
| 29.08.2013 | | SOLD 2000 DRXN DLY GLDMN Bl3x USD 95.9478 | | 191,892.36 | 665,097.75 |
| 29.08.2013 | | SOLD -2000 DRXN DLY GLDMN Bl3x USD 95.9478 | | -191,892.36 | 473,205.39 |
| 29.08.2013 | | SOLD 2000 DRXN DLY GLDMN Bl3x USD 96.6800 | | 193,356.66 | 666,562.05 |
| 30.08.2013 | | CASH WITHDRAWAL | 2,460.00 | | 664,102.05 |
| 03.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X USD 24.2346 | 121,173.00 | | 542,929.05 |
| 03.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X USD 24.6847 | 123,423.40 | | 419,505.65 |
| 03.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X USD 25.2212 | 126,106.04 | | 293,399.61 |
| 03.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X USD 25.3250 | 126,624.90 | | 166,774.71 |
| 03.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X USD 25.4322 | 127,161.00 | | 39,613.71 |
| 03.09.2013 | | SOLD 10000 DRXN DLY GLDMN BR3X USD 26.4794 | | 264,789.64 | 304,403.35 |
| 03.09.2013 | | SOLD 15000 DRXN DLY GLDMN BR3X USD 26.3729 | | 395,586.91 | 699,990.26 |
| 06.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 79.9240 | 79,924.00 | | 620,066.26 |
| 06.09.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x USD 79.9020 | | 79,898.61 | 699,964.87 |
| 10.09.2013 | | BOUGHT 1000 DRXN DLY FIN BULL3X USD 66.6230 | 66,623.00 | | 633,341.87 |
| 10.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X USD 28.1000 | 140,500.00 | | 492,841.87 |
| 10.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X USD 28.2744 | 141,372.00 | | 351,469.87 |
| 10.09.2013 | | SOLD 10000 DRXN DLY GLDMN BR3X USD 27.8000 | | 277,995.16 | 629,465.03 |
| 10.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X USD 28.4810 | 142,405.00 | | 487,060.03 |
| 10.09.2013 | | SOLD 5000 DRXN DLY GLDMN BR3X USD 28.1666 | | 140,830.55 | 627,890.58 |
| 10.09.2013 | | SOLD 1000 DRXN DLY FIN BULL3X USD 65.8771 | | 65,875.95 | 693,766.53 |
| 10.09.2013 | | BOUGHT 2000 DIREXION DL SC BL3X USD 55.3460 | 110,692.00 | | 583,074.53 |
| 10.09.2013 | | SOLD 2000 DIREXION DL SC BL3X USD 55.2055 | | 110,409.08 | 693,483.61 |
| 11.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 74.3330 | 74,333.00 | | 619,150.61 |
| 11.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 74.4320 | 74,432.00 | | 544,718.61 |

Please examine this statement and report any discrepancies to us within 30 days.

Detailed Transactions



# UBS

NO 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Cash Transactions 31.12.2013

**USD   0/032,377/01,00   CURRENT ACCOUNT   By Currency & Value Date**

| Value Date | Description | Debit | Credit | Balance |
|---|---|---|---|---|
| 11.09.2013 | SOLD 1000 DRXN DLY GLDMN Bl3x  USD 73.8400 | | 73,838.72 | 618,557.33 |
| 11.09.2013 | SOLD 1000 DRXN DLY GLDMN Bl3x  USD 73.8170 | | 73,815.72 | 692,373.05 |
| 11.09.2013 | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.1005 | 74,100.50 | | 618,272.55 |
| 11.09.2013 | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.6456 | 74,645.60 | | 543,626.95 |
| 11.09.2013 | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.7990 | 74,799.01 | | 468,827.94 |
| 11.09.2013 | SOLD 3000 DRXN DLY GLDMN Bl3x  USD 74.4825 | | 223,443.61 | 692,271.55 |
| 12.09.2013 | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.4980 | 74,498.00 | | 617,773.55 |
| 12.09.2013 | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.5430 | 74,543.00 | | 543,230.55 |
| 12.09.2013 | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.6535 | 74,653.50 | | 468,577.05 |
| 12.09.2013 | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.6990 | 74,699.00 | | 393,878.05 |
| 12.09.2013 | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.9435 | 74,943.50 | | 318,934.55 |
| 12.09.2013 | SOLD 5000 DRXN DLY GLDMN Bl3x  USD 73.9556 | | 369,771.57 | 688,706.12 |
| 13.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.0663 | 124,265.00 | | 564,441.12 |
| 13.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.0990 | 124,396.00 | | 440,045.12 |
| 13.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.1809 | 124,723.61 | | 315,321.51 |
| 13.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.2000 | 124,800.00 | | 190,521.51 |
| 13.09.2013 | SOLD 16000 DRXN DLY GLDMN BR3X  USD 31.0777 | | 497,234.36 | 687,755.87 |
| 16.09.2013 | BOUGHT 5000 DRXN DLY GLDMN BR3X  USD 33.0615 | 165,307.40 | | 522,448.47 |
| 16.09.2013 | SOLD 5000 DRXN DLY GLDMN BR3X  USD 32.7813 | | 163,903.43 | 686,351.90 |
| 16.09.2013 | BOUGHT 5000 DRXN DLY GLDMN BR3X  USD 32.4168 | 162,084.00 | | 524,267.90 |
| 16.09.2013 | SOLD 5000 DRXN DLY GLDMN BR3X  USD 32.4536 | | 162,265.18 | 686,533.08 |
| 16.09.2013 | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 63.3450 | 63,345.00 | | 623,188.08 |
| 16.09.2013 | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 63.4896 | 63,489.60 | | 559,698.48 |
| 16.09.2013 | SOLD 1000 DRXN DLY GLDMN Bl3x  USD 63.3620 | | 63,360.90 | 623,059.38 |
| 16.09.2013 | SOLD 1000 DRXN DLY GLDMN Bl3x  USD 63.2800 | | 63,278.90 | 686,338.28 |
| 16.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.6110 | 126,444.00 | | 559,894.28 |
| 16.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.4800 | 125,920.00 | | 433,974.28 |
| 16.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.9163 | 127,665.00 | | 306,309.28 |



NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

# Cash Transactions 31.12.2013

| USD | 0/032,377/01,00 | By Currency & Value Date | | | |
|---|---|---|---|---|---|
| Value Date | CURRENT ACCOUNT | Description | Debit | Credit | Balance |
| 16.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 32.2360 | 128,944.00 | | 177,365.28 |
| 16.09.2013 | | SOLD 9000 DRXN DLY GLDMN BR3X USD 31.9600 | | 287,635.00 | 465,000.28 |
| 16.09.2013 | | SOLD 7000 DRXN DLY GLDMN BR3X USD 31.6680 | | 221,672.14 | 686,672.42 |
| 16.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 31.9715 | 127,886.00 | | 558,786.42 |
| 16.09.2013 | | SOLD 4000 DRXN DLY GLDMN BR3X USD 31.8233 | | 127,290.79 | 686,077.21 |
| 17.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 34.6975 | 138,790.00 | | 547,287.21 |
| 17.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 34.6975 | 138,790.00 | | 408,497.21 |
| 17.09.2013 | | SOLD 8000 DRXN DLY GLDMN BR3X USD 34.7939 | | 278,346.55 | 686,843.76 |
| 17.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 34.7980 | 139,192.00 | | 547,651.76 |
| 17.09.2013 | | SOLD 4000 DRXN DLY GLDMN BR3X USD 34.7780 | | 139,109.58 | 686,761.34 |
| 17.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.2020 | 140,808.10 | | 545,953.24 |
| 17.09.2013 | | SOLD 4000 DRXN DLY GLDMN BR3X USD 35.1998 | | 140,796.55 | 686,749.79 |
| 17.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.2016 | 140,806.57 | | 545,943.22 |
| 17.09.2013 | | SOLD 4000 DRXN DLY GLDMN BR3X USD 35.2827 | | 141,128.18 | 687,071.40 |
| 18.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN BI3x USD 55.8588 | 55,858.75 | | 631,212.65 |
| 18.09.2013 | | SOLD 1000 DRXN DLY GLDMN BI3x USD 55.7770 | | 55,776.03 | 686,988.68 |
| 18.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN BI3x USD 55.1375 | 55,137.50 | | 631,851.18 |
| 18.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN BI3x USD 55.1840 | 55,184.00 | | 576,667.18 |
| 18.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN BI3x USD 55.3090 | 55,309.00 | | 521,358.18 |
| 18.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BI3x USD 55.3900 | 276,949.90 | | 244,408.28 |
| 18.09.2013 | | SOLD 8000 DRXN DLY GLDMN BI3x USD 55.2086 | | 441,661.46 | 686,069.74 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.6010 | 142,404.00 | | 543,665.74 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.6400 | 142,560.00 | | 401,105.74 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.6530 | 142,612.00 | | 258,493.74 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.7395 | 142,958.00 | | 115,535.74 |
| 18.09.2013 | | SOLD 16000 DRXN DLY GLDMN BR3X USD 35.4698 | | 567,506.37 | 683,042.11 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.8208 | 143,283.00 | | 539,759.11 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.8233 | 143,293.00 | | 396,466.11 |

Please examine this statement and report any discrepancies to us within 30 days.

Detailed Transactions



# Cash Transactions 31.12.2013

NO. 3 2 · 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

**USD   0/032,377/01,00   By Currency & Value Date**

| Value Date | CURRENT ACCOUNT Description | Debit | Credit | Balance |
|---|---|---|---|---|
| 18.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.9400 | 143,760.00 | | 252,706.11 |
| 18.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.9003 | 143,601.00 | | 109,105.11 |
| 18.09.2013 | SOLD 16200 DRXN DLY GLDMN BR3X USD 35.7517 | | 572,017.06 | 681,122.17 |
| 18.09.2013 | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 54.8607 | 54,860.65 | | 626,261.52 |
| 18.09.2013 | SOLD 1000 DRXN DLY GLDMN Bl3x USD 54.6250 | | 54,624.05 | 680,885.57 |
| 18.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.9433 | 143,773.00 | | 537,112.57 |
| 18.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 36.0100 | 144,040.00 | | 393,072.57 |
| 18.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 36.3620 | 145,448.00 | | 247,624.57 |
| 18.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 36.4623 | 145,849.00 | | 101,775.57 |
| 18.09.2013 | SOLD 12000 DRXN DLY GLDMN BR3X USD 36.5139 | | 438,158.82 | 539,934.39 |
| 18.09.2013 | SOLD 4000 DRXN DLY GLDMN BR3X USD 36.4266 | | 145,703.86 | 685,638.25 |
| 18.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 36.9893 | 147,957.00 | | 537,681.25 |
| 18.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 37.0855 | 148,342.00 | | 389,339.25 |
| 18.09.2013 | SOLD 4000 DRXN DLY GLDMN BR3X USD 37.0000 | | 147,997.42 | 537,336.67 |
| 18.09.2013 | SOLD 2120 DRXN DLY GLDMN BR3X USD 37.1828 | | 78,826.23 | 616,162.90 |
| 18.09.2013 | SOLD 1860 DRXN DLY GLDMN BR3X USD 36.9929 | | 68,805.60 | 684,968.50 |
| 18.09.2013 | SOLD 20 DRXN DLY GLDMN BR3X USD 36.9000 | | 737.99 | 685,706.49 |
| 19.09.2013 | BOUGHT 2000 DRXN DLY GLDMN Bl3x USD 57.8665 | 115,733.00 | | 569,973.49 |
| 19.09.2013 | BOUGHT 2000 DRXN DLY GLDMN Bl3x USD 56.0995 | 112,199.00 | | 457,774.49 |
| 19.09.2013 | SOLD 2000 DRXN DLY GLDMN Bl3x USD 56.6904 | | 113,378.85 | 571,153.34 |
| 19.09.2013 | SOLD 2000 DRXN DLY GLDMN Bl3x USD 57.3000 | | 114,598.01 | 685,751.35 |
| 19.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 34.2553 | 137,021.00 | | 548,730.35 |
| 19.09.2013 | SOLD 4000 DRXN DLY GLDMN BR3X USD 33.9000 | | 135,597.64 | 684,327.99 |
| 19.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 34.6566 | 138,626.50 | | 545,701.49 |
| 19.09.2013 | SOLD 4000 DRXN DLY GLDMN BR3X USD 35.0000 | | 139,997.56 | 685,699.05 |
| 19.09.2013 | CHEQUE ISSUANCE | 14,275.80 | | 671,423.25 |
| 19.09.2013 | FEES CHEQUE ISSUANCE | 50.00 | | 671,373.25 |
| 20.09.2013 | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.1660 | 140,664.00 | | 530,709.25 |

Please examine this statement and report any discrepancies to us within 30 days.

Detailed Transactions



# UBS

NO 3 2 · 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Cash Transactions 31.12.2013

| USD | 0/032,377/01,00 | By Currency & Value Date | | | |
|---|---|---|---|---|---|
| Value Date | CURRENT ACCOUNT | Description | Debit | Credit | Balance |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.1167 | 140,466.72 | | 390,242.53 |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.1818 | 140,727.00 | | 249,515.53 |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.2000 | 140,800.00 | | 108,715.53 |
| 20.09.2013 | | SOLD 16000 DRXN DLY GLDMN BR3X USD 35 0486 | | 560,768.24 | 669,483.77 |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.6248 | 142,499.00 | | 526,984.77 |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.6403 | 142,561.00 | | 384,423.77 |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.5400 | 142,160.00 | | 242,263.77 |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.4942 | 141,976.95 | | 100,286.82 |
| 23.09.2013 | | SOLD 8000 DRXN DLY GLDMN BR3X USD 30.0848 | | 240,673.81 | 340,960.63 |
| 23.09.2013 | | SOLD 8000 DRXN DLY GLDMN BR3X USD 29.6820 | | 237,451.87 | 578,412.50 |
| 30.09.2013 | | FEES – ALL IN FEE | 3,375.74 | | 575,036.76 |
| 10.10.2013 | | Account Transfer re coverage of | 14,520.33 | | 560,516.43 |
| 30.12.2013 | | FEES – ALL IN FEE | 2,812.17 | | 557,704.26 |
| 31.12.2013 | | **Total Debit/Credits** | **11,603,361.34** | **11,543,283.66** | **557,704.26** |
| 31.12.2013 | | **Closing Balance** | | | **557,704.26** |

Please examine this statement and report any discrepancies to us within 30 days.

