# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

YURI STAROSTENKO
IRINA TSAREVA,
and all others similarly situated,

Plaintiffs,

**1:19-cv-09993-KPF**

-against-

**FIRST AMENDED COMPLAINT**

UBS AG (A SWISS BANK)

Defendant.

## SUMMARY

1.  UBS AG conducted a fraudulent securities scheme through the use of deceptive practices involving the concealment of assets or securities transactions, manipulation of bank account balances through the use of fictitious bank or accounting records, a corporate shell, and third-party accounts. The totality of the scheme was sophisticated either in the execution or concealment.

2.  The purchases and sales of securities registered on United States national securities exchanges were an integral or helpful component of the fraudulent scheme directly related to both the trading process in the United States  whereby UBS AG  diverted the plaintiffs' funds to its own use.

3.  UBS AG conducted an anti-competitive scheme by which trading in certain United States securities on national securities exchanges was restrained.

# I. BASIS FOR JURISDICTION

**Federal Question**

4.  Claims of this First Amended Complaint arose under the federal securities laws, which granted federal district courts exclusive jurisdiction over suits and nationwide service of process.

**General Jurisdiction**

5.  UBS AG is a foreign defendant, and not subject to any state's courts of general jurisdiction.

6.  Venue is proper under 28 U.S.C. § 1391(c)(3), which provides that "a defendant not resident in the United States may be sued in any judicial district." 28 U.S.C. § 1391(c)(3).

    With respect to UBS AG, thus, the plaintiffs may take advantage of the nationwide service of process, Fed. R. Civ. P. 4(k)(2), and the venue provisions of § 1391.

**Basis for Court's personal jurisdictions**

7.  Personal jurisdiction is asserted over UBS AG pursuant to section 27 of the Securities Exchange Act which extend personal jurisdiction to the full reach permitted by the due process clause.

8.   Because the Court's jurisdiction is invoked based on the federal laws authorizing nationwide or worldwide service of process the proper forum for minimum contacts purposes is the United States as a whole.

9.   Plaintiffs assert two alternative grounds for personal jurisdiction over UBS AG: specific and supplemental.

*Specific or conduct-linked jurisdiction*

10.   This action is based upon activities of UBS AG that arise out of or relate to its contacts with the forum.

11.   The allegations in this Complaint give rise to the reasonable inference that UBS AG by engaging in securities trading activity in the United States participated in the fraudulent scheme in the United States or participated elsewhere with the aim to cause harm in the United States.

12.   Specific jurisdiction in this case exists and may be exercised by the Court because '"the cause of action arises out of the very activity being conducted, in part," inside the forum' and, in part, out-of-forum, or "has a substantial connection with that activity", where the jurisdictional contacts with the forum were "in-forum effects" harmful to the plaintiffs.

13.   UBS AG engaged in conduct to impose trade restraints in the United States securities market that had substantially affected interstate and United States import trade and commerce.

14.   Thus, the illegal conduct either took place in, or was directed into, the United States, or had effects expressly aimed inside the United States due to UBS AG's substantial securities businesses in this country, and has resulted in injury and damage not only to the plaintiffs but to a class throughout the United States.

15.   For instance: during the relevant period, UBS AG did not effect or complete securities transactions in a continuous and uninterrupted flow of interstate and U.S. import trade and commerce to customers and counterparties located in U.S. states or foreign countries in which UBS AG agreed to purchase or sell these securities.

16.   The business activities of UBS AG in connection with the purchase and sale of securities were the subject of the fraudulent scheme and were within the flow of, and substantially affected, interstate and U.S. import trade and commerce.

17.   The scheme had a direct effect on trade and commerce within the United States, as well as on U.S. import trade and commerce, and was carried out, in part, within the United States.

18.   UBS AG has "purposefully directed" its activities toward the United States and "expressly aimed its conduct at the forum."

19.   UBS AG purposefully established and was engaged in sufficient minimum contacts to support specific jurisdiction over it.

*Minimum contacts*

20.   The following UBS AG's contacts throughout the United States may be considered for personal jurisdiction purposes.

21.   First of all, UBS AG's contacts with the United States involve ongoing business relationships and brokerage accounts maintained at securities broker-dealers as service to its banking customers, including the plaintiffs.

22.   The purpose of UBS AG was to provide a specific and important service to its customers, including the plaintiffs, such as the purchase and sale of United States securities on United States exchanges by trading on these  exchanges that was to be carried out by a broker in the United States.

23.   Primarily, UBS AG must have maintained a brokerage account with a United States brokerage firm as a service to its customers in the expectation that this extra service will attract present and potential customers, including the plaintiffs, and thus "inure to its benefit."

24.   UBS AG must have maintained a United States dollar bank account for purposes of carrying out the purchases and sales of securities of United States companies and trusts traded on United States exchanges such as shares of exchange-traded funds subject to this action.

25.   The use of both a brokerage and a United States dollar account was implied and necessary to fulfill UBS AG's agency duty and to facilitate the "the transfer[s] of cash or securities made to complete securities transaction[s]" within the definition interpreted "in the context of the securities industry", out of which causes of action arose.

26.   Secondly, bank and accounting records of securities transactions, the UBS Bahamas' Statements of Account 32,377/01,00 of Junkanoo Estates Ltd. and UBS AG's "Junkanoo Estates Ltd - Trade Confirmation" and "UBS (Bahamas) Ltd - Custodian Instructions" and "UBS (Bahamas) Ltd Security Trail Contracts" (*see* Discovery of fraud in this Complaint), related to a "securities contract" were made in connection with purchases and sales of securities on the NYSE and NASDAQ and were a means by which UBS AG defrauded the plaintiffs.

27.   Thus, the "securities contract", records of securities transactions and a U.S. dollar bank account were related to, and gave rise to, the causes of action for failure to execute securities trades on U.S. national securities exchanges because they were the means by which the purchases and sales were represented as such that were carried out and because each of the contacts was a step by which the fraudulent securities scheme was carried out.

28.   On the other hand, "Even a single purposeful contact may be sufficient to meet the minimum contacts standard when the underlying proceeding is directly related to that contact."

29. Second of all, UBS AG's contacts with the United States were not 'random, fortuitous, or attenuated' or those on the unilateral activity' of the plaintiffs. Instead, UBS AG contemplated a continuing relationship with the plaintiffs and the forum by maintaining offices and personnel in the United States and advertising in United States newspapers, magazines and other media.

30. UBS AG's presence in the United States such as, for example, maintaining branches, having U.S.-based employees, including those with whom UBS AG made communications in furtherance of or who participated in the fraudulent and anti-competitive schemes or who knew about false records of transactions on national securities exchanges, or who made directives from the United States that facilitated or encouraged these schemes, would be possible to identify during discovery.

31. Third of all, UBS AG purposefully availed itself of the privileges of conducting activities within the United States, thus invoking the benefits and protections of the laws of the United States, such that it "could reasonably anticipate being subject to the jurisdiction of the United States" and "could reasonably have expected to be haled into court in this country" when it deliberately set about to violate "the general statutory and regulatory prohibition on fraud in connection with the purchase or sale of securities".

32. UBS AG was fully aware or knew or had good reason to know that their conduct, actions or omissions would have effects in the United States.

33.     Thus, UBS AG had or must have had an awareness of the effects in the United States of its violative activity that arise out of or relate to its contacts with the United States.

34.     Even if the relevant conduct purportedly took place outside the forum, the contacts with the United States had in-forum effects harmful to the plaintiffs caused by UBS AG expressly aiming its conduct at the United States' securities markets.

35.     Since the cause of action here arises out of the purchases and sales of United States shares of exchange-traded funds in the United States which were not only the direct and foreseeable but the intended "effects" of UBS AG's "acts" in New York, Connecticut, Switzerland or elsewhere, this Court has jurisdiction over it.

36.     Fourth of all, exercising jurisdiction over UBS AG comports with due process pursuant to traditional notions of fair play and substantial justice because:

   36.1.    (1) it would not be a significant burden on UBS AG to litigate in the United States as the "modern methods of transportation and communication" have ameliorated and "lessened the burden of defending a lawsuit in a distant forum". Much of the evidence needed exists in New York city, in the UBS AG's records and the records of the NYSE, NASDAQ, custodians of the relative exchange-traded funds and the Depository Trust Corporation (DTC);

36.2.    (2) there is the United States' "obvious interest in stamping out the type of nefarious economic chicanery alleged";

36.3.    (3) the plaintiffs' have a strong interest in litigating this case in this forum because they have no other means of obtaining relief;

36.4.    (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy or the shared interest of the several states in furthering substantive policies regarding transactions in securities on U.S. national securities exchanges; and

36.5.    (5) "[t]here is a strong interest in having an American court interpret and apply U.S. securities law claims."

36.6.    Additionally, UBS AG has consented to appear in this forum, therefore the Court's exercise of personal jurisdiction comports with due process.

37.    Fifth of all, UBS AG's contacts are such sufficiently "`continuous and systematic'" that the exercise of jurisdiction would be "`reasonable and just.'"

38.    Nothing in the nature of either the effects or UBS AG's contacts with this forum suggest that the exercise of such jurisdiction is "unreasonable."

39.    Thus, this case is not "one of those rare cases in which minimum requirements inherent in the concept of fair play and substantial justice . . . defeat the reasonableness of jurisdiction. . . ."

40. Sixth of all, the plaintiffs' injury resulted directly from the UBS AG's conduct within the United States in the course of its agency for their trade orders to purchases and sales of United States securities on United States exchanges, and there is no risk of potential conflict with foreign nations' laws.

41. Thereby, UBS AG purposefully established minimum contacts with the forum sufficient to confer specific jurisdiction on the plaintiffs' federal claims against it.

42. Accordingly, those contacts suffice "to make it fair to require defense of the action in (this) forum."

43. The plaintiffs contend that they made a *prima facie* showing that this District Court has personal jurisdiction over UBS AG.

**Other subjects of the Court's personal jurisdictions**

44. UBS AG that is subject to the personal jurisdiction of the courts of the United States, its employees or members may themselves be subject to jurisdiction if those employees were primary participants in the activities forming the basis of jurisdiction over UBS AG.

45. For the same reasons set forth above in connection with UBS AG, this Court may properly assert personal jurisdiction over each of the employees or members of UBS AG or UBS Group AG or any its subsidiary because, when such an individual undertook their responsibilities in connection with the plaintiffs, he or

she knew or had good reason to know, that his or her conduct would have effects in the United States.

46.   In the alternative, the plaintiffs contend that they may seek permission to engage in jurisdictional discovery in order to amend allegations of jurisdiction.

**Venue under Clayton Act**

47.   Venue lies in this District under Section 12 of the Clayton Act because a substantial part of the events comprising acts, practices and courses of business constituting violations of the Act relate to trading venues, the New York Stock Exchange ("NYSE") and NASDAQ, both operated in New York, New York, where the defendants named in this action transact business, 15 U.S.C. § 22.

## II. NAMED PARTIES

**A. Plaintiffs' Information**

48.   Plaintiffs, Yuri Starosteko and Irina Tsareva, (collectively the "plaintiffs"), were traders in securities, husband and wife and parents of six children residing on New Providence Island, The Bahamas; address for service by hand: c/o Priderock Corporate Centre, 11 East Street & Bay Street, City of Nassau, the Bahamas; postal address: P.O. Box N-4816, Nassau, the Bahamas. Phone#: 1(242)817-4372; email: starostenkovubsag@gmail.com

49.     Originally the plaintiffs sought to represent a class of purchasers and sellers of securities on United States exchanges.

**B. Defendant's Information**

50.     Defendant, UBS AG (the "defendant" or "defendant bank" or "UBS" or "UBS Group AG"), was a Swiss corporation organized as an Aktiengesellschaft (AG) that has issued shares of common stock to investors listed on New York Stock Exchange ("NYSE"). UBS AG headquartered in Zurich and Basel with offices in the City of New York, New York, Stamford, Connecticut, United States.

51.     UBS AG's stock is publicly traded on the New York Stock Exchange and it has a class of securities registered under Section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d).

52.     UBS AG globally maintains a net of direct and indirect, incorporated and unincorporated entities, subsidiaries, affiliates, branches, *etc.* under umbrella names "UBS AG" or "UBS Group" or "UBS Group AG".

### III. STATEMENT OF CLAIM

**FACTS:**

**Places**

53.    Places of occurrence of the acts of primary liability by UBS AG are the City of New York, New York, Weehawken, New Jersey, Stamford, Connecticut, the United States, Nassau, The Bahamas, locations in Switzerland and elsewhere.

54.    Acts, practices and courses of business in furtherance of the fraudulent scheme were carried out within the Southern District of New York where the New York Stock Exchange ("NYSE") and the National Association of Securities Dealers Automated Quotations System ("NASDAQ") are operated and UBS Securities LLC is headquartered and operated, District of New Jersey where UBS Financial Services, Inc. is headquartered, District of Connecticut where UBS AG's branch is headquartered, locations in Switzerland where UBS AG is headquartered and operated, in Nassau, the Bahamas where one of UBS AG's subsidiaries, headquartered and operated, and elsewhere.

**Dates**

55.    Dates of occurrence: between July, 2012 and the date of this First Amended Complaint.

**Plaintiffs as a single entity**

56.    At all times relevant to this Complaint, the plaintiffs were a single entity with Junkanoo Estates Ltd. ("Junkanoo") a company incorporated in the Bahamas and beneficially owned by the plaintiffs, who founded it and solely and exclusively owned and controlled all rights and interests of whatever nature in and to it.

57.    The plaintiffs were Junkanoo's agents which have rights and duties under, and can enforce, Junkanoo's contracts because of their intention to substitute or superadd their personal liability for, or to that of Junkanoo, manifested and proved by the fact that they were guarantors of the loan  and accommodation parties to both the Commitment to Finance dated August 23, 2012, and Indenture of Mortgage (by way of guarantee) made on September, 18, 2012 and thereafter agreed to bind themselves personally to the securities contract (*see* Securities contract in this Complaint).

