## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

YURI STAROSTENKO,
IRINA TSAREVA,

Plaintiffs,

**1:19-cv-09993-KPF**

-against-

**SECOND AMENDED COMPLAINT**

UBS AG (A SWISS BANK) and
UBS (BAHAMAS) LTD (IN LIQUIDATION).

Defendants.

## SUMMARY

1.  This Second Amended Complaint (this "Complaint") is an amendment of the plaintiffs' pleading, acting *pro se,* once as a matter of course within 21 days after service of a motion under Rule 12(b)(1), (2), (3), (5) and (6), on July 27, 2020, under Fed.R.Civ.P. Rule 15(a)(B).

2.  UBS Bahamas conducted a fraudulent scheme through the use of deceptive practices, involving the concealment of securities transactions and manipulation of bank account balances, totality of which was sophisticated either in the execution or concealment, and UBS AG was a culpable participant in the fraud.

3.  It is alleged that UBS Bahamas violated section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and UBS AG is liable under section 20(a) of the Exchange Act as a "control person" of Bahamian defendants.

## I. BASIS FOR JURISDICTION

**Venue**

4.   Claims of this Complaint arose under the federal securities laws, which granted federal district courts exclusive jurisdiction over suits and nationwide service of process, of which plaintiffs may take advantage, Fed. R. Civ. P. 4(k)(2), and the venue provisions of 28 U.S.C. § 1391, subsection (c)(3) of which provides that "a defendant not resident in the United States may be sued in any judicial district."

**Basis for Court's personal jurisdictions**

5.   Personal jurisdiction is asserted over UBS AG and UBS Bahamas pursuant to section 27 of the Securities Exchange Act which extend personal jurisdiction to the full reach permitted by the due process clause.

6.   Because the Court's jurisdiction is invoked based on the federal laws authorizing nationwide or worldwide service of process the proper forum for minimum contacts purposes is the United States as a whole.

*Specific or conduct-linked jurisdiction*

7.   The documents attached to this Complaint such as bank and accounting records of securities transactions, namely, the UBS Bahamas' Statements of Account 32,377/01,00 of Junkanoo Estates Ltd. and UBS AG's "Junkanoo Estates Ltd - Trade Confirmation" and "UBS (Bahamas) Ltd - Custodian Instructions" and "UBS (Bahamas) Ltd Security Trail Contracts" (*see* Discovery of fraud in this Complaint), related to a "securities contract" were made in connection with

purchases and sales of securities on the NYSE and NASDAQ, give rise to the reasonable inference that UBS AG and UBS Bahamas (collectively, the "defendants"), by engaging in securities trading activities in the United States, have purposefully directed their activities toward the United States and expressly aimed their respective conducts at the forum.

*Minimum contacts*

8.   The following defendants' contacts throughout the United States may be considered for personal jurisdiction purposes.

9.   First of all, the purchases and sales were represented as such that were carried out and completed in the United States and each of the purchases or sales was a contact with the forum and a step by which the fraudulent scheme was carried out.

10.   It is alleged that "[e]ven a single purposeful contact may be sufficient to meet the minimum contacts standard when the underlying proceeding is directly related to that contact."

11.   Second of all, defendants' contacts with the United States involve ongoing business relationships and brokerage accounts maintained at securities broker-dealers as service to its banking customers, including the plaintiffs.

12.   The purpose of defendants was to provide a specific service to their customers, including the plaintiffs, such as the purchase and sale of securities registered on

United States exchanges that was to be carried out by a broker or brokers in the
United States.

13.    UBS AG or UBS Bahamas or both must have maintained a brokerage account(s)
with a United States brokerage firm(s) in order to provide the service in the
expectation that this extra service will attract present and potential customers.

14.    UBS AG or UBS Bahamas or both must have maintained a United States dollar
bank account for purposes of carrying out the purchases and sales of securities of
United States companies and trusts such as shares of exchange-traded funds
("ETFs"), the subject of this case.

15.    The use of both a brokerage and a United States dollar account(s) was implied and
necessary to fulfill UBS Bahamas' agency duty owed to the plaintiffs, including
"the transfer[s] of cash or securities made to complete securities transaction[s]"
within the definition interpreted "in the context of the securities industry".

16.    Thirdly, defendants' contacts with the United States were not 'random, fortuitous,
or attenuated' or those of the unilateral activity of the plaintiffs.

17.    UBS AG contemplated a continuing relationship with the forum by maintaining
offices and personnel in the United States and advertising in United States
newspapers, magazines and on the United States Internet Segments.

18.    UBS Bahamas contemplated a continuing relationship with the forum by
maintaining a form named "UBS Account Application for Entities", executed by

the plaintiffs on July 18, 2012 and by UBS Bahamas on August 10, 2012, on which customers of UBS Bahamas authorized it "to take positions in Derivative products and in U.S. Securities" for the purpose of "Investments in U.S. Securities."

19. UBS AG's presence in the United States such as, for example, maintaining branches, having U.S.-based employees, including those who made communications within UBS AG in furtherance of or participated in the fraudulent scheme or knew about false records of transactions, or made directives from or to the United States that facilitated or encouraged the scheme, and whom it would be possible to identify during discovery.

20. Fourthly, defendants purposefully availed themselves of the privileges of conducting activities within the United States, thus invoking the benefits and protections of the laws of the United States, such that it "could reasonably anticipate being subject to the jurisdiction of the United States" and "could reasonably have expected to be haled into court in this country", when they deliberately set about to violate "the general statutory and regulatory prohibition on fraud in connection with the purchase or sale of securities".

21. Defendants were aware or knew or had good reason to know that their conduct, actions or omissions that arise out of or relate to their contacts with the United States would have effects in the United States.

22.    Fifthly, UBS AG's contacts are such sufficiently "`continuous and systematic'" that the exercise of jurisdiction would be "`reasonable and just.'"

23.    Nothing in the nature of either the effects or UBS AG's contacts with this forum suggest that the exercise of such jurisdiction is "unreasonable."

24.    Thus, this case is not "one of those rare cases in which minimum requirements inherent in the concept of fair play and substantial justice . . . defeat the reasonableness of jurisdiction. . . ."

25.    Sixthly, the plaintiffs' injury resulted directly from the UBS AG's conduct within the United States in the course of its agency for their trade orders to purchases and sales of United States securities on United States exchanges, and there is no risk of potential conflict with foreign nations' laws.

