UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

YURI STAROSTENKO and IRINA TSAREVA-
STAROSTENKO,

                    Plaintiffs,


                    -v.-


UBS AG (A SWISS BANK) and UBS (BAHAMAS)
LTD (IN VOLUNTARY LIQUIDATION),

                    Defendants.

---

19 Civ. 9993 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Yuri Starostenko and Irina Tsareva-Starostenko (together, "Plaintiffs") maintained an investment account at Defendant UBS Bahamas, a private bank.  In 2013, Plaintiffs lost hundreds of thousands of dollars on day trades that they directed the bank to execute.  In this action, Plaintiffs allege that the bank never actually processed those trade requests, and instead pocketed their cash.  Because this New York-based Court has no role to play in this dispute among two Bahamian residents, a Swiss bank, and its Bahamian subsidiary, Defendants' motion to dismiss is granted.

### BACKGROUND[1]

#### A.    Factual Background

Defendant UBS AG is a bank incorporated in Switzerland.  (*See* TAC ¶ 6). It maintains "a number of separate business lines and legal entities ... in many

---

[1]    This Opinion draws its facts from the Third Amended Complaint (Dkt. #109 ("TAC")), the well-pleaded allegations of which are taken as true for the purposes of this Opinion. The Court sources additional facts from the exhibits attached to the TAC (Dkt. #110,

countries around the world," including the United States.  (*Id.*).  UBS Bahamas is UBS AG's Bahamian subsidiary.  (*Id.* ¶ 7).  UBS Bahamas suspended operations and entered voluntary liquidation in 2015.  (*Id.* ¶ 12).  Plaintiffs assert that the operations of UBS AG and UBS Bahamas (together, "Defendants") are so intertwined "that the two entities [a]re essentially one" such that "all UBS Bahamas['s] activities could be ascribed to UBS AG."  (*Id.* ¶ 8).

Irina Tsareva-Starostenko is an Italian citizen currently residing in the Bahamas with her husband, Yuri Starostenko.  (Tsareva Decl. ¶ 1).  Plaintiffs are the founders and owners of Junkanoo Estates Ltd. ("Junkanoo"), a company incorporated in the Bahamas.  (TAC ¶ 4).  They are active day traders (Tsareva Decl. ¶ 1),[2] and have used UBS Bahamas to broker their trades since 2008 (*see id.* ¶ 4).

In 2012, Junkanoo took out a $1.4 million loan from UBS Bahamas to obtain capital for trading.  (Maillis Decl. ¶ 7; Tsareva Decl. ¶ 42).  The loan was secured by a mortgage on a Bahamian residential property owned by Junkanoo

---

112), including the Affidavit of Irina Tsareva (Dkt. #110-1 ("Tsareva Decl.")) and the Affidavit of George Maillis (Dkt. #112-11 ("Maillis Decl.")).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #126); to Plaintiffs' memorandum of law in opposition to Defendants' motion as "Pl. Opp." (Dkt. #128); and to Defendants' reply memorandum as "Def. Reply" (Dkt. #134).

[2]     *See generally* James Chen, *Day Trader: Definition, Techniques, Strategies, and Risks* (June 13, 2022), https://www.investopedia.com/terms/d/daytrader.asp ("A day trader is a type of trader who executes a relatively large volume of short and long trades to capitalize on intraday market price action.  The goal is to profit from very short-term price movements.  Day traders can also use leverage to amplify returns, which can also amplify losses.").

(the "Junkanoo Property"), and was personally guaranteed by Plaintiffs. (Maillis Decl. ¶¶ 9-11).  In relevant part, the loan agreement required Junkanoo to maintain at least half of the loan amount ($700,000) in its investment account at UBS Bahamas (the "Junkanoo Account").  (Id. ¶ 8).

After obtaining the loan, Plaintiffs began to trade through the Junkanoo Account.  (See Tsareva Decl. ¶¶ 48-49).  Indicative of their day-trading strategy, Yuri Starostenko ordered 252 trades between July and September 2013.  (Id. ¶ 49).  By July 2013, the balance of the Junkanoo Account had fallen below $75,000.  (Id. at Tab 6; see also Maillis Decl. ¶ 14).  Around this time, Yuri Starostenko exchanged "many emails" and had several meetings with Defendants' representatives in which he complained about slow trade execution times and his inability to access an electronic trading platform. (Tsareva Decl. ¶¶ 49-61).  He also repeatedly requested that Defendants produce confirmations from their U.S.-registered carrying firms affirming that they had processed each of Plaintiff's trades on the New York Stock Exchange (the "NYSE") and/or the National Association of Securities Dealers Automated Quotations Stock Market ("NASDAQ").  (Id.; see also id. ¶ 21).  UBS AG investigated Plaintiffs' complaints and concluded that the bank had acted properly.  (Id. ¶ 58).  In or around November 2013, UBS Bahamas halted trading from the Junkanoo Account.  (Id. ¶¶ 54-55).