# UBS

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Security Transactions 31.12.2013

By Currency & Value Date

**USD**

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 26.06.2013 / 01.07.2013 | PURCHASE US25459W8477 | 1,200.0000 DIREXION DAILY SMALL CAP BULL | 45.69 | 54,827.88 | 411.21 | | |
| 26.06.2013 / 01.07.2013 | SALE US25459W8477 | 1,200.0000 DIREXION DAILY SMALL CAP BULL | 45.58 | 54,696.00 | 410.22 | | 0.95 |
| 26.06.2013 / 01.07.2013 | SALE US0674OC1889 | 3,000.0000 IPATH ETN BARCLAYS BANK S&P 500 VIX 30 JAN 2019 | 21.64 | 64,919.00 | 486.89 | | 1.13 |
| 16.07.2013 / 19.07.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 5.81 | 58,100.00 | 435.75 | | |
| 16.07.2013 / 19.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.14 | 61,370.75 | 460.28 | | 1.07 |
| 19.07.2013 / 24.07.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.17 | 61,700.00 | | | |
| 19.07.2013 / 24.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.20 | 62,000.00 | | | 1.08 |
| 23.07.2013 / 26.07.2013 | PURCHASE US74347B2016 | 1,000.0000 PROSHARES TRUST SHS ULTRASHORT 20+YR TRE | 74.40 | 74,400.00 | | | |
| 23.07.2013 / 26.07.2013 | SALE US74347B2016 | 1,000.0000 PROSHARES TRUST SHS ULTRASHORT 20+YR TRE | 73.78 | 73,780.00 | | | 1.28 |
| 23.07.2013 / 26.07.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 8.05 | 80,499.00 | | | |
| 23.07.2013 / 26.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 8.16 | 81,600.00 | | | 1.42 |
| 25.07.2013 / 30.07.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.81 | 78,100.00 | | | |
| 25.07.2013 / 30.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.72 | 77,173.00 | | | |
| 25.07.2013 / 30.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.83 | 78,339.00 | | | 1.36 |
| 25.07.2013 / 30.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.68 | 76,800.00 | | | 1.34 |
| 26.07.2013 / 31.07.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.37 | 73,700.00 | | | |
| 26.07.2013 / 31.07.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.42 | 74,219.00 | | | |

Please examine this statement and report any discrepancies to us within 30 days.





**UBS**

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

# Security Transactions 31.12.2013

## USD

By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fee/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 26.07.2013 31.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.35 | 73,500.00 | | | 1.28 |
| 26.07.2013 31.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.74 | 77,398.43 | | | 1.35 |
| 31.07.2013 05.08.2013 | PURCHASE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 79.94 | 39,970.00 | | | |
| 31.07.2013 05.08.2013 | SALE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 79.00 | 39,500.00 | | | 0.69 |
| 01.08.2013 06.08.2013 | PURCHASE US25459Y4961 | 5,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.10 | 35,480.00 | | | |
| 01.08.2013 06.08.2013 | SALE US25459Y4961 | 5,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.94 | 34,700.00 | | | 0.60 |
| 01.08.2013 06.08.2013 | PURCHASE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 81.87 | 40,934.00 | | | |
| 01.08.2013 06.08.2013 | SALE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 81.13 | 40,567.00 | | | 0.71 |
| 01.08.2013 06.08.2013 | SALE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 81.05 | 40,525.00 | | | |
| 01.08.2013 06.08.2013 | SALE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 80.32 | 40,161.06 | | | 0.70 |
| 02.08.2013 07.08.2013 | PURCHASE US25459Y4961 | 5,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.87 | 34,350.00 | | | |
| 02.08.2013 07.08.2013 | SALE US25459Y4961 | 5,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.89 | 34,450.25 | | | 0.60 |
| 02.08.2013 07.08.2013 | SALE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 86.45 | 43,224.00 | | | |
| 02.08.2013 07.08.2013 | SALE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 86.10 | 43,050.00 | | | 0.75 |
| 06.08.2013 09.08.2013 | PURCHASE US25459Y4961 | 1,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 5.50 | 5,500.00 | | | |
| 06.08.2013 09.08.2013 | SALE US25459Y4961 | 1,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 5.52 | 5,520.00 | | | 0.10 |
| 06.08.2013 09.08.2013 | PURCHASE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 102.70 | 102,700.00 | | | |

Please examine this statement and report any discrepancies to us within 30 days.

**UBS**

NO. 3 2' 3 7 7
Portfolio Number 32377
Statement of Assets as of 31.12.2013

# Security Transactions 31.12.2013

## USD

By Currency & Value Date

| Trade Date Value Date | Transaction Type | Quantity Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 06.08.2013 09.08.2013 | PURCHASE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 101.51 | 101,512.80 | | | 1.78 |
| 06.08.2013 09.08.2013 | SALE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 102.40 | 102,404.00 | | | |
| 06.08.2013 09.08.2013 | SALE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 102.64 | 102,643.35 | | | 1.79 |
| 07.08.2013 12.08.2013 | PURCHASE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 103.16 | 103,158.00 | | | |
| 07.08.2013 12.08.2013 | SALE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 101.15 | 101,152.00 | | | 1.76 |
| 09.08.2013 14.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.49 | 64,854.30 | | | |
| 09.08.2013 14.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.90 | 68,951.49 | | | |
| 09.08.2013 14.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.84 | 68,400.00 | | | |
| 09.08.2013 14.08.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.76 | 57,609.02 | | | 1.18 |
| 09.08.2013 14.08.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.38 | 63,772.08 | | | 1.11 |
| 09.08.2013 14.08.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.99 | 69,890.00 | | | 1.22 |
| 12.08.2013 15.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.73 | 77,299.75 | | | |
| 12.08.2013 15.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.73 | 77,300.00 | | | |
| 12.08.2013 15.08.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.76 | 77,600.00 | | | 1.35 |
| 12.08.2013 15.08.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.59 | 75,900.00 | | | 1.32 |
| 14.08.2013 19.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 8.26 | 82,600.00 | | | |
| 14.08.2013 19.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 8.30 | 83,000.00 | | | |

Please examine this statement and report any discrepancies to us within 30 days.

Detailed Transactions                Page 17 of 28

# Security Transactions 31.12.2013

NO. 32`377
Portfolio Number 32377
Statement of Assets as of 31.12.2013

## USD

By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 14.08.2013 / 19.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 8.26 | 82,556.50 | | | |
| 14.08.2013 / 19.08.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 8.33 | 83,300.00 | | | 1.45 |
| 14.08.2013 / 19.08.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 8.16 | 81,600.00 | | | 1.42 |
| 14.08.2013 / 19.08.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 8.24 | 82,400.00 | | | 1.43 |
| 20.08.2013 / 20.08.2013 | REVERSE SPLIT US25459Y4961 | 1,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 9.26 | | | | |
| 20.08.2013 / 20.08.2013 | REVERSE SPLIT US25459Y3898 | 100.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 92.59 | | | | |
| 16.08.2013 / 21.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 9.75 | 97,531.00 | | | |
| 16.08.2013 / 21.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 9.55 | 95,523.00 | | | |
| 16.08.2013 / 21.08.2013 | SALE US25459Y4961 | 20,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 9.81 | 196,201.50 | | | 3.41 |
| 19.08.2013 / 22.08.2013 | PURCHASE US25459Y4961 | 1,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 9.05 | 9,050.00 | | | |
| 19.08.2013 / 22.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 9.28 | 92,800.00 | | | |
| 19.08.2013 / 22.08.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 9.12 | 91,231.76 | | | 1.59 |
| 20.08.2013 / 23.08.2013 | PURCHASE US25459Y3898 | 100.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 97.00 | 9,700.00 | | | |
| 20.08.2013 / 23.08.2013 | PURCHASE US25459Y3898 | 100.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 97.25 | 9,725.00 | | | |
| 20.08.2013 / 23.08.2013 | PURCHASE US25459Y3898 | 100.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 96.88 | 9,688.00 | | | |
| 20.08.2013 / 23.08.2013 | PURCHASE US25459Y3898 | 400.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 96.00 | 38,400.00 | | | |
| 20.08.2013 / 23.08.2013 | PURCHASE US25459Y3898 | 324.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 94.00 | 30,456.00 | | | |

# UBS

## Security Transactions 31.12.2013

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

**USD** — By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 20.08.2013 / 23.08.2013 | PURCHASE US25459Y3898 | 500.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 94.92 | 47,462.00 | | | |
| 20.08.2013 / 23.08.2013 | SALE US25459Y3898 | 300.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 97.40 | 29,220.00 | | | 0.51 |
| 20.08.2013 / 23.08.2013 | SALE US25459Y3898 | 1,324.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 95.20 | 126,050.32 | | | 2.19 |
| 21.08.2013 / 26.08.2013 | PURCHASE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 24.40 | 24,400.00 | | | |
| 21.08.2013 / 26.08.2013 | SALE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 24.00 | 24,000.00 | | | 0.42 |
| 21.08.2013 / 26.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 93.00 | 93,000.00 | | | |
| 21.08.2013 / 26.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 91.77 | 91,774.00 | | | |
| 21.08.2013 / 26.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 91.11 | 91,110.00 | | | |
| 21.08.2013 / 26.08.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 91.00 | 91,000.00 | | | 1.58 |
| 21.08.2013 / 26.08.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 91.17 | 91,174.00 | | | 1.59 |
| 21.08.2013 / 26.08.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 91.71 | 91,705.70 | | | 1.60 |
| 21.08.2013 / 26.08.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 92.50 | 92,500.00 | | | 1.58 |
| 21.08.2013 / 26.08.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 90.87 | 90,870.00 | | | 1.58 |
| 21.08.2013 / 26.08.2013 | SALE US25459Y3898 | -1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 90.87 | -90,870.00 | | | -1.58 |
| 21.08.2013 / 26.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 93.64 | 93,639.00 | | | |
| 23.08.2013 / 28.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 95.00 | 95,000.00 | | | |
| 23.08.2013 / 28.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 96.59 | 96,588.00 | | | |

Please examine this statement and report any discrepancies to us within 30 days.

# UBS

NO. 3 2 · 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Security Transactions 31.12.2013

**USD**   By Currency & Value Date

| Trade Date / Value Date | Transaction Type / Description | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 23.08.2013 / 28.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 95.63 | 95,633.84 | | | |
| 23.08.2013 / 28.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 96.32 | 96,315.75 | | | |
| 23.08.2013 / 28.08.2013 | SALE US25459Y3898 | 2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 95.56 | 191,113.24 | | | 3.33 |
| 26.08.2013 / 29.08.2013 | SALE US25459Y3898 | 2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 96.68 | 193,360.00 | | | 3.34 |
| 26.08.2013 / 29.08.2013 | SALE US25459Y3898 | 2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 95.95 | 191,895.70 | | | 3.34 |
| 26.08.2013 / 29.08.2013 | SALE US25459Y3898 | -2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 95.95 | -191,895.70 | | | -3.34 |
| 28.08.2013 / 03.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 24.23 | 121,173.00 | | | |
| 28.08.2013 / 03.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 25.32 | 126,624.90 | | | |
| 28.08.2013 / 03.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 24.68 | 123,423.40 | | | |
| 28.08.2013 / 03.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 25.43 | 127,161.00 | | | |
| 28.08.2013 / 03.09.2013 | SALE US25459W2355 | 15,000.0000 DIREXION SHARES ETF TRUST | 26.37 | 395,593.79 | | | 6.88 |
| 28.08.2013 / 03.09.2013 | SALE US25459W2355 | 10,000.0000 DIREXION SHARES ETF TRUST | 26.48 | 264,794.25 | | | 4.61 |
| 28.08.2013 / 03.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 25.22 | 126,106.04 | | | |
| 03.09.2013 / 06.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 79.92 | 79,924.00 | | | |
| 03.09.2013 / 06.09.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 79.90 | 79,900.00 | | | 1.39 |
| 05.09.2013 / 10.09.2013 | PURCHASE US25459W8477 | 2,000.0000 DIREXION DAILY SMALL CAP BULL | 55.35 | 110,692.00 | | | |
| 05.09.2013 / 10.09.2013 | SALE US25459W8477 | 2,000.0000 DIREXION DAILY SMALL CAP BULL | 55.21 | 110,411.00 | | | 1.92 |

Please examine this statement and report any discrepancies to us within 30 days.