58.    The plaintiffs were officers of Junkanoo and had unrestricted decision-making authority regarding Junkanoo's bank account 32,377/01,00 through which, between June, 12, 2013 and October 10, 2013, the plaintiffs had purchased and sold securities in the United States, through UBS AG, as a broker engaged in discount brokerage transactions, by placing trade orders with representatives of the Booking Center Bahamas of UBS AG by email or by phone.

**Defendant as a single entity**

59.    At all times relevant to this Complaint, UBS AG and UBS (Bahamas) Ltd. ("UBS Bahamas"), a Bahamian off-shore subsidiary of UBS AG, a banking company incorporated under the laws of the Bahamas, engaged in the business of banking in the Bahamas until the suspension of its banking license by the Central Bank of the Bahamas in 2015, shared a parent-subsidiary relationship in which UBS AG directly owned 99,99999% of the outstanding 4,000,000 voting shares of UBS Bahamas, where "the parent exercised the type of control necessary to ascribe to it the activities of the subsidiary."

60.    UBS AG provided brokerage services in the Bahamas through UBS Bahamas' local activities and used UBS Bahamas as a corporate shell to perform ministerial functions (*see* Account maintenance, order placement & booking functions; Discovery of fraud in this Complaint).

61.    UBS Bahamas was the "alter-ego" or "instrumentality" of UBS AG, where "the separate corporate identities ... are a fiction and ... the subsidiary is, in fact, being operated as a department of the parent" and "where there is a lack of attention to corporate formalities, such as where the assets of two entities are commingled, and their operations intertwined" or "where a corporate parent exercises complete domination and control over its subsidiary" (*see* Account maintenance, order placement & booking functions in this complaint).

62.   The degree of dominion of UBS AG to control UBS Bahamas or 'complete control' was such that all UBS Bahamas activities could be ascribed to UBS AG.

63.   UBS Bahamas was merely a facade for the brokerage services operations of UBS AG in the face of the Booking Center Bahamas, a nonentity of UBS AG (*see* Account maintenance, order placement & booking functions in this complaint).

64.   At the time when UBS Bahamas was a going concern, there was an obvious failure to observe corporate formalities, where there was the direct management by UBS AG and the use of common officers.

65.   In particular, Beat Paoletto, who served as President & CEO of UBS Bahamas, at the same time was a member of UBS AG.

66.   Kevin L. Price, who served as the Investment Portfolio Supervision (IPS) Head Nassau, at the same time, was employed by UBS Financial Services, Inc. according to the FINRA's BrokerCheck Report# 66539-83561 data, current as of Friday, September 04, 2015 (*see* Exhibit KP to this Complaint).

67.   The evidence discovered in the bahamian action shows that representatives of the Booking Center Bahamas of UBS AG did not consider its business unit as an entity independent from UBS AG, rather they considered themselves and the CEO of UBS AG as members of different business units or offices within UBS AG, "the business management unit of Sergio Ermotti (UBS CEO)", who had control

over their office, according to a Memorandum dated January 13, 2013 (*see* Exhibit BU to this Complaint).

68. UBS Bahamas had never been an independent profit center. In 2013-2014, UBS Bahamas' liquidity was compromised solely by the reluctance of UBS AG to support this overseas subsidiary. In particular, UBS AG's intention to liquidate UBS Bahamas was announced to the general public in newspapers circulated in the Caribbean and Bahamas (*see* Exhibit CC to this Complaint).

69. On March 19, 2015, UBS Bahamas was liquidated by passing a resolution of one UBS AG's member, Beat Paoletto.

70. At the time of the commencement of the liquidation UBS Bahamas maintained all its clearing, custodial and brokerage accounts at UBS AG.

71. On March 31, 2015, UBS Bahamas' value of assets in respect of which joint liquidators were appointed was $114,816,054.00 according to the Unaudited Non-Consolidated Statements of Financial Position of UBS (Bahamas) Ltd. registered with the Registrar General's Department on April 29, 2015.

72. In 2015, UBS Bahamas' sold to the Government of the Bahamas its headquarters building at 31A East Bay Street, Nassau, New Providence, the Bahamas, for $22M or about (*see* Exhibits T5 & T7 to this Complaint).

73. In the Bahamian action, UBS Bahamas' attorneys represented on many occasions that it has no credit available.

74.   There is reasonable ground to believe that UBS AG siphoned off the corporate funds and caused gross undercapitalization of UBS Bahamas.

75.   The building at 31A East Bay Street in Nassau is currently headquartered by the Securities Commission of the Bahamas, the Deputy Chairman of the Board of which is Michael Paton, a partner of Lennox Patton, the law firm representing UBS Bahamas in the Bahamian action (*see* Exhibit SB to this Complaint).

76.   Since March 2015, UBS Bahamas has had no officers, directors, or employees, it was not functioning in any manner. Documents filed with the courts in the Bahamian action and the totality of the circumstances in this action have demonstrated the absence of corporate records in that UBS Bahamas did not have records of securities transactions in question.

77.   At all times relevant to this Complaint, an agency relationship in the provision of brokerage services had existed between UBS AG and UBS Bahamas. UBS Bahamas acted with either actual or apparent authority on behalf of UBS AG in its brokerage operations. UBS AG lent the prestige of its name to the products and services offered through UBS Bahamas (*see* Account maintenance, order placement & booking functions in this Complaint).

78.   UBS Bahamas touted UBS AG's or UBS Group AG's brokerage services to the world and placed itself as a part of "the entire global UBS Group" (*see* Reliance in this Complaint).

**Inter-parties relationship**

*Pre-agency negotiations*

79.   At all times relevant to this Complaint, the essential service that UBS AG provided to the plaintiffs was the execution of trades on U.S. national securities exchanges and the settlement of the trades so executed in the U.S. clearance and settlement system.

80.   This was a discount brokerage service where UBS AG "executes orders for securities only and does not give investment advice."

81.   In 2012, at the time of pre-agency negotiations between the plaintiffs and UBS Bahamas, "the relationship was already known: they were future broker-client and hence future agent-principal" with UBS AG, as a broker . UBS AG reputation, as the leading broker, was the only reason why plaintiffs entered relationships with UBS Bahamas, as booking center Bahamas of UBS AG. UBS Bahamas did not offer to the plaintiffs a selection of broker-dealers to execute the trades, but only UBS AG.

82.   UBS Bahamas touted UBS AG's or UBS Group AG's brokerage services to the world and urged the plaintiffs to use the brokerage services of UBS AG or UBS Group AG's, as "the entire global UBS Group", which was thought by them to be their broker(s) advertised as the most excellent service to process their order on US exchanges.

83.   The plaintiffs, as "future principal", and UBS Bahamas, as a department of "future agent" were discussing "the term of the agency", specifically the execution and settlement of their future trades in the United States by UBS AG.

*Pre-agency representations*

84.   During pre-agency negotiations, the plaintiffs relied upon representations by way of advertisement or promotion contained in the printed marketing materials of UBS Bahamas disseminated to the plaintiffs, including a leaflet called "Welcome to UBS (Bahamas) Ltd.", which included the genuine UBS logo on the front page and in which UBS Bahamas describes itself "[a]s a wholly-owned subsidiary of UBS AG, Switzerland" which "gives you access to the advantages of this outstanding offshore location, combined with the services of the entire global UBS Group" and states that "[w]ith UBS (Bahamas) Ltd. you gain access to products and services offered by the UBS Group" and Bahamas trading desk "can execute equity, bond, derivative products" (*see* Exhibits B1 & B2 to this Complaint).

85.   The plaintiffs were led to believe "UBS Group" meant "the entire global UBS Group", the Union Bank of Switzerland, UBS AG was a broker in reliance on the trust and confidence in UBS AG, as the future broker, and relied on UBS Bahamas, as the broker's department called "Booking Center Bahamas" ("Booking Center Bahamas of UBS AG", to deal fairly with them, as "potential

customers", in arranging" the terms of the broker's employment as an agent" of UBS AG.

86.   There was no ground to believe that these representations were false because As to the discount brokerage services, UBS AG and UBS Bahamas were so closely intertwined that they were a single, fully integrated entity because in all aspects of the brokerage business, the two corporations actually functioned as a single entity, and the actions of UBS Bahamas the plaintiffs attributed to UBS AG because of its total domination and control for reasons, as stated here above (*see* Defendant as a single entity in this Complaint; Account maintenance, order placement & booking functions).

*Broker-customer relationship & agency*

87.   UBS AG was a broker-dealer engaged in the business of effecting securities transactions, a broker or dealer not a member of a national securities exchange effecting transactions on such exchange on a regular basis within the scope of 15 U.S.C. § 78f(f)(2) with its primary place of business in Zurich, Switzerland.

88.   "A broker is, by definition, an agent: "an agent who negotiates contracts of purchase and sale (as of real estate, commodities, or securities)." Merriam-Webster's Collegiate Dictionary 145 (10th ed. 2000).

89.   "A "securities broker" is "[a] broker employed to buy or sell securities *for a customer*" (emphasis added) (Black's Law Dictionary 188 (7th ed. 1999)), and

therefore the broker is the customer's agent (see Restatement (Third) of Agency §
1.01 (2006)). Because the broker is the agent and the customer is the principal,
they are in a fiduciary relationship as a matter of law."

90.   Between June, 12, 2013 and October 10, 2013, the plaintiffs had utilized UBS AG
as an executing broker to effect their trade orders by buying and selling securities
for bank account 32,377/01,00.

91.   At all times relevant to this Complaint, the agency relationship began every time
when the plaintiffs placed a trade order with representatives of the Booking
Center Bahamas of UBS AG and ended every time when UBS AG executed or
cause to execute the plaintiff's trade order on a U.S. national securities exchange
and settle or cause to settle the plaintiffs' trade in the U.S. clearance and
settlement system.

92.   Each trade order was an unsolicited instruction from a customer to route that
plaintiffs' order to a United States national securities exchange for execution and
a request that UBS AG consents to act for the plaintiffs and fulfill the requirement
"to process that [customer's] order promptly and in accordance with the terms of
the order".

93.   Throughout their broker-customer relationship, the plaintiffs and UBS AG
implied to have agreed that, in exchange for commission payments to UBS
Bahamas, UBS AG would, on the plaintiffs' trade orders, timely execute trades to
buy or sell particular securities on the major U.S. securities exchanges in

accordance with the trade orders placed with UBS AG by representatives of Booking Center Bahamas of UBS AG, and timely settle these trades so executed in the U.S. clearance and settlement system.

94. Execution of trade orders on behalf of the plaintiffs was the essential service that UBS AG performed in effecting securities transactions.

95. All other actions that remain to be performed by UBS AG between the trade date and the settlement date were of a ministerial nature to effectuate the mechanics of transfers and were merely in confirmation of the trades executed.

96. The plaintiffs purchased United States securities through UBS AG employed to act in an agency capacity without discretionary power as to investment decisions.

97. There was the traditional broker-customer relationship and hence the agency between the plaintiffs established by the securities contract (*see* Securities contract in this Complaint).

98. The plaintiffs were the principal, and UBS AG was the discount broker and duly authorized agent.

99. The realm of securities transactions in the United States was a matter within the scope of that broker-customer relationship and the agency, including the ability to make their trades on U.S. national securities exchanges, acquired through access to the U.S. markets through the use of brokerage services of UBS AG.

100.    The essential service that UBS AG provided to the plaintiffs was execution of the plaintiffs' trades on the major U.S. national securities exchanges required to be effected only through access to the exchanges, where these securities are registered and listed for trading.

101.    The plaintiffs expressly instructed representatives of the Booking Center Bahamas of UBS AG to route their trade orders for execution only to the U.S. major securities exchanges such as the NYSE or NASDAQ.

102.    Generally, UBS AG's routing practices were disclosed by statements at UBS AG's websites: "Our comprehensive broker dealer offering gives you the tools you need to achieve best execution" (*see* "Competitive edge" webpage); "Our clearing and execution team is fully integrated international network"; "Our front-to-back technology gives you fast, direct access to over 70 global exchanges" (*see* "Clearing and Execution" webpage); "UBS AG will take all reasonable steps to obtain the best possible result (or "best execution") on behalf of its Clients either when executing client Orders or receiving and transmitting Orders for execution. To this end, UBS had  put in place effective execution arrangements and an internal order execution policy" and "UBS will be executing Orders "on a Client's behalf" where the Client legitimately relies on UBS to protect his or her interests in relation to the pricing or other aspects of the transaction that may be affected by how UBS executes the Order" (*see* "Information on the Order Execution Policy of UBS AG" webpage.

103.    Thus, the agency implied the UBS AG's right to transfer the plaintiffs' trade orders to a broker-dealer(s), a member(s) of a U.S. securities exchange, and therefore the use by a sub-agent(s) registered with or regulated by the U.S. Securities and Exchange Commission ("SEC"), to which UBS would route the plaintiffs' trade orders for execution, and UBS AG was neither.

104.    Upon execution of a trade order, a written confirmation was to be generated automatically, after the relevant securities exchange provided execution records, and a Sub-Agent's computer was to confirm what orders had been executed and what purchases or sales had, in fact, been made.

105.    In one theory, UBS AG contracted to route the plaintiffs' trade orders for execution to UBS Securities LLC, a Delaware corporation with headquarters in New York, New York, or UBS Financial Services, Inc., a Delaware corporation with headquarters in Weehawken, New Jersey, the brokerage units of UBS AG.

106.    In another theory, UBS AG entered into an agreement for execution, clearing, and custodial services with a third party broker.

107.    In any event, the precise nature of the agency and sub-agency relationships, and the relevant routing practices can be determined through discovery and resolved on a fuller factual record.

**Account maintenance, order placement & booking functions**

108.    Between August 10, 2012 and April 11, 2014, UBS Bahamas performed account maintenance function with respect to current account 32,377/01,00 and was the plaintiffs' cash custodian, who held cash credit balances and issued periodic account statements to them.

109.    In particular, on September 28, 2012, UBS Bahamas held in current account 32,377/01,00 $729,749, money that the plaintiffs actually had (*see* Discovery of fraud in this Complaint).

110.    Between June, 12, 2013 and September 26, 2013, UBS Bahamas performed functions to place the plaintiffs' trade orders with UBS AG, the order placement function, and to book the plaintiffs' trades, the booking function.