26.    The plaintiffs contend that they made a *prima facie* showing that this District Court has personal jurisdiction over the defendants.

## Other subjects of the Court's personal jurisdictions

27.    Kevin Lee Price, the Investment Portfolio Supervision (IPS) Head Nassau, Tibaud Halwyck, the Capital Markets Head Nassau, and George Maillis, the plaintiffs' account manager, employed by UBS Bahamas, who were primary participants in the activities of UBS Bahamas and who defrauded the plaintiffs by way of oral and written representations relating to the purchases and sales of securities.

6

**Due process**

28.     Exercising jurisdiction over both defendants comports with due process pursuant to traditional notions of fair play and substantial justice because: (1) it would not be a significant burden on defendants to litigate in the United States as the "modern methods of transportation and communication" have ameliorated and "lessened the burden of defending a lawsuit in a distant forum". Much of the evidence needed exists in New York city, in the UBS AG's records and the records of the NYSE, NASDAQ, custodians of the relative exchange-traded funds and the Depository Trust Corporation (DTC); (2) there is the United States' "obvious interest in stamping out the type of nefarious economic chicanery alleged"; (3) plaintiffs have a strong interest in litigating this case in this forum because they have no other means of obtaining relief provided by the Exchange Act; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy or the shared interest of the several states in furthering substantive policies regarding transactions in securities on U.S. national securities exchanges; and (5) "[t]here is a strong interest in having an American court interpret and apply U.S. securities law claims."

29.     Accordingly, those contacts suffice to make it fair to require defense of the action in this forum.

## II. PARTIES

## A. Plaintiffs' Information

30.   Plaintiffs, Yuri Starosteko and Irina Tsareva, (collectively the "plaintiffs"), were
      traders in securities, husband and wife and parents of six children residing on
      New Providence Island, The Bahamas; address for service by hand: c/o Priderock
      Corporate Centre, 11 East Street & Bay Street, City of Nassau, the Bahamas;
      postal address: P.O. Box N-4816, Nassau, the Bahamas. Phone#: 1(242)817-4372;
      email: starostenkovubsag@gmail.com

*Plaintiffs as a single entity with their company*

31.   At all times relevant to this Complaint, plaintiffs were a single entity with
      Junkanoo Estates Ltd. ("Junkanoo"), a company incorporated in the Bahamas,
      which was founded, beneficially and exclusively owned, and controlled by the
      plaintiffs who were officers of Junkanoo and had unrestricted decision-making
      authority regarding Junkanoo's bank account 32,377/01,00 on which they had
      purchased and sold securities in the United States through the defendants, by
      placing their trade orders with UBS Bahamas.

32.   The plaintiffs were signatories of both the Account Opening Documents and the
      Loan Documents constituting the securities contract between Junkanoo and UBS
      Bahamas, which established the relationship involved "agreement[s]" that are
      "similar to" "contracts for the purchase, sale… of a security...." 11 U.S.C. §§
      741(7)(A)(i),(vii).

33.   The plaintiffs were Junkanoo's agents with rights and duties under an agency, who can enforce Junkanoo's contracts because of their intention to substitute or superadd their personal liability for, or to that of Junkanoo, proved by the fact that plaintiffs were guarantors of the loan and accommodation parties to both the Commitment to Finance dated August 23, 2012, and Indenture of Mortgage (by way of guarantee) made on September, 18, 2012, the "Loan Documents", and thereafter agreed to bind themselves personally to the securities contract between junkanoo and UBS Bahamas (*see, i.e.,* Exhibit CF to this Complaint).

34.   Thus, the plaintiffs were intended third-parties of the securities contract, which was made for the plaintiffs' benefit; the benefit was immediate, and not incidental, so that the contracting parties had assumed a duty to compensate the plaintiffs if the benefit was lost.

**B. Defendants' Information**

35.   At all times relevant to this Complaint, defendant UBS AG was a Swiss corporation organized as an Aktiengesellschaft (AG) headquartered in Zurich and Basel with offices in the City of New York, New York, and Stamford, Connecticut, United States, maintaining a net of incorporated and unincorporated entities, subsidiaries, affiliates, branches, *etc.* under umbrella names "UBS AG" or "UBS Group" or "UBS Group AG".

36.     UBS AG's stock were publicly traded on the New York Stock Exchange and it
        had other classes of securities registered under Section 12 of the Exchange Act,
        15 U.S.C. § 78o(d).

37.     At all times relevant to this Complaint, UBS Bahamas was a Bahamian off-shore
        subsidiary of UBS AG, a banking company incorporated under the laws of the
        Bahamas and engaged in the business of dealing in securities in the Bahamas.

*Defendants as a single entity*

38.     At the time when UBS Bahamas was a going concern, the two corporations
        actually functioned as a single entity, and the actions of UBS Bahamas the world
        attributed to UBS AG because of total domination and control by the latter.

39.     On March 19, 2015, UBS Bahamas was liquidated by passing a resolution of one
        UBS AG's member, Beat Paoletto.

40.     In 2015, UBS Bahamas' sold to the Government of the Bahamas its headquarters
        building at 31A East Bay Street, Nassau, New Providence, the Bahamas, for
        $22M or about (*see* Exhibits T5 & T7 to this Complaint), while UBS Bahamas'
        attorneys represented on many occasions in the Bahamian action that UBS
        Bahamas has no credit available.

41.     There is reasonable ground to believe that UBS AG siphoned off the corporate
        funds and caused gross undercapitalization of UBS Bahamas.

42.     The building at 31A East Bay Street in Nassau is currently headquartered by the Securities Commission of the Bahamas, the Deputy Chairman of the Board of which is Michael Paton, a partner of Lennox Patton, the law firm representing UBS Bahamas in the Bahamian action (*see* Exhibit SB to this Complaint).

43.     Since March 2015, UBS Bahamas has had no officers, directors, or employees, it was not functioning in any manner.

### III. STATEMENT OF CLAIM

**FACTS:**

**Places**

44.     Places of occurrence of the acts of primary liability by the defendants are the City of New York, New York, Nassau, The Bahamas, and locations in Switzerland and elsewhere.