In October 2014, UBS Bahamas filed an action against Plaintiffs in the Bahamas Supreme Court of Common Law and Equity (the "Bahamian Litigation"), claiming that Junkanoo was in default of the loan agreement.

3

(Tsareva Decl. ¶ 14; *see also* Maillis Decl. ¶¶ 15-23).  Plaintiffs filed a counterclaim in the Bahamian Litigation and later filed a separate action against UBS Bahamas that was ultimately consolidated with the Bahamian Litigation.  (Tsareva Decl. ¶ 14).  In March 2015, UBS Bahamas took possession of the Junkanoo Property pursuant to an interlocutory order from the Bahamian court.  (*Id.* ¶¶ 14, 17-18, 68).  To the Court's knowledge, the Bahamian Litigation is ongoing.  (S*ee id.* ¶¶ 71-72 (describing Plaintiffs' pending appeal)).

Plaintiffs continued to request trade confirmations from UBS Bahamas throughout the Bahamian Litigation.  (Tsareva Decl. ¶ 21).  In November 2018, UBS Bahamas produced to Plaintiffs at least one hundred internal records documenting trades processed by UBS Bahamas from the Junkanoo Account in 2013.  (TAC ¶ 17).  UBS Bahamas's disclosures, it is alleged, did not contain trade confirmations from the bank's U.S.-based carrying firms.  (Tsareva Decl. ¶ 25).  From this production, Plaintiffs reason that the records UBS Bahamas produced are falsified and that Defendants never actually executed Plaintiffs' 2013 trades.  (TAC ¶ 22).

In the instant action, Plaintiffs assert that Defendants, along with a number of non-party UBS employees and officers,[3] engaged in a massive

---

[3]    Plaintiffs identify fifteen current and former employees and executives from various UBS offices around the world whom they would have added as defendants had the Court not denied them leave to do so.  (*See* Dkt. #108 (granting Plaintiffs leave to file a third amended complaint, but denying their request to name additional defendants because Plaintiffs had not attempted to add those parties in more than two years of litigation and failed to name the parties they wished to add)).

"fraudulent and manipulative scheme" to defraud investors who use their brokerage services in order to create "risk-free profit" for themselves.  (Tsareva Decl. ¶¶ 9, 13).  Specifically, Plaintiffs allege that Defendants intentionally failed to execute client trade orders on U.S. stock exchanges, including the 252 trades ordered by Plaintiff Yuri Starostenko between July and September 2013.  (*Id.* ¶¶ 9, 49, 64).  Instead, Plaintiffs allege, Defendants kept clients' money for themselves and "create[d] fictitious trade reports" to cover their tracks.  (*Id.* ¶ 9).  Any losses on clients' purported trades thus became profit for Defendants.  (*Id.*).

## B.  Procedural Background

Plaintiffs, proceeding *pro se*, initiated this suit by filing a complaint against a single defendant, UBS AG, on October 28, 2019.  (Dkt. #3).  On November 22, 2019, the Court granted Plaintiffs' request to proceed *in forma pauperis*.  (Dkt. #8).  After Plaintiffs informed the Court that they were having trouble publishing the class notices required by the Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 (Dkt. #12), the Court explained that *pro se* plaintiffs may not represent the interests of third parties and informed Plaintiffs that only their individual claims would go forward (Dkt. #13).

On March 30, 2020, without conceding that it had been properly served, UBS AG requested leave to file a motion to dismiss the complaint.  (Dkt. #23). Shortly thereafter, Plaintiffs filed an opposition to such pre-motion letter (Dkt. #26), a brief detailing the Bahamas Litigation (Dkt. #27, 28), and a letter

requesting leave to amend their pleading (Dkt. #28). The Court granted Plaintiffs leave to amend on April 29, 2020. (Dkt. #30). Plaintiffs filed the First Amended Complaint (the "FAC" (Dkt. #31)) on May 28, 2020. With leave of the Court (Dkt. #36), UBS AG filed a motion to dismiss the FAC on July 27, 2020 (Dkt. #41), portions of which were refiled on August 14, 2020, to conform with the Court's filing conventions (Dkt. #44-45). The Court stayed discovery pending the resolution of UBS AG's potentially dispositive motion. (Dkt. #38).