Detailed Transactions   Page 20 of 28



# ✳ UBS

NO. 3 2 ´ 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Security Transactions 31.12.2013

**USD**

By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 05.09.2013 / 10.09.2013 | PURCHASE / US25459Y6941 | 1,000.0000 / DIREXION SHARES ETF TRUST | 66.62 | 66,623.00 | | | |
| 05.09.2013 / 10.09.2013 | SALE / US25459Y6941 | 1,000.0000 / DIREXION SHARES ETF TRUST | 65.88 | 65,877.10 | | | 1.15 |
| 05.09.2013 / 10.09.2013 | PURCHASE / US25459W2355 | 5,000.0000 / DIREXION SHARES ETF TRUST | 28.48 | 142,405.00 | | | |
| 05.09.2013 / 10.09.2013 | PURCHASE / US25459W2355 | 5,000.0000 / DIREXION SHARES ETF TRUST | 28.10 | 140,500.00 | | | |
| 05.09.2013 / 10.09.2013 | PURCHASE / US25459W2355 | 5,000.0000 / DIREXION SHARES ETF TRUST | 28.27 | 141,372.00 | | | |
| 05.09.2013 / 10.09.2013 | SALE / US25459W2355 | 5,000.0000 / DIREXION SHARES ETF TRUST | 28.17 | 140,833.00 | | | 2.45 |
| 05.09.2013 / 10.09.2013 | SALE / US25459W2355 | 10,000.0000 / DIREXION SHARES ETF TRUST | 27.80 | 278,000.00 | | | 4.84 |
| 06.09.2013 / 11.09.2013 | PURCHASE / US25459Y3898 | 1,000.0000 / DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.65 | 74,645.50 | | | |
| 06.09.2013 / 11.09.2013 | PURCHASE / US25459Y3898 | 1,000.0000 / DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.80 | 74,799.01 | | | |
| 06.09.2013 / 11.09.2013 | PURCHASE / US25459Y3898 | 1,000.0000 / DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.33 | 74,333.00 | | | |
| 06.09.2013 / 11.09.2013 | PURCHASE / US25459Y3898 | 1,000.0000 / DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.43 | 74,432.00 | | | |
| 06.09.2013 / 11.09.2013 | PURCHASE / US25459Y3898 | 1,000.0000 / DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.10 | 74,100.50 | | | |
| 06.09.2013 / 11.09.2013 | SALE / US25459Y3898 | 1,000.0000 / DIREXION SHS ETF TRUST DAILY GOLD MINERS | 73.82 | 73,817.00 | | | 1.28 |
| 06.09.2013 / 11.09.2013 | SALE / US25459Y3898 | 1,000.0000 / DIREXION SHS ETF TRUST DAILY GOLD MINERS | 73.84 | 73,840.00 | | | 1.28 |
| 06.09.2013 / 11.09.2013 | SALE / US25459Y3898 | 3,000.0000 / DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.48 | 223,447.50 | | | 3.89 |
| 09.09.2013 / 12.09.2013 | PURCHASE / US25459Y3898 | 1,000.0000 / DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.50 | 74,498.00 | | | |
| 09.09.2013 / 12.09.2013 | PURCHASE / US25459Y3898 | 1,000.0000 / DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.54 | 74,543.00 | | | |



# UBS

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Security Transactions 31.12.2013

**USD** — By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 09.09.2013 / 12.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.94 | 74,943.50 | | | |
| 09.09.2013 / 12.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.70 | 74,699.00 | | | |
| 09.09.2013 / 12.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.65 | 74,653.50 | | | |
| 09.09.2013 / 12.09.2013 | SALE US25459Y3898 | 5,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 73.96 | 369,778.00 | | | 6.43 |
| 10.09.2013 / 13.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.07 | 124,265.00 | | | |
| 10.09.2013 / 13.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.20 | 124,800.00 | | | |
| 10.09.2013 / 13.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.10 | 124,396.00 | | | |
| 10.09.2013 / 13.09.2013 | SALE US25459W2355 | 16,000.0000 DIREXION SHARES ETF TRUST | 31.08 | 497,243.01 | | | 8.65 |
| 10.09.2013 / 13.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.18 | 124,723.61 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.61 | 126,444.00 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.97 | 127,886.00 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.48 | 125,920.00 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 32.24 | 128,944.00 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.92 | 127,665.00 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 32.42 | 162,084.00 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 33.06 | 165,307.40 | | | |
| 11.09.2013 / 16.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.82 | 127,293.00 | | | 2.21 |

Please examine this statement and report any discrepancies to us within 30 days.



**UBS**

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

# Security Transactions 31.12.2013

**USD**

By Currency & Value Date

| Trade Date Value Date | Transaction Type | Quantity Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 11.09.2013 16.09.2013 | SALE US25459W2355 | 7,000.0000 DIREXION SHARES ETF TRUST | 31.67 | 221,676.00 | | | 3.86 |
| 11.09.2013 16.09.2013 | SALE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 32.45 | 162,268.00 | | | 2.82 |
| 11.09.2013 16.09.2013 | SALE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 32.78 | 163,906.28 | | | 2.85 |
| 11.09.2013 16.09.2013 | SALE US25459W2355 | 9,000.0000 DIREXION SHARES ETF TRUST | 31.96 | 287,640.00 | | | 5.00 |
| 11.09.2013 16.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 63.35 | 63,345.00 | | | |
| 11.09.2013 16.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 63.49 | 63,489.60 | | | 1.10 |
| 11.09.2013 16.09.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 63.36 | 63,362.00 | | | |
| 11.09.2013 16.09.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 63.28 | 63,280.00 | | | 1.10 |
| 12.09.2013 17.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 34.80 | 139,192.00 | | | |
| 12.09.2013 17.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.20 | 140,806.57 | | | |
| 12.09.2013 17.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 34.70 | 138,790.00 | | | |
| 12.09.2013 17.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 34.70 | 138,790.00 | | | |
| 12.09.2013 17.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.28 | 141,130.64 | | | 2.46 |
| 12.09.2013 17.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 34.78 | 139,112.00 | | | 2.42 |
| 12.09.2013 17.09.2013 | SALE US25459W2355 | 8,000.0000 DIREXION SHARES ETF TRUST | 34.79 | 278,351.39 | | | 4.84 |
| 12.09.2013 17.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.20 | 140,808.10 | | | |
| 12.09.2013 17.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.20 | 140,799.00 | | | 2.45 |



# UBS

NO. 3 2 · 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Security Transactions 31.12.2013

**USD** — By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.74 | 142,958.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.82 | 143,293.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.64 | 142,560.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 37.09 | 148,342.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 36.36 | 145,448.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.82 | 143,283.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.60 | 142,404.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 36.99 | 147,957.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.94 | 143,760.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 36.46 | 145,849.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.94 | 143,773.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.65 | 142,612.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 36.01 | 144,040.00 | | | |
| 13.09.2013 / 18.09.2013 | SALE US25459W2355 | 1,860.0000 DIREXION SHARES ETF TRUST | 36.99 | 68,806.80 | | | 1.20 |
| 13.09.2013 / 18.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 37.00 | 148,000.00 | | | 2.58 |
| 13.09.2013 / 18.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 36.43 | 145,706.40 | | | 2.54 |
| 13.09.2013 / 18.09.2013 | SALE US25459W2355 | 2,120.0000 DIREXION SHARES ETF TRUST | 37.18 | 78,827.60 | | | 1.37 |

Please examine this statement and report any discrepancies to us within 30 days.

# UBS

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Security Transactions 31.12.2013

**USD**

By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 13.09.2013 / 18.09.2013 | SALE US25459W2355 | 16,000.0000 DIREXION SHARES ETF TRUST | 35.47 | 567,516.24 | | | 9.87 |
| 13.09.2013 / 18.09.2013 | SALE US25459W2355 | 12,000.0000 DIREXION SHARES ETF TRUST | 36.51 | 438,166.44 | | | 7.62 |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 55.86 | 55,858.75 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 55.18 | 55,184.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 55.31 | 55,309.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 55.14 | 55,137.50 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 54.86 | 54,860.65 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459Y3898 | 5,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 55.39 | 276,949.90 | | | |
| 13.09.2013 / 18.09.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 54.63 | 54,625.00 | | | 0.95 |
| 13.09.2013 / 18.09.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 55.78 | 55,777.00 | | | 0.97 |
| 13.09.2013 / 18.09.2013 | SALE US25459Y3898 | 8,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 55.21 | 441,669.15 | | | 7.69 |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.90 | 143,601.00 | | | |
| 13.09.2013 / 18.09.2013 | SALE US25459W2355 | 20.0000 DIREXION SHARES ETF TRUST | 36.90 | 738.00 | | | 0.01 |
| 13.09.2013 / 18.09.2013 | SALE US25459W2355 | 16,000.0000 DIREXION SHARES ETF TRUST | 35.75 | 572,027.01 | | | 9.95 |
| 16.09.2013 / 19.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 34.66 | 138,626.50 | | | |
| 16.09.2013 / 19.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 34.26 | 137,021.00 | | | |
| 16.09.2013 / 19.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.00 | 140,000.00 | | | 2.44 |

Please examine this statement and report any discrepancies to us within 30 days.

Detailed Transactions

Page 25 of 28

# UBS

NO. 32'377

Portfolio Number: 32377

Statement of Assets as of 31.12.2013

## Security Transactions 31.12.2013

### USD

By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 16.09.2013 / 19.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 33.90 | 135,600.00 | | | 2.36 |
| 16.09.2013 / 19.09.2013 | PURCHASE US25459Y3898 | 2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 56.10 | 112,199.00 | | | |
| 16.09.2013 / 19.09.2013 | PURCHASE US25459Y3898 | 2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 57.87 | 115,733.00 | | | |
| 16.09.2013 / 19.09.2013 | SALE US25459Y3898 | 2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 57.30 | 114,600.00 | | | 1.99 |
| 16.09.2013 / 19.09.2013 | SALE US25459Y3898 | 2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 56.69 | 113,380.82 | | | 1.97 |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.49 | 141,976.95 | | | |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.17 | 140,664.00 | | | |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.12 | 140,466.72 | | | |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.54 | 142,160.00 | | | |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.62 | 142,499.00 | | | |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.20 | 140,800.00 | | | |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.64 | 142,561.00 | | | |
| 17.09.2013 / 20.09.2013 | SALE US25459W2355 | 16,000.0000 DIREXION SHARES ETF TRUST | 35.05 | 560,778.00 | | | 9.76 |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.18 | 140,727.00 | | | |
| 18.09.2013 / 23.09.2013 | SALE US25459W2355 | 8,000.0000 DIREXION SHARES ETF TRUST | 29.68 | 237,456.00 | | | 4.13 |
| 18.09.2013 / 23.09.2013 | SALE US25459W2355 | 8,000.0000 DIREXION SHARES ETF TRUST | 30.08 | 240,678.00 | | | 4.19 |

Please examine this statement and report any discrepancies to us within 30 days.

NO. 3 2 '3 7 7

Portfolio Number: 32377

Statement of Assets as of 31.12.2013

# Foreign Exchange Rates, Abbreviations and Explanations

**Foreign Exchange Rates**

Market Value in (USD) is based on the following exchange rates:

| | | | | |
|---|---|---|---|---|
| EUR | Euro | 1 = | 1.375750 | 1 USD = | 0.726876 EUR |
| USD | U.S. Dollar | 1 = | 1.000000 | 1 USD = | 1.000000 USD |

Please examine this statement and report any discrepancies to us within 30 days.

Additional Information   Page 27 of 28



# UBS

NO. 3 2 · 3 7 7

Portfolio Number: 32377

Statement of Assets as of 31.12.2013

## Other Information

The information contained herein is based on information provided to UBS (Bahamas) Limited ("UBS") from sources which UBS believes to be reliable. Valuation information for particular assets is derived from different sources in the market and as a result, the price of a particular asset may be valued differently. The effect of this is that multiple statements may be received showing a particular asset listed at differing prices. Although care has been taken in preparing the information UBS cannot and does not guarantee its accuracy. UBS cannot be held responsible for any errors or omissions and accepts no liability or responsibility, directly or indirectly for any losses or damages whatsoever resulting from the use (or misuse) of the information contained or implied herein.

Additional Information

Page 28 of 28

Please examine this statement and report any discrepancies to us within 30 days.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Yuri Starostenko
_____

Irina Tsareva and all others similarly situated
_____

Write the full name of each plaintiff.

**19 C. 9993**

_____CV_____

(Include case number if one has been assigned)

-against-

UBS AG (A SWISS BANK)
_____

_____

_____

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

### COMPLAINT

Do you want a jury trial?
☐ Yes   ☑ No

2019 OCT 28  AM 9:49
S.D. OF N.Y.
RECEIVED
SDNY PRO SE OFFICE

---

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 1/9/17

## I.    BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑    **Federal Question**

☑    **Diversity of Citizenship**

## A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

See paragraphs 13 - 41 of the plaintiffs' complaint (the "Complaint")

## B.   If you checked Diversity of Citizenship

### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff ,  Irina Tsareva                          , is a citizen of the State of
                  (Plaintiff's name)

(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

Italy, resident in The Bahamas                          .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

Page 2

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
(Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____

If the defendant is a corporation:

The defendant, **UBS AG**_____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) **Switzerland**

and has its principal place of business in **Switzerland and worldwide**.

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

**Irina**                                              **Tsareva**
First Name                   Middle Initial        Last Name

**11 East & Bay Street and see paragraphs 42 - 60 of the Complaint**
Street Address

**Nassau**                       **Bahamas**        PO Box SS-5800
County, City                     State              Zip Code

**+1(242)817-4372**              **irastaro@gmail.com**
Telephone Number                 Email Address (if available)

## B.   Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:      **UBS AG**                         a corporation

First Name                     Last Name

**See the Complaint, as described in paragraphs 61 - 90**

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                          State                    Zip Code

Defendant 2:

First Name                     Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                          State                    Zip Code

Defendant 3:

First Name                     Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                          State                    Zip Code

Defendant 4:

First Name           Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City          State          Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: the City of New York, New York, United States

Date(s) of occurrence: between June 2012 and September 2013

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

See the facts descibed in paragraphs 104 through 239 of the Complaint

_____

_____

_____

_____

_____

_____

_____

_____

_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

As per the injury-in-fact of US$11,281,645.00, see paragraphs 58 and 120 and, as per

antitrust injuries, see paragraphs 171 through 207 of the Complaint.

_____

_____

_____

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

See paragraph 240 of the Complaint.

_____

_____

_____

_____

## V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| October 18, 2019 | | |
| --- | --- | --- |
| Dated | Plaintiff's Signature | |
| Irina | Tsareva | |
| First Name          Middle Initial | Last Name | |
| 11 East Street & Bay Street | | |
| Street Address | | |
| Nassau | The Bahamas | PO Box SS-5800 |
| County, City | State | Zip Code |
| +1(242)817-4372 | irastaro@gmail.com | |
| Telephone Number | Email Address (if available) | |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☑ Yes    ☐ No

    If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

YURI STAROSTENKO
IRINA TSAREVA,
on behalf of themselves and all others similarly situated,
                                    Plaintiffs,

        -against-                                              _____ CV

UBS AG (A SWISS BANK)
                            Defendant.



## CERTIFICATION

1.    Plaintiffs bring this private action as plaintiffs class action pursuant to the Federal Rules
      of Civil Procedure.

2.    Plaintiff Irina Tsareva seeking to serve as a representative party on behalf of classes
      referred to in the plaintiffs' Complaint provides a sworn certification to be filed with the
      Complaint pursuant to Section 21D(a) of the Securities Exchange Act of 1934 [15 U.S.
      Code § 78u–4. Private securities litigation].