111.    On October 2, 2018, a document has been produced by UBS Bahamas in the Bahamas litigation called Dealing Procedure Manual UBS Capital Markets (CM) (Booking Center Bahamas), version V2, April 2013, (the "CM Dealing Procedure Manual", which disclosed order placement and booking practices performed by Booking Center Bahamas, a nonentity of UBS AG, rather than by UBS Bahamas (*see* Exhibit DP to this Complaint).

112.    All these functions were ministerial in nature and were performed from a single office at 31A East Bay Street, Nassau, New Providence, the Bahamas.

113.    During its existence, 1968-2015, UBS Bahamas was never a member of any United States exchange or had software links with any registered United States exchange, broker-dealer, the National Securities Clearing Corporation ("NSCC"), or the Depository Trust Company ("DTC") of the Depository Trust & Clearing Corporation (DTCC).

114.    The plaintiffs were assigned to the following UBS Bahamas employees who were, in fact, representatives of the Booking Center Bahamas UBS AG: George Maillis; Jamaal Wright; Lynette Martinborough; and Marcia 'Marsha' Adderley (*see* Exhibit DP to this Complaint).

115.    In the Bahamian litigation, UBS Bahamas filed on December 13, 2018, affidavit of Renate Raeber, its former Head of Business Management, which were akin to an implicit admission by UBS Bahamas to the truth of the plaintiffs' allegations that, during 2013, none of these representatives had been registered with the Securities Commission of the Bahamas as a Trading Representative under the Securities Industry Act of 2011, or as a Broker or Stockbroker under the Securities Industry Act of 1999, the Bahamian Statutes (*see* Exhibit LC to this Complaint).

116.    These four representatives of UBS Bahamas were not employed by UBS Bahamas as Trading Representatives or Brokers or Stockbrokers and, obviously, were not functioning with respect to the plaintiffs' trade orders as the Client

Advisors or Market/Client Advisors or Portfolio Managers or Investment Managers.

117.   At all times material to this Complaint, the plaintiffs' were self-directed traders, who wished to conduct their own research, make their own investment decisions to avoid paying brokerage commissions for research, advice, and portfolio management.

118.   According to the CM Dealing Procedure Manual, UBS Bahamas depended on and utilized the services and facilities of UBS AG, who performed the execution and settlement functions for all UBS Bahamas account holders, including the plaintiffs (*see* Exhibit DP to this Complaint at page 7).

119.   Between June, 12, 2013 and October 10, 2013, the plaintiffs submitted trade orders to the representatives of the Booking Center Bahamas of UBS AG by email or by phone, for their further placement with UBS AG for execution on U.S. national securities exchanges and for settlement in the U.S. clearance and settlement system.

120.   According to the CM Dealing Procedure Manual, representatives of UBS BCB, to whom the plaintiffs were assigned, were forbidden to deal directly with UBS Investment Bank, a nonentity of UBS AG, or any Third Party Broker (*see* Exhibit DP to this Complaint at page 7).

121.   The trade orders must be entered into the Order Entry System (OES), which routed them to the Execution Desk electronically for the acceptance (*see* Exhibit DP to this Complaint at page 9).

122.   The Execution Desk in the Bahamas was a part of Capital Markets (*see* Exhibit DP to this Complaint at page 7). In one theory, Capital Markets or CM was not a legal entity, the Capital Markets Banking, a part of the banking side of UBS AG. In other theory, it is "UBS Capital Markets, L.P., formerly known as Schwab Capital Markets, L.P." (See *Pelosi v. Schwab Capital Markets, L.P.*, 462 F. Supp. 2d 503, 518 (S.D.N.Y. 2006).

123.   The Execution Desk placed the plaintiffs' trade orders with UBS Investment Bank using "Straight–Through–Processing" or "STP" via "Osmosys Tool" (*see* Exhibit DP to this Complaint at pages 9) in a captive customer order flow.

124.   Osmosys Tool is a third party application, a part of Order Routing System (UBS-internal system), connected to UBS Bahamas' Backend Banking System, where the trade orders travel through automated servers and are processed without manual intervention (*see* Exhibit OT to this Complaint).

125.   Once executed, the details of the trade orders were fed back into OES from KeyTrader (*see* Exhibit DP to this Complaint at page 9).

126.   In the booking function, the plaintiffs' transactions were entered on UBS Bahamas' accounting records, including the recording of fees and commissions

due to it, which were partly disseminated to the world, including the plaintiffs (*see* Discovery of fraud in this Complaint).

## INFORMATION OR BELIEF

### Execution & settlement functions

127. After each trade order of the plaintiffs was placed by UBS Bahamas with UBS Investment Bank, an unincorporated division of UBS AG, UBS AG was to transmit (route) the order to a national securities exchange for execution to effectuate the purchase and sale of securities via the exchange's system or through floor brokers.

128. A report of execution, which lists the transaction in terms of shares purchased or sold, was to be returned to UBS AG as a trade record containing the details of the trade orders were fed back into OES from KeyTrader (*see* Exhibit DP to this Complaint at page 9).

129. In these purchases and sales UBS AG was to make use of the U.S. clearance and settlement system — the system of intermediaries and guarantees employed in securities transactions.

130. In the settlement system, a third-party clearing agency acts as an intermediary between an anonymous buyer and seller. The clearing agency, however, is more than just a conduit because it guarantees to the buyer and seller that the transaction will settle as agreed, an event normally occurring a few days after the

trade is booked. This guarantee inspires confidence in the trading system and permits lightning-fast trading but it also subjects the clearing agency to possible liability if the transaction does not settle as agreed. For their part, the buyer and seller guarantee that they will deliver the money and securities as promised, even though they may be waiting to receive that property from some other party.

131. Since 1995, the settlement cycle in the United States was not a function of market custom, exchange rules, or industry practice. There is in place a Federal rule that mandated a specific settlement cycle for securities transactions requiring every and each transaction to be settled.

132. The SEC adopted a rule under the Securities Exchange Act of 1934, which establishes a settlement period for broker-dealer trades, effective June 1, 1995, 17 C.F.R. sec. 240.15c6–1 (1996), "designed to: (i) Reduce settlement risk, the risk to clearing corporations, their members, and public investors inherent in settling securities transactions by reducing the number of unsettled trades in the clearance and settlement system at any given time; (ii) reduce the liquidity risk among the derivative and cash markets and reduce financing costs by allowing investors that participate in both markets to obtain the proceeds of securities transactions sooner; and (iii) facilitate risk reduction by achieving closer conformity between the corporate securities markets and Government securities and derivative securities markets that currently settle in fewer than 5 days. 58 Fed.Reg. 52891 (Oct. 13, 1993)."

**Authority to debit bank account**

133.    On the settlement date, UBS AG was to deliver the purchase price, in the case of a purchase, or received the sale price, in the case of a sale.

134.    Provided that, at all times relevant to this First Amended Complaint, the plaintiffs had sufficient funds in current account 32,377/01,00, UBS AG automatically was to use these funds on the settlement date to pay for securities purchased.

135.    At all times relevant to this First Amended Complaint, UBS AG accepted the plaintiffs' purchase orders and therefore accepted payments for securities to be acquired on behalf of the plaintiffs, and at no time it was free to choose whether to complete the securities transactions.

136.    The above factors indicate that UBS AG's execution of a trade for the plaintiffs was a condition precedent that fixes UBS AG's right to deliver the purchase price or receive the sale price arising of securities out of the securities transactions purportedly executed according to the plaintiffs' trade orders.

137.    UBS AG was under the duty to perform the execution function, and the failure to discharge that function was to divest UBS AG of its right to transfer either money or securities with respect to the plaintiffs' trades.

138.    At all times relevant to this First Amended Complaint, UBS AG had access to and substantial control over the plaintiffs' bank account 32,377/01,00 administered by UBS Bahamas.

139.    However, UBS AG had authority to debit the plaintiff's bank account 32,377/01,00 and apply the amounts so debited to deliver the purchase prices only if after the relevant plaintiffs' trades were settled in the U.S. clearance and settlement system.

### Discovery of fraud

140.    Between October and November 2018, UBS Bahamas adduced in the Bahamas proceedings the following records on which 204 plaintiffs' securities transactions were entered in books of UBS AG: (1) 206 documents called "Junkanoo Estates Ltd - Trade Confirmation" and "UBS (Bahamas) Ltd - Custodian Instructions"; and (2) 50 documents called "UBS (Bahamas) Ltd Security Trail Contracts" (*see* Exhibits TG to this Complaint).

141.    The UBS AG's documents which had been produced by UBS Bahamas in the Bahamian action (the "discovered documents") reflected purchases and sales in the name of UBS Bahamas of United States exchange-traded fund shares ("ETF shares") between June 12, 2013 and July 25, 2013, list no broker-dealer, while they list UBS AG as a custodian that provided UBS Bahamas custodial services in Zurich, Switzerland, with respect to these plaintiffs trades purportedly executed on the NYSE and NASDAQ.

142.    These documents do not contain evidence to show that any of the plaintiffs' trades was ever executed on the U.S. national securities exchanges reflected in the documents or settled in the U.S. clearance and settlement system.

143.    There is reasonable grounds to believe that none of the plaintiffs' trades booked by the Booking center Bahamas of UBS AG was ever so settled and the fact that the securities in question have been purchased for or sold to the plaintiffs' account 32,377/01,00 was not conveyed by means of these documents, because they merely show pending transactions.

144.    The plaintiffs had no reason to and in fact did not question the legality of the securities transactions in question until March of 2019, after they had received a copy of an affidavit sworn by Renate Raeber filed in the Bahamian action on March 7, 2019, in response to the plaintiffs' request for trade execution statistics for all their trades revealed the truth. It reads in paragraph 8: "As it relates to Schedule 1 of Exhibit RR-5, to the best of my knowledge, information and belief, UBS has produced all of the contract notes, trade advices and trade receipts in its possession. UBS does not have any other contract notes in its possession, other than what has already been produced."

145.    By means of this affidavit, UBS Bahamas claimed that UBS AG was a "custodian", but UBS AG is not a custodian as so defined as that term is defined in 11 U.S.C. § 101(11), able to maintain a custody over any U.S. exchange-traded fund shares ("ETF shares") for the purchase or sale of which the plaintiffs placed

their trade orders with Booking Center Bahamas of UBS AG or for any U.S. exchange-traded fund the U.S. regulation of which requires the existence of an agreement with the exchange-traded fund's custodian in order to be a foreign sub-custodian of its ETF shares, and that agreement must be deposited with the SEC by way of a filing of that exchange-traded fund.

146.   Thus, UBS AG legally could not hold a "custodian" in Switzerland or the U.S. ETF shares which it purportedly executed or caused to execute on U.S. national securities exchanges and settled or caused to settle in the U.S. clearance and settlement system according to the plaintiffs trade orders.

147.   By authorising the representation by way of 50 documents called "UBS (Bahamas) Ltd Security Trail Contracts" produced by its Booking Center Bahamas, UBS AG claims it held as a "custodian" the U.S. ETF shares for UBS Bahamas, again, UBS AG has not submitted any evidence of any purchase or sale of these ETF shares according to the plaintiffs' trade orders.

148.   Thus, the plaintiffs understood that the securities in question had not been purchased for or sold to and therefore have never become the subject of completed or executory contract for purchase from or sale for their current account 32,377/01,00 at UBS Bahamas.

149.   In any event, analysis of trade execution statistics for the plaintiffs' trades, which may have required plaintiffs to seek and obtain trade execution data from UBS

AG, can be done through discovery and the execution and settlement issues can be resolved on a fuller factual record.

150.  Thus, the plaintiff discovered the fraud and became aware of their injuries of the type that the United States securities laws seek to prevent, and which are the basis of the action.

151.  In particular, the plaintiffs were alerted to possible violations antifraud provisions of the Securities Exchange Act or the rules and regulations thereunder, which "do not proscribe all fraudulent schemes concocted to take undue advantage of investors, but only those fraudulent schemes that are employed "in connection with the purchase or sale of any security", while "outlaw the employment of manipulative or deceptive devices or contrivances, however novel or atypical they might be, "of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell * * * securities.""

**ALLEGATIONS SUPPORTED BY FACTS**

**Violations of section 10(b) of the SEA & SEC Rule 10b-5**

152.  In sum, UBS AG did not route, execute the plaintiffs' trade orders to U.S. national securities exchanges or settle the plaintiffs' trades purportedly executed on those exchanges in the U.S. clearance and settlement system, as promised to do and represented that it did, thereby violating anti fraud provisions of the Securities Exchange Act of 1934.

153.   The UBS AG's failure to execute the plaintiffs' trade orders resulted in a benefit to UBS AG and damages to the plaintiffs. Each time UBS AG exercised its "power of disposition for his own benefit," that conduct, "without more," was a fraud included under section 10(b).

154.   UBS AG's fraudulent conduct and inducement related not only to its agency relationship with the plaintiffs, and to the value of their investments it purportedly executed, but to the loss "a reasonable opportunity to make knowing, intelligent decisions regarding their purchases and sales of securities in unmanipulated markets, and to transact in securities in a "climate of fair dealing" intended by Congress.

*Misrepresentations or omissions of material facts*

155.   UBS AG made misrepresentations of or failed to disclose material facts, which were repeated in email messages sent to the plaintiffs by representatives of the Booking Center Bahamas of UBS AG, and in other documents, or otherwise omitted to disclose material information, each time the plaintiffs placed their trade orders with these representatives.

156.   Each and every misrepresentations or omissions that  made by UBS AG or by representatives of the Booking Center Bahamas of UBS AG was made during the existence of the customer-broker relationship between the plaintiffs and UBS AG

and it was related to the matter within the scope of the agency (*see* Inter-parties relationship; Securities Contract in this Complaint).

157.    In particular, there are email exchanged between the plaintiffs and the representatives, as follows: George Maillis (226 emails sent to, 142 emails received from George.Maillis@ubs.com ); Jamaal Wright (133 emails sent to, 49 emails received from Jamaal.Wright@ubs.com); Lynette Martinborough (168 emails sent to, 51 emails received from Lynette.Martinborough@ubs.com ); and Marcia 'Marsha' Adderley (333 emails sent to, 112 emails received from Marsha.Adderley@ubs.com).