45.     Acts, practices and courses of business in furtherance of the fraudulent scheme were carried out within the Southern District of New York where the New York Stock Exchange ("NYSE") and the National Association of Securities Dealers Automated Quotations System ("NASDAQ") are operated.

**Dates**

46.     Dates of occurrence: between June, 2013 and October, 2013..

47.     In March 2019, the plaintiffs discovered the fraudulent scheme and became aware of their injuries of the type that the United States securities laws seek to prevent, and which are the basis of the action.

**Discovery of fraud in March 2019**

48.     Between October and November 2018, in the Bahamas action, UBS Bahamas adduced at discovery the following records on which 204 plaintiffs' securities transactions were entered in books of UBS Bahamas: (1) 206 documents called "Junkanoo Estates Ltd - Trade Confirmation" and "UBS (Bahamas) Ltd - Custodian Instructions"; and (2) 50 documents called "UBS (Bahamas) Ltd Security Trail Contracts" (*see* Exhibit TG to this Complaint).

49.     These documents (the "discovered documents") reflected purchases and sales in the name of UBS Bahamas of United States exchange-traded fund shares ("ETF shares") taken place in the United States between June 12, 2013 and July 25, 2013 which list no broker-dealer, while they list UBS AG as a custodian who provided to UBS Bahamas custodial services in Zurich, Switzerland, with respect to these trades executed on the NYSE and NASDAQ.

50.     The discovered documents do not contain evidence to show that the trades taken place in the United States between June 12, 2013 and July 25, 2013 on behalf of the plaintiffs were completed and settled in the U.S. clearance and settlement system.

51.    There is reasonable grounds to believe that these plaintiffs' trades booked by UBS Bahamas are pending transactions, not executed or settled.

52.    The fact that the securities in question have been purchased for or sold to the plaintiffs' account 32,377/01,00 was not conveyed by means of the discovered documents, because they merely show pending transactions.

53.    The plaintiffs had no reason to and in fact did not question the existence of the securities transactions in question until March of 2019, when they had received a copy of an affidavit sworn by Renate Raeber filed in the Bahamian action on March 7, 2019, which reads in paragraph 8: *"As it relates to Schedule 1 of Exhibit RR-5, to the best of my knowledge, information and belief, UBS has produced all of the contract notes, trade advices and trade receipts in its possession. UBS does not have any other contract notes in its possession, other than what has already been produced." See* Exhibit RA to this Complaint.

54.    The plaintiffs had no access to correct information.

55.    UBS Bahamas, by means of this affidavit, and UBS AG, by authorising the representation by way of 50 documents called "UBS (Bahamas) Ltd Security Trail Contracts" produced by UBS Bahamas, claimed that it was a "custodian" or a "foreign sub-custodian" of U.S. exchange-traded fund shares ("ETF shares") in question, but UBS AG was neither and, thus, legally could not be a "custodian" or a "foreign sub-custodian" of ETF shares in question in Switzerland.

56.   The term "custodian" able to maintain a custody over any U.S. ETF shares, as
      defined in 11 U.S.C. § 101(11), the U.S. regulation requires the existence of an
      agreement with the U.S. exchange-traded fund's custodian in order to be a foreign
      sub-custodian of its ETF shares, and that agreement must be deposited with the
      SEC by way of a filing of that U.S. exchange-traded fund.

57.   The above led the plaintiffs to the understanding that ETF shares in question had
      not been purchased for or sold to the plaintiffs' account and therefore have not
      become the subject of completed or executory contract for purchase from or sale
      for their current account 32,377/01,00, but of pending transactions.

58.   In any event, analysis of trade execution statistics for the plaintiffs' trades, which
      may have required the plaintiffs to seek and obtain trade execution data from the
      defendants or a third party(ies), can be done through discovery and the execution
      and settlement issues can be resolved on a fuller factual record.

**Account maintenance, order placement & booking functions**

59.   Between August 10, 2012 and April 11, 2014, UBS Bahamas performed account
      maintenance function with respect to current account 32,377/01,00 and was the
      plaintiffs' cash custodian, who held cash credit balances and issued periodic
      account statements to them. On September 28, 2012, UBS Bahamas held in
      current account 32,377/01,00 $729,749, money that the plaintiffs actually had (*see*
      Discovery of fraud in this Complaint).

60.    Also, UBS Bahamas performed functions to place the plaintiffs' trade orders with UBS AG and to book the plaintiffs' trade, which were ministerial in nature. In the booking function, the plaintiffs' transactions were entered on UBS Bahamas' accounting records, including the recording of fees and commissions due to it, which were disseminated to the world, including the plaintiffs  (*see* Discovery of fraud in this Complaint).

61.    The plaintiffs were assigned to and contacted the following UBS Bahamas employees who were, in fact, representatives of the Booking Center Bahamas UBS AG: Kevin Lee Price, Tibaud Halwyck and George Maillis (*see* Exhibit DP to this Complaint).

62.    On October 2, 2018, a document has been produced by UBS Bahamas in the Bahamas action called Dealing Procedure Manual UBS Capital Markets (CM) (Booking Center Bahamas), version V2, April 2013, (the "CM Dealing Procedure Manual", which disclosed order placement and booking practices performed by Booking Center Bahamas, a nonentity of UBS AG, through the individuals employed by UBS Bahamas (*see* Exhibit DP to this Complaint).

63.    According to the CM Dealing Procedure Manual, UBS Bahamas depended on and utilized the services and facilities of UBS AG, who performed or caused to perform the execution and settlement functions for all UBS Bahamas account holders, including the plaintiffs (*see* Exhibit DP to this Complaint at page 7).

64.     The Execution Desk in the Bahamas was a part of Capital Markets (*see* Exhibit DP to this Complaint at page 7).

65.     In one theory, Capital Markets or CM was not a legal entity, the Capital Markets Banking, a part of the banking side of UBS AG.

66.     In other theory, it is "UBS Capital Markets, L.P., formerly known as Schwab Capital Markets, L.P." (See *Pelosi v. Schwab Capital Markets, L.P.*, 462 F. Supp. 2d 503, 518 (S.D.N.Y. 2006).

67.     The plaintiffs' trade orders must be entered by a representative into the Order Entry System (OES), which routed them to the Execution Desk electronically for the acceptance by UBS Investment Bank, a nonentity of UBS AG (*see* Exhibit DP to this Complaint at page 9).