Rather than filing an opposition to UBS AG's motion to dismiss the FAC, on August 17, 2020, Plaintiffs filed a Second Amended Complaint (the "SAC" (Dkt. #46)), which named UBS Bahamas as a second defendant. The Court accepted the amended pleading but clarified that it would "supplant, rather than supplement, Plaintiffs' prior complaints." (Dkt. #48).

Throughout this period, Plaintiffs struggled to properly serve Defendants, largely due to Defendants' international status. On August 28, 2020, the Court suspended briefing until the service issues could be resolved. (Dkt. #56). The Court held an initial conference to discuss service and Defendants' anticipated motion to dismiss on November 4, 2020. (Minute Entry for Nov. 4, 2020). Following that conference, the Court granted Plaintiffs' application for limited *pro bono* counsel for the purpose of serving Defendants in accordance with the dictates of the Hague Service Convention. (Dkt. #60). On February 8, 2021, the Court stayed this matter pending Plaintiffs' efforts to effectuate service. (Dkt. #75). Several days later, Plaintiffs requested a certificate of default against UBS Bahamas (Dkt. #76-79), which request the Court denied because

6

that entity's obligation to answer the SAC had been stayed by the Court's February 8, 2021 Order (Dkt. #80).

UBS Bahamas accepted service on May 31, 2021, and the Court restored the claims against that entity to the active docket shortly thereafter.  (Dkt. #81-83).  UBS Bahamas requested leave to renew its motion to dismiss the SAC on June 21, 2021 (Dkt. #84), which request the Court denied "pending resolution of Plaintiffs' efforts to serve Defendant UBS AG in accordance with Hague Service Convention requirements" (Dkt. #86).  UBS AG joined UBS Bahamas's request to file a motion to dismiss on October 6, 2021.  (Dkt. #87).  The Court then unstayed the action in full and set a briefing schedule for Defendants' anticipated motion to dismiss.  (Dkt. #89).

Defendants jointly filed a motion to dismiss the SAC on November 24, 2021.  (Dkt. #92).  On November 30, 2021, Plaintiffs submitted a letter requesting that the Court disregard materials in Defendants' motion outside the SAC or convert the motion into a motion for summary judgment.  (Dkt. #93).  The Court construed this letter as Plaintiffs' opposition to the motion to dismiss, but afforded Plaintiffs an opportunity to supplement their opposition. (Dkt. #95, 97).  On January 18, 2022, Plaintiffs requested leave to again amend the operative pleading and requested referral of the pending motion to a magistrate judge.  (Dkt. #103).  The Court denied this request without prejudice as to its renewal upon a more detailed showing of Plaintiffs' reasons for amendment.  (Dkt. #104).

Plaintiffs renewed their request to amend the pleadings on January 28, 2022. (Dkt. #105). Defendants filed a letter opposing that request. (Dkt. #106). On February 4, 2022, the Court expressed frustration that Plaintiffs had already had ample time to address any shortcomings in their pleadings but nonetheless permitted Plaintiffs to amend the operative complaint for the limited purposes of (i) ensuring that certain claims that were alleged in the FAC but not the SAC were included in the operative pleading, and (ii) clarifying the statute(s) under which certain of Plaintiffs' securities fraud claims arose. (Dkt. #108). The Court denied Plaintiffs' request to name new, unspecified defendants, denied Plaintiffs' request for appointment of *pro bono* counsel, denied Plaintiffs' request for referral to a magistrate judge, and set a schedule for Plaintiffs to amend their pleadings and for briefing of Defendants' anticipated motion to dismiss. (*Id.*).

Plaintiffs filed a Third Amended Complaint (the "TAC" (Dkt. #109)) on February 28, 2022, along with accompanying exhibits (Dkt. #110). With leave of the Court (*see* Dkt. #111), Plaintiffs filed additional exhibits on March 2, 2022 (Dkt. #112). Defendants subsequently requested that the TAC be stricken for noncompliance with the Court's February 4, 2022 Order. (Dkt. #113). After considering Plaintiffs' response (Dkt. #118), the Court determined to accept the TAC as the operative pleading, but struck the TAC's incorporation by reference of the FAC and the SAC and Plaintiffs' claims under (i) the Securities Act of 1933, Pub. L. 73-22, 48 Stat. 74, (ii) New York common law, and (iii) the federal Racketeer Influenced and Corrupt Organizations Act, 18

U.S.C. §§ 1961-1968, all of which claims were raised for the first time in the TAC (Dkt. #122). As such, what remains in this case are Plaintiffs' claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, Pub. L. 73-291, 48 Stat. 881, as well as their claim under Section 1 of the Sherman Antitrust Act of 1890, 26 Stat. 209. (*See id.*). The Court again set a motion to dismiss briefing schedule. (*Id.*).