3.    I, Irina Tsareva, the plaintiff 2 in this action, of New Providence Island of the
      Commonwealth of The Bahamas, make oath and state that:

4.    I have reviewed the Complaint and authorized its filing;

5.    I did not purchase the security that is the subject of the Complaint at the direction of any
      counsel or in order to participate in any private action arising under this chapter;

6.    I am willing to serve as a representative party on behalf of the classes, including
      providing testimony at deposition and trial, if necessary;

7.    The following transactions in the securities that are the subjects of the Complaint during
      the relevant period were recorded by the defendant in:

7.1.   Statement of Account 32,377/01,00 of Junkanoo Estates Ltd. issued by UBS (Bahamas) Ltd. as of 01.07.2013, attached to this Certification as Exhibit 1; and

7.2.   Statement of Account 32,377/01,00 of Junkanoo Estates Ltd. issued by UBS (Bahamas) Ltd. as of 31.12.2013, attached to this Certification as Exhibit 2;

8.   There is no any other action under this chapter, filed during the 3-year period preceding the date on which this Certification is signed by me, in which I have sought to serve as a representative party on behalf of any class;

9.   I will not accept any payment for serving as a representative party on behalf of the classes beyond my pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4) of this Section.

SWORN to at New Providence, The Bahamas)

This _____ day of October, A.D., 2019) _____

Before Me,
NOTARY PUBLIC

2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

YURI STAROSTENKO
IRINA TSAREVA,
on behalf of themselves and all others similarly situated,
                              Plaintiffs,

                                                    _____ CV _____

    -against-

UBS AG (A SWISS BANK)
                              Defendant.


I, hereby certify that the exhibits referred to and marked as "Exhibit 1" and "Exhibit 2" in this Certification of Irina Tsareva sworn herein.


        This        day of October, A.D., 2019.



        Before Me,
        NOTARY PUBLIC

# CERTIFICATION

# Exhibit 1

 **UBS**

UBS (Bahamas) Ltd.
UBS House, East Bay Street
P.O. Box N-7757
Nassau, Bahamas
Tel. +1 242 394 9300
Fax. +1 242 394 9333

09/066

Junkanoo Estates Ltd.

RETAINED

Statement of Account
01.01.2013 - 30.06.2013
USD Account

32,377/01,00

Page 1/1

| Value Date | Description | Debit | Credit | USD Balance |
|---|---|---|---|---|
| 31.12.2012 | Balance Brought Forward | | | 715,419.06 |
| 02.01.2013 | Account Transfer | 15,026.76 | | 700,392.30 |
| 28.03.2013 | FEES - ACCOUNT MAINTENANCE FEE | 175.00 | | 700,217.30 |
| 31.03.2013 | Account Transfer | 13,932.33 | | 686,284.97 |
| 18.06.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X  USD 9.5823 | 97,259.84 | | 589,025.13 |
| 19.06.2013 | SOLD 10000 DRXN DLY GLDMN BI3X  USD 9.9994 | | 98,492.60 | 687,517.73 |
| 27.06.2013 | BOUGHT 3000 BARCL IPATH ETN 19   USD 23.0143 | 69,560.79 | | 617,956.94 |
| 28.06.2013 | FEES - ACCOUNT MAINTENANCE FEE | 175.00 | | 617,781.94 |
| 30.06.2013 | Total Debits/Credits | 196,129.72 | 98,492.60 | |
| | **Balance** | | | **617,781.94** |

## Pending Transactions

| Value Date | Description | Debit | Credit |
|---|---|---|---|
| 01.07.2013 | ACCOUNT TRANSFER | 14,226.33 | |
| 01.07.2013 | BOUGHT 1200 DIREXION DL SC BL3X  USD 45.6899 | 55,239.09 | |
| 01.07.2013 | SOLD 3000 BARCL IPATH ETN 19   USD 21.6397 | | 64,430.98 |
| 01.07.2013 | SOLD 1200 DIREXION DL SC BL3X  USD 45.5800 | | 54,284.83 |

E. & O.E.

Statements of Account are now available on-line.  For more information please contact your client advisor.

Transactions subject to correction pending collection from paying agent.

# CERTIFICATION

# Exhibit 2



# UBS

UBS (Bahamas) Ltd.
P.O. Box N-7757
Nassau, Bahamas

Tel. (242) 394-9300
Fax (242) 394-9333

# Statement as of 31.12.2013

## Client Information

Name:                    NO. 32 ' 377
Portfolio Number:        32377

## Client Investment Profile

Account Currency:        USD

Junkanoo Estates Ltd.

## Important Notes

Please examine this statement and report any discrepancies to us within 30 days.



# UBS

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Table of Contents

| | |
|---|---|
| Valuation | |
| Asset Summary | 3 |
| Account Summary | 4 |
| Performance Details | 5 |
| Detailed Positions | |
| Cash & Money Market | 6 |
| Detailed Transactions | |
| Transactions | 7 |
| Additional Information | |
| Foreign Exchange Rates, Abbreviations and Explanations | 27 |
| Other Information | 28 |

Please examine this statement and report any discrepancies to us within 30 days.

# UBS

## Asset Summary

NO. 32 ' 377
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

### Summary of Currency as of 31.12.2013

| | Value USD |
|---|---|

### Portfolio Breakdown By Asset Category Group and Currency

| Currency | Cash and Money Market | Bonds | Equities | Real Estate | Alternative Investments | Others | Totals |
|---|---|---|---|---|---|---|---|
| | % | % | % | % | % | | % |
| USD | 557,704.26 | | | | | | 557,704.26 |
| USD | 557,704.26 | | | | | | 557,704.26 |
| | 100.00 | | | | | | 100.00 |
| **Totals** | | | | | | | |
| USD | 557,704.26 | | | | | | 557,704.26 |
| | 100.00 | | | | | | 100.00 |

# UBS

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Account Summary

### Summary of Account as of 31.12.2013

Value USD

#### Asset Allocation



**Cumulative Performance**

| | 01.10.2012 | 12.2012 | 03.2013 | 06.2013 | 09.2013 | 12.2013 |
|---|---|---|---|---|---|---|

#### Portfolio Breakdown

| | Value in USD | % of Portfolio |
|---|---|---|
| ☐ Cash and Money Market | 557,704.26 | 100.00 |
| Total | 557,704.26 | 100.00 |

100.00%

#### Market Indicators

| | QTD | YTD | 1 Yr | 3 Yr | 5 Yr |
|---|---|---|---|---|---|
| DOW JONES INDUS. AVG | 9.56 | 26.50 | 26.50 | 43.18 | 88.88 |
| EURO STOXX 50 INDEX | 7.46 | 17.95 | 17.95 | 11.32 | 27.02 |
| NIKKEI 225 | | | 56.72 | 59.27 | 83.88 |
| S&P/TSX COMPOSITE INDEX | 6.53 | 9.56 | 9.56 | 1.33 | 51.56 |
| BRAZIL BOVESPA INDEX | -1.59 | -15.50 | -15.50 | -25.68 | 37.17 |

#### Quarterly Details

| | |
|---|---|
| Value as of   30.09.2013 | 575,036.76 |
| Withdrawals | 14,520.33 |
| Deposits | |
| Change in Market Value | -2,812.17 |
| Value as of   31.12.2013 | 557,704.26 |
| QTD Performance | -0.50% |

#### Performance Details

| | |
|---|---|
| Portfolio Inception Date | 01.10.2012 |
| YTD Performance | -12.45% |
| 1 Year Performance | -12.45% |
| 3 Year Annualized Performance | |
| 5 Year Annualized Performance | |
| Cumulative Performance | -14.38% |

* Performance is based on a time-weighted return calculation.

**Valuation**

# UBS

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Performance Details

Performance Period 01.10.2012 To 31.12.2013

Value USD

| Period Start | Period Ending | Beginning Value | Withdrawals & Deposits | Change in Market Value | Closing Value | % Change |
|---|---|---|---|---|---|---|
| 01.10.2012 | 31.12.2012 | -637,944.35 | 1,367,420.00 | -14,056.59 | 715,419.06 | -2.20 |
| 01.01.2013 | 31.03.2013 | 715,419.06 | -15,026.76 | -175.00 | 700,217.30 | -0.02 |
| 01.04.2013 | 30.06.2013 | 700,217.30 | -13,932.33 | -5,026.31 | 681,258.66 | -0.73 |
| 01.07.2013 | 30.09.2013 | 681,258.66 | -30,962.13 | 75,259.77 | 575,036.76 | -11.35 |
| 01.10.2013 | 31.12.2013 | 575,036.76 | -14,520.33 | -2,812.17 | 557,704.26 | -0.50 |

# UBS

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Detailed Positions

### Cash & Money Market

| Currency | Amount | Description | Avg Cost Price | Book Value | Market Price | Market Value Market Value USD | Unrealized G/L USD | % of Portfolio Acc Int USD |
|---|---|---|---|---|---|---|---|---|
| USD | 557,704.260 | 32,377/01,00 CURRENT ACCOUNT | 100.0000 | | 100.0000 | 557,704.26 557,704.26 | | 100.00 |
| | | Subtotal | | | | 557,704.26 | | 100.00 |
| | | Total | | | | 557,704.26 | | 100.00 |

# UBS

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Cash Transactions 31.12.2013

| USD | 0/032,377/01,00 | By Currency & Value Date | | | |
|---|---|---|---|---|---|
| Value Date | CURRENT ACCOUNT | Description | Debit | Credit | Balance |
| | | Balance Brought Forward | 0.00 | | 617,781.94 |
| 01.07.2013 | | SOLD 3000 BARCLIPATH ETN 19   USD 21.6397 | | 64,430.98 | 682,212.92 |
| 01.07.2013 | | BOUGHT 1200 DIREXION DL SC BL3X USD 45.6859 | 55,239.09 | | 626,973.83 |
| 01.07.2013 | | SOLD 1200 DIREXION DL SC BL3X  USD 45.5800 | | 54,284.83 | 681,258.66 |
| 01.07.2013 | | ACCOUNT TRANSFER | 14,226.33 | | 667,032.33 |
| 19.07.2013 | | SOLD 10000 DRXN DLY GLDMN BI3X  USD 6.1371 | | 60,909.40 | 727,941.73 |
| 19.07.2013 | | BOUGHT 10000 DRXN DLY GLDMN BI3X  USD 5.8100 | 58,535.75 | | 669,405.98 |
| 24.07.2013 | | SOLD 10000 DRXN DLY GLDMN BI3X  USD 6.2000 | | 61,998.92 | 731,404.90 |
| 24.07.2013 | | BOUGHT 10000 DRXN DLY GLDMN BI3X  USD 6.1700 | 61,700.00 | | 669,704.90 |
| 26.07.2013 | | SOLD 1000 PR ULSH 20+Y TR ETF  USD 73.7800 | | 73,778.72 | 743,483.62 |
| 26.07.2013 | | SOLD 10000 DRXN DLY GLDMN BI3X  USD 8.1600 | | 81,598.58 | 825,082.20 |
| 26.07.2013 | | BOUGHT 10000 DRXN DLY GLDMN BI3X  USD 8.0499 | 80,499.00 | | 744,583.20 |
| 26.07.2013 | | BOUGHT 1000 PR ULSH 20+Y TR ETF  USD 74.4000 | 74,400.00 | | 670,183.20 |
| 30.07.2013 | | SOLD 10000 DRXN DLY GLDMN BI3X  USD 7.8339 | | 78,337.64 | 748,520.84 |
| 30.07.2013 | | BOUGHT 10000 DRXN DLY GLDMN BI3X  USD 7.8100 | 78,100.00 | | 670,420.84 |
| 30.07.2013 | | BOUGHT 10000 DRXN DLY GLDMN BI3X  USD 7.7173 | 77,173.00 | | 593,247.84 |
| 30.07.2013 | | SOLD 10000 DRXN DLY GLDMN BI3X  USD 7.6800 | | 76,798.66 | 670,046.50 |
| 31.07.2013 | | SOLD 10000 DRXN DLY GLDMN BI3X  USD 7.3500 | | 73,498.72 | 743,545.22 |
| 31.07.2013 | | BOUGHT 10000 DRXN DLY GLDMN BI3X  USD 7.4219 | 74,219.00 | | 669,326.22 |
| 31.07.2013 | | BOUGHT 10000 DRXN DLY GLDMN BI3X  USD 7.3700 | 73,700.00 | | 595,626.22 |
| 31.07.2013 | | SOLD 10000 DRXN DLY GLDMN BI3X  USD 7.7398 | | 77,397.08 | 673,023.30 |
| 05.08.2013 | | SOLD 500 DRXN DLY GLDMN BR3X  USD 79.0000 | | 39,499.31 | 712,522.61 |
| 05.08.2013 | | BOUGHT 500 DRXN DLY GLDMN BR3X  USD 79.9400 | 39,970.00 | | 672,552.61 |
| 06.08.2013 | | BOUGHT 5000 DRXN DLY GLDMN BI3X  USD 7.0960 | 35,480.00 | | 637,072.61 |
| 06.08.2013 | | SOLD 5000 DRXN DLY GLDMN BI3X  USD 6.9400 | | 34,699.40 | 671,772.01 |
| 06.08.2013 | | SOLD 500 DRXN DLY G.LDMN BR3X  USD 80.3221 | | 40,160.36 | 711,932.37 |
| 06.08.2013 | | SOLD 500 DRXN DLY GLDMN BR3X  USD 81.0500 | | 40,524.29 | 752,456.66 |
| 06.08.2013 | | BOUGHT 500 DRXN DLY GLDMN BR3X USD 81.8680 | 40,934.00 | | 711,522.66 |

Please examine this statement and report any discrepancies to us within 30 days.