158.    Most of the emails of these representatives were misrepresentations, "pertaining securities themselves", related directly to the execution of 204 plaintiffs' trade orders for particular securities in particular transactions.

159.    For example, in the period between August and September 2013  a representative of the Booking Center Bahamas of UBS AG sent to the plaintiffs an email confirming execution of the relevant trade order in the United States, as follows: on August 2, 2013 at 2:19 PM; on August 6, 2013 at 12:53 PM; on August 9, 2013 at 10:27 AM; on August 9, 2013 at 12:04 PM; on August 21, 2013 at 11:18 AM; on August 26, 2013 at 9:29 AM; on September 9, 2013 at 10:22 AM; on September 10, 2013 at 10:12 AM; on September 11, 2013 at 10:59 AM; on September 11, 2013 at 12:35 PM; on September 11, 2013 at 2:05 PM; on September 11, 2013 at 2:26 PM; on September 12, 2013 at 10:40 AM; on

September 13, 2013 at 10:52 AM; on September 13, 2013 at 11:36 AM; on
September 13, 2013 at 12:00 PM; on September 13, 2013 at 12:52 PM; on
September 13, 2013 at 1:51 PM; on September 13, 2013 at 2:05 PM; on
September 16, 2013 at 10:00 AM; on September 16, 2013 at 10:49 AM; on
September 16, 2013 at 12:28 PM; on September 16, 2013 at 1:28 PM; on
September 17, 2013 at 9:47 AM; on September 17, 2013 at 10:10 AM; on
September 17, 2013 at 10:17 AM.

160. These misrepresentations were both by "conduct and/or implication" and
contained statements that were misleading as to a material fact that the purchases
and sales of securities in the United States on their behalf were legitimate
transactions occurring in the regular flow of business, that UBS AG had complied
with its duties as a broker and hence an agent and that the Booking Center
Bahamas of UBS AG had disclosed all information that might call those
purchases and sales of securities into question.

161. There is "a substantial likelihood that the disclosure of the omitted fact would
have been viewed by the reasonable investor as having significantly altered the
'total mix' of information made available."

162. In the plaintiffs' case, they would not do any securities transaction with UBS AG
and would not assent to any amount debited to their current account 32,377/01,00
on the books of UBS Bahamas applied to a securities transaction purportedly
executed according to a purchase trade order, if UBS AG disclosed that the

securities transaction was not executed on a U.S. national securities exchange or not settled in the U.S. clearance and settlement system.

163.    Thus, by way of misrepresentation, representatives of the Booking Center Bahamas of UBS AG induced the plaintiffs to assent to the following they otherwise would not have:

163.1.    the right to deliver the purchase price of securities arising out of the securities transaction which was not executed on a U.S. national securities exchange or not settled in the U.S. clearance and settlement system (*see* Authority to debit bank account in this Complaint); and

163.2.    the amounts debited to their current account 32,377/01,00 on the books of UBS Bahamas applied to securities transactions which were purportedly executed according to their purchase trade orders, but in reality were not executed on any U.S. national securities exchange or not settled in the U.S. clearance and settlement system.

164.    The plaintiffs relied upon the representations made by representatives of the Booking Center Bahamas of UBS AG, as aforesaid, and were induced to assent to the amounts debited to their current account 32,377/01,00 on the books of UBS Bahamas applied to securities transactions purportedly executed according to their purchase trade orders.

165.   The reason why each misrepresentation was misleading is that the plaintiffs were led into thinking that the trades  according to their trade orders were carried out in the United States, while in reality UBS AG did not execute the plaintiffs' trade orders on any U.S. national securities exchange or did not settle the plaintiffs' trades so executed in the U.S. clearance and settlement system (*see* Discovery of fraud in this Complaint).

166.   Even earlier, representatives of the Booking Center Bahamas of UBS AG induced the plaintiffs to assent to the whole relationship between the plaintiffs and UBS AG they otherwise would not have.

167.   The whole relationship between the plaintiffs and UBS AG was induced by fraud in the inducement "by misrepresentation of motivating factors such as value, usefulness," including the false promises to obtain access to the major U.S. major national securities exchanges and the best price, which were "material to a decision to buy or sell a security" through "UBS Group" or "the entire global UBS Group" *(see* Pre-agency representations in this Complaint).

168.   The reason why misrepresentations were misleading is that the plaintiffs were led into thinking that UBS AG was to provide the brokerage service, the essence of which were the execution of the plaintiffs' trade orders and settlement of the plaintiffs' trades, while in reality it did not. Ant that was the only reason that the whole relationship between the plaintiffs and UBS AG and therefore between Junkanoo and UBS Bahamas ever existed.

169.   The plaintiffs relied upon representations by way of the securities contract which they executed with neither knowledge nor reasonable opportunity to obtain knowledge of its real character or its essential terms hidden from them by acts of deception and misrepresentations (*see* Securities contract in this Complaint).

170.   Were it not for the ability to make trades on U.S. national securities exchanges, acquired through access to the U.S. markets through the use of brokerage services of UBS AG as they were represented on behalf of UBS AG by by way of the securities contract, there would be no basis for the plaintiffs to enter any relationship with UBS AG or any of its subsidiary or entity.

171.   By way of these representations UBS AG induced the plaintiffs "to believe the nature of [their] act[s] is something entirely different than it actually is" (*see* 12 Williston on Contracts § 1488, at 332 (3d ed. 1970).

172.   There was a misrepresentation as to the character or essential terms of a proposed securities contract in that UBS AG gave the plaintiffs the impression that it would be making execution of their trade orders in the United States and that they would trade in United States ETF shares and have a good chance of making a profit in the transactions, whereas, in reality, the transactions would be designed to make the plaintiffs' lose money with UBS Bahamas.

*Securities contract*

173.  In August 2012, the plaintiffs, as the guarantors, and Junkanoo, as the borrower, entered into a security contract with UBS Bahamas, as the lender, for five years with the purpose to make trades of U.S. securities on U.S. national securities exchanges. The execution of the plaintiffs' trade orders was the only reason that any relationship between Junkanoo and UBS Bahamas existed, including the loan of $1,400,000.00 which was secured by a blanket security interest and lien against the dwelling house of the plaintiffs legally owned by Junkanoo worth $2,800,000.00 and cash, securities, or other property, as a collateral, with an agreement by the plaintiffs to be personally responsible for the debt.

174.  UBS AG breached the securities contract with and duties to the plaintiffs by failing to execute orders they gave it, and therefore UBS AG is primarily liable to the plaintiffs for its fault.

175.  Among the documents the plaintiffs were required to execute when opening the Junkanoo's current account 32,377/01,00 there was an "UBS Account Application for Entities", executed by the plaintiffs on July 18, 2012 and by UBS bahamas on August 10, 2012, on in which the plaintiffs authorized UBS Bahamas to deal in "securities whether held as security or for safe custody", to effect "the purchase or sale of any securities on behalf of the Company" and "to take positions in Derivative products and in U.S. Securities" for the purpose of "Investments in U.S. Securities."

176.    The second document, a "Terms and Conditions of UBS (Bahamas) Ltd.", in section "Liability and Use of Agents" UBS Bahamas states the plaintiffs appointed UBS AG, as a third party, to be the their agent obliged to buy, sell and securities in accordance with the terms and conditions for the [plaintiffs'] account.

177.    The account opening documents (together, the "Account Documents") authorized UBS Bahamas and therefore UBS AG to engage in securities transactions on their behalf and consequently established a "securities contract", the term as defined in 11 U.S.C. § 741(7)(A), that "expansively includes contracts for the purchase or sale of securities, as well as any agreements that are *similar* or *related* to contracts for the purchase or sale of securities".

178.    The function contemplated for the Account Documents satisfies the definition of "securities contract" in § 741(7)(A)(x), under which the parties intended to be engaged in purchase and sale transactions because the parties expressed their intent that all transactions be sales and purchases.

179.    UBS Bahamas agreed to transfer to Junkanoo purchased securities against the transfer of funds by Junkanoo, and the transfer of funds by UBS Bahamas to Junkanoo was to occur in the future against sold securities.

180.    The plaintiffs were required to execute other documents when obtaining a loan from UBS Bahamas for the purpose to use UBS AG's brokerage service, the essence of which were the execution of the plaintiffs' trade orders on U.S.

national securities exchanges and settlement of the plaintiffs' trades so executed in the U.S. clearance and settlement system.

181.   In the first, a UBS Bahamas' letter to the plaintiffs dated August 23, 2012 called "Commitment to Finance", the plaintiffs authorized UBS Bahamas to "open[ ] or maintain[ ] one or more accounts" for their benefit and agreed to the "Minimum invested assets under management" "The higher of USD$500,000 (net of any Lombard financing) or 50% of the Facility Amount" (or $700,000.00); and the term of "The Term of the facility [which] shall be 5 years 0 months" (*see* Exhibit CF to this Complaint).

182.   In the second, a "Indenture of Mortgage (by way of guarantee)" made on September, 18, 2012, the plaintiffs placed their dwelling house as a collateral for the loan from UBS Bahamas, a source of funds for trading in the U.S. securities through UBS AG.

183.   These loan documents (together, the "Loan Documents") included all of the necessary terms of a loan transaction coupled with a securities purchases and sales transactions and consequently constituted a "securities contract" which satisfies the definitions under 11 U.S.C. §§ 741(7)(A)(vi)-(viii).

184.   The relationship established by the Account Documents and Loan Documents involved "agreement[s]" that are "similar to" "contracts for the purchase, sale... of a security...." 11 U.S.C. §§ 741(7)(A)(i),(vii).

185.   The Account Documents and Loan Documents contained a purchase or sale requirement and were agreements by which UBS AG agreed to be the plaintiffs' broker and, as such, became their agent, who would acquire or dispose of securities on behalf of them in accordance with their trade orders.

186.   The plaintiffs were signatories of the Account Documents and Loan Documents constituting the securities contract between Junkanoo and UBS Bahamas and therefore between the plaintiffs, as a customer, and UBS AG, as a broker.

187.   Both UBS AG, as a broker, and the plaintiffs, a customer, were intended third-parties of the securities contract, which was made for the plaintiffs' benefit; the benefit was immediate, and not incidental, so that the contracting parties had assumed a duty to compensate the plaintiffs if the benefit is lost.

188.   The Account Documents and Loan Documents included the genuine UBS logo on each and every page.

189.   UBS AG failed to explain to the plaintiffs that they effectively would not be trading in United States securities with UBS Bahamas, and not in real life but on a simulator and would pay for the simulator that would cause UBS Bahamas to win the wagers if the plaintiff lost and to lose if the plaintiffs gained.

*Reliance*

190.   Strong reliance was placed by the plaintiffs on the misrepresentations or omissions set out above.

191.    Until November 2018, the plaintiffs did not understand that they were paying UBS Bahamas the loan interest, money for the service and spending their time not to trade securities on the United States national securities exchanges but to participate in wagers (and losses) on the movements of prices of these securities.

192.    The plaintiffs were induced to do the following and to act to their detriment by the fraudulent conduct of UBS AG, because in the absence of the misrepresentations, there would be no basis for the plaintiffs:

192.1.    to commit to the loan their dwelling house worth $2,800,000.00 as of August 2012;

192.2.    to make a deposit of $729,749.00 with UBS Bahamas, on September 28, 2012;

192.3.    to pay interest at rate 4.12% on that deposit from September 28, 2012 through April 11, 2014, totaled $45,098.49; and

192.4.    to pay $9,974.00 of the brokerage and transaction fees for the transactions which have never been executed on any U.S. national securities exchange or settled in the U.S. clearance and settlement system.

193.    Thus, the plaintiffs relied upon representations by way of inducement to make the contract, whereby the plaintiffs were persuaded to establish relationship with UBS AG and the Booking Center Bahamas of UBS AG in order to acquire the ability

to make their trades on U.S. national securities exchanges (*see* Inter-parties relationship; Securities contract in this Complaint).

*Scienter*

194.   At all times relevant to this Complaint, the above fraudulent scheme was in the minds of UBS AG and Booking Center Bahamas of UBS AG.

195.   UBS AG engaged in fraudulent conduct, which was (1) directed at the plaintiffs (2) in order to induce them to purchase or sell securities through UBS AG for a fee, and (3) caused losses directly resulting from what the plaintiffs believed to be legitimate securities transactions.

196.   UBS AG by its actions intended to defraud and mislead the plaintiffs. Primarily, fraud was concerned with UBS AG's execution of the plaintiffs' trade orders and manipulation of account balances of their bank account.

197.   The facts, giving rise to a strong inference that UBS AG and certain representatives of Booking center Bahamas of UBS AG acted with the purpose of misleading the plaintiffs, as follows.

198.   UBS AG joined in the scheme from the outset and had full control, and last word in decisions over the Booking Center Bahamas of UBS AG, according to a Memorandum dated January 13, 2013, by helping to market the Real Estates Collateralized Loan ("RECL") Offering Program to investors, and by sponsoring it, despite knowing, or consciously avoiding knowing, that the Booking Center

Bahamas of UBS AG was a fraud, and misrepresenting to investors that Booking Center Bahamas of UBS AG performed rigorous due diligence, because the RECL Offering Program was approved by the bahamian regulator only on May 21, 2013, or 9 months after the Booking Center Bahamas of UBS AG induced the plaintiffs to enter it (*see* Exhibits BC & BU to this Complaint).

199.     Thus, UBS AG certified that, at all times, it was aware that the Booking Center Bahamas of UBS AG was engaged in fraud, but despite that knowledge sponsored its activity from the outset. UBS AG thereby lent the prestige of its name to the Booking Center Bahamas of UBS AG, and participated in its fraudulent activities, ultimately helping itself attract additional customers, including the plaintiffs, and willfully defrauding them in order to collect lucrative fees for servicing the funds and to misappropriate $729,749 of the plaintiffs, and helping UBS Bahamas to obtain possession of the plaintiffs' dwelling house owned by Junkanoo.

200.     UBS AG financed UBS Bahamas' Real Estate Collateralized Loan program induced the plaintiffs to enter into a five years loan arrangements, part of which was the securities contract to trade U.S. securities on U.S. national securities exchanges; did not execute any trade order placed by the plaintiffs; accepted money debited to current account 32,377/01,00 on the books of UBS Bahamas applied to a securities transaction purportedly executed according to purchase trade order, but in reality, not executed on any U.S. exchange or not settled in the U.S. clearance and settlement system.