68.     In some cases, the Execution Desk placed the plaintiffs' trade orders with UBS Investment Bank using "Straight–Through–Processing" or "STP" via "Osmosys Tool" (*see* Exhibit DP to this Complaint at pages 9).

69.     Osmosys Tool is a third party application, a part of Order Routing System (UBS-internal system), connected to UBS Bahamas' Backend Banking System, where the trade orders travel through automated servers and are processed without manual intervention (*see* Exhibit OT to this Complaint).

70.     Once executed, a report of execution, which lists the transaction in terms of shares purchased or sold and other details of the trades so executed, was to be fed back into OES from KeyTrader (*see* Exhibit DP to this Complaint at page 9).

**Execution & settlement functions**

71.     Throughout broker-customer relationship between the plaintiffs and UBS Bahamas it was implied that they have agreed that, in exchange for commission payments to UBS Bahamas, UBS AG would timely execute or cause to execute the purchase or sale of particular securities on U.S. national securities exchanges in accordance with the trade orders placed with UBS Bahamas and timely settle or cause to settle trades so executed in the U.S. clearance and settlement system.

72.     After each trade order of the plaintiffs was placed by UBS Bahamas with UBS Investment Bank of UBS AG was to transmit (route) the order to a U.S. national securities exchange for execution to effectuate the purchase and sale of securities via the exchange's system or through floor brokers. At no time UBS Bahamas was free to choose whether or not to complete the securities transactions.

73.     Upon execution of a trade order, a written confirmation was to be generated automatically after the relevant U.S. national securities exchange provided execution records, and a broker-dealer's computer was to confirm that the order had been executed and what purchase or sale had, in fact, been made.

74.   In these purchases and sales UBS AG was to make use of the U.S. clearance and settlement system — the system of intermediaries and guarantees employed in securities transactions.

75.   In the settlement system, a third-party clearing agency acts as an intermediary between an anonymous buyer and seller. The clearing agency, however, is more than just a conduit because it guarantees to the buyer and seller that the transaction will settle as agreed, an event normally occurring a few days after the trade is booked. This guarantee inspires confidence in the trading system and permits lightning-fast trading but it also subjects the clearing agency to possible liability if the transaction does not settle as agreed. For their part, the buyer and seller guarantee that they will deliver the money and securities as promised, even though they may be waiting to receive that property from some other party.

76.   Since 1995, the settlement cycle in the United States was not a function of market custom, exchange rules, or industry practice. There is in place a Federal rule that mandated a specific settlement cycle for securities transactions requiring every and each transaction to be settled.

77.   The SEC adopted a rule under the Exchange Act, which establishes a settlement period for broker-dealer trades, effective June 1, 1995, 17 C.F.R. sec. 240.15c6–1 (1996), "designed to: (i) Reduce settlement risk, the risk to clearing corporations, their members, and public investors inherent in settling securities transactions by reducing the number of unsettled trades in the clearance and settlement system at

any given time; (ii) reduce the liquidity risk among the derivative and cash markets and reduce financing costs by allowing investors that participate in both markets to obtain the proceeds of securities transactions sooner; and (iii) facilitate risk reduction by achieving closer conformity between the corporate securities markets and Government securities and derivative securities markets that currently settle in fewer than 5 days. 58 Fed.Reg. 52891 (Oct. 13, 1993)."

**Money or securities transfer function**

78.  The actions to be performed by UBS Bahamas between the trade date and the settlement date included transfers of money or securities, which should have been made only after confirmation of the fact of transactions.

79.  On the settlement date, UBS Bahamas was to deliver the purchase price, in the case of a purchase, or received the sale price, in the case of a sale.

80.  Provided that, at all times relevant to this Complaint, the plaintiffs had sufficient funds in current account 32,377/01,00, UBS Bahamas automatically used these funds on the settlement date to pay for securities purchased.

81.  UBS Bahamas had authority to debit the plaintiff's bank account 32,377/01,00 and apply the amounts so debited to deliver the purchase prices only if the relevant plaintiffs' trades were executed on the relevant U.S. national securities exchange and settled in the U.S. clearance and settlement system.

82. Thus, the execution of trades for the plaintiffs and settlement of trades so executed was a condition precedent that fixed UBS Bahamas' right to deliver the purchase price or receive the sale price arising out of the securities transaction.

83. UBS Bahamas was under the duty to perform the execution and settlement functions, and agreed to transfer to Junkanoo's account purchased securities against the transfer of funds by Junkanoo.

84. The failure to discharge the execution and settlement functions was to divest of UBS Bahamas' right to transfer either money or securities with respect to the plaintiffs' trades.

85. The refusal to execute the plaintiffs' trade orders was intentional and resulted in a benefit to the defendants achieved by means of the power of disposition as to the plaintiffs' current account 32,377/01,00 at UBS Bahamas.

**Misrepresentations or omissions of material facts**

86. By misrepresentations as to the purchases or sales of securities registered on U.S. national securities exchanges, UBS Bahamas manipulated account balances of the plaintiffs' account 32,377/01,00 in order to assist itself in obtaining an order for possession of the dwelling house of the plaintiffs a few days after UBS AG resolved to liquidate UBS Bahamas (*see* Exhibit PO to this Complaint).

87. To conceal its fraudulent securities scheme UBS Bahamas (1) intercepted the trade execution data for the plaintiffs' trades its was supposed to execute on U.S.

national securities exchanges; (2) fraudulently debited the plaintiffs' bank account 32,377/01,00 and applied the amounts so debited to deliver the purchase prices for the plaintiffs' trades neither executed nor settled in the U.S. clearance and settlement system; and (3) manipulated account balances of the plaintiffs' bank account 32,377/01,00 in furtherance of its fraudulent securities scheme.

88.   The misrepresentations or omissions were repeated orally and in email messages sent to the plaintiffs by George Maillis employed by UBS Bahamas, and in other representations, or otherwise omitted each time the plaintiffs communicated with him regarding the purchases or sales of securities in the United States (226 emails sent to, 142 emails received from George.Maillis@ubs.com ).

89.   Most of these emails were misrepresentations, "pertaining securities themselves", related directly to the execution of 204 plaintiffs' the purchases or sales of securities listed on a American stock exchanges.