Defendants filed a motion to dismiss the TAC on May 3, 2022 (Dkt. #123-125), portions of which were refiled on May 9, 2022, to comply with the Court's filing conventions (Dkt. #126-127). Plaintiffs filed an overlength opposition on May 31, 2022. (Dkt. #128). The next day, Defendants moved the Court to compel Plaintiffs to refile their opposition in accordance with the Court's page limits. (Dkt. #129). Finding that such an order would cause unnecessary delay and yield little benefit, the Court denied Defendants' request but afforded them additional time to file an extended reply brief. (Dkt. #131). Defendants filed their reply on June 28, 2022. (Dkt. #134). Accordingly, Defendants' motion to dismiss the TAC is finally fully briefed and ripe for the Court's resolution.

## DISCUSSION

### A.   Motions to Dismiss for Lack of Personal Jurisdiction Under Federal Rule of Civil Procedure 12(b)(2)

As it must, the Court begins by addressing whether it has personal jurisdiction over Defendants. *See Sinochem Int'l Co.* v. *Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the ...

parties (personal jurisdiction).").  Although Defendants style their motion as a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), (3), and (6) (*see* Dkt. #123; Def. Br. 1), the Court construes Defendants' challenges to personal jurisdiction as a motion to dismiss under Rule 12(b)(2).  *See* Fed. R. Civ. P. 12(b)(2) (permitting motions to dismiss based on "lack of personal jurisdiction"); *see also Roberts* v. *Am. Neighborhood Mort. Acceptance Co.*, No. 17 Civ. 157 (JKB), 2017 WL 3917011, at *3 (D. Md. Sept. 6, 2017); *Koepke* v. *Allstate Vehicle & Prop. Ins. Co.*, No. 16 Civ. 4633 (MMB), 2016 WL 6838429, at *1 n.1 (E.D. Pa. Nov. 21, 2016); *In re Teligent Servs., Inc.* 324 B.R. 467, 471 n.2 (Bankr. S.D.N.Y. 2005) (all construing motions to dismiss under the correct subsection of Rule 12 where doing so would not prejudice the non-movant).

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant."  *Metro. Life Ins. Co.* v. *Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996).  To survive a motion to dismiss, a plaintiff need only provide "legally sufficient allegations of jurisdiction."  *Id.*  A plaintiff makes such a showing through "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."  *Id.* at 567 (quoting *Ball* v. *Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990) (alterations adopted)).  In this context, a court may consider materials outside the pleadings, including affidavits, declarations, and other written materials.  *Dorchester Fin. Secs., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81,

86 (2d Cir. 2013); *Vasquez* v. *Hong Kong & Shanghai Banking Corp., Ltd.*, 477
F. Supp. 3d 241, 245 n.1 (S.D.N.Y. 2020).

Jurisdictional allegations "are construed in the light most favorable to
the plaintiff and doubts are resolved in the plaintiff's favor." *Elsevier, Inc.* v.
*Grossman*, 77 F. Supp. 3d 331, 341 (S.D.N.Y. 2015) (quoting *A.I. Trade Fin.,
Inc.* v. *Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993) (alteration adopted)).
Nevertheless, the Court "will not draw argumentative inferences in the
plaintiff's favor" and need not "accept as true a legal conclusion couched as a
factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673
(2d Cir. 2013) (citations omitted).  Additionally, because Plaintiffs are
proceeding *pro se*, the Court "read[s] [their] supporting papers liberally, and
will interpret them to raise the strongest arguments that they suggest." *Burgos*
v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

"In the absence of a federal statute specifically directing otherwise, and
subject to the limitations imposed by the United States Constitution, we look to
the law of the forum state to determine whether a federal district court has
personal jurisdiction over a foreign corporation." *Brown* v. *Lockheed Martin
Corp.*, 814 F.3d 619, 624 (2d Cir. 2015).  Three requirements must be met to
exercise personal jurisdiction over a non-domiciliary defendant: (i) service of
process must have been procedurally proper; (ii) there must be a statutory
basis for personal jurisdiction; and (iii) the exercise of personal jurisdiction
must comport with constitutional due process.  *Waldman* v. *Palestine
Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016); *accord Licci ex rel. Licci* v.

*Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012); *see also*

*Chloé* v. *Queen Bee of Beverly Hills*, 616 F.3d 158, 163-64 (2d Cir. 2010) ("First,

we apply the forum state's long-arm statute .... If the long-arm statute permits

personal jurisdiction, the second step is to analyze whether personal

jurisdiction comports with the Due Process Clause of the United States

Constitution.").

Defendants only challenge the third element of personal jurisdiction,

which addresses constitutional due process.  Due process considerations

require that the defendant have certain minimum contacts with the forum state

such that maintenance of the suit does not offend "traditional notions of fair

play and substantial justice."  *Int'l Shoe Co.* v. *Washington*, 326 U.S. 310, 316

(1945) (quotation omitted).  There are two kinds of personal jurisdiction:

general and specific.  General jurisdiction renders a defendant amenable to suit

on all claims, while specific jurisdiction covers only claims that arise from

conduct related to the forum.  *Metro. Life Ins. Co.*, 84 F.3d at 567-68; *see also*

*Brown*, 814 F.3d at 624.  For the reasons that follow, the Court has neither

general nor personal jurisdiction over Defendants with respect to Plaintiffs'

claims.

**B.      The Court Lacks General Personal Jurisdiction over Defendants**

Consistent with due process, "[a] court may assert general jurisdiction

over foreign (sister-state or foreign-country) corporations to hear any and all

claims against them when their affiliations with the State are so 'continuous

and systematic' as to render them essentially at home in the forum State."

*Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe*, 326 U.S. at 317).   Because general jurisdiction is not necessarily related to the events giving rise to the suit, the continuous and systematic contacts inquiry is "stringent."   *In re Terrorist Attacks*, 714 F.3d at 674.   The court's task is not to decide "whether a foreign corporation's in-forum contacts can be said to be in some sense continuous or systematic," but rather to determine whether those contacts are *so extensive* that the company is fairly considered to be at-home in the forum.   *Daimler AG* v. *Bauman*, 571 U.S. 117, 138-39 (2014) (internal quotation marks and citation omitted).   Aside from "an exceptional case," this standard is met only for the state(s) where a company is (i) incorporated and (ii) maintains its principal place of business.   *Id.* at 137-39 & 139 n.19; *see Brown*, 814 F.3d at 627 ("[I]n our view *Daimler* established that, except in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business — the 'paradigm' cases.").

Defendants are plainly not subject to this Court's general personal jurisdiction.   Plaintiffs do not argue that either Defendant is incorporated or headquartered in the United States.   Indeed, the Second Circuit has previously determined that "UBS AG's place of incorporation and principal place of business is in Switzerland."   *SPV Osus Ltd.* v. *UBS AG*, 882 F.3d 333, 343 (2d Cir. 2018).   Similarly, UBS Bahamas, a former UBS subsidiary now in voluntary liquidation, was incorporated and based in the Bahamas.   (*See* TAC ¶¶ 7, 12).   *See also SPV Osus Ltd.*, 882 F.3d at 343 (noting that other UBS

subsidiaries were based only in their home countries and "lack any presence in New York at all").

Instead, Plaintiffs assert that this is an "exceptional case" that warrants an exercise of general personal jurisdiction over entities that are neither domiciled in nor principally conduct business in New York or the United States. *See Daimler*, 571 U.S. at 139 n.19. The exceptional case doctrine recognizes that in rare circumstances, a foreign company's ties to a forum may be so substantial that all-purpose jurisdiction is appropriate. The paradigmatic exceptional case is *Perkins* v. *Benguet Consolidated Mining Company*, in which the Supreme Court found that a Philippines-based company was subject to general jurisdiction in Ohio because the company's Philippine operations were "completely halted" and its business was entirely relocated to that state during the Japanese occupation of the Philippines. 342 U.S. 437, 447-48 (1952).