# UBS

No. 3 2 ´ 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Cash Transactions 31.12.2013

**USD    0/032,377/01,00    By Currency & Value Date**

| Value Date | Description | Debit | Credit | Balance |
|---|---|---|---|---|
| CURRENT ACCOUNT | | | | |
| 06.08.2013 | BOUGHT 500 DRXN DLY GLDMN BR3X USD 81.1340 | 40,567.00 | | 670,955.66 |
| 07.08.2013 | SOLD 5000 DRXN DLY GLDMN BI3X USD 6.8901 | | 34,449.65 | 705,405.31 |
| 07.08.2013 | BOUGHT 5000 DRXN DLY GLDMN BI3X USD 6.8700 | 34,350.00 | | 671,055.31 |
| 07.08.2013 | SOLD 500 DRXN DLY GLDMN BR3X USD 86.1000 | | 43,049.25 | 714,104.56 |
| 07.08.2013 | BOUGHT 500 DRXN DLY GLDMN BR3X USD 86.4480 | 43,224.00 | | 670,880.56 |
| 09.08.2013 | SOLD 1000 DRXN DLY GLDMN BI3X USD 5.5200 | | 5,519.90 | 676,400.46 |
| 09.08.2013 | BOUGHT 1000 DRXN DLY GLDMN BI3X USD 5.5000 | 5,500.00 | | 670,900.46 |
| 09.08.2013 | SOLD 1000 DRXN DLY GLDMN BR3X USD 102.4040 | | 102,402.22 | 773,302.68 |
| 09.08.2013 | SOLD 1000 DRXN DLY GLDMN BR3X USD 102.6434 | | 102,641.56 | 875,944.24 |
| 09.08.2013 | BOUGHT 1000 DRXN DLY GLDMN BR3X USD 101.5128 | 101,512.80 | | 774,431.44 |
| 09.08.2013 | BOUGHT 1000 DRXN DLY GLDMN BR3X USD 102.7000 | 102,700.00 | | 671,731.44 |
| 12.08.2013 | SOLD 1000 DRXN DLY GLDMN BR3X USD 101.1520 | | 101,150.24 | 772,881.68 |
| 12.08.2013 | BOUGHT 1000 DRXN DLY GLDMN BR3X USD 103.1580 | 103,158.00 | | 669,723.68 |
| 14.08.2013 | SOLD 10000 DRXN DLY GLDMN BI3X USD 6.3772 | | 63,770.97 | 733,494.65 |
| 14.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 6.4854 | 64,854.30 | | 668,640.35 |
| 14.08.2013 | SOLD 10000 DRXN DLY GLDMN BI3X USD 6.7609 | | 67,607.84 | 736,248.19 |
| 14.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 6.8951 | 68,951.49 | | 667,296.70 |
| 14.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 6.8400 | 68,400.00 | | 598,896.70 |
| 14.08.2013 | SOLD 10000 DRXN DLY GLDMN BI3X USD 6.9890 | | 69,888.78 | 668,785.48 |
| 15.08.2013 | SOLD 10000 DRXN DLY GLDMN BI3X USD 7.5900 | | 75,898.68 | 744,684.16 |
| 15.08.2013 | SOLD 10000 DRXN DLY GLDMN BI3X USD 7.7600 | | 77,598.65 | 822,282.81 |
| 15.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 7.7300 | 77,299.75 | | 744,983.06 |
| 15.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 7.7300 | 77,300.00 | | 667,683.06 |
| 19.08.2013 | SOLD 10000 DRXN DLY GLDMN BI3X USD 8.2400 | | 82,398.57 | 750,081.63 |
| 19.08.2013 | SOLD 10000 DRXN DLY GLDMN BI3X USD 8.1600 | | 81,598.58 | 831,680.21 |
| 19.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 8.3000 | 83,000.00 | | 748,680.21 |
| 19.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 8.2600 | 82,600.00 | | 666,080.21 |
| 19.08.2013 | BOUGHT 10000 DRXN DLY GLDMN BI3X USD 8.2557 | 82,556.50 | | 583,523.71 |

Please examine this statement and report any discrepancies to us within 30 days

# UBS

NO. 3 2 · 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Cash Transactions 31.12.2013

| USD | 0/032,377/01,00 | By Currency & Value Date | | | |
|---|---|---|---|---|---|
| Value Date | CURRENT ACCOUNT | Description | Debit | Credit | Balance |
| 19.08.2013 | | SOLD 10000 DRXN DLY GLDMN Bl3x USD 8.3300 | | 83,298.55 | 666,822.26 |
| 21.08.2013 | | SOLD 20000 DRXN DLY GLDMN Bl3x USD 9.8101 | | 196,198.09 | 863,020.35 |
| 21.08.2013 | | BOUGHT 10000 DRXN DLY GLDMN Bl3x USD 9.5523 | 95,523.00 | | 767,497.35 |
| 21.08.2013 | | BOUGHT 10000 DRXN DLY GLDMN Bl3x USD 9.7531 | 97,531.00 | | 669,966.35 |
| 22.08.2013 | | SOLD 10000 DRXN DLY GLDMN Bl3x USD 9.1232 | | 91,230.17 | 761,196.52 |
| 22.08.2013 | | BOUGHT 10000 DRXN DLY GLDMN Bl3x USD 9.2800 | 92,800.00 | | 668,396.52 |
| 22.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 9.0500 | 9,050.00 | | 659,346.52 |
| 23.08.2013 | | BOUGHT 324 DRXN DLY GLDMN Bl3x USD 94.0000 | 30,456.00 | | 628,890.52 |
| 23.08.2013 | | SOLD 1324 DRXN DLY GLDMN Bl3x USD 95.2042 | | 126,048.13 | 754,938.65 |
| 23.08.2013 | | BOUGHT 500 DRXN DLY GLDMN Bl3x USD 94.9240 | 47,462.00 | | 707,476.65 |
| 23.08.2013 | | BOUGHT 100 DRXN DLY GLDMN Bl3x USD 96.8800 | 9,688.00 | | 697,788.65 |
| 23.08.2013 | | BOUGHT 100 DRXN DLY GLDMN Bl3x USD 97.0000 | 9,700.00 | | 688,088.55 |
| 23.08.2013 | | BOUGHT 100 DRXN DLY GLDMN Bl3x USD 97.2500 | 9,725.00 | | 678,363.65 |
| 23.08.2013 | | BOUGHT 400 DRXN DLY GLDMN Bl3x USD 96.0000 | 38,400.00 | | 639,963.65 |
| 23.08.2013 | | SOLD 300 DRXN DLY GLDMN Bl3x USD 97.4000 | | 29,219.49 | 669,183.14 |
| 26.08.2013 | | SOLD 1000 DRXN DLY GLDMN BR3X USD 24.0000 | | 23,999.58 | 693,182.72 |
| 26.08.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x USD 91.7057 | | 91,704.10 | 784,886.82 |
| 26.08.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x USD 90.8700 | | 90,868.42 | 875,755.24 |
| 26.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN BR3X USD 24.4000 | 24,400.00 | | 851,355.24 |
| 26.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 93.0000 | 93,000.00 | | 758,355.24 |
| 26.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 93.6390 | 93,659.00 | | 664,716.24 |
| 26.08.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x USD 91.0000 | | 90,998.42 | 755,714.66 |
| 26.08.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x USD 91.1740 | | 91,172.41 | 846,887.07 |
| 26.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 91.7740 | 91,774.00 | | 755,113.07 |
| 26.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 91.1100 | 91,110.00 | | 664,003.07 |
| 26.08.2013 | | SOLD -1000 DRXN DLY GLDMN Bl3x USD 90.8700 | 90,868.42 | | 573,134.65 |
| 26.08.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x USD 92.5000 | | 92,498.42 | 665,633.07 |
| 28.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x USD 95.6338 | 95,633.84 | | 569,999.23 |

Please examine this statement and report any discrepancies to us within 30 days.

Detailed Transactions





# UBS

## Cash Transactions 31.12.2013

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

| USD | 0/032,377/01,00 | CURRENT ACCOUNT | By Currency & Value Date | | |
|---|---|---|---|---|---|
| Value Date | | Description | Debit | Credit | Balance |
| 28.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 95.0000 | 95,000.00 | | 474,999.23 |
| 28.08.2013 | | SOLD 2000 DRXN DLY GLDMN Bl3x  USD 95.5566 | | 191,109.91 | 666,109.14 |
| 28.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 96.5880 | 96,588.00 | | 569,521.14 |
| 28.08.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 96.3158 | 96,315.75 | | 473,205.39 |
| 29.08.2013 | | SOLD 2000 DRXN DLY GLDMN Bl3x  USD 95.9478 | | 191,892.36 | 665,097.75 |
| 29.08.2013 | | SOLD -2000 DRXN DLY GLDMN Bl3x  USD 95.9478 | | -191,892.36 | 473,205.39 |
| 29.08.2013 | | SOLD 2000 DRXN DLY GLDMN Bl3x  USD 96.6800 | | 193,356.66 | 666,562.05 |
| 30.08.2013 | | CASH WITHDRAWAL | 2,460.00 | | 664,102.05 |
| 03.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X  USD 24.2346 | 121,173.00 | | 542,929.05 |
| 03.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X  USD 24.6847 | 123,423.40 | | 419,505.65 |
| 03.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X  USD 25.2212 | 126,106.04 | | 293,399.61 |
| 03.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X  USD 25.3250 | 126,624.90 | | 166,774.71 |
| 03.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X  USD 25.4322 | 127,161.00 | | 39,613.71 |
| 03.09.2013 | | SOLD 10000 DRXN DLY GLDMN BR3X  USD 26.4794 | | 264,789.64 | 304,403.35 |
| 03.09.2013 | | SOLD 15000 DRXN DLY GLDMN BR3X  USD 26.3729 | | 395,586.91 | 699,990.26 |
| 06.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 79.9240 | 79,924.00 | | 620,066.26 |
| 06.09.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x  USD 79.9000 | | 79,898.61 | 699,964.87 |
| 10.09.2013 | | BOUGHT 1000 DRXN DLY FIN BULL3X  USD 66.6230 | 66,623.00 | | 633,341.87 |
| 10.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X  USD 28.1000 | 140,500.00 | | 492,841.87 |
| 10.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X  USD 28.2744 | 141,372.00 | | 351,459.87 |
| 10.09.2013 | | SOLD 10000 DRXN DLY GLDMN BR3X  USD 27.8000 | | 277,995.16 | 629,465.03 |
| 10.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X  USD 28.4810 | 142,405.00 | | 487,060.03 |
| 10.09.2013 | | SOLD 5000 DRXN DLY GLDMN BR3X  USD 28.1666 | | 140,830.55 | 527,890.58 |
| 10.09.2013 | | SOLD 1000 DRXN DLY FIN BULL3X  USD 65.8771 | | 65,875.95 | 693,766.53 |
| 10.09.2013 | | BOUGHT 2000 DIREXION DL SC BL3X  USD 55.3460 | 110,692.00 | | 583,074.53 |
| 10.09.2013 | | SOLD 2000 DIREXION DL SC BL3X  USD 55.2055 | | 110,409.08 | 693,483.61 |
| 11.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.3330 | 74,333.00 | | 619,150.61 |
| 11.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.4320 | 74,432.00 | | 544,718.61 |

Please examine this statement and report any discrepancies to us within 30 days.   Detailed Transactions   Page 10 of 28



# UBS

NO. 3 2 ' 3 7 7
Portfolio Number 32377
Statement of Assets as of 31.12.2013

## Cash Transactions 31.12.2013

| USD | 0/032,377/01,00 | By Currency & Value Date | | | |
|---|---|---|---|---|---|
| Value Date | CURRENT ACCOUNT | Description | Debit | Credit | Balance |
| 11.09.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x  USD 73.8400 | | 73,838.72 | 618,557.33 |
| 11.09.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x  USD 73.8170 | | 73,815.72 | 692,373.05 |
| 11.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.1005 | 74,100.50 | | 618,272.55 |
| 11.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.6456 | 74,645.60 | | 543,626.95 |
| 11.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.7990 | 74,799.01 | | 468,827.94 |
| 11.09.2013 | | SOLD 3000 DRXN DLY GLDMN Bl3x  USD 74.4825 | | 223,443.61 | 692,271.55 |
| 12.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.4980 | 74,498.00 | | 617,773.55 |
| 12.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.5430 | 74,543.00 | | 543,230.55 |
| 12.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.6535 | 74,653.50 | | 468,577.05 |
| 12.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.6990 | 74,699.00 | | 393,878.05 |
| 12.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 74.9435 | 74,943.50 | | 318,934.55 |
| 12.09.2013 | | SOLD 5000 DRXN DLY GLDMN Bl3x  USD 73.9556 | | 369,771.57 | 688,706.12 |
| 13.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.0663 | 124,265.00 | | 564,441.12 |
| 13.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.0990 | 124,396.00 | | 440,045.12 |
| 13.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.1809 | 124,723.61 | | 315,321.51 |
| 13.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.2000 | 124,800.00 | | 190,521.51 |
| 13.09.2013 | | SOLD 16000 DRXN DLY GLDMN BR3X  USD 31.0777 | | 497,234.36 | 687,755.87 |
| 16.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X  USD 33.0615 | 165,307.40 | | 522,448.47 |
| 16.09.2013 | | SOLD 5000 DRXN DLY GLDMN BR3X  USD 32.7813 | | 163,903.43 | 686,351.90 |
| 16.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BR3X  USD 32.4168 | 162,084.00 | | 524,267.90 |
| 16.09.2013 | | SOLD 5000 DRXN DLY GLDMN BR3X  USD 32.4536 | | 162,265.18 | 686,533.08 |
| 16.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 63.3450 | 63,345.00 | | 623,188.08 |
| 16.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN Bl3x  USD 63.4896 | 63,489.60 | | 559,698.48 |
| 16.09.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x  USD 63.3620 | | 63,360.90 | 623,059.38 |
| 16.09.2013 | | SOLD 1000 DRXN DLY GLDMN Bl3x  USD 63.2800 | | 63,278.90 | 686,338.28 |
| 16.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.6110 | 126,444.00 | | 559,894.28 |
| 16.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.4800 | 125,920.00 | | 433,974.28 |
| 16.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.9163 | 127,665.00 | | 306,309.28 |