201.    The inducement intended to cause the plaintiffs to choose UBS AG over competing securities brokers, that would mean UBS AG's misrepresentations were "in connection with" securities transactions; the false promise that the plaintiffs will receive access to the U.S. major national securities exchanges and the best price for their trades was material to "*every* decision to purchase or sell a security" through UBS AG.

202.    Moreover, a representative of the Booking Center Bahamas of UBS AG, from the outset, induced the plaintiffs to do voluminous securities transactions. George Maillis in his email sent to the plaintiffs on June 26, 2013 at 17:08 urged the plaintiffs to "manifest volume" (*see* Exhibit MV to this Complaint).

203.    On December 20, 2014, the plaintiffs sent an email to the assistant of then the CEO of UBS AG, Sergio Ermotti, expressing concerns related to brokerage services provided by the Booking Center Bahamas of UBS AG and representations made by its representatives related to the securities transactions (*see* Exhibit SE to this Complaint).

204.    On February 3, 2014, by an email timed to 13:35, sent to the plaintiffs by of Sasha Savic, the UBS AG's Chief of Staff Americas and Caribbean, UBS AG verified the truth of false and misleading representations made by the representatives of the Booking Center Bahamas of UBS AG, including George Maillis, regarding the purchases and sales of securities (*see* Exhibit ES to this Complaint).

205.   The evidence received in the Bahamas action (*see* Exhibit ND to this Complaint), attests to the fact that UBS AG did not execute the plaintiffs' trades, acting in the same way which have allowed its trader Mawuli Adoboli of the London Branch to escape the detection of UBS AG's risk-control systems from 2008 through 2011. So, the opportunity may have presented itself for false records to be created in the Booking Center Bahamas of UBS AG and UBS AG's systems in the course of an off-the-book accounting notwithstanding that the Swiss and UK regulators' found in 2012 that UBS AG's risk management systems and controls were not fit for the purpose, creating an environment in which dangerously large off-the-book positions could be concealed.

206.   The Swiss and UK regulators' investigations into UBS AG's brokerage businesses and involvement in various ETFs markets and transactions that identified individuals and business units within UBS AG and misconduct (*see* Exhibits F1 through F17 to this Complaint).

207.   In 2102, organisational measures (the "UTIR Programme") implemented across the UBS AG led by a special Group Executive Board task force, chaired by then Group COO Ulrich Körner and overseen by UBS AG's Board of Directors, and the post-incident reviews carried out by KPMG, were called to assure the fit and proper conduct of UBS AG's business operations and ensure that identified control deficiencies were in fact sustainably remediated, but there is no evidence that they ever achieved these objectives.

208.   The UBS AG's top management had sufficient knowledge of the misconduct in ETF trading by the Execution Desk of the Booking Center Bahamas of UBS AG.

209.   The Swiss and UK regulators' investigations into UBS AG's brokerage businesses and involvement in various ETFs markets and transactions that identified individuals and business units within UBS AG and misconduct.

210.   Material systemic procedures, management systems and internal controls' failures within UBS AG, identified by the Swiss and UK regulators in 2012, persisted for a significant and continuous period of time without correction, being unable to ensure transparency in the financial health of the business and the transactions between UBS AG and its customers, the accuracy of the corporate books and records and the reliability of the audit process which constitute a strong inference that UBS AG acted with a dishonest or fraudulent state of mind.

*Connection with the purchases or sales of securities*

211.   The misrepresentations and omissions were made "in connection with" the purchase or sale of securities of securities registered on national securities exchanges which were to take place in the United States.

212.   UBS AG's fraudulent acts were "integral to the purchase and sale of the securities in question" because its misrepresentations related directly to the execution of the plaintiffs' trade orders for particular securities in particular transactions.

*Loss causation*

213.    UBS AG's fraudulent conduct not only "coincided" with securities transactions, but was material to the decision by the plaintiffs (1) to buy or sell securities; (2) to buy or sell securities through UBS AG; (3) to enter any relationship with "UBS Group" or "the entire global UBS Group".

214.    Each time placing trade orders, the plaintiffs signified to UBS AG their intention to purchase or sell particular securities registered on U.S. national securities exchanges and were specifically induced thereafter by UBS AG's misrepresentations to not receive or retain the securities in question because none of the plaintiffs' trade orders was ever executed on any U.S. national securities exchange or settled in the U.S. clearance and settlement system (*see* Discovery of fraud in this Complaint).

*Economic and other losses*

215.    The plaintiffs relied upon representations and/or pretences as to create a debt by way of documents disseminated by UBS Bahamas in its performing the account maintenance function by which UBS AG actually received money in the sum of $729,749.00 that the plaintiffs actually had in bank account 32,377/01,00 on September 28, 2012 (*see* Account maintenance, order placement & booking functions; Authority to debit bank account).

216.    The plaintiffs relied on representations by way of the UBS AG's acceptance of payments for securities purportedly purchased in the United States (*see* Authority to debit bank account in this Complaint).

217.    The plaintiffs were entitled to rely upon UBS AG's representations, promises and pretences, which were false. Such reliance caused the plaintiffs to have suffered losses directly resulting from what they "believed to be legitimate securities transactions."

*Loss of profits*

218.    The experience and expertise of the plaintiffs was a capital available for them as seasoned financial traders. The plaintiffs were injured by UBS AG after being able to establish a career as traders in securities and predicting their future profits is not difficult. Possible sources of evidence include education records, the trading track record and average profits statistics.

219.    In the situation in which the plaintiffs were at time of the alteration of their respective positions, the decision to enter into relationship with the Booking Center Bahamas of UBS  AG was supported by consideration of profits from the trading on U.S. national securities exchanges in which the plaintiffs have a history of profitability evidenced by the trading track record of net profit of $1,147,418.00 or so in a trading account on the books of Credit Suisse Nassau

Branch with an initial balance $360,312.00 in February 2009 and an interim balance $1,507,730.00 in May 2009 (*see* Exhibit LP to this Complaint).

220.    Further, despite multiple defaults on the part of the Booking Center Bahamas of UBS AG, the plaintiffs made a profit $30,694.00 or so evidenced by the relevant emails with account balances of the plaintiffs' account 32,377/01,00 sent to the plaintiffs at 11:59 AM on August 1, 2013 and at 5:31 PM on September 4, 2013.

*Section 10(b)'s manipulative device*

221.    UBS AG participated in creating false pretenses as to create a debt and in making, knowingly and fraudulently, false representations through its actions and in its omissions regarding the purchases and sales of securities in the United States on their behalf with an intent to defraud and mislead the plaintiffs.

222.    On February 3, 2014, by an email of Sasha Savic timed to 13:35, UBS AG verified the truth of false or misleading representations made by the representatives of the Booking Center Bahamas of UBS AG regarding the false pretenses as to create a debt.

223.    UBS AG fraudulently accepted payments for securities that it never intended to deliver, and therefore violated section 10(b) and Rule 10(b)-5 of the Securities Exchange Act.

224.   As a result, money that the plaintiffs actually had in account 32,377/01,00 at UBS Bahamas in the sum of $729,749.00, were fraudulently obtained by UBS AG from the plaintiffs and that money is not discharged.

225.   UBS AG's misappropriation of the proceeds of its misdeed has the requisite connection with the purchases and sales of securities because the securities purchases and sales and UBS AG's practices were not independent events.

226.   Each purchase or sale was made to further UBS AG's fraudulent scheme, was deceptive because none was neither executed on the relevant national securities exchange nor settled in the U.S. clearance and settlement system and that was neither authorized by, nor disclosed to, the plaintiffs.

227.   In the aggregate, the purchase and sales in question were acts, practices, or course of business that operated as a fraud or deceit on the plaintiffs. This was a fraudulent scheme in which the securities transactions and breaches of agency duty coincide. Those breaches were therefore "in connection with" securities sales within section 10(b)'s meaning.

228.   By misrepresentations as to the purchases or sales of securities registered on U.S. national securities exchanges, UBS AG manipulated account balances of the plaintiffs' account 32,377/01,00 in order to assist UBS Bahamas in obtaining an order for possession of the dwelling house of the plaintiffs a few days after UBS AG resolved to liquidate UBS Bahamas (*see* Exhibit PO to this Complaint).

229.    UBS AG's brokerage and banking practices enabled it to manipulate account balances of the plaintiffs' bank account 32,377/01,00 to cover its intention to misappropriate the plaintiffs' funds, masking harm to the plaintiffs by the use of sophisticated means,  including the concealment of assets or transactions through the use of fictitious bank or accounting records, UBS Bahamas, a corporate shell, and third-party accounts.

230.    UBS AG's degree of domination and control over UBS Bahamas in all aspects was such that the use of that corporate form caused the fraud because UBS Bahamas was "a fraud or a sham existing only for the purpose of serving as a vehicle for fraud."

231.    These fraudulent brokerage and banking practices undermined purity of the securities transaction and the securities trading process on United States national securities exchanges and caused injuries to the plaintiffs who were buyers and sellers of United States securities and persons engaged in "buying and selling and trading in * * * securities as broadly defined in the [Securities Exchange] Act".

232.    The plaintiffs were deprived of their right to transact in securities in a "climate of fair dealing" by the use of these fraudulent practices.

233.    The plaintiffs' suffered economic and other loss in connection with purchases or sales made without benefit of "a reasonable opportunity to make knowing,

intelligent decisions regarding their purchases and sales of securities in unmanipulated markets," in connection with which fraud had been committed.

234.   Wrongs done to the plaintiffs were intentional and involved an invasion by UBS AG of their own federally protected interest to engage in securities transactions while free from the effects of deceptive or unfair practices employed in connection therewith, not merely a wrong done to someone else.

235.   To conceal its fraudulent securities scheme UBS AG (1) intercepted the trade execution data for the plaintiffs' trades its was supposed to execute on U.S. national securities exchanges; (2) fraudulently debited the plaintiffs' bank account 32,377/01,00 and applied the amounts so debited to deliver the purchase prices for the plaintiffs' trades neither executed nor settled in the U.S. clearance and settlement system; and (3) manipulated account balances of the plaintiffs' bank account 32,377/01,00 in furtherance of its fraudulent securities scheme.

236.   UBS AG maintained this pattern of fraud without detection for more than five years, between June 2013 and November 2018.

237.   UBS AG used its position of trust to manipulate account balances of the plaintiffs' bank account 32,377/01,00 to conceal its fraudulent securities scheme. As such, UBS AG presents a case in which it stole from its principal and employer, using its position to facilitate the misappropriation of the plaintiffs' money.

238.    In any event, the plaintiffs need to depose Kevin L. Price, the Investment Portfolio Supervision (IPS) Head Nassau, Tibaud Halwyck, the Capital Markets Head Nassau and other officers and executives of both UBS Bahamas and UBS AG in order to uncover facts relating to (1) UBS AG's practices regarding authority to debit the plaintiff's bank account 32,377/01,00 for reasons of executing securities transactions at issue; (2) individuals' knowledge of the brokerage services practices employed by UBS AG; (3) individuals' authorizations to sign certain withdrawal forms on the plaintiffs' behalf; and (4) individuals's knowledge regarding any trading that occurred in the plaintiffs' bank account 32,377/01,00.

**COUNT ONE: claim for relief for violations of Section 10(b) of the Exchange Act**

239.    Paragraphs 1 through 239 are re-alleged and incorporated by reference as if set forth fully therein.

240.    Plaintiffs allege that, during the relevant period, UBS AG, acting as an agent of the plaintiffs, deliberately orchestrated and conducted a fraudulent scheme regarding plaintiffs' orders for the transactions in securities publicly traded on national securities exchanges booked at the Booking Center Bahamas of UBS AG by not sending or routing to and not representing or executing these orders on these securities exchanges.

241. The fraudulent scheme involved actions by UBS AG to steal directly from the plaintiffs by doctoring and disseminating false account statements and other written financial information to the plaintiffs.

242. The said orders were both marketable orders and displayed limit orders for the purpose of Rules under Regulation NMS (National Market System) and two amendments to the joint industry plans for disseminating market information adopted on August 29, 2005 ("Regulation NMS") in addition to redesignating the national market system rules previously adopted under Section 11A of the Exchange Act, which states at Page 118:

> "Displayed limit orders are the primary source of public price discovery. They typically set quoted spreads, supply liquidity, and in general establish the public "market" for a stock. The quality of execution for marketable orders, which, in turn, trade with displayed liquidity, depends to a great extent on the quality of markets established by limit orders (i.e., the narrowness of quoted spreads and the available liquidity at various price levels). Limit orders, however, make the first move – when submitted, they must be displayed rather than executed, and therefore offer a "free option" for other market participants to trade a stock by submitting marketable orders and taking the liquidity supplied by limit orders. Consequently, the fate of limit orders – whether or when they receive an execution – is dependent on the choices made by those who route marketable orders. Much of the time, the interests of marketable

> *orders in obtaining the best available price are aligned with those of limit*
>
> *orders that are displaying the best available price."*

243.   Regulation NMS was adopted to ensure the fairness and efficiency of the NMS for all investors and to promote fair and efficient access by the public to the markets' quotations where, for example, data for each stock, quotations and trades are continuously collected from many different trading centers and then disseminated to the public in a consolidated stream of data (Rules 601 and 603 under Regulation NMS). When Congress mandated the creation of the NMS in 1975, it noted that the systems for disseminating consolidated market data would *"form the heart of the national market system."* H.R. Rep. No. 94-229, 94th Cong., 1st Sess. 93 (1975).

244.   Regulation NMS is premised on promoting fair competition among individual markets, while at the same time assuring that all of these markets are linked together, through facilities and rules, in a unified system that promotes interaction among the orders of buyers and sellers in a particular NMS stock and allowed the resulting unparalleled transparency concerning stock trading activity that is one of the reasons that the U.S. equity markets are widely recognized as being the fairest, most efficient, and most competitive in the world.