90.   For example, in the period between August and September 2013 George Maillis sent to plaintiffs emails confirming execution of their trade orders in the United States, as follows: on August 2, 2013 at 2:19 PM; on August 6, 2013 at 12:53 PM; on August 9, 2013 at 10:27 AM; on August 9, 2013 at 12:04 PM; on August 21, 2013 at 11:18 AM; on August 26, 2013 at 9:29 AM; on September 9, 2013 at 10:22 AM; on September 10, 2013 at 10:12 AM; on September 11, 2013 at 10:59 AM; on September 11, 2013 at 12:35 PM; on September 11, 2013 at 2:05 PM; on September 11, 2013 at 2:26 PM; on September 12, 2013 at 10:40 AM; on

September 13, 2013 at 10:52 AM; on September 13, 2013 at 11:36 AM; on

September 13, 2013 at 12:00 PM; on September 13, 2013 at 12:52 PM; on

September 13, 2013 at 1:51 PM; on September 13, 2013 at 2:05 PM; on

September 16, 2013 at 10:00 AM; on September 16, 2013 at 10:49 AM; on

September 16, 2013 at 12:28 PM; on September 16, 2013 at 1:28 PM; on

September 17, 2013 at 9:47 AM; on September 17, 2013 at 10:10 AM; on

September 17, 2013 at 10:17 AM.

91.   Moreover, George Maillis from the outset induced the plaintiffs to do voluminous

securities transactions. For example, in his email sent to the plaintiffs on June 26,

2013 at 17:08 urged the plaintiffs to "manifest volume" (*see* Exhibit MV to this

Complaint).

92.   These misrepresentations were both by "conduct and/or implication" and

contained statements that were misleading as to a material fact that the purchases

and sales of securities in the United States on the plaintiffs' behalf were made and

were legitimate transactions occurring in the regular flow of business, that the

defendants had complied with their duties as a broker(s) and hence an agent(s) of

the plaintiffs and that UBS Bahamas had disclosed all information that might call

those purchases and sales of securities into question.

93.   UBS Bahamas failed to explain to the plaintiffs that they effectively would not be

trading in securities on American exchanges in the United States in real life but on

a simulator and would pay for the simulator that would cause UBS Bahamas to win the wagers if the plaintiff lost and to lose if the plaintiffs gained.

94.   It is alleged that the disclosure of the omitted facts would have been viewed by the plaintiffs, as reasonable investors, as having altered their decision to purchase and sell securities. Plaintiffs would not do any securities transaction through the defendants and would not assent to any amount debited to their current account 32,377/01,00 on the books of UBS Bahamas applied to a securities transaction which were never executed on a U.S. national securities exchange contrary to their purchase trade order.

**Reliance**

95.   The defendants' fraudulent conduct not only "coincided" with  securities transactions, but was material to the decision by the plaintiffs (1) to buy or sell securities; (2) to buy or sell securities through the defendants or "UBS Group" or "the entire global UBS Group" because a strong reliance was placed by the plaintiffs on the misrepresentations or omissions set out above.

96.   The plaintiffs relied upon representations and pretences as to create a debt by way of documents disseminated by UBS Bahamas in its performing the account maintenance function by which the defendants appropriated money in the sum of $729,749.00 that the plaintiffs actually had in bank account 32,377/01,00 on

September 28, 2012 (*see* Account maintenance, order placement & booking functions; Money and securities transfer function).

97. The plaintiffs relied on representations by way of the acceptance by UBS Bahamas of payments for securities purportedly purchased in the United States.

98. The plaintiffs were entitled to rely upon UBS AG's representations, promises and pretences, which were false.

99. Such reliance caused the plaintiffs to have suffered losses directly resulting from what they "believed to be legitimate securities transactions."

100. Until November 2018, the plaintiffs did not understand that they were paying UBS Bahamas the loan interest, money for the service and spending their time not for trading in securities on American exchanges in the United States, but for participating in wagers (and losses) on the movements of prices of these securities which was a part of a fraudulent scheme employed "in connection with the purchase or sale of any security" by UBS Bahamas or UBS AG or both.

101. Thus, by way of misrepresentation UBS Bahamas induced the plaintiffs to assent to the following, which they would otherwise disagree with:

101.1.   the right to deliver the purchase price of securities arising out of a securities transaction which was not executed on a U.S. national securities exchange and not settled in the U.S. clearance and settlement system;

101.2.     the amounts debited to their current account 32,377/01,00 on the books of UBS Bahamas applied to securities transactions which were never executed and settled according to their purchase trade orders;

101.3.     the commitment to the loan of their dwelling house worth $2,800,000.00 as of August 2012;

101.4.     a deposit of $729,749.00 with UBS Bahamas, on September 28, 2012;

101.5.     the payment of interest at rate 4.12% on that deposit from September 28, 2012 through April 11, 2014, totaled $45,098.49; and

101.6.     the payment $9,974.00 of the brokerage and transaction fees.

**Scienter**

102.     At all times relevant to this Complaint, the above fraudulent scheme was in the minds of UBS Bahamas or UBS AG or both. The defendants' top management had sufficient knowledge of the misconduct in ETFs trading by the Execution Desk of the Booking Center Bahamas of UBS AG and UBS Bahamas.

103.     The defendants, by their actions intended to defraud and mislead the plaintiffs, engaged in fraudulent conduct, which was (1) directed at the plaintiffs (2) in order to induce them to purchase or sell securities in the United States through UBS Bahamas for a fee, and (3) caused losses directly resulting from what the plaintiffs believed to be legitimate securities transactions.

104.    The facts, giving rise to a strong inference that the defendants acted with the purpose of misleading the plaintiffs, as follows.

105.    The evidence received in the Bahamas action, attests to the fact that UBS Bahamas did not execute the plaintiffs' trades, acting in the same way which have allowed its trader of the London Branch, Mawuli Adoboli, to escape the detection of UBS AG's risk-control systems from 2008 through 2011. So, the opportunity may have presented itself for false records to be created in the Booking Center Bahamas of UBS AG and UBS Bahamas in the course of an off-the-book accounting notwithstanding that the Swiss and UK regulators' found in 2012 that UBS AG's risk management systems and controls were not fit for the purpose, creating an environment in which dangerously large off-the-book positions could be concealed (*see* Exhibit ND to this Complaint).