Plaintiffs identify several facts that, in their view, establish Defendants' continuous and systematic contacts with New York and the United States.[4] Plaintiffs note, for instance, that UBS is "one of the largest broker-dealers in the world" that operates through "subsidiaries or third parties on the NYSE located in New York City." (Pl. Opp. 10). They also allege that UBS's carrying firms are subject to United States tax laws, and that "UBS Bahamas['s] fraud

---

[4]     Portions of Plaintiffs' argument on this point do not differentiate between Defendants and refer only to "UBS." (*See, e.g.*, Pl. Opp. 10). In consideration of Plaintiffs' *pro se* status and the Court's obligation to construe all facts in the light most favorable to Plaintiffs, the Court construes mentions of "UBS" as referring to both UBS AG and UBS Bahamas.

affected U.S. domestic commerce because Plaintiffs held assets … in the U.S. domestic securities market." (TAC ¶ 54).

Even accepting these allegations as true, the Court concludes that Plaintiffs have not shown that Defendants' contacts with the New York or the United States are so extensive as to render them at home in this forum. The fact that Defendants have a subsidiary or partner in New York does not subject them to general jurisdiction here. *See Gucci Am., Inc.* v. *Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014) ("[*Daimler*] cast doubt on previous [New York State] cases that permitted general jurisdiction on the basis that a foreign corporation was doing business through a local branch office in the forum."); *see also Brown*, 814 F.3d at 627-29 (determining that Maryland company was not at home in Connecticut despite maintaining an office there for more than three decades and deriving significant revenue from its operations in the state); *Mali* v. *British Airways*, No. 17 Civ. 685 (KPF), 2018 WL 3329858, at *6 (S.D.N.Y. July 6, 2018) (determining that airline's maintenance of an office in New York office did not render it at home there). Nor can general jurisdiction be predicated on the mere fact that Defendants' American affiliates are subject to U.S. tax laws. *See Johnson* v. *UBS AG*, 791 F. App'x 240, 243 (2d Cir. 2019) (summary order) (rejecting argument that UBS AG is subject to general jurisdiction in New York because its banking and investment services in the state are regulated by the New York State Department of Financial Services and the New York State Banking Authority). And the impact of Defendants' actions on the U.S. economy writ large are simply not relevant to the minimum

contacts analysis.[5]  Although Plaintiffs have pleaded that Defendants have some contacts with the United States, they have not alleged that those contacts are so extensive as to render them at home here.  In sum, Defendants' alleged contacts with the United States fall far short of those in *Perkins*, as they "have not transported their princip[al] home to the United States, even temporarily[.]"  *See Waldman*, 835 F.3d at 335 (internal quotation marks omitted).

Plaintiffs also cite the importance of their claims as further support for their exceptional case argument.  Specifically, they assert that this case is exceptional because Defendants may have acted in a similarly fraudulent manner toward "many other foreign citizens" such that resolution of Plaintiffs' claims will "assist justice and [the] public interest at large."  (Pl. Opp. 10).  This argument misconstrues the exceptional case doctrine, which focuses on the extent of the defendant's ties to the forum, and not the significance of the cause of action asserted.  *See Daimler*, 571 U.S. at 139 n.19 ("We do not foreclose the possibility that in an exceptional case, … a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State.").

---

[5]      A plurality of the Supreme Court held that if a foreign company voluntarily and purposefully places its product into the "stream of commerce" in the forum state, it may be subject to jurisdiction there.  *Asahi Metal Indus. Co., Ltd.* v. *Sup. Ct.*, 480 U.S. 102, 111-13 (1987).  Plaintiffs' argument that Defendants' fraud impacts U.S. citizens is not the type of deliberate decision to engage in commerce in the forum state contemplated by the *Asahi* plurality.

In short, "the UBS defendants simply lack sufficient contacts with the United States to allow the exercise of general jurisdiction." *SPV Osus Ltd.*, 882 F.3d at 344.  The Court joins the numerous other courts that have concluded that Defendants are not "at home" in New York such that any claim may be brought against them here.  *See id.* at 342-45 (finding UBS AG and its Luxembourgian subsidiaries not subject to general jurisdiction in New York); *Johnson*, 791 F. App'x at 243 (finding UBS AG not subject to general jurisdiction in New York); *see also Am Trust* v. *UBS AG*, 681 F. App'x 587, 588-89 (9th Cir. 2017) (unpublished) (finding UBS AG not subject to general jurisdiction in California); *Day* v. *Cornèr Bank (Overseas) Ltd.*, 789 F. Supp. 2d 150, 155-57 (D.D.C. 2011) (finding UBS AG and UBS Bahamas not subject to general jurisdiction in the District of Columbia).