# UBS

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Cash Transactions 31.12.2013

| USD | 0/032,377/01,00 | By Currency & Value Date | | | |
|---|---|---|---|---|---|
| Value Date | CURRENT ACCOUNT | Description | Debit | Credit | Balance |
| 16.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 32.2360 | 128,944.00 | | 177,365.28 |
| 16.09.2013 | | SOLD 9000 DRXN DLY GLDMN BR3X  USD 31.9600 | | 287,635.00 | 465,000.28 |
| 16.09.2013 | | SOLD 7000 DRXN DLY GLDMN BR3X  USD 31.6680 | | 221,672.14 | 686,672.42 |
| 16.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 31.9715 | 127,886.00 | | 558,786.42 |
| 16.09.2013 | | SOLD 4000 DRXN DLY GLDMN BR3X  USD 31.8233 | | 127,290.79 | 686,077.21 |
| 17.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 34.6975 | 138,790.00 | | 547,287.21 |
| 17.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 34.6975 | 138,790.00 | | 408,497.21 |
| 17.09.2013 | | SOLD 8000 DRXN DLY GLDMN BR3X  USD 34.7939 | | 278,346.55 | 686,843.76 |
| 17.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 34.7980 | 139,192.00 | | 547,651.76 |
| 17.09.2013 | | SOLD 4000 DRXN DLY GLDMN BR3X  USD 34.7780 | | 139,109.58 | 686,761.34 |
| 17.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 35.2020 | 140,808.10 | | 545,953.24 |
| 17.09.2013 | | SOLD 4000 DRXN DLY GLDMN BR3X  USD 35.1998 | | 140,796.55 | 686,749.79 |
| 17.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 35.2016 | 140,806.57 | | 545,943.22 |
| 17.09.2013 | | SOLD 4000 DRXN DLY GLDMN BR3X  USD 35.2827 | | 141,128.18 | 687,071.40 |
| 18.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN BI3x  USD 55.8588 | 55,858.75 | | 631,212.65 |
| 18.09.2013 | | SOLD 1000 DRXN DLY GLDMN BI3x  USD 55.7770 | | 55,776.03 | 686,988.68 |
| 18.09.2013 | | BOUGHT 1000 DRXN DLY BI3x  USD 55.1375 | 55,137.50 | | 631,851.18 |
| 18.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN BI3x  USD 55.1840 | 55,184.00 | | 576,667.18 |
| 18.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN BI3x  USD 55.3090 | 55,309.00 | | 521,358.18 |
| 18.09.2013 | | BOUGHT 5000 DRXN DLY GLDMN BI3x  USD 55.3900 | 276,949.90 | | 244,408.28 |
| 18.09.2013 | | SOLD 8000 DRXN DLY GLDMN BI3x  USD 55.2086 | | 441,661.46 | 686,069.74 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 35.6010 | 142,404.00 | | 543,665.74 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 35.6400 | 142,560.00 | | 401,105.74 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 35.6530 | 142,612.00 | | 258,493.74 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 35.7395 | 142,958.00 | | 115,535.74 |
| 18.09.2013 | | SOLD 16000 DRXN DLY GLDMN BR3X  USD 35.4698 | | 567,506.37 | 683,042.11 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 35.8208 | 143,283.00 | | 539,759.11 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 35.8233 | 143,293.00 | | 396,466.11 |

Please examine this statement and report any discrepancies to us within 30 days

Detailed Transactions



# UBS

## Cash Transactions 31.12.2013

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

**USD    0/032,377/01,00    By Currency & Value Date**

| Value Date | CURRENT ACCOUNT | Description | Debit | Credit | Balance |
|---|---|---|---|---|---|
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 35.9400 | 143,760.00 | | 252,706.11 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 35.9003 | 143,601.00 | | 109,105.11 |
| 18.09.2013 | | SOLD 16000 DRXN DLY GLDMN BR3X  USD 35.7517 | | 572,017.06 | 681,122.17 |
| 18.09.2013 | | BOUGHT 1000 DRXN DLY GLDMN BI3x  USD 54.8607 | 54,860.65 | | 626,261.52 |
| 18.09.2013 | | SOLD 1000 DRXN DLY GLDMN BI3x  USD 54.6250 | | 54,624.05 | 680,885.57 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 35.9433 | 143,773.00 | | 537,112.57 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 36.0100 | 144,040.00 | | 393,072.57 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 36.3620 | 145,448.00 | | 247,624.57 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 36.4623 | 145,849.00 | | 101,275.57 |
| 18.09.2013 | | SOLD 12000 DRXN DLY GLDMN BR3X  USD 36.5139 | | 438,158.82 | 539,934.39 |
| 18.09.2013 | | SOLD 4000 DRXN DLY GLDMN BR3X  USD 36.4266 | | 145,703.86 | 685,638.25 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 36.9893 | 147,957.00 | | 537,681.25 |
| 18.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 37.0855 | 148,342.00 | | 389,339.25 |
| 18.09.2013 | | SOLD 4000 DRXN DLY GLDMN BR3X  USD 37.0000 | | 147,997.42 | 537,336.67 |
| 18.09.2013 | | SOLD 2120 DRXN DLY GLDMN BR3X  USD 37.1828 | | 78,826.23 | 616,162.90 |
| 18.09.2013 | | SOLD 1860 DRXN DLY GLDMN BR3X  USD 36.9929 | | 68,805.60 | 684,968.50 |
| 18.09.2013 | | SOLD 20 DRXN DLY GLDMN BR3X  USD 36.9000 | | 737.99 | 685,706.49 |
| 19.09.2013 | | BOUGHT 2000 DRXN DLY GLDMN BI3x  USD 57.8665 | 115,733.00 | | 569,973.49 |
| 19.09.2013 | | BOUGHT 2000 DRXN DLY GLDMN BI3x  USD 56.0995 | 112,199.00 | | 457,774.49 |
| 19.09.2013 | | SOLD 2000 DRXN DLY GLDMN BI3x  USD 56.6904 | | 113,378.85 | 571,153.34 |
| 19.09.2013 | | SOLD 2000 DRXN DLY GLDMN BI3x  USD 57.3000 | | 114,598.01 | 685,751.35 |
| 19.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 34.2553 | 137,021.00 | | 548,730.35 |
| 19.09.2013 | | SOLD 4000 DRXN DLY GLDMN BR3X  USD 33.9000 | | 135,597.64 | 684,327.99 |
| 19.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 34.6566 | 138,626.50 | | 545,701.49 |
| 19.09.2013 | | SOLD 4000 DRXN DLY GLDMN BR3X  USD 35.0000 | | 139,997.56 | 685,699.05 |
| 19.09.2013 | | CHEQUE ISSUANCE | 14,275.80 | | 671,423.25 |
| 19.09.2013 | | FEES CHEQUE ISSUANCE | 50.00 | | 671,373.25 |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X  USD 35.1660 | 140,664.00 | | 530,709.25 |

Please examine this statement and report any discrepancies to us within 30 days.

Detailed Transactions                                                                 Page 13 of 28

# UBS

NO. 3 2 ' 3 7 7

Portfolio Number: 32377

Statement of Assets as of 31.12.2013

## Cash Transactions 31.12.2013

| USD | 0/032,377/01,00 | By Currency & Value Date | | | |
|---|---|---|---|---|---|
| Value Date | CURRENT ACCOUNT | Description | Debit | Credit | Balance |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.1167 | 140,466.72 | | 390,242.53 |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.1818 | 140,727.00 | | 249,515.53 |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.2000 | 140,800.00 | | 108,715.53 |
| 20.09.2013 | | SOLD 16000 DRXN DLY GLDMN BR3X USD 35.0486 | | 560,768.24 | 669,483.77 |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.6248 | 142,499.00 | | 526,984.77 |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.6403 | 142,561.00 | | 384,423.77 |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.5400 | 142,160.00 | | 242,263.77 |
| 20.09.2013 | | BOUGHT 4000 DRXN DLY GLDMN BR3X USD 35.4942 | 141,976.95 | | 100,286.82 |
| 23.09.2013 | | SOLD 8000 DRXN DLY GLDMN BR3X USD 30.0848 | | 240,673.81 | 340,960.63 |
| 23.09.2013 | | SOLD 8000 DRXN DLY GLDMN BR3X USD 29.6820 | | 237,451.87 | 578,412.50 |
| 30.09.2013 | | FEES - ALL IN FEE | 3,375.74 | | 575,036.76 |
| 10.10.2013 | | Account Transfer re coverage of | 14,520.33 | | 560,516.43 |
| 30.12.2013 | | FEES - ALL IN FEE | 2,812.17 | | 557,704.26 |
| 31.12.2013 | | Total Debit/Credits | 11,603,361.34 | 11,543,283.66 | 557,704.26 |
| 31.12.2013 | | Closing Balance | | | 557,704.26 |

# UBS

NO. 3 2 ' 3 7 7
Portfolio Number: 32377

Statement of Assets as of 31.12.2013

## Security Transactions 31.12.2013

**USD**

By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 26.06.2013 / 01.07.2013 | PURCHASE US25459W8477 | 1,200.0000 DIREXION DAILY SMALL CAP BULL | 45.69 | 54,827.88 | 411.21 | | |
| 26.06.2013 / 01.07.2013 | SALE US25459W8477 | 1,200.0000 DIREXION DAILY SMALL CAP BULL | 45.58 | 54,696.00 | 410.22 | | 0.95 |
| 26.06.2013 / 01.07.2013 | SALE US06740C1889 | 3,000.0000 IPATH ETN BARCLAYS BANK S&P 500 VIX 30 JAN 2019 | 21.64 | 64,919.00 | 486.89 | | 1.13 |
| 16.07.2013 / 19.07.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 5.81 | 58,100.00 | 435.75 | | |
| 16.07.2013 / 19.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.14 | 61,370.75 | 460.28 | | 1.07 |
| 19.07.2013 / 24.07.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.17 | 61,700.00 | | | |
| 19.07.2013 / 24.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.20 | 62,000.00 | | | 1.08 |
| 23.07.2013 / 26.07.2013 | PURCHASE US7434782016 | 1,000.0000 PROSHARES TRUST SHS ULTRASHORT 20+YR TRE | 74.40 | 74,400.00 | | | |
| 23.07.2013 / 26.07.2013 | SALE US7434782016 | 1,000.0000 PROSHARES TRUST SHS ULTRASHORT 20+YR TRE | 73.78 | 73,780.00 | | | 1.28 |
| 23.07.2013 / 26.07.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 8.05 | 80,499.00 | | | |
| 23.07.2013 / 26.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 8.16 | 81,600.00 | | | 1.42 |
| 25.07.2013 / 30.07.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 7.81 | 78,100.00 | | | |
| 25.07.2013 / 30.07.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 7.72 | 77,173.00 | | | |
| 25.07.2013 / 30.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 7.83 | 78,339.00 | | | 1.36 |
| 25.07.2013 / 30.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.68 | 76,800.00 | | | 1.34 |
| 26.07.2013 / 31.07.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 7.37 | 73,700.00 | | | |
| 26.07.2013 / 31.07.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.42 | 74,219.00 | | | |

# UBS

NO. 3 2 ' 3 7 7
Portfolio Number 32377
Statement of Assets as of 31.12.2013

## Security Transactions 31.12.2013

**USD**

By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 26.07.2013 / 31.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 7.35 | 73,500.00 | | | 1.28 |
| 26.07.2013 / 31.07.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 7.74 | 77,398.43 | | | 1.35 |
| 31.07.2013 / 05.08.2013 | PURCHASE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 79.94 | 39,970.00 | | | |
| 31.07.2013 / 05.08.2013 | SALE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 79.00 | 39,500.00 | | | 0.69 |
| 01.08.2013 / 06.08.2013 | PURCHASE US25459Y4961 | 5,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 7.10 | 35,480.00 | | | |
| 01.08.2013 / 06.08.2013 | SALE US25459Y4961 | 5,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 6.94 | 34,700.00 | | | 0.60 |
| 01.08.2013 / 06.08.2013 | PURCHASE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 81.87 | 40,934.00 | | | |
| 06.08.2013 / 06.08.2013 | SALE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 81.13 | 40,567.00 | | | 0.71 |
| 01.08.2013 / 06.08.2013 | SALE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 81.05 | 40,525.00 | | | 0.71 |
| 01.08.2013 / 06.08.2013 | SALE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 80.32 | 40,161.06 | | | 0.70 |
| 02.08.2013 / 07.08.2013 | PURCHASE US25459Y4961 | 5,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 6.87 | 34,350.00 | | | |
| 02.08.2013 / 07.08.2013 | SALE US25459Y4961 | 5,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 6.89 | 34,450.25 | | | |
| 02.08.2013 / 07.08.2013 | PURCHASE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 86.45 | 43,224.00 | | | |
| 02.08.2013 / 07.08.2013 | SALE US25459W2355 | 500.0000 DIREXION SHARES ETF TRUST | 86.10 | 43,050.00 | | | 0.75 |
| 06.08.2013 / 09.08.2013 | PURCHASE US25459Y4961 | 1,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 5.50 | 5,500.00 | | | |
| 06.08.2013 / 09.08.2013 | SALE US25459Y4961 | 1,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 5.52 | 5,520.00 | | | 0.10 |
| 06.08.2013 / 09.08.2013 | PURCHASE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 102.70 | 102,700.00 | | | |

Please examine this statement and report any discrepancies to us within 30 days.

# UBS

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Security Transactions 31.12.2013

**USD**

By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 06.08.2013 / 09.08.2013 | PURCHASE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 101.51 | 101,512.80 | | | |
| 06.08.2013 / 09.08.2013 | SALE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 102.40 | 102,404.00 | | | 1.78 |
| 06.08.2013 / 09.08.2013 | SALE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 102.64 | 102,643.35 | | | 1.79 |
| 07.08.2013 / 12.08.2013 | PURCHASE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 103.16 | 103,158.00 | | | |
| 07.08.2013 / 12.08.2013 | SALE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 101.15 | 101,152.00 | | | 1.76 |
| 09.08.2013 / 14.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.49 | 64,854.30 | | | |
| 09.08.2013 / 14.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.90 | 68,951.49 | | | |
| 09.08.2013 / 14.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.84 | 68,400.00 | | | |
| 09.08.2013 / 14.08.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.76 | 67,609.02 | | | |
| 09.08.2013 / 14.08.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.38 | 63,772.08 | | | 1.18 |
| 09.08.2013 / 14.08.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 6.99 | 69,890.00 | | | 1.11 |
| 12.08.2013 / 15.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.73 | 77,299.75 | | | 1.22 |
| 12.08.2013 / 15.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.73 | 77,300.00 | | | |
| 12.08.2013 / 15.08.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.76 | 77,600.00 | | | |
| 12.08.2013 / 15.08.2013 | SALE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 7.59 | 75,900.00 | | | 1.35 |
| 14.08.2013 / 19.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 8.26 | 82,600.00 | | | |
| 14.08.2013 / 19.08.2013 | PURCHASE US25459Y4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 8.30 | 83,000.00 | | | 1.32 |

Please examine this statement and report any discrepancies to us within 30 days.