245.   At all material times, UBS AG knowledge of the said unexecuted customer's orders and concealed its wrongs.

246.    It is alleged that the defendant bank acting as agent of a plaintiffs' company called Junkanoo Estates Ltd., with intent to deceive the principal, used documents in respect of which the principal is interested, and which contain statements which are false, and which were intended to mislead the principal as follows.

247.    They in defendant bank knew that the unexecuted trades were fictitious and the above mentioned records of these trades were false, intended them to be so and sought to and did execute this scheme to engage in  transnational securities fraud, as a part of defendant bank's strategies to defraud the public, including plaintiffs.

248.    In doing so, defendant bank engaged in acts, practices, or courses of business which operated as a fraud or deceit upon plaintiffs

249.    As described in the paragraphs above, defendant bank, by the use of means or instrumentality of interstate commerce or of the mails, or of facilities of national securities exchanges, employed, in connection with the purchase or sale of securities registered on these exchanges, manipulative or deceptive, or other fraudulent device or contrivance within the term meaning in Exchange Act Rule 15c1-2 [17 C.F.R. § 240.15c1-2].

250.    As described in the paragraphs above, defendant bank made untrue and misleading oral and written statements, disseminated to the public, including plaintiffs, or omitted to state material facts necessary in order to make the statements or omissions made, in the light of the circumstances under which they

were made, not misleading, with knowledge or reasonable grounds to believe that these statements or omissions were untrue or misleading.

251. By virtue of the violative conduct alleged herein, defendant bank, directly or indirectly, singly or in concert, willfully violated provisions contained in Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder having the scope which shall not be limited by any specific definitions of the term "manipulative, deceptive, or other fraudulent device or contrivance" contained in Rule 15c1-2 [17 C.F.R. § 240.15c1-2] or other Rules and Regulations adopted pursuant to Section 15(c) of the Exchange Act.

252. For the purposes of this Count, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services as provided by Section 1343 of the Criminal and Penal Code of the United States [18 U.S. Code § 1346 Definition of "scheme or artifice to defraud"].

253. Plaintiffs were not aware that their orders for the transactions in securities were not sent or routed to and not represented or executed on any national securities exchange by the defendant bank or its subsidiaries or agents.

254. Plaintiffs would have considered it important in their decision to trade through defendant bank or any of its subsidiaries to know that their orders were not sent or routed to and not represented or executed on any national securities exchange; neither would plaintiffs do it if they were to make the decision again.

255.   The said manipulative or deceptive activities that occurred in connection with the purchase or sale of a security in the United States entitled plaintiffs for private rights of action seeking damages and such other relief as this Court deems necessary or appropriate taking in consideration that the purchase or sale prices paid or received by the plaintiffs for the subject securities does not exist, and therefore could not be determined for the purposes under Section 21D(e) [15 U.S.C. § 78u-4(e)] of the Securities Exchange.

**COUNT TWO: Infringement of a natural person's freedom to buy or sell any equity security**

256.   As a result, trading in securities on national securities exchanges was not conducted by or on behalf of the plaintiffs in contravention of their natural persons' freedom to buy or sell any equity security.

257.   The plaintiffs were deprived by the use of these practices of their right to transact in securities in a "climate of fair dealing" intended by Congress

258.   Paragraphs through are re-alleged and incorporated by reference as if set forth fully therein.

259.   Plaintiffs allege that, during the class period, defendant bank, by not sending or routing to and not representing or executing on securities national securities exchanges plaintiffs' orders for transactions in equity securities, made the impact on the plaintiffs' freedom to buy or sell any equity security, their natural right,

which is a sort of "unalienable right" to pursue happiness recognised in the United States Declaration of Independence.

260. When submitting to the defendant bank orders for transactions in equity securities on national securities exchanges, plaintiffs, as investors, were exercising their intellectual and financial freedoms, and in doing so, plaintiffs were orderly pursuing their happiness.

261. The Declaration of Independence has no standing in the legal system of the United States; nevertheless, more than 200 years after Thomas Jefferson, who penned the words "pursuit of happiness," this right has gained significant protections in American jurisprudence and international constitutional theory.

262. In June 1776, the Virginia Convention of Delegates adopted the Virginia Declaration of Rights, which included a guarantee of the inherent right to *"the enjoyment of life and liberty… and pursuing and obtaining happiness and safety"*; and these protections remain in place today in the Virginia's constitution.

263. The Commonwealth of Massachusetts followed Virginia's lead, including the term happiness in the state constitution and protecting the unalienable rights of the people in *"seeking and obtaining their happiness and safety."*

264. The Wisconsin's constitution, adopted in 1848, repeated the assurance of the inherent rights of "life, liberty, and the pursuit of happiness," for its people.

265.    In the nineteenth century, immigrants from all over the world, who came by the millions, and by the millions were absorbed most of whom prospered in the United States because they were left perfectly free to pursue their own interest in their own way, and to bring both their industry and capital into competition with those of any other man, or order of man.

266.    As the Statue of Liberty inscription has it:

> *"Give me your tired, your poor,*
>
> *Your huddled masses yearning to breathe free,*
>
> *The wretched refuse of your teeming shore.*
>
> *Send these, the homeless, tempest-tossed to me:*
>
> *I lift my lamp beside the golden door."*

267.    While the right to the pursuit of happiness may not be stated outright in the United States Constitution, the Supreme Court has, and continues to recognize, this right and to protect the many freedoms it encompasses.

268.    In 1923, the United States Supreme Court recognized the pursuit of happiness at the national level when interpreting the Fourteenth Amendment's protection of the right to liberty. In the case ***Meyer v. State of Nebraska*** (No. 325) 262 U.S. 390 Justice McReynolds, writing for the majority, found that the Fourteenth Amendment's due process clause protects not only one's freedom from restraint, but also one's freedom, among others, to engage in contracts, to hold an occupation etc: *"While this Court has not attempted to define with exactness the*

*liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men. Slaughter-House Cases, 16 Wall. 36; Butchers' Union Co. v. Crescent City Co., 111 U.S. 746; Yick Wo v. Hopkins, 118 U.S. 356; Minnesota v. Barber, 136 U.S. 313; Allgeyer v. Louisiana, 165 U.S. 578; Lochner v. New York, 198 U.S. 45; Twining v. New Jersey, 211 U.S. 78; Chicago, Burlington & Quincy R.R. Co. v. McGuire, 219 U.S. 549; Truax v. Raich, 239 U.S. 33; Adams v. Tanner, 244 U.S. 590; New York Life Ins. Co. v. Dodge, 246 U.S. 357; Truax v. Corrigan, 257 U.S. 312; Adkins v. Children's Hospital, 261 U.S. 525; Wyeth v. Cambridge Board of Health, 200 Mass. 474."* (Emphasis added)

269.   The ***Meyer*** precedent has held, and the right to pursue happiness has been central to two landmark decisions defining the constitutionality of marriage in the case ***Loving v. Virginia*** (No. 395) 388 U.S. 1 and in the Court's majority opinion in ***Obergefell v Hodges*** 772 F. 3d 388.

270.   In the like manner, as in cases ***Loving v. Virginia*** (No. 395) 388 U.S., ***Obergefell v Hodges*** 772 F. 3d 388 there is a constitutional protection for the right to buy or

sell any equity security "essential to the orderly pursuit of happiness by free men."

271.     This right had been interfered with under the execution of the fraudulent and anti-competitive schemes by defendant bank, by actions which were unlawful or arbitrary or without reasonable relation to any purpose within the defendant bank's duties or competencies, as agent acting on behalf of plaintiffs, to effect.

272.     Under Title 15 of the U.S. Code the SEC, consistent with the purposes of subsection (i) of Section 9 of the Exchange Act [15 U.S.C. § 78i(i)], undertook to minimize an impact such as mentioned above on "a natural person's freedom to buy or sell any equity security, in adopting rules under paragraph (2) of this subsection."

273.     Defendant bank by engaging in the conduct described above, made use of the mails or means or instrumentalities of interstate commerce or facilities of national securities exchanges, employed acts or practices in connection with the purchase or sale of equity securities in contravention of rules or regulations adopted by the SEC, consistent with the public interest, the protection of investors, and the maintenance of fair and orderly markets, and interfered with the free and fair operation of the market and plaintiffs' freedom to buy or sell any equity security.

274.     The said interference has the effect of destroying or injuring the right of plaintiffs to receive the fruits of the freedom to buy or sell any equity security and entitled

them for rights of action seeking damages, declaratory relief and such other relief as this Court deems necessary or appropriate.

## COUNT THREE: Unjust enrichment

275.   Paragraphs through are re-alleged and incorporated by reference as if set forth fully therein.

276.   Plaintiffs allege that, during the class period, defendant bank, by the use of manipulative or deceptive, or other fraudulent device or contrivance, such as the said records of fictitious trades, and making false claims that all plaintiffs' orders for the transactions of purchase or sale of securities publicly traded on national securities exchanges have been executed, misappropriated money from plaintiffs using them for:

276.1.   (i) the services that the defendant or its subsidiaries never performed; or

276.2.   (ii) items and expenses plaintiffs never agreed to pay; or

276.3.   (iii) trades in securities on national exchanges that were never made.

277.   The plaintiffs' money has been diverted for the defendant bank's use facilitated by doctoring of account statements, unauthorized funds transfer activities, or other conduct in breach of the agent's fiduciary responsibilities to plaintiffs.

278.   In particular, defendant bank through the medium of its Bahamain subsidiary's illicit and unauthorized actions to steal directly from plaintiffs through transfers

from or by debiting plaintiffs' bank account at the said subsidiary, withdrew brokerage and transaction fees and profited by reaping plaintiffs' wealth in the case when fictitious trades recorded in UBS' books resulted in loss, even though none of these revenues were proceeds of any real trading activity.

279.   They in UBS knew that trades in securities were fictitious, intended them to be so, and knew and intended that the records of these fictitious trades would and did allow the defendant bank to unlawfully use or misappropriate plaintiffs' money.

280.   In doing so, UBS had misused and/or misappropriated plaintiffs' money.

281.   Plaintiffs were not aware that their money was being used for purposes other than trading in securities on national securities exchanges.

282.   Plaintiffs would have considered it important in their decision to trade through defendant bank or its Bahamian subsidiary to know that their money was being used for purposes other than the purposes claimed by defendant bank; neither would plaintiffs do it if they were to make the decision again.

283.   Unknown representatives of different business units within UBS AG colluded among themselves to engage in transactional securities fraud for their own benefit by making fictitious quotations and indicating false cash prices to plaintiffs, who dealt directly with them or have something akin to specific knowledge of one another's existence, and thereby harmed those plaintiffs.

284.    As a result, defendant bank was enriched at the plaintiff's expense, and that it is against equity and good conscience to permit defendant bank to retain what is sought to be recovered.

285.    The misappropriation described in the paragraphs above entitled plaintiffs for rights of common-law action against unjustly enriched defendant bank seeking damages and such other relief as this Court deems necessary or appropriate.

**COUNT FOUR: Breach of the implied covenant of good faith and fair dealing**

286.    Paragraphs through are re-alleged and incorporated by reference as if set forth fully therein.

287.    In the alternative to Count Three, plaintiffs allege that, during the class period, defendant bank's manipulative, deceptive and fraudulent devices or contrivances included misrepresentations to plaintiffs that securities transactions occurred on national securities exchanges, trades were carried out and securities were held in their account with defendant bank, when no such transactions occurred on any national securities exchange and no securities were held in the plaintiffs' account.

288.    The said misrepresentations were made through the medium of client advisers or members of management employed by UBS Bahamas acting as agent of the company owned by plaintiffs and owing fiduciary and other duties, including duties of fair dealing and transparency, trust and confidence.

289.    Defendant bank by engaging in the conduct described above, breached the implied covenant of good faith and fair dealing with plaintiffs, who dealt directly with the said persons within defendant bank, and that breach has the effect of destroying or injuring the right of plaintiffs to receive the fruits of the contract with the defendant bank.

290.    This breach entitled plaintiffs for rights of common-law action seeking damages for breach of the implied covenant of good faith and fair dealing and such other relief as this Court deems necessary or appropriate.

**COUNT FIVE: Violations of Section 1 of the Sherman Act and subsection (i) of Section 9 of the Exchange Act**

291.    Paragraphs through are re-alleged and incorporated by reference as if set forth fully therein.

292.    Plaintiffs allege that, during the class period, defendant bank and its subsidiaries agreed, combined, and conspired and intentionally sought to negate, and did negate, price competition in trades, transactions or positions in equity securities publicly traded on national securities exchanges ordered by plaintiffs, wilfully, not sending or routing and not representing, handling, executing, clearing, or not carrying the transactions openly and competitively by any open and competitive methods adopted in trading places or prescribed by relevant market for trading in such equity securities, provided that none of the transactions ordered by plaintiffs was a transaction which in accordance with rules of the relevant market

specifically providing for the non-competitive execution of certain transactions submitted to and approved by the Securities and Exchange Commission ("SEC"), which, if executed non-competitively, must be identified and marked by appropriate symbol or designation any contract, order, record, and memoranda pertaining thereto by a person handling, executing, clearing, or carrying such a transaction.

293. This practice was effective where the defendant bank with large money-market desks was involved because it could easily move cash prices and affect the market for such security it would lawfully submit the said customers' orders to the relevant exchange. There was a years-long conspiracy to indirectly manipulate the securities prices, where the misconduct occurred on a daily basis.

294. Management at defendant bank and its subsidiaries facilitated their employees' activities by making structural changes to their money markets and derivatives desks that allowed for collusion, implemented lax compliance standards that failed to detect misconduct, and concealed evidence from regulators. As an example, the defendant bank did not maintain records which employees accepted and handled the said customers' orders and did not train employees on the methodologies used for handling or making submissions of customers orders for transactions in instruments traded on public exchanges.

295.   As a result of the defendant bank and subsidiaries' manipulation, plaintiffs suffered losses in their own equity securities transactions, as did others unnamed plaintiffs similarly situated.

296.   Transactions directly involving the plaintiffs made up a modest portion of the overall value of the U.S. stock market which is currently $34 trillion, compared to the rest of the world's $44 trillion capitalization or 43% of world market value, housing only 17% of the world's stocks, while the gross market value of OTC derivatives nears $10 trillion at end-June 2018 and $11 trillion at end-2017 – compared with the peak of $35 trillion observed in 2008 according to the Statistical release: OTC derivatives statistics at end June 2018 published on October 31, 2018 by the Bank for International Settlements.