106.    The Swiss and UK regulators' investigations into UBS AG's brokerage businesses and involvement in various exchange-traded funds ("ETFs") markets and transactions that identified individuals and business units within UBS AG and misconduct (*see* Exhibits F1 through F17 to this Complaint).

107.    Material systemic procedures, management systems and internal controls' failures within UBS AG, identified by the Swiss and UK regulators in 2012, persisted for a significant and continuous period of time without correction, being unable to ensure transparency in the financial health of the business and the transactions between UBS AG and its customers, the accuracy of the corporate books and

records and the reliability of the audit process which constitute a strong inference that UBS AG acted with a scienter.

108.    UBS Bahamas joined and participated in the fraudulent activities just like the London Branch of UBS AG in the period between 2008 and 2011, helping itself attract additional customers, including the plaintiffs, by willfully defrauding them in order to collect lucrative fees and to misappropriate $729,749, and, ultimately, to obtain possession of the plaintiffs' dwelling house owned by Junkanoo.

109.    UBS Bahamas participated in creating false pretenses as to create a debt and in making, knowingly and fraudulently, false representations through its actions and in its omissions regarding the purchases and sales of securities registered on U.S. national securities exchanges on the plaintiffs' behalf with an intent to defraud and mislead them.

**Connection with the purchases or sales of securities**

110.    The misrepresentations and omissions were made "in connection with" the purchase or sale of securities of securities registered on American exchanges, which were to take place in the United States.

111.    The defendants' fraudulent acts were integral to the purchase and sale of the securities in question because its misrepresentations related directly to the execution of the plaintiffs' trade orders for particular securities in particular transactions on particular American exchanges.

112.    UBS Bahamas' misappropriation of the proceeds of its misdeed has the requisite connection with the purchases and sales of securities in the United States and the securities purchases and sales and UBS Bahamas' fraudulent practices were not independent events, but the integral part of the same scheme.

**Loss causation**

113.    Plaintiffs plead the loss causation by demonstrating that misrepresentations and pretences maintained not-existing, artificial prices at which ETF shares in question were purportedly executed on U.S. national securities exchanges in order to create a debt.

114.    It is alleged that under this approach, broker-dealers like UBS Bahamas would have every incentive to maintain non-existing or artificial prices of shares in securities transactions by making false or misleading statements in order to create a debt, which otherwise would not exist.

115.    By means of such misrepresentations and pretences, money that the plaintiffs actually had in account 32,377/01,00 at UBS Bahamas in the sum of $729,749.00, were fraudulently appropriated by UBS Bahamas from the plaintiffs.

**COUNT ONE: claim against UBS Bahamas for relief for violations of subsection 10(b) of the Exchange Act & SEC Rule 10b-5**

116.    Paragraphs 1 through 115 are re-alleged and incorporated by reference as if set forth fully therein.

117.  Plaintiffs allege that UBS Bahamas, acting with scienter, deliberately orchestrated and conducted a fraudulent scheme regarding plaintiffs' trade orders for the transactions in securities publicly traded on U.S. national securities exchanges and made false material representations or omitted to disclose material information that the defendants did not execute or cause to execute the plaintiffs' trade orders on any U.S. national securities exchange and did not settle or cause to settle any trade so executed in the U.S. clearance and settlement system, and caused plaintiffs to rely on their actions and representations, and, in connection therewith, so relying, caused plaintiffs to purchase and sell securities.

118.  Primarily, fraud was concerned with the execution of the plaintiffs' trade orders, settlement of the trades so executed, and manipulation of account balances of the plaintiffs' bank account.

119.  The cause of action in this case arises out of these very activities such as misrepresentations and pretences as to the transfers of cash or securities made to complete securities transactions which took place in the United States within the definition interpreted in the context of the securities industry, having in-forum effects harmful to the plaintiffs resulted in injury and damage.

120.  Each time placing trade orders, the plaintiffs signified to UBS Bahamas their intention to purchase or sell particular securities registered on U.S. national securities exchanges and were specifically induced thereafter by the misrepresentations to not receive or retain the securities in question because none

of the plaintiffs' trade orders was ever executed on any U.S. national securities exchange or settled in the U.S. clearance and settlement system  (*see* Discovery of fraud in this Complaint).

121.   Each purchase or sale of securities was made to further the fraudulent scheme and was deceptive because none was neither executed on any U.S. national securities exchange nor settled in the U.S. clearance and settlement system and that was neither authorized by, nor disclosed to, the plaintiffs.

122.   It is alleged that UBS Bahamas fraudulently accepted payments for securities that it never intended to purchase and deliver to the plaintiffs.

123.   The scheme enabled UBS Bahamas to manipulate account balances of the plaintiffs' bank account 32,377/01,00 to cover its intention to misappropriate the plaintiffs' funds, masking harm to the plaintiffs by the use of sophisticated means, including the concealment of assets or transactions through the use of fictitious bank or accounting records of the plaintiffs' trades purportedly executed on U.S. national securities Exchanges, disseminated to the plaintiffs with the intent to deceive and mislead the plaintiffs.

124.   The fictitious records included cash prices to the plaintiffs corresponding to quotations of the public "market" for the ETFs shares in question. These cash prices were fictitious because they were not obtained through public price discovery on the relevan U.S. national securities exchanges and were not a result

of executions for the plaintiffs' trade orders traded with liquidity displayed on these exchanges.

125.   The discovered documents show that plaintiffs were the parties to 204 pending transactions in securities listed on exchanges in the United States and that irrevocable liability was incurred within the United States, supporting factual allegations concerning contract formation, placement of purchase orders.

126.   UBS Bahamas did not make settlement payments commonly used in the securities trade to complete transactions involving the exchange of money for securities and was a broker who accepts payment for securities that he never intends to deliver, who pocketed or paid out-of-pocket any difference between purchase price money to be delivered to sellers and sale price money to be delivered to us.

127.   For example, in August, 2013 the plaintiffs made a profit of $30,694 and received partial compensation for breach of duty of best execution of 3,110, which both were paid to plaintiffs' account by UBS Bahamas out-of-pocket.