## C.  The Court Lacks Specific Personal Jurisdiction over Plaintiffs' Claims Arising out of Events in the Bahamas

Unlike general jurisdiction, which permits a court to assert jurisdiction over a defendant for all purposes, specific jurisdiction is limited to claims stemming from a defendant's activities in the forum.  It "focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Walden* v. *Fiore*, 571 U.S. 277, 283-84 & 284 n.6 (2014) (quoting *Keeton* v. *Hustler Mag., Inc.*, 465 U.S. 770, 775 (1984)); *see also Goodyear*, 564 U.S. at 919 ("[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." (internal quotation omitted)); *Brown*, 814 F.3d at 624 ("Specific jurisdiction is available when the cause of action sued upon arises out of the defendant's activities in a state.").

17

Specific jurisdiction is thus proper only if the defendant's "suit-related conduct" creates "a substantial connection with the forum [s]tate." *Walden*, 571 U.S. at 284. In other words, the Court must determine "whether there was some act by which the defendant[s] purposefully availed [themselves] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Goodyear*, 564 U.S. at 924 (alteration adopted and internal quotation omitted).

The Second Circuit has established a sliding scale to determine whether a defendant's in-forum activities are sufficient to support the exercise of specific jurisdiction:

> Where the defendant has had only limited contacts with the state it may be appropriate to say that he will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts. Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.

*SPV Osus Ltd.*, 882 F.3d at 344 (quoting *Chew* v. *Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998)).[6]

None of the events giving rise to Plaintiffs' claims occurred in the United States. The core of Plaintiffs' claims is that Defendants accepted money from the Junkanoo Account and instead of using those funds to purchase securities

---

[6]     Not all Circuits take this approach. Some require the defendant's in-forum conduct to be the proximate cause of the plaintiff's injuries, while others require the defendant's activities to be the but-for cause of those injuries. *See Chew* v. *Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998) (cataloguing courts' varying approaches).

on U.S. exchanges, Defendants kept the money for themselves and later falsified records to cover up their theft.  All of this alleged conduct took place in the Bahamas (and perhaps in Switzerland): the Junkanoo Account is maintained in a Bahamian bank (Maillis Decl. ¶ 7; *see also* Tsareva Decl. ¶¶ 42, 48-49); Defendants participated in the alleged fraud from the Bahamas and Switzerland, respectively (TAC ¶¶ 6-7); and the allegedly false trade records were produced by Bahamian entity UBS Bahamas in the course of litigation in a Bahamian court (*see id.* ¶ 17).  None of these wholly foreign actions can be the basis for jurisdiction here.  *See In re Lifetrade Litig.*, No. 17 Civ. 2987 (JPO), 2021 WL 1178087, at *3 (S.D.N.Y. Mar. 29, 2021) (finding a lack of personal jurisdiction because none of the claims against foreign defendants "appear[ed] directly related to [defendants'] use of New York banks, nor d[id] they have any other obvious New York connection").

Plaintiffs offer several possible connections between this action and this forum, which arguments the Court addresses in turn.  First is the fact that Plaintiffs intended to trade on U.S. securities exchanges.  (Pl. Opp. 15-16).  But the minimum contacts inquiry focuses on actions *by the defendant* targeted at the forum, not actions by the plaintiff.  *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 766 (S.D.N.Y. 2017) ("The Court considers the contacts the 'defendant himself creates with the forum,' not the plaintiff's connections to the forum." (quoting *Walden*, 571 U.S. at 284)).  What is more, Plaintiffs' theory of liability turns on their allegation that Defendants did not actually execute Plaintiffs' trades on the NYSE or NASDAQ, and thus did not target any action

19

at the United States.  (TAC ¶ 22 ("UBS AG's Booking Center Bahamas and UBS Bahamas did not execute the Plaintiffs' trades[.]")).

Next, Plaintiffs emphasize that UBS Bahamas transacts business through U.S.-based carrying firms.  (Pl. Opp. 23-25).  But they fail to allege what role, if any, UBS Bahamas's relationship with those entities played in the alleged fraud; indeed, if Plaintiffs are correct that their trades were never executed, then the carrying firms would have played no role with respect to the (non-)execution of Plaintiffs' trades.  *See Walden*, 571 U.S. at 286 (explaining that "a defendant [may only] be haled into a court in a forum ... based on his own affiliation with the [s]tate, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the [s]tate" (quoting *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 475 (1985))); *see also SPV Osus Ltd.*, 882 F.3d at 345 (finding "a handful of communications and transfers of funds" between foreign UBS entities and the United States "insufficient to allow the exercise of specific personal jurisdiction").