Detailed Transactions

# �won UBS

NO. 32`377
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Security Transactions 31.12.2013

**USD**

By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 14.08.2013 / 19.08.2013 | PURCHASE US2545SY4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 8.25 | 82,556.50 | | | |
| 14.08.2013 / 19.08.2013 | SALE US2545SY4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 8.33 | 83,300.00 | | | 1.45 |
| 14.08.2013 / 19.08.2013 | SALE US2545SY4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 8.16 | 81,600.00 | | | 1.42 |
| 14.08.2013 / 19.08.2013 | SALE US2545SY4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 8.24 | 82,400.00 | | | 1.43 |
| 20.08.2013 / 20.08.2013 | REVERSE SPLIT US2545SY4961 | 1,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 9.26 | | | | |
| 20.08.2013 / 20.08.2013 | REVERSE SPLIT US2545SY3898 | 100.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 92.59 | | | | |
| 16.08.2013 / 21.08.2013 | PURCHASE US2545SY4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 9.75 | 97,531.00 | | | |
| 16.08.2013 / 21.08.2013 | PURCHASE US2545SY4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 9.55 | 95,523.00 | | | |
| 16.08.2013 / 21.08.2013 | SALE US2545SY4961 | 20,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 9.81 | 196,201.50 | | | 3.41 |
| 19.08.2013 / 22.08.2013 | PURCHASE US2545SY4961 | 1,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 9.05 | 9,050.00 | | | |
| 19.08.2013 / 22.08.2013 | PURCHASE US2545SY4961 | 10,000.0000 DIREXION SHARES ETF TRUST DIREXION DAILY GOLD MINERS BULL 3X | 9.28 | 92,800.00 | | | |
| 19.08.2013 / 22.08.2013 | SALE US2545SY4961 | 10,000.0000 DIREXION SHARES ETF TRUST:DIREXION DAILY GOLD MINERS BULL 3X | 9.12 | 91,231.76 | | | 1.59 |
| 20.08.2013 / 23.08.2013 | PURCHASE US2545SY3898 | 100.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 97.00 | 9,700.00 | | | |
| 20.08.2013 / 23.08.2013 | PURCHASE US2545SY3898 | 100.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 97.25 | 9,725.00 | | | |
| 20.08.2013 / 23.08.2013 | PURCHASE US2545SY3898 | 100.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 96.88 | 9,688.00 | | | |
| 20.08.2013 / 23.08.2013 | PURCHASE US2545SY3898 | 400.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 96.00 | 38,400.00 | | | |
| 20.08.2013 / 23.08.2013 | PURCHASE US2545SY3898 | 324.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 94.00 | 30,456.00 | | | |

Please examine this statement and report any discrepancies to us within 30 days.

# UBS

**Security Transactions 31.12.2013**

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## USD

By Currency & Value Date

| Trade Date Value Date | Transaction Type | Quantity Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 20.08.2013 23.08.2013 | PURCHASE US25459Y3898 | 500.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 94.92 | 47,462.00 | | | |
| 20.08.2013 23.08.2013 | SALE US25459Y3898 | 300.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 97.40 | 29,220.00 | | | 0.51 |
| 20.08.2013 23.08.2013 | SALE US25459Y3898 | 1,324.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 95.20 | 126,050.32 | | | 2.19 |
| 26.08.2013 26.08.2013 | PURCHASE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 24.40 | 24,400.00 | | | |
| 21.08.2013 26.08.2013 | SALE US25459W2355 | 1,000.0000 DIREXION SHARES ETF TRUST | 24.00 | 24,000.00 | | | 0.42 |
| 21.08.2013 26.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 93.00 | 93,000.00 | | | |
| 21.08.2013 26.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 91.77 | 91,774.00 | | | |
| 21.08.2013 26.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 91.11 | 91,110.00 | | | |
| 21.08.2013 26.08.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 91.00 | 91,000.00 | | | 1.58 |
| 21.08.2013 26.08.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 91.17 | 91,174.00 | | | 1.59 |
| 21.08.2013 26.08.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 91.71 | 91,705.70 | | | 1.60 |
| 21.08.2013 26.08.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 92.50 | 92,500.00 | | | 1.58 |
| 21.08.2013 26.08.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 90.87 | 90,870.00 | | | 1.58 |
| 21.08.2013 26.08.2013 | SALE US25459Y3898 | -1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 90.87 | -90,870.00 | | | -1.58 |
| 21.08.2013 26.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 93.64 | 93,639.00 | | | |
| 23.08.2013 28.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 95.00 | 95,000.00 | | | |
| 23.08.2013 28.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 96.59 | 96,588.00 | | | |

Please examine this statement and report any discrepancies to us within 30 days.



**UBS**

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

# Security Transactions 31.12.2013

**USD**

By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 23.08.2013 / 28.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 95.63 | 95,633.84 | | | |
| 23.08.2013 / 28.08.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 96.32 | 96,315.75 | | | 3.33 |
| 23.08.2013 / 28.08.2013 | SALE US25459Y3898 | 2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 95.56 | 191,113.24 | | | 3.34 |
| 26.08.2013 / 29.08.2013 | SALE US25459Y3898 | 2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 96.68 | 193,360.00 | | | 3.34 |
| 26.08.2013 / 29.08.2013 | SALE US25459Y3898 | 2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 95.95 | 191,895.70 | | | -3.34 |
| 26.08.2013 / 29.08.2013 | SALE US25459Y3898 | -2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 95.95 | -191,895.70 | | | |
| 28.08.2013 / 03.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 24.23 | 121,173.00 | | | |
| 28.08.2013 / 03.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 25.32 | 126,624.90 | | | |
| 28.08.2013 / 03.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 24.68 | 123,423.40 | | | |
| 28.08.2013 / 03.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 25.43 | 127,161.00 | | | |
| 28.08.2013 / 03.09.2013 | SALE US25459W2355 | 15,000.0000 DIREXION SHARES ETF TRUST | 26.37 | 395,593.79 | | | 6.88 |
| 28.08.2013 / 03.09.2013 | SALE US25459W2355 | 10,000.0000 DIREXION SHARES ETF TRUST | 26.48 | 264,794.25 | | | 4.61 |
| 28.08.2013 / 03.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 25.22 | 126,106.04 | | | |
| 03.09.2013 / 06.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 79.92 | 79,924.00 | | | |
| 03.09.2013 / 06.09.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 79.90 | 79,900.00 | | | 1.39 |
| 05.09.2013 / 10.09.2013 | PURCHASE US25459W8477 | 2,000.0000 DIREXION DAILY SMALL CAP BULL | 55.35 | 110,692.00 | | | |
| 05.09.2013 / 10.09.2013 | SALE US25459W8477 | 2,000.0000 DIREXION DAILY SMALL CAP BULL | 55.21 | 110,411.00 | | | 1.92 |

Please examine this statement and report any discrepancies to us within 30 days.



**UBS**

NO. 32'377

Portfolio Number: 32377

Statement of Assets as of 31.12.2013

# Security Transactions 31.12.2013

**USD**

By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 05.09.2013 / 10.09.2013 | PURCHASE US25459Y6941 | 1,000.0000 DIREXION SHARES ETF TRUST | 66.62 | 66,623.00 | | | |
| 05.09.2013 / 10.09.2013 | SALE US25459Y6941 | 1,000.0000 DIREXION SHARES ETF TRUST | 65.88 | 65,877.10 | | | 1.15 |
| 05.09.2013 / 10.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 28.48 | 142,405.00 | | | |
| 05.09.2013 / 10.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 28.10 | 140,500.00 | | | |
| 05.09.2013 / 10.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 28.27 | 141,372.00 | | | 2.45 |
| 05.09.2013 / 10.09.2013 | SALE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 28.17 | 140,833.00 | | | |
| 05.09.2013 / 10.09.2013 | SALE US25459W2355 | 10,000.0000 DIREXION SHARES ETF TRUST | 27.80 | 278,000.00 | | | 4.84 |
| 06.09.2013 / 11.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.65 | 74,645.60 | | | |
| 06.09.2013 / 11.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.80 | 74,799.01 | | | |
| 06.09.2013 / 11.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.33 | 74,333.00 | | | |
| 06.09.2013 / 11.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.43 | 74,432.00 | | | |
| 06.09.2013 / 11.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.10 | 74,100.50 | | | |
| 06.09.2013 / 11.09.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 73.82 | 73,817.00 | | | 1.28 |
| 06.09.2013 / 11.09.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 73.84 | 73,840.00 | | | 1.28 |
| 06.09.2013 / 11.09.2013 | SALE US25459Y3898 | 3,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.48 | 223,447.50 | | | 3.89 |
| 09.09.2013 / 12.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.50 | 74,498.00 | | | |
| 09.09.2013 / 12.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.54 | 74,543.00 | | | |

Please examine this statement and report any discrepancies to us within 30 days.

 UBS

# Security Transactions 31.12.2013

NO. 3 2 '3 7 7
Portfolio Number 3237?
Statement of Assets as of 31.12.2013

## USD

By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 09.09.2013 / 12.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.94 | 74,943.50 | | | |
| 09.09.2013 / 12.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.70 | 74,699.00 | | | |
| 09.09.2013 / 12.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 74.65 | 74,653.50 | | | |
| 09.09.2013 / 12.09.2013 | SALE US25459Y3898 | 5,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 73.96 | 369,778.00 | | | 6.43 |
| 10.09.2013 / 13.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.07 | 124,265.00 | | | |
| 10.09.2013 / 13.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.20 | 124,800.00 | | | |
| 10.09.2013 / 13.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.10 | 124,396.00 | | | |
| 10.09.2013 / 13.09.2013 | SALE US25459W2355 | 16,000.0000 DIREXION SHARES ETF TRUST | 31.08 | 497,243.01 | | | 8.65 |
| 10.09.2013 / 13.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.18 | 124,723.61 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.61 | 126,444.00 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.97 | 127,886.00 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.48 | 125,920.00 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 32.24 | 128,944.00 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.92 | 127,665.00 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 32.42 | 162,084.00 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 33.06 | 165,307.40 | | | |
| 11.09.2013 / 16.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 31.82 | 127,293.00 | | | 2.21 |

Please examine this statement and report any discrepancies to us within 30 days.

Detailed Transactions

# Security Transactions 31.12.2013

NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

**USD** | By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 11.09.2013 / 16.09.2013 | SALE US25459W2355 | 7,000.0000 DIREXION SHARES ETF TRUST | 31.67 | 221,676.00 | | | 3.86 |
| 11.09.2013 / 16.09.2013 | SALE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 32.45 | 162,268.00 | | | 2.82 |
| 11.09.2013 / 16.09.2013 | SALE US25459W2355 | 5,000.0000 DIREXION SHARES ETF TRUST | 32.78 | 163,906.28 | | | 2.85 |
| 11.09.2013 / 16.09.2013 | SALE US25459W2355 | 9,000.0000 DIREXION SHARES ETF TRUST | 31.96 | 287,640.00 | | | 5.00 |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 63.35 | 63,345.00 | | | |
| 11.09.2013 / 16.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 63.49 | 63,489.60 | | | 1.10 |
| 11.09.2013 / 16.09.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 63.36 | 63,362.00 | | | 1.10 |
| 11.09.2013 / 16.09.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 63.28 | 63,280.00 | | | |
| 12.09.2013 / 17.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 34.80 | 139,192.00 | | | |
| 12.09.2013 / 17.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.20 | 140,806.57 | | | |
| 12.09.2013 / 17.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 34.70 | 138,790.00 | | | |
| 12.09.2013 / 17.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 34.70 | 138,790.00 | | | |
| 12.09.2013 / 17.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.28 | 141,130.64 | | | 2.46 |
| 12.09.2013 / 17.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 34.78 | 139,112.00 | | | 2.42 |
| 12.09.2013 / 17.09.2013 | SALE US25459W2355 | 8,000.0000 DIREXION SHARES ETF TRUST | 34.79 | 278,351.39 | | | 4.84 |
| 12.09.2013 / 17.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.20 | 140,808.10 | | | |
| 12.09.2013 / 17.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.20 | 140,799.00 | | | 2.45 |

Please examine this statement and report any discrepancies to us within 30 days.



NO. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

# Security Transactions 31.12.2013

## USD

By Currency & Value Date

| Trade Date Value Date | Transaction Type | Quantity Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 13.09.2013 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.74 | 142,958.00 | | | |
| 13.09.2013 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.82 | 143,293.00 | | | |
| 13.09.2013 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.64 | 142,560.00 | | | |
| 13.09.2013 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 37.09 | 148,342.00 | | | |
| 13.09.2013 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 36.36 | 145,448.00 | | | |
| 13.09.2013 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.82 | 143,283.00 | | | |
| 13.09.2013 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.60 | 142,404.00 | | | |
| 13.09.2013 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 36.99 | 147,957.00 | | | |
| 13.09.2013 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.94 | 143,760.00 | | | |
| 13.09.2013 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 36.46 | 145,849.00 | | | |
| 13.09.2013 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.94 | 143,773.00 | | | |
| 13.09.2013 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.65 | 142,612.00 | | | |
| 13.09.2013 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 36.01 | 144,040.00 | | | |
| 13.09.2013 18.09.2013 | SALE US25459W2355 | 1,860.0000 DIREXION SHARES ETF TRUST | 36.99 | 68,806.80 | | | 1.20 |
| 13.09.2013 18.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 37.00 | 148,000.00 | | | 2.58 |
| 13.09.2013 18.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 36.43 | 145,706.40 | | | 2.54 |
| 13.09.2013 18.09.2013 | SALE US25459W2355 | 2,120.0000 DIREXION SHARES ETF TRUST | 37.18 | 78,827.60 | | | 1.37 |





NO. 3 2 · 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

# Security Transactions 31.12.2013

**USD**

By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 13.09.2013 / 18.09.2013 | SALE US25459W2355 | 16,000.0000 DIREXION SHARES ETF TRUST | 35.47 | 567,516.24 | | | 9.87 |
| 13.09.2013 / 18.09.2013 | SALE US25459W2355 | 12,000.0000 DIREXION SHARES ETF TRUST | 36.51 | 438,166.44 | | | 7.62 |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 55.86 | 55,858.75 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 55.18 | 55,184.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 55.31 | 55,309.00 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 55.14 | 55,137.50 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 54.86 | 54,860.65 | | | |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459Y3898 | 5,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 55.39 | 276,949.90 | | | |
| 13.09.2013 / 18.09.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 54.63 | 54,625.00 | | | 0.95 |
| 13.09.2013 / 18.09.2013 | SALE US25459Y3898 | 1,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 55.78 | 55,777.00 | | | 0.97 |
| 13.09.2013 / 18.09.2013 | SALE US25459Y3898 | 8,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 55.21 | 441,669.15 | | | 7.69 |
| 13.09.2013 / 18.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.90 | 143,601.00 | | | |
| 13.09.2013 / 18.09.2013 | SALE US25459W2355 | 20.0000 DIREXION SHARES ETF TRUST | 36.90 | 738.00 | | | 0.01 |
| 13.09.2013 / 18.09.2013 | SALE US25459W2355 | 16,000.0000 DIREXION SHARES ETF TRUST | 35.75 | 572,027.01 | | | 9.95 |
| 16.09.2013 / 19.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 34.66 | 138,626.50 | | | |
| 16.09.2013 / 19.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 34.26 | 137,021.00 | | | |
| 16.09.2013 / 19.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.00 | 140,000.00 | | | 2.44 |

**UBS**

No. 3 2 ' 3 7 7
Portfolio Number: 32377
Statement of Assets as of 31.12.2013

## Security Transactions 31.12.2013

**USD**                    By Currency & Value Date

| Trade Date / Value Date | Transaction Type | Quantity / Description | Price | Gross Amt | Fees/Commissions | Accrued Interest | Withholding Tax |
|---|---|---|---|---|---|---|---|
| 16.09.2013 / 19.09.2013 | SALE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 33.90 | 135,600.00 | | | 2.36 |
| 16.09.2013 / 19.09.2013 | PURCHASE US25459Y3898 | 2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 56.10 | 112,199.00 | | | |
| 16.09.2013 / 19.09.2013 | PURCHASE US25459Y3898 | 2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 57.87 | 115,733.00 | | | 1.99 |
| 16.09.2013 / 19.09.2013 | SALE US25459Y3898 | 2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 57.30 | 114,600.00 | | | 1.97 |
| 16.09.2013 / 19.09.2013 | SALE US25459Y3898 | 2,000.0000 DIREXION SHS ETF TRUST DAILY GOLD MINERS | 56.69 | 113,380.82 | | | |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.49 | 141,976.95 | | | |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.17 | 140,664.00 | | | |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.12 | 140,466.72 | | | |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.54 | 142,160.00 | | | |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.62 | 142,499.00 | | | |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.20 | 140,800.00 | | | |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.64 | 142,561.00 | | | |
| 17.09.2013 / 20.09.2013 | SALE US25459W2355 | 16,000.0000 DIREXION SHARES ETF TRUST | 35.05 | 560,778.00 | | | 9.76 |
| 17.09.2013 / 20.09.2013 | PURCHASE US25459W2355 | 4,000.0000 DIREXION SHARES ETF TRUST | 35.18 | 140,727.00 | | | |
| 18.09.2013 / 23.09.2013 | SALE US25459W2355 | 8,000.0000 DIREXION SHARES ETF TRUST | 29.68 | 237,456.00 | | | 4.13 |
| 18.09.2013 / 23.09.2013 | SALE US25459W2355 | 8,000.0000 DIREXION SHARES ETF TRUST | 30.08 | 240,678.00 | | | 4.19 |

Please examine this statement and report any discrepancies to us within 30 days.

Detailed Transactions



# UBS

NO. 3 2 ´ 3 7 7

Portfolio Number: 32377

Statement of Assets as of 31.12.2013

# Foreign Exchange Rates, Abbreviations and Explanations

Foreign Exchange Rates

**Market Value in (USD) is based on the following exchange rates:**

| | | | | | |
|---|---|---|---|---|---|
| EUR | Euro | 1 = | 1.375750 | 1 USD = | 0.726876 EUR |
| USD | U.S. Dollar | 1 = | 1.000000 | 1 USD = | 1.000000 USD |

Please examine this statement and report any discrepancies to us within 30 days.

**% UBS**

NO 3 2 ' 3 7 7

Portfolio Number: 32377

Statement of Assets as of 31.12.2013

## Other Information

The information contained herein is based on information provided to UBS (Bahamas) Limited ("UBS") from sources which UBS believes to be reliable. Valuation information for particular assets is derived from different sources in the market and as a result, the price of a particular asset may be valued differently. The effect of this is that multiple statements may be received showing a particular asset listed at differing prices. Although care has been taken in preparing the information UBS cannot and does not guarantee its accuracy. UBS cannot be held responsible for any errors or omissions and accepts no liability or responsibility, directly or indirectly for any losses or damages whatsoever resulting from the use (or misuse) of the information contained or implied herein.

Please examine this statement and report any discrepancies to us within 30 days.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YURI STAROSTENKO
IRINA TSAREVA,
on behalf of themselves and all others similarly situated,
Plaintiffs,

_____ CV _____

    -against-

UBS AG (A SWISS BANK)
Defendant.

# Bundle of Exhibits 1 to 6

# COMPLAINT

# Exhibit 1

 **UBS**

**UBS (Bahamas) Ltd.**
East Bay Street
P.O. Box N-7757
Nassau, Bahamas
Tel +1242-394-9300

www.ubs.com

# Dealing Procedure Manual
# UBS Capital Markets (CM)
# (Booking Center Bahamas)

| Reviewed by: | Kevin Price | IPS Head Nassau |
| --- | --- | --- |
| | Thibaud Halewyck | Capital Markets Head Nassau |

| Approved by: | Kevin Price | IPS Head Nassau |
| --- | --- | --- |
| | Thibaud Halewyck | Capital Markets Head Nassau |
| | Beat Paoletto | CEO Nassau |
| | Urs Stettler | COO Nassau |
| | Andreas Ito | Risk Head Nassau |

| Applies to: | Treasury | - All Staff |
| --- | --- | --- |
| | Foreign Exchange | - All Staff |
| | Securities Execution | - All Staff |
| | CM DAC | - All Staff |
| | Investment Management | - As appropriate |

**Abbreviations used:**

| Classification | For internal use only |
| --- | --- |
| Date | April 2013 |
| Author(s) | Thibaud Halewyck |
| Version | V2 |
| Status | Final |

 **UBS**

| | |
|---|---|
| CM | Capital Markets |
| FIM | Financial Intermediary |
| APS | Active Portfolio Supervision |
| UBS IB | UBS Investment Bank |
| ICRM | Intl. Client Relationship Management |
| DAC | Direct Access clients – Capital Markets Service |

 **UBS**

For internal use only

# Table of Contents

**A. Execution: NON DAC CLIENTS**

| | | |
|---|---|---|
| 1 | Introduction | 6 |
| 1.1 | Aims and Objectives | 6 |
| 1.2 | Eligible Instruments | 6 |
| | | |
| 2 | Organisation and Responsibilities | 7 |
| 2.1 | Current Business Model | 7 |
| 2.2 | Responsibilities | 7 |
| 2.3 | Trading Errors | 7 |
| 2.4 | Systems Access and Control | 7 |
| | | |
| 3 | Securities | 8 |
| 3.1 | Wealth Management Securities Dealing Policy Statement | 8 |
| 3.2 | Exceptions / Special Situations | 8 |
| 3.2.1 | Investment Management: | 8 |
| 3.2.2 | Good till Cancelled Orders (GTC): | 8 |
| 3.2.3 | Short Sales / Overdrawn Accounts: | 8 |
| 3.2.4 | Back-Valued Transactions: | 9 |
| 3.2.5 | Riskless Principal trades: | 9 |
| 3.3 | Pre Order / Trade Execution Duties:  Product Suitability Confirmation | 9 |
| 3.4 | Orders | 9 |
| 3.4.1 | General Execution Desk Order Procedures using OES | 9 |
| 3.4.2 | General Execution Desk Order Procedures using Paper Tickets | 10 |
| 3.4.3 | Switch Orders | 11 |
| 3.4.4 | Limit Orders | 11 |
| 3.4.5 | Stop Loss Orders | 11 |
| 3.4.6 | Not Held or Careful Discretion Orders | 11 |
| 3.4.7 | Verbal Orders | 11 |
| 3.4.8 | Hand Written Orders | 11 |
| 3.4.9 | Orders for markets in other time zones | 12 |
| 3.4.10 | Cancellation of Orders | 12 |
| 3.5 | Trade Execution | 12 |
| 3.5.1 | Exchange Traded and OTC Derivatives | 12 |
| 3.5.2 | Fixed Income and OTC | 13 |
| 3.5.3 | Broker Selection | 13 |
| 3.5.4 | Trade Execution Priority | 13 |
| 3.5.5 | Order Aggregation | 14 |
| 3.5.6 | Executing Funds | 14 |
| 3.6 | Special Situations | 14 |

�des UBS                                                  For internal use only

| | | |
|---|---|---|
| 3.6.1 | Initial Public Offerings (IPOs)/ primary market subscriptions | 14 |
| 3.7 | Proprietary Limits | 15 |
| 3.8 | Post Trade / Execution Duties | 15 |
| | | |
| 4 | Treasury, FX Spot and FX Forwards | 15 |
| 4.1 | Wealth Management Treasury and FX Dealing Policy Statement | 15 |
| 4.2 | Exceptions | 16 |
| 4.3 | Pre Order / Trade Execution Duties | 16 |
| 4.4 | Orders | 16 |
| 4.4.1 | General Order Procedures | 16 |
| 4.4.2 | Foreign Exchange (FX) spots and precious metal spots | 16 |
| 4.4.3 | FX Forwards, swaps and Precious Metals Forwards | 17 |
| 4.4.4 | Money Markets (MM) | 17 |
| 4.4.5 | Cash Management | 17 |
| 4.4.6 | Cancellation of Orders | 17 |
| 4.5 | Trade Execution | 18 |
| 4.5.1 | General | 18 |
| 4.5.2 | Best Execution | 18 |
| 4.6 | Special Situations | 18 |
| 4.7 | Limits | 18 |
| 4.7.1 | Foreign Exchange | 18 |
| 4.7.2 | Money Market | 18 |
| | | |
| 5 | Rates and Payments | 19 |
| 5.1 | Rates | 19 |
| 5.2 | Payments involving FX | 19 |
| | | |
| 6 | Appendices | 19 |
| 6.1 | CM Workflow and Product Shelf | 19 |
| 6.2 | FX and IR Limits | 19 |

**B. Execution: DIRECT ACCESS PLATFORM**

| | | |
|---|---|---|
| 1 | Service Overview | 20 |
| | | |
| 2 | Bahamas DAC Service | 21 |
| | | |
| 3 | Responsibilities | 21 |
| 3.1 | Client Advisor (CA) | 21 |
| 3.2 | DAC Advisor | 21 |
| 3.3 | Operations Team | 21 |
| | | |
| 4 | DAC Onboarding and review process | 22 |
| 4.1 | Onboarding process | 22 |
| 4.2 | Annual DAC Review | 22 |
| 4.3 | Direct Access Termination Process | 23 |
| 4.4 | Supporting Documents | 23 |

 **UBS**

For internal use only

| | | |
|---|---|---|
| 5 | Front to Back Order Execution | 23 |
| 5.1 | Orders – General | 23 |
| 5.1.1 | Equities | 24 |
| 5.1.2 | Exchange Traded Derivatives | 24 |
| 5.1.3 | Equity Short Selling | 24 |
| 5.1.4 | Fixed Income / OTC Structured Products | 25 |
| 5.1.5 | Fixed Income Short Selling | 25 |
| 5.1.6 | NDFs, DFs, FX Options | 25 |
| 5.1.7 | Investment Funds (UBS and 3rd Party) | 25 |
| 5.2 | Paper tickets | 25 |
| 5.3 | End of day process: | 26 |
| 5.4 | Fee Schedule: commissions vs  Riskless Principal | 26 |
| 5.5 | Fallback, Conflicts handling and Investigations | 26 |
| 5.5.1 | Fallback – Tape recordings | 27 |
| 5.5.2 | Conflict handling & Clarifications | 27 |

**C. IPS Supplemental Support and Controls**

| | | |
|---|---|---|
| 1 | Suitability | 28 |
| 2 | Cross Border Compliance Monitoring | 28 |
| 3 | Personal Account Dealing | 28 |

 **UBS**

**A- EXECUTION: NON DAC CLIENTS**

# 1   Introduction

## 1.1   Aims and Objectives

Being compliant with these procedures, with regular review and update, will ensure:

➢ Satisfaction of client requirements whilst mitigating operational risk and minimizing transaction related losses

➢ Clear delineation of duties and responsibilities between Client Advisors and Capital Markets execution desk.

➢ Accuracy of UBS' Bahamas books and records with respect to trade orders to achieve compliant status with applicable regulations.

➢ Timeliness and efficiency in the execution and processing of trade orders.

➢ Priority of trade execution on behalf of advisory and portfolio management clients.

➢ Clarification of CM execution desk's responsibilities.

➢ Mitigate the risk of fraud.

## 1.2   Eligible Instruments

The Execution desk, in respect to dealing related activities, may accept orders in the following instruments (Implementation of procedures may be required for OTC instruments and structured products):

| | |
|---|---|
| ➢ Equities | All equity markets with established settlement systems and freely convertible currencies, including Warrants. |
| ➢ Foreign Exchange | All leading currencies except those with currency control procedures in place, including Spots, Forwards and Swaps. |
| ➢ Money Markets | Fixed Term deposits |
| ➢ Bonds | All bond markets with freely convertible currencies, incl. plain vanilla, Convertibles, Reverse Convertibles and Eurobonds. |
| ➢ Exchange Traded Derivatives | Futures, Listed Options |
| ➢ OTC instruments etc | UBS and third party products such as GOALs, PIPs, BLOCs, PERLES, GROIs, |
| ➢ OTC Derivatives | NDFs, Options on NDFs, Options on FWDs |