297.   By virtue of violative conduct alleged herein, defendant bank caused actual adverse effects in the marketplace as follows.

*The marketplace consequences that flow from the violation*

298.   Defendant bank by unlawfully not sending or routing to and not representing or executing plaintiffs' orders on national securities exchanges indirectly manipulated price levels of the relevant equity security market by corrupting the result of the price discovery.

299.   It is alleged that:

299.1.   Defendant bank by engaging in the conduct described above was able to

influence market prices;

299.2.   Prices of the relevant securities were artificial not being the result of ordinary market process of competion of quotes to buy and sell;

299.3.   Defendant caused the said artificial price. (See in *re Amaranth*, 730 F.3d at 173.)

300.   The said indirect manipulation of security prices created artificial, false or misleading appearances with respect to the price of an equity security, subject of unexecuted orders, or the market for such a security, the widespread last sale and quotation information with respect to which was not reliable and accurate.

301.   As a result of the said manipulative or deceptive activities of defendant bank, quotations for such securities were fictitious or the market for these securities suffered from a lack of reliable and accurate quotation and last sale information available to investors and regulators against the public interest and inappropriate for the protection of investors and the maintenance of fair and orderly markets.

302.   It is alleged that by reason of the said manipulative or deceptive conduct:

302.1.   Investors and market participants were unable to meet their information needs deprived of the visibility of all orders to buy or sell an equity security at the instances of the said unexecuted orders;

302.2.   Automated quotation systems operated by the relevant registered securities association or national securities exchanges in accordance with rules

prescribed by the SEC,  at the instances of the said unrepresented or unexecuted orders:

302.2.1.   collected and disseminated real-time quotation and transaction information which were misleading;

302.2.2.   provided misleading bid and ask real-time quotations of participating brokers or dealers, which constituted UBS Securities' or UBS FS' bids or offers; and

302.2.3.   provided the volume and the last sale reportings of transactions, subjects of the said unexecuted orders, which were misleading.

303.   As a result of the anti-competitive or manipulative conduct alleged herein, the NYSE market data disseminated to data consumers, at the instances of the said unrepresented or unexecuted orders, was misleading.

304.   Such data consumers include the Network A (real-time quotes and transactions information in New York Stock Exchange LLC) professional subscribers:

304.1.   (a) Broker-Dealer Enterprises, [followed description] entities that are registered as brokers/dealers under the Exchange Act, which according to the Consolidated Tape Association's Schedule of Market Data Charges are not required to pay more than the enterprise maximum for any month for the aggregate amount of (a) a network's display device charges for devices used for its Internal Distribution plus (b) that network's display device and

per-quote-packet charges payable in respect of services that it provides to nonprofessional subscribers that are brokerage account customers of the broker/dealer, "BrokerDealer Enterprise Maximum" which, during 2013, for the Network A became $686,400 applicable monthly; and

304.2.   (b) Television Broadcasters [followed description]who may simulcast over multiple channels through cable, satellite, or traditional means, which according to the Consolidated Tape Association's Schedule of Market Data Charges are not required to pay more than the "Television Ticker Maximum" for any calendar month, where for months falling in calendar year 2012, the monthly Network A Television Ticker Maximum was $125,000 with prorating permitted for those who broadcast the data for less than the entire business day, based upon the number of minutes the real-time ticker is displayed, divided by the number of minutes the primary market is open for trading (currently 390 minutes) and billing amounts based on the "households-reached" totals that are published periodically in the Nielsen Report. The Participants of the Consolidated Tape Association (CTA) post the amount of each network's applicable monthly BrokerDealer Enterprise Maximum and Television Ticker Maximum on the website that CTA maintains for the CTA Plan and its amendments.

305.   The Consolidated Tape Association (CTA) oversees the dissemination of real-time quotes and transactions information in New York Stock Exchange LLC (Network A) and Bats, NYSE Arca, NYSE American and other regional exchange (Network B) listed securities. Since the late 1970s, all SEC-registered exchanges and market centers that trade Network A or Network B securities send their trades and quotes to a central consolidator where consolidated data products, the Consolidated Tape System (CTS) and Consolidated Quote System (CQS) data streams, are produced and distributed worldwide. The purpose of the above dissemination and use of market data was to ensure the executions in the above trading venues occurred at or within the current National Best Bid and Offer ("NBBO"), which is required by the SEC Rules under Regulation NMS.

306.   Defendant bank contributed to the risk of lower liquidity which refers to the ability of market participants to buy and sell securities in that, hypothetically, some orders were only partially executed, or not at all by the following reasons:

306.1.   the more orders that are available in a market, the greater the liquidity;

306.2.   with greater liquidity it is easier for investors to buy or sell securities; and

306.3.   investors are more likely to pay or receive a competitive price for securities purchased or sold.

307.   As a result, defendant bank contributed to the risk of wider spreads which refers to the difference in price between what an investor can buy a security for and

what he can sell it for, when lower liquidity may result in wider than normal spreads for a particular security.

308.   Market volatility was affected by the said indirect manipulation of price levels of the equity securities market or the relevant segment thereof by defendant bank, who, when doing so, contributed to levels of volatility that even if had not or have not threatened the maintenance of fair and orderly markets, but made an impact on the normal operations of the market, contrary to the public interest and the maintenance of fair and orderly markets.

309.   By virtue of the anti-competitive conduct alleged herein in violation of section 1 of the Sherman Act, where unknown persons in defendant bank, who dealt directly with each other or have something akin to specific knowledge of one another's existence, colluded among themselves to engage in the said anti-competitive or manipulative scheme for the defendant bank's benefit and thereby injured plaintiffs.

310.   Section 1 of the Sherman Act states:

> *"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1.*

311.   Defendant bank and its subsidiaries restrained trading in equity securities by colluding to not send or transmit to and not represent or execute on national

securities exchanges consumers' orders for transactions in equity securities on these exchanges, artificially starving them with cash resulting in an indirect manipulation of price levels, at the instances of the said unrepresented or unexecuted orders, by corrupting the result of the price discovery process.

312.    As a consequence, the prices, at the said instances, were the product of collusion and did not accurately reflect competitive market prices; this, in turn, caused plaintiffs and putative class members to either pay more or receive less than they should have when they participated in equity securities transactions on either side thereof, having as core components for calculating these value such securities. *"[T]he fixing of a component of price violates the antitrust laws."* (See ***United States v. Sacony-Vacuum Oil Co***., <u>310 U.S. 150</u>, 222 (1940)).

313.    It is alleged that the following plaintiff classes suffered *"antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." (*See ***Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.***, <u>429 U.S. 477</u>, 489 (1977)). *"Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer `injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"* (See ***Gelboim***, 823 F.3d at 772 (quoting ***Brunswick***, 429 U.S. 489); ***State of N.Y. v. Hendrickson Bros., Inc.***, <u>840 F.2d 1065</u>, 1079 (2d Cir. 1988) *"In general, the person who has purchased directly from those who have fixed prices*

*at an artificially high level in violation of the antitrust law is deemed to have suffered the antitrust injury within the meaning of § 4 of the Clayton Act. . . ."*):

313.1.   Class of securities investors, who have participated in equity securities transactions on national securities exchanges that included both defendant bank or any of its subsidiaries as counterparty and were injured as a result of the said manipulation;

313.2.   Class of derivatives investor, who have participated in transactions in securities-based derivative contracts, the amount of the consideration, or the value of which are determined, derived from or varies by reference to, wholly or in part, tied to the value or amount of any security or any securities index, a hypothetical portfolio of which contains any of securities subject of the said unexecuted orders, and were injured as a result of the manipulation, where their "umbrella"-type damages claims would include virtually any loss on any such securities-based derivative transaction, regardless of the nature of the transaction or identity of counterparty; the damages would be determined based on transactions with non-parties; and the total quantum of damages would be orders of magnitude greater than any ill-gotten gains of defendant bank; and

313.3.   Class of the market data consumers, who have purchased or used the market data, real-time quotes and transactions information for in New York Stock Exchange LLC (Network A) and Bats, NYSE Arca, NYSE

American and other regional exchange (Network B) listed securities, dissemination of which is overseen by the Consolidated Tape Association (CTA), and were injured as a result of the manipulation.

314. Plaintiffs suffered injury-in-fact because any unlawful manipulation of any quote in any national securities exchange would have affected the value of any transaction on these exchanges, where prices are determined according to the auction process, and there would be no need to separately assess different categories of financial instruments than those transacted in by plaintiffs and separate acts of manipulation because any harm suffered by a plaintiff as a result of the said manipulation would have been caused by the identical misconduct of defendant bank or any of its subsidiaries.

315. It is alleged that UBS AG had purposefully devised that anticompetitive scheme for its own benefit, and plaintiffs were injured as a direct result. The many intervening links between the defendant bank and its subsidiaries' manipulations and plaintiffs' ultimate injuries also weigh the attenuated causation between the said scheme and any harm to plaintiffs.

316. Plaintiff class of securities investors paid or sold for artificially "discovered" prices instead of market prices and/or liquidated their positions at a loss depending from influences caused by the defendant bank's not submissions of their orders to the securities exchanges that corrupted market conditions.

317.    Defendant bank and its subsidiaries knew that they were acting unlawfully, and actively concealed their actions from the public by producing records of financial information which are false, as described in Count One of this Complaint.

318.    It is alleged that defendant bank's unlawful manipulation placed plaintiffs in a worse position, thereby demonstrating "that their injury is one the antitrust laws were designed to prevent."

319.    Plaintiffs allege the following links of causation: 1.) defendant bank and its subsidiaries' agreement to not submit customers' orders to exchanges, 2.) the corruption of the price discovery process by the exclusion of the said orders, 3.) the effect that the final, widespread disseminated security's price had on market perceptions about the price level of that security and 4.) any final pricing effect on security-based derivatives.

320.    Plaintiffs claim violation (and injury in the form of artificial prices) flowing from the corruption of the price discovery process, which turned a process in which defendant bank and its subsidiaries jointly participated into conspiracy.

321.    Plaintiffs allege an anticompetitive tendency: the warping of market factors affecting the prices for equity securities and other related financial instruments.

322.    Plaintiffs were injured by this purposefully anti-competitive conduct, with the injury intertwined with the injury the said persons sought to inflict.

323.   It is alleged that the plaintiffs' injury and the nature of their dealings with defendant bank render them suitable as an instrument for vindicating the Sherman Act, where they are well positioned to serve as efficient enforcers and vindicate the public's interest in enforcing the antitrust laws

324.   Plaintiffs allege that defendant bank and its subsidiaries' conduct implicates the same set of concerns between themselves and those who transacted in any financial instrument traded on national securities through  defendant bank or any of its subsidiaries.

325.   By virtue of the anti-competitive or deceptive conduct alleged herein, defendant bank and its subsidiaries made use of the mails or means or instrumentalities of interstate commerce, by acts, practices, and courses of business which were fraudulent, deceptive, or manipulative, indirectly, negatively affected the maintenance of fair and orderly markets.

326.   Defendant bank and its subsidiaries by engaging in the conduct described above, by the use of the mails or means or instrumentalities of interstate commerce or facilities of national securities exchanges, employed acts or practices in connection with the purchase or sale of any equity security in contravention of rules or regulations adopted by the SEC, consistent with the public interest, the protection of investors, and the maintenance of fair and orderly markets to prescribe means reasonably designed to prevent manipulation of price levels of

the equity securities market or a substantial segment thereof under subsection (i) of Section 9 of the Exchange Act [15 U.S. Code § 78i(i)].

327.   It is alleged that any person who has purchased or sold securities at prices which were affected by the said manipulative or deceptive activities and anti-competitive conduct may enforce any liability of bank, who willfully participated in acts in violation of subsection (a)(1)(A) of Section 9 of the Exchange Act [ 15 U.S. Code § 78i(a)], and to recover the damages sustained as a result of any such act under subsection (f) of Section 9 of the Exchange Act [ 15 U.S. Code § 78i(f)].

328.   The said manipulative or deceptive activities that occurred in connection with the purchase or sale of a security in the United States entitled plaintiffs for private rights of action seeking damages and such other relief as this Court deems necessary or appropriate.

**COUNT SIX: Violations of Section 13(b), Section 15(d) and for enforcement liability pursuant to Section 18(a) of the Exchange Act**

329.   Paragraphs through are re-alleged and incorporated by reference as if set forth fully therein.

330.   In the alternative to Counts One to Five, if the said "UBS (Bahamas) Ltd Security Trail Contracts" are legal allocated execution reports, between June 13 and September 18, 2013, UBS Bahamas as an agent of Junkanoo Estates Ltd., a company owned by plaintiffs, by the use of means or instrumentality of interstate

commerce or of the mails, or of facilities of national securities exchanges purportedly effected, accepted, or facilitated transactions of the purchase or sale of securities in the United States involving the loan in contravention of such rules and regulations as the SEC prescribed as necessary or appropriate in the public interest or for the protection of investors promulgated under subsection (c) of Section 10 of the Exchange Act [15 U.S. Code § 78j(c)], having the actual knowledge of the violation of the provisions of this chapter and  rules or regulations thereunder affecting the legality of such debt, obligation, or lien.

331.   It is alleged that when the defendant bank claimed to have executed the plaintiffs' orders on a national securities exchange, it is in effect claiming that it has made those transactions available for regulation and oversight of this exchange, which is, for the purpose of this Count, the New York Stock Exchange ("NYSE").

332.   The plaintiffs' orders were *"public customers' orders"* within the meaning of NYSE Rule 112. Orders initiated "Off the Floor." Adopted: May 21, 1964. Amended: July 16, 1964 effective August 3, 1964; September 21, 1967 revised October 19, 1967 effective December 11, 1967; December 11, 1975 effective March 12, 1976; May 18, 1972; August 9, 1976; August 11, 1978; February 1, 1979; June 2, 1983; September 27, 1985; October 26, 1989; May 24, 1991; June 17, 1991; October 1, 2002, effective August 10, 2002 (NYSE-02-31); June 14, 2007 (NYSE-2007-51) of Dealings and Settlements (Rules 45—299C) of the Regulation of the Exchange and its Member Organizations ("NYSE Regulation").

333.    Under NYSE Regulation, the plaintiffs' orders *"must be sent to the Floor through a clearing firm's order room or other facilities regularly used for transmission of public customers' orders to the Floor."* (NYSE Rule 112(a)) *"On the Floor" or "On-Floor" means the trading Floor of the Exchange and the premises immediately adjacent thereto, such as the various entrances and lobbies of the 11 Wall Street, 18 New Street, 8 Broad Street, 12 Broad Street and 18 Broad Street Buildings, and also means the telephone facilities available in these locations."* (NYSE Rule 112(b)) Any of these orders *"deemed to be an off-Floor order, provided (i) that such order is transmitted to the Floor through an order room or other facility regularly used for the transmission of public orders to the Floor, where a time-stamped record of the order is maintained; or (ii) an exception from the order room transmission requirement is available under paragraph (a) of this Rule."* (NYSE Rule 112(d)) These orders were orders to buy (sell) NMS (National Market System) stocks.

334.    The NYSE facilitates trading and brings together potential buyers and sellers to engage in price discovery by developing computer systems, rules, and processes that allow these market participants: (1) to show the level of trading interest and to learn about the eligible contra-side interest, by displaying (a) orders' display prices (*""Display price" means the price at which a Limit Order is displayed, which may be different from the limit price or working price of the order."* NYSE Rule 7.36(1)) or (b) orders' limit prices (*""Limit price" means the highest (lowest) specified price at which a Limit Order to buy (sell) is eligible to trade."*

NYSE Rule 7.36(2)) or (c) orders' working prices (""Working price" means the price at which an order is eligible to trade at any given time, which may be different from the limit price or display price of the order." NYSE Rule 7.36(3)), and by assigning to orders working times (""Working time" means the effective time sequence assigned to an order for purposes of determining its priority ranking." NYSE Rule (4)); and (2) to transact with each other, and to determine a market price when a quotation is traded-through, where buy and sell orders, aggregated together, contribute to price discovery, by matching orders for execution against contra-side orders in the Exchange Book. "The term "Exchange Book" refers to the Exchange's electronic file of orders, which contains all orders entered on the Exchange." NYSE Rule 1.1(i).

335.    After orders have been submitted, the NYSE, having a legal obligation to meet its responsibilities under the Exchange Act to provide venues for trading that is orderly and efficient (See, e.g., Exchange Act Sections 6(b)(1) and 6(b)(5); Exchange Act Section 15; Exchange Act Sections 15A(b)(2) and 15A(b)(6); Exchange Act Section 11A(a)(1)(C)), provided to the world two types of real-time quotes and transaction information: (1) market data on the willingness of traders to buy or sell before transactions take place; and (2) market data on transactions that result from the matching of buyers and sellers after executing with eligible contra-side interest on the Exchange Book.

336. Despite many requests, defendant bank failed to provide any proof that the said transactions were registered on the book or system of the New York Stock Exchange such as, for example, execution reports, as required by NYSE Rule 123(f), setting forth the data elements to be recorded for each execution entered into the same database as required by NYSE Rule 123(e) for the entry of orders.

337. The defendant bank by engaging in the conduct described above made a negative impact on the public reporting of trade data and trading activity and contributed to the risk of lack of calculation or Dissemination of Underlying Index Value ("UIV") or Intraday Indicative Value ("IIV").

338. The defendant bank's defaults described above impaired the ability of New York Stock Exchange Regulation., Inc. ("NYSE Regulation" or "NYSER") Division of Market Surveillance ("MKS") to perform certain surveillances and to detect trading in violation of NYSE rules and regulations, such as, for example, NYSE Rule 123(e) and NYSE Rule 123(f), NYSE Information Memo 05-13 and NYSE Information Memo 06-67, and federal securities laws, in efforts to fulfill its regulatory mission to maintain the integrity of the marketplace and protect the investing public.

339. In particular, defendant bank or its agents failed to provide the details of plaintiffs' orders for transactions in equity securities to Front End Systemic Capture ("FESC") database, thereby corrupting FESC data, which impaired MKS's ability to perform certain surveillances which utilized the FESC data.

340.   As a result, defendant bank, indirectly, by generating or causing exceptions, interfered with the operation of FESC system, which captures and electronically time-stamps all orders (including order modifications and/or cancellations) prior to representation or execution at the point-of-sale, and links the entry of orders with reports of execution after the execution.

341.   In particular, the defendant bank's FESC exceptions that occurred during the class period involved instances in which no execution report was found in FESC database corresponding the plaintiffs' orders because they were not sent or routed to FESC system by any member organization proprietary system used to record the details of orders pursuant to NYSE Rule 123(e).

342.   Also, defendant bank's failure to reasonably supervise and implement adequate controls, including a separate system of follow-up and review, reasonably designed to achieve compliance with the UBS Securities' FESC obligations, as described above, constitutes a failure to supervise on the part of UBS Securities in violation of NYSE Rule 342.

343.   Additionally, defendant bank by engaging in the conduct described above, impaired the functioning of a national system of linked or coordinated facilities established for the prompt and accurate clearance and settlement of transactions in securities under Section 17A of the Exchange Act [U.S. Code § 78q–1 National system for clearance and settlement of securities transactions].

344.    By virtue of the violative conduct alleged herein, defendant bank failed to comply with the Recordkeeping and Internal Controls Provisions of subsection (b) of Section 13 of the Exchange Act [15 U.S.C. § 78m(b)], for the purpose of paragraph (2) of this subsection, to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

344.1.    (i) transactions are executed in accordance with management's general or specific authorization; and

344.2.    (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements.

345.    It is alleged that unknown person or persons in defendant bank or in any of its subsidiaries in the United States or in The Bahamas knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified books, records, or accounts described above and as alleged in Count One of this Complaint.

346.    For the purposes of paragraphs (2) and (6) of the said subsection, defendant bank is an issuer which has a class of securities registered pursuant to section 78l of 15 U.S. Code or an issuer which is required to file reports pursuant to subsection 78o(d) of 15 U.S. Code which holds more then 50 per centum of the voting power with respect to UBS Securities, UBS FS, UBS-CM and UBS Bahamas.

347.    It is alleged that under the defendant bank's circumstances the Recordkeeping and Internal Controls Provisions of subsection (b) of Section 13 of the Exchange Act [15 U.S.C. § 78m] must be construed as the obligation for the defendant bank to exercise its powers of control over the said subsidiaries to ensure that the subsidiary did not fail to comply with the said provisions, in particular with the provisions of paragraph (2) of this subsection.

348.    There is a reasonable ground to believe that defendant bank, UBS Securities or UBS FS, a member organization of NYSE, continued and still continue to generate such exceptions from the class period with respect to ordres of other plaintiffs that had or have direct dealings and were or are direct counterparties with any subsidiary or affiliate of defendant bank to transactions in equity securities publicly traded on the NYSE.

349.    By virtue of the violative conduct alleged herein, defendant bank failed to comply with the provisions of  Section 13(a) or 15(d) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder in that at least one since 2014 its annual reports, containing the assets, liabilities, capital and major funding sources of the consolidated organization for each year, in particular, the Annual Report for the year ending December 31, 2011, filed with the United States Securities Exchange Commission ("SEC") on 14th April 2014, did not contain then current and accurate information, being certified as required by the rules and regulations of the SEC by independent public accountants; and any securities offering in the United States, during the class period, into which the SEC allowed UBS Group to

"incorporate by reference" certain reports and other documents that UBS filed with, or furnished to, the SEC, and which is deemed to form part of this offering even though such information is not physically included therein.

350.   In particular, in the instances mentioned above, there is a reasonable ground to believe that defendant bank failed to furnish, for the purpose of Section 229.301 of Title 17, Code of Federal Regulations [17 CFR § 229.301 - (Item 301) Selected financial data], then current selected financial data which highlight certain significant trends in the registrant's financial condition and results of operations.

351.   By virtue of the violative conduct alleged herein, defendant bank failed to comply with the provision of Section 240.13b2-1 of title 17, Code of Federal Regulations [17 CFR § 240.13b2-1 Falsification of accounting records] in that unknown person or persons in defendant bank, directly or indirectly, falsified or cause to be falsified, books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act.

352.   Additionally, defendant bank failed to comply with the provision of Section 240.13b-2 of title 17, Code of Federal Regulations [17 CFR § 240.13b2-2 Representations and conduct in connection with the preparation of required reports and documents] in that unknown director(s) or officer(s) of defendant bank, or any other person acting under the direction thereof, directly or indirectly:

352.1.    (1) Made or cause to be made a materially false or misleading statement to an accountant in connection with; or

352.2.    (2) Omitted to state, or cause another person to omit to state material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:

    352.2.1.    (i) Any audit, review or examination of the financial statements of defendant bank required to be made pursuant to this subpart; or

    352.2.2.    (ii) The preparation or filing of any document or report required to be filed with the SEC pursuant to this subpart or otherwise.

352.3.    (3) Took action(s) to coerce, manipulate, mislead, or fraudulently influence independent public or certified public accountants engaged in the performance of an audit or review of the financial statements of defendant bank that are required to be filed with the SEC pursuant to this subpart or otherwise, knowing that such action(s), if successful, could result in rendering the defendant bank's financial statements materially misleading, including, for purposes of paragraph (b)(1) of Section 240.13b-2 of title 17, Code of Federal Regulations, actions that, "if successful, could result in rendering the defendant bank's financial statements materially misleading" include, but are not limited to, actions

taken at any time with respect to the professional engagement period to coerce, manipulate, mislead, or fraudulently influence an auditor:

352.3.1.　(iii) Not to withdraw an issued report; or

352.3.2.　(iv) Not to communicate matters to the defendant bank's audit committee.

353.　It is alleged that, for purposes of paragraph (b)(1) of Section 240.13b-2 of title 17, Code of Federal Regulations, at least the following persons "knew or should have known that such action, if successful, could result in rendering the issuer's financial statements materially misleading", who were asked to be notified by plaintiffs for the purpose of Section 302 of the Sarbanes-Oxley Act of 2002 and for the purpose to ascertain their knowing state of mind with regard to the defendant bank's violative conduct under Title 15 of the U.S. Code when it was engaged in securities trading through Execution Desk in The Bahamas on behalf of plaintiffs, in particular, regarding the defendant bank's defaults to comply with the Record of Orders provisions of Rule 123 of NYSE Dealings and Settlements Rules 45—299C regarding plaintiffs' orders for the transactions in equity securities on the New York Stock Exchange ("NYSE") booked at the Booking Center Bahamas of UBS-CM which were not sent or routed to and represented or executed on this exchange:

353.1.　Beatrice Weder di Mauro;

353.2.　Bernard Sechaud;

353.3.   Isabelle Romy;

353.4.   Sergio Ermotti; and

353.5.   Tom Naratil.

354.   The above named UBS persons were also contacted by plaintiffs for the purpose of pre-action correspondence regarding an eventual application in civil or criminal proceedings against defendant bank.

355.   By virtue of the violative conduct alleged herein, defendant bank failed to comply with the Recordkeeping and Internal Controls Provisions of Section (b) of Section 13 of the Exchange Act [15 U.S.C. § 78m], for the purpose of paragraph (2) of this subsection, to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the defendant bank.

356.   It is alleged that unknown persons in the defendant bank or in The Bahamas knowingly circumvented or knowingly failed to implement a system of internal accounting controls described above.

357.   For the like reasons as aforesaid, it is alleged that when UBS Bahamas defaulted there was a clear breach by the defendant bank in allowing it to do so.

358.   As described in the paragraphs above, defendant bank, who is an issuer which has filed a registration statement containing an undertaking which is or becomes operative under subsection (d) of Section 15 of the Exchange Act [15 U.S. Code

§ 78o] as in effect prior to August 20, 1964, and an issuer which shall after such date file a registration statement which has become effective pursuant to the Securities Act of 1933, as amended [15 U.S.C. § 77a et seq.], made or caused to be made in the reports, or documents filed pursuant to this Title or any rule or regulation thereunder or any undertaking contained in registration statements as provided in subsection (d) of Section 15 of this Title were, at the time and in the light of the circumstances under which they were made, false or misleading with respect to certain material facts within the meaning of Section 18 of the Exchange Act [15 U.S. Code § 78r. Liability for misleading statements].

359.    It is alleged that any person (not knowing that such statements were false or misleading) who, in reliance upon such statements, have purchased or sold a security at a price which was affected by such statements may seek to enforce liability of defendant bank under subsection (a) of Section 18 of the Exchange Act [15 U.S. Code § 78r(a)] in this action for damages caused by such reliance, unless defendant bank shall prove that it acted in good faith and had no knowledge that such statements were false or misleading.

## IV. RELIEF

360.    WHEREFORE, the plaintiffs respectfully request that this Court, and grand the following relief:

360.1.    (a) Final Judgment in favour of the plaintiffs finding that the defendant violated the securities laws and rules promulgated thereunder as alleged

herein and directing the defendant to pay damages pursuant to Section 21D of the Exchange Act [15 U.S. Code § 78u–4], subsection (f) of Section 9 of the Exchange Act [ 15 U.S. Code § 78i(f)] and subsection (a) of Section 18 of the Exchange Act [15 U.S. Code § 78r(a)];

360.2.   (b) Final Judgment in favour of the plaintiffs finding that there is a constitutional protection for the natural person's right to buy or sell any equity security as alleged herein;

360.3.   (c) Final Judgment in favour of the plaintiffs finding that the defendant unjustly enriched or, in the alternative, breached the implied covenant of good faith and fair dealing as alleged herein and directing the defendant to pay money damages damages;

360.4.   (d) Final Judgment in favour of the plaintiffs finding that the defendant violated the antitrust laws as alleged herein and directing the defendant to pay money damages for antitrust injuries;

360.5.   (e) Such other and further relief as this Court may deem just and appropriate.

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the Complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are

supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Respectfully submitted,

Dated: May 28, 2020    _____
The plaintiff

Dated: May 28, 2020    _____
The plaintiff