128.   On the other hand, on September 17, 2013 the plaintiffs placed with UBS Bahamas four orders to buy securities on the New York Stock Exchange (NYSE), totaling $564,400. UBS Bahamas wrongfully booked these pending transactions and debited $569,196 to the plaintiffs' current account as the purchase price money for these securities. On September 18, 2013, after an announcement of the Federal Reserve, the market moved drastically against the plaintiffs' position. To save time, they placed two orders by phone to close the position out at a price

bringing proceeds of sale $560,000 or about, but UBS Bahamas recorded the execution at prices significantly lower, and thus the securities were shown to be sold for $478,126.

129.    The difference between the purchase and sale prices of $91,070, or the plaintiffs' loss, was diverted by UBS Bahamas $91,070 to its own use, who thereby profited from the use misrepresentations and pretences and the maintenance of not-existing, artificial prices at which securities were purportedly executed on the NYSE, while they were not.

130.    The plaintiffs allege that they are victims of an elaborate scheme sophisticated either in the execution or concealment that "simulated" fictitious or fake trades and generated hundreds of falsified trading records of transactions which took place in the United States.

131.    The injury caused to the plaintiffs is also an economic loss suffered as a result of wrongs committed in violation of section 10(b) of the Exchange Act, and they claim actual and consequential damages for fraud, having direct effects on the projected income based on the plaintiffs' ability to make a profit from trading in securities, where the experience and expertise of the plaintiffs was a capital available for them as seasoned traders in securities. The decision to enter into relationship withUBS Bahamas was supported by consideration of profits from the trading on U.S. national securities exchanges in which the plaintiffs have a history of profitability evidenced by the trading track record of net profit of

$1,147,418.00 or so in a trading account on the books of Credit Suisse Nassau Branch with an initial balance $360,312.00 in February 2009 and an interim balance $1,507,730.00 in May 2009 (*see* Exhibit LP to this Complaint).

132.    At all times to this Complaint, UBS Bahamas knew that the fictitious records of the plaintiffs' trades were false and intended them to be so that would and did allow UBS Bahamas to induce the plaintiffs to purchase and sell securities and to use and misappropriate the plaintiffs' money.

133.    Wrongs done to the plaintiffs by UBS Bahamas were intentional and involved an invasion by UBS Bahamas of the plaintiffs' federally protected interest to engage in securities transactions free from the effects of deceptive or unfair practices employed in connection therewith.

134.    At all times to this Complaint, UBS Bahamas sought to and did execute the scheme to engage in securities fraud, as a part of UBS Bahamas' strategy to defraud the public, including plaintiffs.

135.    UBS Bahamas concealed its wrongs and maintained this pattern of fraud without detection for more than five years, between June 2013 and March 2019.

136.    In doing so, UBS Bahamas engaged in acts, practices, or courses of business which operated as a fraud or deceit upon plaintiffs.

137.    It is alleged that UBS Bahamas, by the use of means or instrumentality of interstate commerce or of the mails, or of facilities of U.S. national securities

exchanges, employed, in connection with the purchases or sales of securities registered on these exchanges, manipulative or deceptive, or other fraudulent device or contrivance within the term meaning in Exchange Act Rule 15c1-2 [17 C.F.R. § 240.15c1-2].

138. UBS Bahamas' manipulative, deceptive and fraudulent devices or contrivances included untrue and misleading written statements, which were made through the medium of the individuals defendants employed by UBS Bahamas, disseminated to the public, including the plaintiffs, that securities transactions in fact occurred on U.S. national securities exchanges, trades were carried out and securities were held on the plaintiffs' account with UBS Bahamas, when no such transactions occurred on any U.S. national securities exchange, or omitted to state material facts necessary in order to make the statements or omissions made, in the light of the circumstances under which they were made, not misleading, with knowledge that these statements or omissions were untrue or misleading.

139. By virtue of the violative conduct alleged herein, UBS Bahamas, directly or indirectly, singly or in concert, willfully violated provisions contained in Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder having the scope which shall not be limited by any specific definitions of the term "manipulative, deceptive, or other fraudulent device or contrivance" contained in Rule 15c1-2 [17 C.F.R. § 240.15c1-2] or other Rules and Regulations adopted pursuant to Section 15(c) of the Exchange Act.

140.   For the purposes of this Count, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services as provided by Section 1343 of the Criminal and Penal Code of the United States [18 U.S. Code § 1346 Definition of "scheme or artifice to defraud"].

141.   Plaintiffs were not aware that their trade orders for the transactions in securities were not sent or routed to and not represented or executed on any U.S. national securities exchange by UBS Bahamas or its agents or subagents.

142.   Plaintiffs would have considered it important in their decision to trade through UBS Bahamas and UBS AG to know that their orders were not sent or routed to and not represented or executed on any U.S. national securities exchange; neither would plaintiffs do it if they were to make the decision again.

143.   The said manipulative or deceptive activities that occurred in connection with the purchase or sale of a security in the United States entitled plaintiffs for private rights of action seeking damages and such other relief as this Court deems necessary or appropriate.

144.   Additionally, UBS AG, by the scheme, defrauded not only the plaintiffs but also American and other investors because the plaintiffs' offers to buy securities never reached the market and not all those who wanted to sell securities at prices so offered were able to do that, but at values adversely affected by non-delivery of the plaintiffs' purchase price money to the market.

145.    Another example of effects in the United States is the interference with the collection of public revenues, which constitute a threat to the effectiveness of government in that the United States did not collect a cent of the taxes imposed on commission income, which was to be earned by UBS Bahamas' U.S.-based sub-agents, which were to be effecting sales and purchases of securities for it, with respect to the trades at issue.

**COUNT TWO: claim against UBS AG for relief for violations of subsection 20(a) of the Exchange Act**

146.    Paragraphs 1 through 145 are re-alleged and incorporated by reference as if set forth fully therein.

147.    Plaintiffs allege that UBS AG is liable unders section 20(a) of the Exchange Act, which imposes derivative liability on parties controlling persons who commit Exchange Act violations, because UBS AG was a culpable participant in the fraud perpetrated by UBS Bahamas.

148.    UBS AG joined the scheme from the outset and had full control, and last word in decisions over the Booking Center Bahamas of UBS AG and UBS Bahamas regarding brokerage services, according to a Memorandum dated January 13, 2013, by helping to market the Real Estates Collateralized Loan ("RECL") Offering Program to investors, and by sponsoring it, despite knowing, or consciously avoiding knowing, that the Booking Center Bahamas of UBS AG was a fraud, and misrepresenting to investors that Booking Center Bahamas of UBS

AG performed rigorous due diligence, because the RECL Offering Program was approved by the Bahamian regulator only on May 21, 2013, or 9 months after the Booking Center Bahamas of UBS AG induced the plaintiffs to enter it (*see* Exhibits BC & BU to this Complaint).

149.   UBS AG financed UBS Bahamas' Real Estate Collateralized Loan program induced the plaintiffs to enter into a five years loan arrangements, part of which was the securities contract to trade U.S. securities on U.S. national securities exchanges; did not execute any trade order placed by the plaintiffs; accepted money debited to current account 32,377/01,00 on the books of UBS Bahamas applied to a securities transaction purportedly executed according to purchase trade order, but in reality, not executed on any U.S. exchange and not settled in the U.S. clearance and settlement system.

150.   On December 20, 2014, the plaintiffs sent an email to the assistant of then the CEO of UBS AG, Sergio Ermotti, expressing concerns related to brokerage services provided by the Booking Center Bahamas of UBS AG and representations made by its representatives related to the securities transactions (*see* Exhibit SE to this Complaint).

151.   On February 3, 2014, by an email timed to 13:35, sent to the plaintiffs by of Sasha Savic, the UBS AG's Chief of Staff Americas and Caribbean, UBS AG verified the truth of false and misleading statements made by UBS Bahamas and George

Maillis regarding the purchases and sales of securities in the United States (*see* Exhibit ES to this Complaint).

152.   Thus, UBS AG certified that it was aware that both the Booking Center Bahamas of UBS AG and UBS Bahamas were engaged in fraud, but despite that knowledge sponsored its activity from the outset.

153.   UBS Bahamas shared a parent-subsidiary relationship in which UBS AG directly owned 99,99999% of the outstanding 4,000,000 voting shares of UBS Bahamas, where "the parent exercised the type of control necessary to ascribe to it the activities of the subsidiary."

154.   In fact, UBS AG provided brokerage services in the Bahamas through UBS Bahamas' local activities and used UBS Bahamas as a corporate shell to perform ministerial functions (*see* Account maintenance, order placement & booking functions; Discovery of fraud in this Complaint).

155.   UBS Bahamas was merely a facade for the brokerage services operations of UBS AG in the face of the Booking Center Bahamas, a nonentity of UBS AG (*see* Account maintenance, order placement & booking functions in this complaint).

156.   UBS Bahamas was the "alter-ego" or "instrumentality" of UBS AG, where "the separate corporate identities ... are a fiction and ... the subsidiary is, in fact, being operated as a department of the parent" and "where there is a lack of attention to corporate formalities, such as where the assets of two entities are commingled,

and their operations intertwined" or "where a corporate parent exercises complete domination and control over its subsidiary" (*see* Account maintenance, order placement & booking functions in this complaint).

157.   For example, during pre-agency negotiations, UBS Bahamas placed itself as a part of "the entire global UBS Group" and represented by way of advertisement or promotion contained in the printed marketing materials of UBS Bahamas disseminated to them, including a leaflet called "Welcome to UBS (Bahamas) Ltd.", which included the genuine UBS logo on the front page and in which UBS Bahamas describes itself "[a]s a wholly-owned subsidiary of UBS AG, Switzerland" which "gives you access to the advantages of this outstanding offshore location, combined with the services of the entire global UBS Group" and states that "[w]ith UBS (Bahamas) Ltd. you gain access to products and services offered by the UBS Group" and Bahamas trading desk "can execute equity, bond, derivative products" (*see* Exhibits B1 & B2 to this Complaint).

158.   During its existence, 1968-2015, UBS Bahamas was never a member of any United States exchange or had software links with any registered United States exchange, broker-dealer, the National Securities Clearing Corporation ("NSCC"), or the Depository Trust Company ("DTC") of the Depository Trust & Clearing Corporation (DTCC). Thus, UBS Bahamas was unable to execute any trade on any U.S. securities exchange without a third party.

159.   There was an obvious failure to observe corporate formalities, where there was the direct management by UBS AG and the use of common officers.

160.   In particular, Beat Paoletto, who served as President & CEO of UBS Bahamas, at the same time was a member of UBS AG.

161.   Kevin Lee Price, who served as the Investment Portfolio Supervision (IPS) Head Nassau, at the same time, was employed by UBS Financial Services, Inc. according to the FINRA's BrokerCheck Report# 66539-83561 data, current as of Friday, September 04, 2015 (*see* Exhibit KP to this Complaint).

162.   The evidence discovered in the Bahamian action shows that representatives of the Booking Center Bahamas of UBS AG did not consider its business unit as an entity independent from UBS AG, rather they considered themselves and the CEO of UBS AG as members of different business units or offices within UBS AG, "the business management unit of Sergio Ermotti (UBS CEO)", who had control over their office, according to a Memorandum dated January 13, 2013 (*see* Exhibit BU to this Complaint).

163.   UBS AG lent the prestige of its name to the products and services offered through UBS Bahamas (*see* Account maintenance, order placement & booking functions in this Complaint), which acted on behalf of UBS AG in its brokerage operations only with the permission of UBS AG.

164.    For example, both the Account Opening Documents and the Loan Documents included the genuine UBS logo on each and every page.

165.    Also, UBS AG had access to and substantial control over the plaintiffs' bank account 32,377/01,00 administered by UBS Bahamas.

166.    UBS Bahamas had never been an independent profit center and, in 2013-2014, UBS Bahamas' liquidity was compromised solely by the reluctance of UBS AG to support this overseas subsidiary. In particular, UBS AG's intention to liquidate UBS Bahamas was announced to the general public in newspapers circulated in the Caribbean and Bahamas (*see* Exhibit CC to this Complaint).

167.    By virtue of violative conduct alleged herein, UBS AG is liable unders section 20(a) of the Exchange Act.

## IV. RELIEF

168.    WHEREFORE, the plaintiffs respectfully request that this Court, and grand the following relief:

168.1.    (a) Final Judgment in favour of the plaintiffs finding that the defendant violated the securities laws and rules promulgated thereunder as alleged herein and directing the defendants to pay damages;

168.2.    (e) Such other and further relief as this Court may deem just and appropriate.

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the Complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Respectfully submitted,

Dated: August 17, 2020   _____
Plaintiff

Dated: August 17, 2020   _____
Plaintiff