Finally, Plaintiffs note that "[i]f Defendants did not transact business in the United States or do any act in the United States, their acts done in the Bahamas, Switzerland[,] or elsewhere had effects in the United States."  (Pl. Opp. 25).  Inadvertent effects of the purported fraud on the U.S. economy cannot be the basis for specific jurisdiction, however, because a defendant's contacts with the forum state must be intentional.  *Burger King*, 471 U.S. at 475.  Because Plaintiffs have not met their burden of establishing a connection

between Defendants, this forum, and the instant litigation, there is no basis for specific jurisdiction.[7]

The Court has neither general nor specific personal jurisdiction over Defendants. Without jurisdiction, the Court "lacks a legal basis to grant any relief, or even consider the action further." *Cornwall* v. *Credit Suisse Grp.*, 666 F. Supp. 2d 381, 385 (S.D.N.Y. 2009); *see also Monterey Bay Mil. Housing, LLC* v. *Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 699 (S.D.N.Y. 2021) ("[P]ersonal jurisdiction is an essential element of the jurisdiction of a district ... court, without which the court is powerless to proceed to an adjudication." (citing *Ruhrgas AG* v. *Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (internal quotation marks omitted))); *Sinochem*, 549 U.S. at 430-31 ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction).").

## D.    The Court Denies Plaintiffs' Request for Leave to Amend

Plaintiffs ask that if the Court grants Defendants' motion to dismiss, it appoint them *pro bono* counsel "to assist and to find the exact legal definitions

---

[7]    Plaintiffs' invoke a number of other doctrines to establish specific jurisdiction. (*See* Pl. Opp. 14-16, 19-23). None of these doctrines is relevant to the due process specific jurisdiction inquiry. The aborted purchaser-seller doctrine allows an Exchange Act plaintiff to bring a claim even if a securities transaction was never consummated, so long as he or she has a contract to complete that transaction. 69A AM. JUR. 2D *Securities Regulation* § 1343 (2022). This is a doctrine of statutory standing, not jurisdiction. *See Gambella* v. *Guardian Inv. Servs. Corp.*, 75 F. Supp. 2d 297, 299-300 (S.D.N.Y. 1999). The irrevocable liability test speaks to whether a plaintiff has stated a claim under the Commodity Exchange Act of 1936, Pub. L. 74-675, 49 Stat. 1491, which statute is not implicated in this action. *See Myun-Uk Choi* v. *Tower Rsch. Cap. LLC*, 890 F.3d 60, 66-68 (2d Cir. 2018). And compliance with New York's long-arm statute is a separate component of personal jurisdiction not at issue in this motion.

of [Defendants'] incredible unprecedented fraud and falsification[.]" (Pl. Opp. 61). Given Plaintiffs' *pro se* status, the Court construes this as a request both for appointment of *pro bono* counsel and for leave to amend their pleading for a fourth time.

Federal Rule of Civil Procedure 15(a)(2) provides that a court should freely give leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also McCarthy* v. *Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). That said, it remains "within the sound discretion of the district court to grant or deny leave to amend." *Broidy Cap. Mgmt. LLC* v. *Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (internal quotation marks and citation omitted). Leave may be denied where the proposed amendment would be futile. *See Olson* v. *Major League Baseball*, 447 F. Supp. 3d 174, 177 (S.D.N.Y. 2020). Amendment is futile if the "amended portion of the complaint would fail to state a cause of action." *Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000); *see also Kassner* v. *2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007) (finding amendment not futile where amended complaint would be "sufficient to withstand a motion to dismiss").

The Court finds that further amendment would be futile. Although "[a] *pro se* complaint should not be dismissed without the Court granting leave to amend at least once[,]" *Nielsen* v. *Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quotation omitted), Plaintiffs have already amended their pleading three times (*see* Dkt. #31 (FAC); Dkt. #46 (SAC); Dkt. #109 (TAC)). They identify no new facts that would cure the TAC's deficiencies, despite the Court offering them

multiple opportunities to do so.  *See Cuoco* v. *Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (affirming denial of leave to amend on futility grounds where *pro se* plaintiff "suggested no new material she wishes to plead").  Finally, Plaintiffs' request for leave to amend focuses on arguable deficiencies in pleading their causes of action, but does not address the jurisdictional deficiencies the Court found dispositive of this motion.  Accordingly, Plaintiffs' request for leave to amend is denied and their request for *pro bono* counsel is denied as moot.

## CONCLUSION

Because the Court lacks personal jurisdiction over Defendants, their motion to dismiss is GRANTED and the case is dismissed without prejudice. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      January 4, 2023
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge